## UNITED STATES COURT OF INTERNATIONAL TRADE

MĀUI AND HECTOR'S DOLPHIN
DEFENDERS NZ INC.
355 Foster Road, Rd 1
Kumeu, 0891, New Zealand,

<em>Plaintiff</em>

v.

NATIONAL MARINE FISHERIES
SERVICE
1315 East-West Highway
Silver Spring, Montgomery County, MD
20910,

JANET COIT, in her official capacity as
ASSISTANT ADMINISTRATOR for
NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
FISHERIES
1315 East-West Highway
Silver Spring, Montgomery County, MD
20910,

GINA RAIMONDO, in her official
capacity as the SECRETARY OF
COMMERCE
1401 Constitution Avenue, NW
Washington, DC 20230,

JANET YELLEN, in her official capacity
as the SECRETARY OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220,

and

ALEJANDRO MAYORKAS, in his
official capacity as the SECRETARY OF
HOMELAND SECURITY
2707 Martin Luther King Jr. Avenue, SE
Washington, DC 20528,

<em>Defendants.</em>

Case No. 1:24-cv-00218

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

## INTRODUCTION

1.      Under U.S. law, the federal government bears a responsibility to protect the world's marine mammal species from decline by banning seafood imports from foreign fisheries that excessively harm or kill marine mammals. By authorizing imports of seafood from harmful fisheries in New Zealand, the federal government is not only neglecting this duty, but facilitating the extinction of the most endangered marine dolphin in the world: the Māui dolphin.

2.      Less than 50 mature Māui dolphins remain, and the population continues to decline. The primary cause of the dolphin's perilous status is incidental capture and mortality in fishing gear: specifically, trawl nets and set nets fishing on the West Coast of New Zealand's North Island.

3.      The U.S Marine Mammal Protection Act (MMPA) requires the federal government to ban the import of fish from any foreign fishery that harms marine mammals in excess of what would be permitted in the United States. The National Marine Fisheries Service (NMFS) issued a finding in 2024 (Comparability Finding) that the New Zealand West Coast North Island set-net and trawl fisheries do not catch and kill Māui dolphins in excess of U.S. standards. Accordingly, Federal Defendants have not banned imports from those fisheries.

4.      Plaintiff Māui and Hector's Dolphin Defenders NZ Inc. (MHDD) challenges the 2024 Comparability Finding and Defendants' failure to ban the imports, which violate the MMPA and Administrative Procedure Act (APA).

5.      The Comparability Finding fails to apply several U.S. marine mammal bycatch standards. The MMPA does not permit fisheries to have any more than a negligible impact on a marine mammal population—which equates to no more than one Māui dolphin death every 77 years under applicable legal standards. Yet, New Zealand indicates that its fisheries kill one Māui dolphin every 10 to 20 years, nearly five times the permissible negligible impact standard. The MMPA also requires that mortality in fisheries be reduced to a level near zero. New Zealand has no comparable requirement. The Comparability Finding does not address or reach conclusions on either of these standards.

6.      The Comparability Finding also includes several analytical errors. It fails to consider critical ways New Zealand's regulatory limit on Māui dolphin mortality in its fisheries differs from U.S. regulatory limits. It uses an outdated and overly optimistic Māui dolphin population estimate to evaluate New Zealand's standards. And it compares New Zealand's Māui dolphin bycatch monitoring program to the wrong U.S. standards.

7.      In addition, the Comparability Finding legally functions as a certification that the two New Zealand fisheries meet U.S. standards for bycatch of *all* marine mammals. But NMFS never analyzed whether harm to other marine mammals caught in those fisheries—including Hector's dolphins, common dolphins, New Zealand fur seals, and others—exceeds U.S. standards before certifying the fisheries.

8.      This is not the first time court intervention has been needed to prevent Defendants from allowing imports that harm Māui dolphins. In 2022, this Court enjoined imports from the two fisheries because NMFS failed to establish that bycatch was not in excess of U.S. standards. *Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022). Since that litigation began in 2020, Māui dolphin numbers have continued to decline from 63 (2020) to 43 (2024): a loss of about 30%.

9.      With the 2024 Comparability Finding, NMFS sought to dissolve the injunction and resume imports. Yet NMFS again short-circuited the MMPA's requirement to make a well-founded determination based on reasonable proof that New Zealand meets *all* applicable U.S. standards for marine mammal protection.

10.     New Zealand fisheries are driving the Māui dolphin to extinction. This would not be permitted in the United States under the MMPA and other laws. But NMFS effectively asserts in the Comparability Finding that United States standards would allow just that. NMFS is wrong on the law and its analysis, abdicating its responsibility under the MMPA. The MMPA requires banning imports from these fisheries. Defendants' errors and failure to implement a legally required import ban are aiding the extinction of the Māui dolphin.

11.     With such a critically low population, the Māui dolphin cannot afford a mistake by the U.S. agencies charged with ensuring that the actions of the United States do not contribute to its demise. The Māui dolphin certainly cannot afford repeated mistakes.

12.     For the reasons herein, MHDD asks the Court to: declare that NMFS's Comparability Finding is arbitrary and capricious and contrary to law, in violation of the MMPA and APA; declare that Defendants have unlawfully failed to ban imports from the two New Zealand fisheries; vacate and remand the Comparability Finding; and order Defendants to promptly ban imports from those fisheries.

## JURISDICTION AND VENUE

13.     This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(C) because Plaintiff challenges an action of the United States government that arises out of law providing for embargoes "on the importation of merchandise for reasons other than the protection of the public health or safety." The final agency action is reviewable under the APA. 5 U.S.C. § 704.

14.     This Court may grant the relief requested pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

15.     Plaintiff MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC. is a registered New Zealand non-profit organization dedicated to campaigning for improved protection for New Zealand dolphins. MHDD is headquartered in Kumeu, New Zealand. MHDD's objectives are to support the protection, recovery, and stewardship of Māui and Hector's dolphins and their habitats—and therefore also other marine species, including other marine mammals—and to improve their populations' health and status through public awareness, education, involvement, and collaboration with similar groups in New Zealand and overseas. To achieve these objectives, MHDD engages in political advocacy, public education, grass-roots activities, and direct action. MHDD is an Incorporated Society and registered Charity under New Zealand law. Committee membership in MHDD is open to anyone interested in the conservation

and well-being of Māui and Hector's dolphins. MHDD currently has ten committee members. MHDD brings this action for itself and as a representative of its members.

16.    MHDD's members regularly visit the Māui dolphin's habitat along the West Coast of New Zealand's North Island and enjoy and benefit from the continued presence of the species for recreational, aesthetic, spiritual, artistic, cultural, commercial, scientific, and environmental purposes. MHDD's members regularly engage in activities in that habitat, such as swimming, boating, photography, research, advocacy, education, documentary-making, and visiting cliffs and beaches, with the objective of viewing dolphins. Members go out to West Coast beaches and spend hours looking for dolphins, and plan to do this increasingly over the austral summer as the dolphins come closer to shore. This has been and still is a big part of many of the members' lives and activities. During these coastal visits, members also search for other marine species, including common dolphins, fur seals (at sea and resting on beaches and rocks), penguins of various types, orcas, southern right and humpback whales, and other types of marine mammals and seabirds. All of these species are impacted by trawl and set-net fisheries on the West Coast of the North Island. Especially in the summer, MHDD members pursue these activities almost every week—often several times a week. They seek to experience wild animals in their natural environment, raise awareness of the dolphins' plight, celebrate marine biodiversity, promote citizen science, and encourage stewardship of the individual animals, the species, and intact functioning ecosystems distinct to New Zealand.

17.    Members also plan and execute specific trips elsewhere in the country—in both the North Island and South Island—to speak with locals about Māui and Hector's dolphins, distribute pertinent information, and support related conservation efforts.

18.    The ability of MHDD's members to pursue these interests hinges on the well-being of the Māui dolphin and other marine mammals, and on the health of the marine ecosystems on which the species depend.

19.    NMFS's failure to comply with the MMPA and APA has caused and is causing MHDD's members substantive and procedural harms connected to their conservation, recreational, spiritual, scientific, and aesthetic interests. NMFS has found that trawl vessels and

set-net vessels in New Zealand's fisheries interact with Māui dolphins and export seafood to the United States. In addition, the New Zealand government has reported that the fisheries catch and kill Hector's dolphins, common dolphins, New Zealand fur seals, and other marine mammals. Relying on NMFS's Comparability Finding for the fisheries, the United States continues to import seafood from New Zealand's West Coast North Island trawl and set-net fisheries that catch, harm, and kill marine mammals in excess of U.S. standards. The United States is a significant market for these two fisheries. The MMPA requires NMFS to ensure that the U.S. seafood market does not encourage or sustain New Zealand fisheries that incidentally catch, injure, and kill Māui dolphins and other marine mammals.

20.    The interests of MHDD, its members, and supporters have been, are being, and will be adversely affected by Defendants' violations of federal law, as described herein. These harms can only be remedied if the Court orders Defendants to comply with the MMPA and APA. MHDD has no other adequate remedy at law.

21.    Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce with responsibility for administering and implementing the MMPA with respect to whales, dolphins, porpoises, seals, and sea lions. The MMPA and its implementing regulations charge the Secretary of Commerce with determining whether fish from an exporting nation have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of marine mammals in excess of U.S. standards. The Secretary has delegated that responsibility to NMFS. The principal offices of NMFS are located in Silver Spring, Maryland.

22.    Defendant JANET COIT is sued in her official capacity as the National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries. The Assistant Administrator is responsible for implementing and fulfilling NMFS's duties under the MMPA. The office of the Assistant Administrator is located in Silver Spring, Maryland.

23.    Defendant GINA RAIMONDO is sued in her official capacity as the Secretary of Commerce. The Secretary of Commerce is responsible for implementing and fulfilling the

Department of Commerce's duties under the MMPA and for overseeing NMFS. The office of the Secretary of Commerce is located in Washington, D.C.

24.     Defendant JANET YELLEN is sued in her official capacity as the Secretary of the Treasury. The Secretary of the Treasury is responsible for implementing and fulfilling the Department of the Treasury's duties under the MMPA. The office of the Secretary of the Treasury is located in Washington, D.C.

25.     Defendant ALEJANDRO MAYORKAS is sued in his official capacity as the Secretary of Homeland Security. Pursuant to the Homeland Security Act, the Department of Homeland Security is responsible for certain functions of the Secretary of the Treasury relating to the United States Customs Service, which may include implementing import bans under the MMPA. 6 U.S.C. §§ 203(1), 212(a)(1). The office of the Secretary of Homeland Security is located in Washington, D.C.

**STATUTORY BACKGROUND**

I.     MARINE MAMMAL PROTECTION ACT

26.     Congress enacted the MMPA in 1972 to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). Congress sought to ensure that marine mammal species and populations "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

27.     Through the MMPA, Congress intended to protect marine mammal populations both within the U.S. and abroad, recognizing that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and . . . they should be protected and encouraged to develop to the greatest extent feasible." *Id.* § 1361(6).

7

28.     To this end, the MMPA includes a provision designed to protect marine mammal populations outside of U.S. waters through leveraging the United States' position as a major seafood importer. 16 U.S.C. § 1371(a)(2) requires the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards"—hereinafter, the Import Provision.

29.     In determining whether seafood imports should be banned, the Secretary of Commerce "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." *Id.* § 1371(a)(2)(A).

A.     United States Standards

30.     "United States standards" within the meaning of 16 U.S.C. § 1371(a)(2) include, but are not limited to, the provisions of the MMPA that are applicable to managing incidental mortality and serious harm to marine mammals from commercial fisheries. *See Sea Shepherd*, 606 F. Supp. 3d at 1294–95 (identifying "statutory markers of 'United States standards'" under the MMPA). The MMPA addresses incidental catch of marine mammals in commercial fisheries by requiring, among other things, a mandate to reduce bycatch to insignificant levels approaching zero, bycatch limits, take reduction plans, bycatch monitoring programs, and stock assessments.

*1.     Zero Mortality Rate Goal*

31.     First, the MMPA requires that commercial fisheries reduce incidental mortality and serious injury of marine mammals in a relatively short period of time (five to seven years) to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1387(b), (f)(2); *accord id.* § 1371(a)(2). NMFS defines "insignificant levels approaching a zero mortality and serious injury rate" as 10% of the Potential Biological Removal level (PBR)—which is detailed below—for a given marine mammal stock. 50 C.F.R. § 229.2.

32.    To effectuate the zero-rate mortality mandate, the MMPA requires NMFS to analyze, for each commercial fishery interacting with a marine mammal stock, "whether [the incidental mortality and serious injury] level is insignificant and is approaching a zero mortality and serious injury rate." 16 U.S.C. § 1386(a)(4). If the rate of incidental mortality and serious injury is not achieving that objective, NMFS is required to develop and implement a take reduction plan—as described below—with appropriate actions to reduce incidental mortality and serious injury to insignificant levels within five years. *Id.* § 1387(b), (f).

### 2.    *Potential Biological Removal Level*

33.    Second, the MMPA requires that incidental mortality or serious injury of marine mammals incidentally taken in commercial fisheries be below the calculated PBR level. *Id.* § 1387(f)(2). The MMPA defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20).

34.    NMFS must estimate the PBR for each marine mammal stock. *Id.* § 1386(a)(6). PBR is the mathematical product of three values: "the minimum population estimate of the stock," "[o]ne-half the maximum theoretical or estimated net productivity rate of the stock at a small population size," and a "recovery factor of between 0.1 and 1.0." *Id.* § 1362(20).

35.    The "minimum population estimate" is an estimate of the number of animals in a marine mammal stock that is "based on the best available scientific information on abundance" and "provides reasonable assurance that the stock size is equal to or greater than the estimate." *Id.* § 1362(27). The "net productivity rate" is "the annual per capita rate of increase in a stock resulting from additions due to reproduction, less losses due to mortality." *Id.* § 1362(26). The recovery factor is set at a value that will ensure the recovery of populations to their optimal sustainable populations. To ensure human-caused harms are addressed with the requisite level of urgency, the default value for endangered species is the lowest value, 0.1. NOAA, *Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act* 9 (Feb. 7,

2023), https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-GAMMS-IV-Revisions-clean-1-kdr.pdf.

36.     If human-caused incidental mortality and serious injury exceeds the calculated PBR for any stock, NMFS must enact measures to reduce mortality and serious injury in fisheries in a take reduction plan, as described below. 16 U.S.C. §1387(f)(5).

             *3.     Negligible Impact Standard*

37.     Third, the MMPA only allows commercial fisheries to incidentally take marine mammals listed as threatened or endangered under the Endangered Species Act (ESA) "if the Secretary, after notice and opportunity for public comment, determines that the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock." *Id.* § 1371(a)(5)(E)(i).

38.     Pursuant to NMFS Procedural Directive 02-204-02, NMFS uses a quantitative approach to determine if a fishery has a negligible impact. NMFS, *Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E)*, Procedural Directive 02-204-02  (June 17, 2020), https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf. First, NMFS calculates a threshold for negligible impact for total human-caused mortality and serious injury. *Id.* at 4. For endangered species, this threshold uses the same calculation values as the PBR, so the threshold is equivalent to the PBR. *Id.* at 4, 12. If the total human-caused mortality and serious injury for a stock exceeds this threshold, then NMFS will calculate a second, lower threshold to evaluate whether the effect of an individual commercial fishery is negligible. *Id.* at 4. For endangered species, this smaller threshold equals 13% of the PBR. *Id.* at 5, 14. If mortality and serious injury in a fishery exceeds that threshold, then it has more than a negligible impact. *Id.* at 9.

39.     If the incidental mortality or serious injury from commercial fisheries "has resulted or is likely to result in an impact that is more than negligible on the endangered or threatened species or stock," NMFS is required to use its emergency authority "to protect such species or stock, and may modify any permit . . . as necessary." 16 U.S.C. § 1371(a)(5)(E)(iii).

### 4.    Take Reduction Plans

40.    The MMPA requires NMFS to effectuate the zero-mortality rate goal and PBR limit by developing and implementing a "take reduction plan" for any marine mammal "strategic stock" that interacts with commercial fisheries. *Id.* § 1387(f). A strategic stock includes any species listed, or likely to be listed, as threatened or endangered under the ESA, as well as any other marine mammal stock suffering human-caused mortality exceeding the PBR. *Id.* § 1362(19). The Māui dolphin is listed as endangered under the ESA and is therefore a strategic stock.

41.    A take reduction plan must be designed to achieve two incidental take level goals. The "immediate goal" must be to reduce the level of incidental mortality and serious injury in commercial fisheries below the PBR within six months of implementation. *Id.* § 1387(f)(2). The "long-term goal" must be to reduce the level of incidental mortality and serious injury in commercial fisheries "to insignificant levels approaching a zero mortality and serious injury rate" within five years. *Id.*

42.    If the "incidental mortality and serious injury from commercial fisheries exceeds" the established PBR, the plan "shall include measures the Secretary expects will reduce . . . such mortality and serious injury to a level below" the PBR within six months. *Id.* § 1387(f)(5).

### 5.    Bycatch Monitoring

43.    The MMPA requires NMFS to establish "a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations." *Id.* § 1387(d). One purpose of the monitoring program is to determine whether and when bycatch limits are exceeded.

44.    The program must be sufficient to "obtain statistically reliable estimates of incidental mortality and serious injury." *Id.* § 1387(d)(1)(A); *see also id.* § 1387(d)(3)(A) (requiring program implementation to be guided by a "requirement to obtain statistically reliable information").

45.    The MMPA does not define the term "statistically reliable." Instead of committing to a definitive metric, NMFS determines observer monitoring coverage on a case-by-case basis depending on the relevant management objectives and science information needs. For example, NMFS requires high (in some cases, 100%) observer coverage when monitoring data are needed to estimate protected species bycatch, make in-season management decisions, close fisheries when bycatch limits are exceeded, or ensure regulatory compliance.

6.    *Stock Assessments*

46.    The MMPA requires NMFS to prepare a stock assessment for each marine mammal stock under the agency's jurisdiction. *Id.* § 1386(a).

47.    A stock assessment must contain several elements. It must: 1) describe the stock's range; 2) provide a minimum population estimate, current and maximum productivity rates, and the current population trend, with supporting information; 3) estimate the annual human-caused mortality and serious injury of the stock; 4) describe commercial fisheries that interact with the stock, including a) the number of vessels in the fishery, b) the estimated annual level of incidental mortality and serious injury by each fishery, c) seasonal or geographic differences in such incidental mortality or serious injury, and d) "the rate, based on the appropriate standard unit of fishing effort, of such incidental mortality and serious injury, and an analysis stating whether such level is insignificant and is approaching a zero mortality and serious injury rate"; 5) categorize the stock's status (as either a "strategic stock" or a stock with a "level of human-caused mortality and serious injury that is not likely to cause the stock to be reduced below its optimum sustainable population"); and 6) estimate PBR, as described above. *Id.*

48.    Stock assessments must be based on the "best scientific information available." *Id.*

B.    <u>Marine Mammal Protection Act Regulations</u>

49.    NMFS has promulgated regulations establishing a process for identifying whether each export fishery complies with the Import Provision. 81 Fed. Reg. 54390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.24(h)).

50.     Unless exempt,[1] a fishery that incidentally catches marine mammals is considered to result in incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards unless NMFS has issued "a valid comparability finding" for the fishery. 50 C.F.R. § 216.24(h)(1)(i), (h)(2); *see also id.* § 216.24(h)(1)(ii) (making it unlawful to import fish from any fishery that does not have a valid comparability finding in effect).

51.     A harvesting nation must apply for a comparability finding before NMFS can issue one. *Id.* § 216.24(h)(6)(ii). The application must include reasonable proof of the effects of the relevant fisheries on marine mammals and documentary evidence demonstrating that the conditions for a comparability finding have been met. *Id.* § 216.24(h)(6)(i); *see also* 16 U.S.C. § 1371(a)(2)(A) (requiring "reasonable proof").

52.     The regulations require NMFS to make specified findings and consider mandatory factors before it may issue a comparability finding. 50 C.F.R. § 216.24(h)(6)(iii), (h)(7). In doing so, NMFS "shall consider documentary evidence provided by the harvesting nation *and* relevant information readily available from other sources." *Id.* § 216.24(h)(6)(ii) (emphasis added).

53.     First, NMFS must find that the harvesting nation "[p]rohibits the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations" and "[d]emonstrates that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal." *Id.* § 216.24(h)(6)(iii)(A).

54.     Second, NMFS must find that the harvesting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." *Id.* § 216.24(h)(6)(iii)(B).

---

[1] NMFS defines "exempt" fisheries as foreign operations that export fish to the United States and that were "determined by the Assistant Administrator . . . to have a remote likelihood of, or no known, incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." 50 C.F.R. § 216.3. Foreign fisheries that are not exempt are termed "export fisheries." NMFS is required to publish a list of exempt and export fisheries, known as the "List of Foreign Fisheries," every four years. *See* 81 Fed. Reg. at 54391.

55. To qualify as "comparable in effectiveness" to the U.S. regulatory program, the harvesting nation's regulatory program must "provide[] for, or effectively achieve[] comparable results as," among other things: 1) "Marine mammal assessments that estimate population abundance for marine mammal stocks in waters under the harvesting nation's jurisdiction that are incidentally killed or seriously injured in the export fishery"; 2) a calculation of "bycatch limits" (defined as the PBR or a "comparable scientific metric," *id.* § 216.3) for marine mammal stocks that are incidentally killed or seriously injured by the fishery; 3) "A requirement to implement measures in the export fishery designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit"; 4) "Implementation of monitoring procedures in the export fishery designed to estimate incidental mortality or serious injury in the export fishery, . . . including an indication of the statistical reliability of those estimates"; and 5) a comparison of the incidental mortality and serious injury levels in the fishery with the bycatch limit and a showing that the fishery does not exceed the bycatch limit. *Id.* § 216.24(h)(6)(iii)(C).

56. NMFS is also required to consider: 1) "U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries"; 2) the extent to which the harvesting nation has successfully implemented measures to reduce incidental mortality and serious injury of marine mammals to levels below the bycatch limit; 3) whether measures for the export fishery "have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit"; 4) "[o]ther relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in th[e] export fishery, whether the level of incidental mortality and serious injury . . . exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, . . . the population level impacts of the incidental mortality or serious injury of marine mammals," and the conservation status of the marine mammal stocks. *Id.* § 216.24(h)(7).

57. If NMFS issues a comparability finding, it is valid for four years from its publication, unless otherwise indicated. *Id.* § 216.24(h)(8)(iv). Absent a valid comparability finding, the Secretaries of the Treasury and Homeland Security shall prohibit the importation of

fish and fish products until such time that NMFS issues a valid comparability finding for the fishery. *Id.* § 216.24(h)(1)(i), (h)(9).

58.    The regulations established an exemption period during which the import prohibition would not apply. *Id.* § 216.24(h)(2)(ii). The purpose of this exemption period was "to provide nations with adequate time to assess marine mammal stocks, estimate bycatch, and develop regulatory programs to mitigate that bycatch." 81 Fed. Reg. at 54397. The exemption period was originally scheduled to expire in 2021. *Id.* at 54391. However, NMFS has extended the period twice. 87 Fed. Reg. 63955 (Oct. 21, 2022); 88 Fed. Reg. 80193 (Nov. 17, 2023). The current exemption period will expire on December 31, 2025. 88 Fed. Reg. at 80193. During the exemption period, fisheries for which NMFS has not made a comparability finding are not deemed out of compliance with the Import Provision. 81 Fed. Reg. at 54391. Fisheries for which NMFS has either denied a comparability finding application or issued a comparability finding that is invalid are out of compliance with the Import Provision. 50 C.F.R. § 216.24(h)(1)(i), (ii), (h)(9); *see Sea Shepherd*, 606 F. Supp. 3d at 1323–25 & nn.60-63. Those fisheries remain out of compliance until NMFS issues a new, valid comparability finding. 50 C.F.R. § 216.24(h)(9).

II.    ADMINISTRATIVE PROCEDURE ACT

59.    The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

60.    The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

61.    The APA also provides that the reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL BACKGROUND

I.    THE MĀUI DOLPHIN IS ONE OF THE MOST CRITICALLY ENDANGERED MARINE MAMMALS ON THE PLANET.

62.    The Māui dolphin is one of the most critically endangered animals in the world. There are less than 50 mature individuals left in existence, with some estimates as low as 30. The

Māui dolphin population has experienced a 97.5% decline over the past 50 years from a population of approximately 2,000. This decline continues: over the past two decades, the population has declined by an average of 3 to 4% per year. The remaining few individuals are concentrated in the coastal waters around New Zealand's North Island. *See* Figure 2.



**Figure 1.** Photograph of Māui dolphin (by Steve Dawson, University of Otago)

63.     NMFS has listed the Māui dolphin as endangered under the ESA. 82 Fed. Reg. 43701 (Sep. 19, 2017). The International Union for the Conservation of Nature (IUCN) also has listed the Māui dolphin as critically endangered, meaning it is "considered to be facing an extremely high risk of extinction in the wild."

64.     The Māui dolphin is classified as "Nationally Critical" by New Zealand's Department of Conservation and is also a "protected species" under New Zealand's Marine Mammal Protection Act (1978) (New Zealand MMPA) and Fisheries Act (1996).

65.     Māui dolphins are highly intelligent. They have a complex social system, and typically live in small, tight-knit groups of two to eight individuals. The loss of a single member of one of these groups can disrupt their social dynamic, and thus, reduce the population's viability.

66.     The Māui dolphin's range likely extends around the entire North Island of New Zealand. Today, the dolphins are primarily found along the West Coast of the North Island,

including harbors and extending out to the 100-meter depth contour. *See* Figure 2. The population distribution changes seasonally, with dolphins concentrated close to shore during the summer and more dispersed during the winter.



**Figure 2.** Map of known Māui dolphin habitat (red) and possible Māui dolphin habitat (blue). There are regular dolphin sightings off the East Coast (blue), but it is not known if these are Māui dolphins, Hector's dolphins, or both.

67.     The Māui dolphin is a genetically and morphologically distinct subspecies of the Hector's dolphin. Hector's dolphins are primarily found around the South Island of New Zealand, though they are also found among Māui dolphins on the North Island's West Coast. Māui dolphins have only been found around the North Island.

68.     Māui dolphins have a distinct physical appearance, with grey, white and black markings, a short snout, and a rounded dorsal fin. They are less than 2 meters long and weigh up to 60 kilograms.

69.     The Māui dolphin's biology and distribution makes it especially vulnerable to human impacts. Māui dolphins have a lifespan of roughly 25 years. Females do not reach sexual

maturity until around eight years old and produce just one calf every two to four years. As a result, the Māui dolphin population has an extremely low maximum growth rate. Even low levels of human-caused mortality can outpace the population's natural growth rate, leading to its decline and ultimately, its extinction. The population is rapidly approaching that point.

II.    NEW ZEALAND FISHERIES INCIDENTALLY CATCH AND KILL MĀUI DOLPHINS.

70.    New Zealand's commercial fisheries incidentally catch, seriously injure, and kill Māui dolphins.

71.    Two types of fishing gear pose a risk of bycatch to Māui dolphins: set nets and trawl nets.

72.    Set nets (also known as gillnets) are a type of non-selective fishing net, meaning they catch any animal that swims into them. They are hung vertically in the water and left unattended for hours or days at a time to harvest fish and other species. Māui dolphins are caught in set nets when they swim into them and become entangled.

73.    Trawl fishing is another non-selective fishing method that involves dragging a large net through the water column or along the sea floor, catching nearly everything in the net's path. Māui dolphins are attracted to trawlers, spending many hours feeding around trawl nets. Other dolphin species have been filmed swimming into trawl nets to feed, and Māui dolphins may also engage in this activity. Feeding in and around trawl nets is well known to result in dolphin bycatch.

74.    Māui dolphins that are entangled in set nets or trawl nets can drown or suffer serious injuries. There are few reported incidents of dolphins being able to free themselves from nets before drowning, but even then, they can suffer serious health impacts. Dolphins that drown may be detected when the net is retrieved, but they may also go undetected if they fall out of the net before retrieval, which is referred to as "cryptic mortality."

75.     The West Coast North Island trawl and set-net fisheries, in particular, catch and kill Māui dolphins.[2]

76.     The New Zealand government stated in its 2021 Aquatic Environment and Biodiversity Annual Review, "Fisheries bycatch, particularly in recreational and commercial set-net fisheries and to a lesser extent in commercial trawls, is a known threat to Hector's and Māui dolphins."

77.     NMFS listed the Māui dolphin as endangered in part because of the harm caused by bycatch in trawl and set-net fisheries and because existing regulatory mechanisms for those fisheries are inadequately protective. 82 Fed. Reg. at 43708; 81 Fed. Reg. 64110, 64113–15, 64122–23 (Sept. 19, 2016). NMFS explained, "it is considered unlikely that this subspecies will recover unless sources of anthropogenic mortality are eliminated." 82 Fed. Reg. at 43708.

78.     In 2023, the International Whaling Commission (IWC) Scientific Committee recommended that "highest priority should be assigned to management actions that immediately eliminate bycatch of Māui dolphins, including closure of any fisheries within the range of Māui dolphins that are known to pose a risk of bycatch to dolphins (i.e., set net and trawl fisheries)" and emphasized "the need for precautionary management given the critically endangered status of this subspecies and the inherent and irresolvable uncertainty which surrounds information on most small populations."

79.     In 2012, the IUCN's World Conservation Congress urged the New Zealand Government to "urgently extend dolphin protection measures, with an emphasis on banning gill net and trawl net use from the shoreline to the 100 metre depth contour in all areas where Hector's and Maui's [sic] Dolphins are found, including harbours." IUCN, *Actions to avert the extinctions of rare dolphins: Maui's dolphins, Hector's dolphins, Vaquita porpoises and South Asian river and freshwater dependent dolphins and porpoises*, WCC-2012-Rec-142-EN (2012), https://portals.iucn.org/library/sites/library/files/resrecfiles/WCC_2012_REC_142_EN.pdf.

---

[2] Although not directly implicated by the actions challenged here, trawl and set-net fisheries on the East Coast of the North Island may catch and kill Māui dolphins.

80.    The West Coast North Island set-net and trawl fisheries also catch and kill other species of marine mammals. According to the New Zealand government, incidental captures of at least 18 common dolphins, 23 New Zealand fur seals, 8 seals or sea lions unidentified to species, and 1 baleen whale have been reported in those two fisheries since 2019.

III.    NEW ZEALAND HAS IMPLEMENTED LIMITED PROTECTIONS FOR THE MĀUI DOLPHIN.

81.    The New Zealand government has a history of taking only small, incremental steps to protect Māui dolphins. The first fisheries protection measures for Māui dolphin were implemented in 2003, with modest additions in 2008, 2013, 2014, and 2020.

82.    As a "protected species" under the New Zealand MMPA, the Māui dolphin is eligible for inclusion in a population management plan (PMP). A PMP could impose a strict limit on fishing related mortality and other statutory measures that permit the species to achieve non-threatened status in less than 20 years. The New Zealand government has not developed a PMP for the Māui dolphin.

83.    Instead, the New Zealand government elected to develop a Threat Management Plan (TMP) for the Māui dolphin. The TMP serves as a non-statutory "planning framework" to inform management of bycatch risk to the species. The New Zealand government issued a TMP for Hector's and Māui dolphins in 2008. The TMP underwent a comprehensive review in 2018.

84.    Following extensive delays, the New Zealand government issued a final decision on the TMP in June 2020 announcing regulations that incrementally extended set-net and trawl restrictions along the West Coast of the North Island starting on October 1, 2020. The 2020 regulations closed a subset of the Māui dolphin's range to set-net or trawl fishing. Fisheries (Hector's and Māui Dolphin) Amendment Regulations 2020 (LI 2020/199) (N.Z.), https://www.legislation.govt.nz/regulation/public/2020/0199/latest/whole.html. The closures do not include harbors. The closures fall short of the IWC Scientific Committee and IUCN recommendations. Under the current regulations, set nets are allowed in more than half of Māui dolphin habitat, and trawl fishing is allowed in over 80% of the Māui dolphin's range (including the East Coast).



**Figure 3.** Areas within the Māui dolphin's range that are closed to set netting (light green), closed to both set netting and trawling (dark green), and left unprotected under current regulations (red).

85.     Figure 3 depicts which parts of the Māui dolphin's range have restrictions on the fishing method that can be used. For set nets, the offshore extent of the protected areas is inconsistent, extending 12 nautical miles offshore in some areas, 7 nautical miles in others, and only 4 nautical miles in the northern and southern regions where the smallest, most vulnerable Māui dolphin populations live. Trawling is prohibited only to 4 nautical miles offshore, which is a truncated portion of the shoreline in comparison to the set-net closures and which protects a much smaller portion of the Māui dolphin's range.

86.     As a "backstop measure," the regulations also specify a "fishing-related mortality limit" (FRML) of one dolphin for Hector's or Māui dolphins within a defined "Māui dolphin habitat zone." Fisheries (Fishing-related Mortality Limits of Marine Mammals and Other Wildlife) Regulations 2022 (2022/313) Part 1(7) (N.Z.), http://www.nzlii.org/nz/legis/consol_reg/fmlommaowr2022829/. The delineated Māui Dolphin Habitat Zone follows the boundary of the territorial sea (12 nautical miles) and extends from Cape Egmont to Cape Reinga (Te Rerenga Wairua). This area accordingly covers just a subset of the Māui dolphin's distribution. *See* Figure 4 (showing Māui Dolphin Habitat Zone).



**Figure 4.** Map of the delineated Māui Dolphin Habitat Zone

87.     The FRML regulation: does not specify a temporal metric for the FRML—
whether the FRML permits one Māui dolphin death per year or one Māui dolphin death over
multiple years; does not specify any consequences if this limit is exceeded; by its own terms only
applies within the Māui Dolphin Habitat Zone—fishing-related mortalities of Māui dolphins
outside of the delineated Māui Dolphin Habitat Zone do not count towards the limit; and does
not limit the number of non-fatal captures or serious injuries of Māui dolphins that may occur.

88.     The remainder of New Zealand's measures are aimed at monitoring.

89.     The West Coast North Island set-net and trawl fleets have 0% human observer coverage. Department of Conservation, *Conservation Services Programme Annual Plan 2024/25*, at 17, 25 (N.Z.).

90.     Since 2017, New Zealand has mandated the installation of cameras on certain vessels within the North Island set-net and trawl fleets to monitor bycatch. Cameras are now required on all set-net fishing vessels greater than eight meters in length and to all trawl fishing vessels less than 32 meters in length in the West Coast North Island fisheries. Fisheries (Electronic Monitoring on Vessels) Regulations 2017 (LI 2017/156) (N.Z.). However, in February 2024, the New Zealand government reported that only 38 of the 136 vessels it identified from the West Coast North Island trawl and set-net fisheries had been outfitted with cameras.

91.     Under the regulations, the government reviews only a portion of video footage from vessel cameras in certain fishing areas that overlap with the Māui dolphin's distribution to detect if there has been a dolphin capture.

IV.     THE COURT OF INTERNATIONAL TRADE ENJOINS THE U.S. GOVERNMENT FROM AUTHORIZING IMPORTS OF SEAFOOD FROM TWO NEW ZEALAND FISHERIES.

92.     In 2019, Sea Shepherd New Zealand and Sea Shepherd Conservation Society (collectively, Sea Shepherd) submitted a rulemaking petition to NMFS, the Department of the Treasury, the Department of Commerce, and the Department of Homeland Security asking them to prohibit imports under the MMPA from the West Coast North Island New Zealand set-net and trawl fisheries because those fisheries incidentally kill and harm Māui dolphins in excess of U.S. standards.

93.     On July 10, 2019, NMFS rejected the petition, finding the regulatory program for those fisheries "comparable in effectiveness" to that of the United States.

94.     Sea Shepherd challenged NMFS's denial of the petition in the CIT. Complaint, *Sea Shepherd New Zealand v. United States*, No. 20-00122 (Ct. Int'l Trade May 21, 2020).

95.    While the case was pending, New Zealand submitted an application for a comparability finding to NMFS, primarily based upon the incremental protections for Māui dolphins promulgated in the 2020 regulations.

96.    On November 9, 2020, NMFS issued a comparability finding determination concluding that the West Coast North Island set-net and trawl fisheries do not catch Māui dolphins in excess of U.S. standards. Sea Shepherd challenged that finding in its pending case and moved for a preliminary injunction.

97.    On November 28, 2022, the CIT issued a preliminary injunction enjoining imports from the two North Island fisheries. *Sea Shepherd*, 606 F. Supp. 3d 1286. The CIT held that NMFS's comparability finding was likely arbitrary and capricious in several ways and that imports must be banned if the comparability finding is invalid. *Id*. at 1311–25. The CIT also found that the three other preliminary injunction factors warranted an injunction. *Id*. at 1326–30. The CIT ordered the federal defendants to publish an import ban on specified fish caught in New Zealand's West Coast North Island trawl fishery and inshore set-net fishery. Order, *Sea Shepherd* (Ct. Int'l Trade Nov. 28, 2022), ECF No. 109.

98.    U.S. Customs and Border Protection subsequently prohibited imports in accordance with the CIT's order. U.S. Customs and Border Protection, *CSMS # 54456976 – Import Restrictions on Certain New Zealand Fish and Fish Products* (Dec. 22, 2022); 87 Fed. Reg. 76998 (Dec. 16, 2022).

99.    According to the New Zealand government, the import prohibition resulted in over USD $1 million in costs to exporters. Hon. Todd McClay & Hon. Shane Jones, *United States Lifts Ban on New Zealand Fish Exports* (Apr. 3, 2024),

https://www.beehive.govt.nz/release/united-states-lifts-ban-new-zealand-fish-exports.

V.    NMFS ISSUES A NEW COMPARABILITY FINDING AUTHORIZING IMPORTS FROM THE WEST COAST NORTH ISLAND FISHERIES.

100.    While the *Sea Shepherd* case was pending, New Zealand submitted a new comparability finding application for all of its export fisheries in November 2021.

101.    After the CIT issued the preliminary injunction in 2022, New Zealand submitted supplemental information to NMFS in support of its 2021 application.

102.    On January 24, 2024, NMFS issued a new Comparability Finding (challenged here) for New Zealand's West Coast North Island multi-species set-net and trawl fisheries. NMFS stated that the Comparability Finding was based on materials from New Zealand and from the *Sea Shepherd* case. 89 Fed. Reg. 4595 (Jan. 24, 2024).

103.    The Comparability Finding does not address East Coast North Island fisheries that may also be causing Māui dolphin mortality.

104.    The *Sea Shepherd* parties then asked to dissolve the injunction because the new Comparability Finding superseded the flawed 2020 comparability finding that was the basis for the injunction. The CIT granted the motion, explaining that it was neither expressing a view on the new Comparability Finding nor precluding any legal challenge to the finding. *Sea Shepherd New Zealand v. United States*, 693 F. Supp. 3d 1364, 1367 (Ct. Int'l Trade 2024). The parties later agreed to voluntarily dismiss the case, which the CIT ordered while observing that the "disposition . . . is far from bill of health for a species teetering on the brink of extinction." *Sea Shepherd New Zealand v. United States*, No. 20-00112, 2024 WL 4144419, at *6 (Ct. Int'l Trade Sept. 11, 2024).

105.    The 2024 Comparability Finding purports to find that New Zealand "has met the requirements under the MMPA and [MMPA Regulations] for a comparability finding" for the West Coast North Island trawl and set-net fisheries. However, the Comparability Finding is contrary to the MMPA's Import Provision and its implementing regulations in several ways and is based on arbitrary and inaccurate analyses.

A.    <u>NMFS Did Not Establish that New Zealand Has a Standard Comparable to the MMPA's Zero Mortality Rate Goal.</u>

106.    The Comparability Finding contains no assessment or indication of whether New Zealand has a comparable standard to the MMPA's requirement to reduce incidental mortality and serious harm from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2).

107.    In its 2021 application for a comparability finding, New Zealand responded to a question asking whether it has "an overarching regulation the goal of which is to reduce the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate" by answering, "No."

108.    The Comparability Finding does not address New Zealand's response to the zero-mortality rate mandate question or New Zealand's lack of a comparable standard in any other way.

B.    <u>NMFS Did Not Establish that Māui Dolphin Bycatch in the West Coast North Island Fisheries Will Have No More Than a Negligible Impact on the Species.</u>

109.    Because the Māui dolphin is an endangered species under the ESA, the MMPA would only allow incidental take by commercial fisheries if the incidental mortality and serious injury from the fisheries has no more than a negligible impact on the stock. *Id.* § 1371(a)(5)(E)(i).

110.    The Comparability Finding lacks any analysis of whether incidental mortality and serious injury of Māui dolphins in the West Coast North Island fisheries has more than a negligible impact on the stock.

111.    Applying NMFS's Procedural Directive 02-204-02 to the data in New Zealand's comparability finding application would produce a finding that incidental mortality and serious injury of Māui dolphins in the West Coast North Island fisheries exceeds the negligible impact threshold under U.S. standards.

112.    The threshold for total human-caused mortality under the guidance would be 0.1 Māui dolphins per year—the equivalent of the PBR value NMFS lists in the Comparability Finding. According to the New Zealand government, total human-caused mortality of Māui dolphins is at least 4.16 dolphins per year[3]—more than 440 times the PBR value in the Comparability Finding.

---

[3] New Zealand reports 0.1 deaths per year from set nets and 4.06 deaths per year from other

113.    Because the total human-caused mortality threshold is exceeded, incidental mortality and serious injury from the West Coast North Island fisheries could only be deemed negligible if it is less than 13% of the PBR. Based on NMFS's PBR value, the negligible impact threshold would thus be 0.013 Māui dolphins per year[4]—or approximately 1 dolphin per 77 years.

114.    NMFS did not evaluate whether incidental mortality and serious injury in the West Coast North Island fisheries exceeds the 0.013 negligible impact threshold.

115.    Data in the Comparability Finding (particularly Tables 2 and 4) demonstrate that bycatch in the fisheries exceeds the negligible impact threshold.

116.    In addition, NMFS did not evaluate whether New Zealand applies a regulatory measure comparable to the MMPA's negligible impact standard or whether it requires action to protect a species in the event bycatch levels exceed a negligible impact standard, as the MMPA mandates.

C.    NMFS Found that New Zealand's Bycatch Limit Is Comparable to U.S. Standards Despite Evidence to the Contrary.

117.    In the Comparability Finding, NMFS found that New Zealand implements a bycatch limit for the Māui dolphin that is comparable to U.S. standards.

118.    New Zealand's regulations set a "fishing-related mortality limit" (FRML) of one "Hector's dolphin or Māui dolphin within the Māui dolphin habitat zone." Fisheries (Fishing-related Mortality Limits of Marine Mammals and Other Wildlife) Regulations 2022, Part 1(7) (N.Z.).

119.    Under U.S. standards, the bycatch limit for the Māui dolphin would be the PBR, which NMFS calculated to be 0.1 dolphin deaths per year.

_____

human causes in its application, which does not include an additional 1.90 deaths per year from toxoplasmosis, a disease transmitted from domestic cats. *See* J.O. Roberts et al., Fisheries New Zealand, *Spatial risk assessment of threats to Hector's and Māui dolphins (*Cephalorhynchus hector*i) 50 tbl.15 (2019).
[4] 13% x 0.1 dolphins/year = 0.013 dolphins/year.

120.    NMFS did not explain how New Zealand's FRML of one dolphin death is comparable to a bycatch limit of 0.1 dolphins per year that would apply under U.S. standards.

121.    NMFS did not consider or evaluate that New Zealand law does not specify a timeframe for the FRML—whether it is one dolphin per year, one dolphin every ten years, or some other metric. The PBR, in contrast, limits mortality on an annual basis.

122.    NMFS did not consider or evaluate that the FRML, by its own terms, applies only to mortalities within the designated Māui Dolphin Habitat Zone. Dolphins incidentally caught outside of the Zone do not count towards the FRML. The PBR, by contrast, limits mortality for an entire stock no matter where the mortality occurs.

123.    Ultimately, the Comparability Finding does not address the differences between the values, timeframes, or geographic scopes for the FRML and PBR when concluding the bycatch limits are comparable.

D.    NMFS Used an Inappropriate Population Estimate to Evaluate Whether Bycatch Is in Excess of the U.S. Standard for a Bycatch Limit.

124.    In the Comparability Finding, NMFS compared the estimated mean annual deaths from the set-net and trawl fisheries to the PBR for the Māui dolphin. For that comparison, NMFS used a PBR of 0.10—or one dolphin death per 10 years.

125.    The PBR NMFS used appears to be sourced from New Zealand's 2021 application for a comparability finding. The 2021 application states that the PBR of 0.10 "provided in this Comparability Application is based on the new 2021 Māui dolphin abundance estimate." The 2021 abundance estimate referenced in the application is "54 dolphins aged 1+, with a 95 percent confidence that the number of dolphins over one year old is between 49 and 64." On information and belief, NMFS used a value of 54 mature individuals for the population estimate in calculating the PBR of 0.1

126.    The IWC Scientific Committee published a report in 2023 that estimated the Māui dolphin population at 48 mature individuals. In its Decision Memorandum for the 2024 Comparability Finding, NMFS estimated the Māui dolphin population at 43 individuals. The

Comparability Finding does not explain why an estimate of 54 dolphins was chosen as the population estimate for the PBR calculation over the other, lower estimates.

127.    Using a higher population estimate in the PBR equation necessarily results in a higher PBR value.[5]

128.    NMFS found that the combined mean annual deaths of Māui dolphins in the set-net and trawl fisheries is 0.056 with a 95% confidence interval of 0.030 to 0.098. NMFS found that the "Total mortality + injury" for Māui dolphins is 0.10.

129.    If NMFS had used a smaller population size to calculate PBR, the PBR value necessarily would have been smaller than the 0.10 PBR value that NMFS used.[6]  The smaller PBR would have been less than the 0.1 "Total mortality + injury" value and likely would have fallen within the 95% confidence interval of the lethal bycatch estimate.[7]  In either case, NMFS could not have concluded that the incidental mortality or incidental serious injury of Māui dolphins does not exceed PBR.

E.    NMFS Used the Wrong U.S. Standards for a Monitoring Program When Finding that New Zealand's Monitoring Program Is Comparable to U.S. Standards.

130.    NMFS concluded that "New Zealand's overall monitoring program for Māui dolphin bycatch is comparable to or exceeds the U.S. regulatory program standards."

131.    NMFS based that conclusion on its assessment that New Zealand's percentage monitoring coverage is greater than the 10% level of observer coverage that NMFS asserts it generally uses.

---

[5] Because PBR = minimum population size x recovery factor x population growth rate factor, an increase in any of the inputs (e.g., minimum population size) results in a higher PBR value.

[6] Because the same population size value is also a component of the negligible impact and Zero Mortality Rate Goal equations, using a smaller population size would also make these threshold numbers smaller than the values discussed above (which were based on the PBR value NMFS used). *See* ¶¶ 112, 113.

[7] According to the New Zealand government, new measures are necessary whenever estimated bycatch falls within the confidence interval of PBR. This is because, "to achieve the population objective with 95 percent certainty, the 95th percentile estimate of current fisheries deaths must be less than [PBR]." Government of New Zealand, *Hector's and Māui Dolphin Threat Management Plan: Technical Advice, Part B3: West Coast North Island (Māui Dolphin)* 3 (2019).

132.    However, NMFS did not explain why a 10% monitoring standard would be the applicable U.S. standard to monitor bycatch of a species like the Māui dolphin, nor did it evaluate whether a higher monitoring level would be required under U.S. standards.

133.    NMFS requires much higher levels of monitoring coverage—as high as 100%—in certain circumstances, such as when managing bycatch of endangered species, when in-season management (e.g., fishery closures) is supported by observer data, when higher levels of precision for bycatch estimates may be desired, or when monitoring for regulatory compliance is a priority.

134.    According to NMFS's Guidelines for Preparing Stock Assessment Reports, a monitoring coverage level of 10% is too low when a species has a very small population or a low PBR.

135.    For a critically endangered species like Māui dolphin, where fisheries interactions may be rare but just one death can have significant population-level effects, monitoring must be as near to 100% as possible to be able to detect if a dolphin is caught in the fishery. In fact, the New Zealand government has stated in publicly available documents that, to be able to close fisheries if a bycatch limit is exceeded, there must be "100% monitoring of vessels fishing using trawl or set net in areas of risk." Dep't of Conservation & Fisheries New Zealand, *Protecting Hector's and Māui Dolphins: Supporting Information and Rationale* 30 (June 17, 2019).

136.    NMFS did not evaluate whether circumstances involved with Māui dolphin bycatch in the West Coast North Island fisheries would require a higher level of observer coverage than 10% under U.S. standards.

137.    NMFS also did not evaluate whether New Zealand's monitoring program produces statistically reliable results given the circumstances of the Māui dolphin and the fisheries.

138.    NMFS based its finding that New Zealand's monitoring program is comparable to or exceeds the U.S. regulatory program standards on its finding that "New Zealand has attained 90% monitoring coverage . . . within the [Māui Dolphin Habitat Zone]." Even assuming that finding is accurate, it does not account for the lack of monitoring coverage in the Māui dolphin's

range outside the designated Habitat Zone. NMFS did not evaluate whether monitoring outside the Māui Dolphin Habitat Zone is necessary to sufficiently detect bycatch. Māui dolphins can be caught and killed by set nets and trawls outside the designated Zone. For instance, set-net vessels fishing in harbors are not subject to monitoring despite high levels of fishing effort in harbors. Māui dolphins are present in harbors. The incidental death or serious injury of a Māui dolphin by a set net in a harbor would not be detected by New Zealand's monitoring program.

139.    NMFS did not evaluate whether greater than 90% monitoring coverage in the Māui Dolphin Habitat Zone, greater than 0% monitoring outside the Māui Dolphin Habitat Zone, or both are necessary to meet U.S. standards for monitoring bycatch of a critically endangered species.

140.    In addition, NMFS did not evaluate the degree to which the electronic monitoring method New Zealand primarily uses is comparable to the human observer monitoring method the United States primarily uses. Electronic monitoring has limitations in its ability to record captures that human observers do not. And even recorded captures may not be detected by regulators if only a subset of camera footage is reviewed, as is the case for the West Coast North Island fisheries. NMFS did not address the effect of these differences when concluding the monitoring programs are comparable in effectiveness.

F.    <u>NMFS Failed to Evaluate Whether New Zealand's Regulatory Program Provides for Comparable Marine Mammal Assessments.</u>

141.    The Comparability Finding does not contain any assessment or indication of whether New Zealand's regulatory program provides for marine mammal assessments that are comparable to the MMPA's stock assessment requirements.

142.    The Comparability Finding does not identify any standards under New Zealand's regulatory program for estimating the population size or trend for the Māui dolphin.

G.    <u>NMFS Failed to Evaluate Whether Bycatch of Marine Mammals Other than Māui Dolphins Exceeds U.S. Standards.</u>

143.    The Comparability Finding certifies that the West Coast North Island set-net and trawl fisheries meet the standard in the MMPA Import Provision.

144.    The Comparability Finding contains no evaluation of whether the two fisheries meet the Import Provision's requirements with respect to the Hector's dolphin, common dolphin, New Zealand fur seal, or other marine mammals that are caught and killed in the fisheries. The Comparability Finding contains no conclusion that bycatch of those species does not exceed U.S. standards.

## CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION – The Comparability Finding with Respect to the Māui Dolphin Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

145.    The allegations made in paragraphs 1–144 are realleged and incorporated by this reference.

146.    The MMPA requires Defendants to ban the importation of seafood products caught by a fishery "which results in the incidental kill or incidental serious injury" of marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2). The Secretary of Commerce must require "reasonable proof from the government of [the harvesting nation] of the effects on ocean mammals" from the fishery to determine if the import standard is met. *Id.* § 1371(a)(2)(A).

147.    Implementing regulations prohibit importation of seafood from a fishery "that does not have a valid comparability finding in effect." 50 C.F.R. § 216.24(h)(1)(ii)(A). To issue a valid comparability finding, NMFS must reasonably find "that the harvesting nation for an export . . . fishery has met the applicable conditions specified in § 216.24(h)(6)(iii) subject to the additional considerations for comparability determinations set out in § 216.24(h)(7)." *Id.* § 216.3.

148.    The Comparability Finding is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

149.    The Comparability Finding is arbitrary and capricious and contrary to law in multiple respects.

150.    First, NMFS was required to evaluate whether New Zealand has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals

in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f). NMFS did not do so. And New Zealand lacks an equivalent to this U.S. standard.

151.    Second, NMFS was required to evaluate whether New Zealand has a standard comparable to the U.S. standard that incidental mortality and serious injury of endangered marine mammals in commercial fisheries has no more than a "negligible impact" on the species. *Id.* § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(7)(i). NMFS did not do so. And New Zealand lacks an equivalent standard. Based on available values for PBR, total human-caused mortality, and mortality or serious injury in the West Coast North Island fisheries, Māui dolphin mortality and serious injury in the West Coast North Island fisheries exceeds the threshold for a negligible impact finding under NMFS's policy guidance.

152.    Third, NMFS was required to evaluate whether New Zealand has a bycatch limit that is comparable to the U.S. standard for a bycatch limit. *See* 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*5*), (*6*). The MMPA standard for a bycatch limit is the PBR. 16 U.S.C. § 1387(f)(2). NMFS found New Zealand's FRML limit of "one" death of a "Hector's dolphin or Māui dolphin within the Māui dolphin habitat zone" is comparable to the U.S. standard for a bycatch limit. NMFS did not and could not establish that a limit of one dolphin mortality is comparable to the Māui dolphin PBR of 0.1 dolphins per year. NMFS did not consider or address the fact that New Zealand's FRML lacks a timeframe, unlike PBR. And NMFS did not consider or address the fact that New Zealand's FRML applies only to mortalities and injuries within a geographically constrained area, unlike the PBR.

153.    Fourth, NMFS was required to evaluate whether the rate of mortality or serious injury of Māui dolphins is in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*). NMFS compared mortality and injury rates of Māui dolphins in the West Coast North Island fisheries to its calculated PBR of 0.1 dolphins per year and found the PBR is not being exceeded. NMFS's calculation of PBR was based on an older Māui dolphin population estimate that is higher than more recent estimates. NMFS must use the best available science for the population estimates. *See* 16 U.S.C. § 1362(27). NMFS did not explain why it did

not use the more recent, available population numbers to calculate the PBR, which would have resulted in a PBR value less than 0.1 dolphins per year. A lower PBR value may have resulted in a finding that mortality and serious injury of Māui dolphins in the West Coast North Island fisheries is in excess of U.S. standards.

154.    Fifth, NMFS was required to evaluate whether New Zealand implements monitoring procedures comparable to U.S. standards for monitoring in similar circumstances. *Id.* §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(7)(i). NMFS found New Zealand's monitoring procedures are comparable to U.S. standards because New Zealand's 90% monitoring coverage in the Māui Dolphin Habitat Zone exceeds the 10% observer coverage that NMFS generally requires. NMFS failed to consider that the 10% comparison is inapt under the circumstances present here, involving a critically endangered species. NMFS did not evaluate whether New Zealand's monitoring program produces statistically reliable results given the circumstances and the need to be able to detect any and every instance of Māui dolphin bycatch.

155.    Sixth, NMFS was required to evaluate whether New Zealand's regulatory program provides for marine mammal assessments that are comparable to the MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a). NMFS did not do so. And, New Zealand lacks an equivalent stock assessment requirement.

156.    Accordingly, NMFS's Comparability Finding for the West Coast North Island fisheries with respect to Māui dolphin bycatch is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. 1371(a)(2); 50 C.F.R. § 216.24(h).

**SECOND CAUSE OF ACTION – The Comparability Finding for the West Coast North Island Fisheries with Respect to Bycatch of Other Marine Mammals Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

157.    The allegations made in paragraphs 1–156 are realleged and incorporated by this reference.

158.    The MMPA requires the Defendants to ban the importation of seafood products caught by a fishery "which results in the incidental kill or incidental serious injury" of *any* marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2).

159.    The West Coast North Island set-net and trawl fisheries catch and kill marine mammals other than Māui dolphins, including common dolphins, New Zealand fur seals, and others. Hector's dolphins are also present in the area where these fisheries operate and are susceptible to being caught and killed by the fisheries.

160.    NMFS did not evaluate whether or establish that New Zealand has met the applicable conditions for a comparability finding for marine mammal species other than the Māui dolphin. 50 C.F.R. §§ 216.3, 216.24(h)(6)(iii), (7). Nor did NMFS establish that the incidental kill or incidental serious injury of marine mammals other than Māui dolphins is not in excess of United States standards. 16 U.S.C. § 1371(a)(2).

161.    NMFS did not insist on reasonable proof from the government of New Zealand of the effects of the West Coast North Island fisheries on Hector's dolphins, common dolphins, New Zealand fur seals, or other marine mammal species that are caught in the fisheries. *Id.* § 1371(a)(2)(A).

162.    Nonetheless, NMFS issued a Comparability Finding that the West Coast North Island fisheries "met the applicable procedure[s] and conditions specified in the MMPA Import Provisions."

163.    The Comparability Finding for the West Coast North Island fisheries is arbitrary and capricious and contrary to law because it fails to assess bycatch of marine mammal species other than the Māui dolphin, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. 1371(a)(2); 50 C.F.R. § 216.24(h).

**THIRD CAUSE OF ACTION – Defendants Failed to Ban the Importation of Fish from the West Coast North Island Fisheries as Required by the MMPA.**

164.    The allegations made in paragraphs 1–163 are realleged and incorporated by this reference.

165.     The MMPA requires the Secretary of the Treasury to ban the importation of seafood products caught by a fishery "which results in the incidental kill or incidental serious injury" of marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2). The Homeland Security Act imposes a responsibility on the Department of Homeland Security to implement import bans. 6 U.S.C. §§ 203(1), 212(a)(1).

166.     A fishery without a "valid comparability finding" in effect is deemed to "result[] in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards," unless the fishery is exempt. 50 C.F.R. § 216.24(h)(1)(i), (h)(2); *see also id.* § 216.24(h)(1)(ii)(A) (making it unlawful to import fish from "a fishery that does not have a valid comparability finding in effect at the time of import").

167.     New Zealand's West Coast North Island trawl and set-net fisheries are not exempt because New Zealand has waived the exemption period by applying for a comparability finding for the fisheries. *Sea Shepherd*, 606 F. Supp. 3d at 1323–25 & nn.60–63.

168.     To issue a valid comparability finding, NMFS must reasonably establish "that the harvesting nation for an export . . . fishery has met the applicable conditions specified in § 216.24(h)(6)(iii) subject to the additional considerations for comparability determinations set out in § 216.24(h)(7)." 50 C.F.R. § 216.3. Further, a comparability finding is only valid if NMFS establishes that the fishery does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards" within the meaning of the MMPA. 16 U.S.C. § 1371(a)(2).

169.     NMFS did not reasonably and lawfully establish that the West Coast North Island set-net or trawl net fisheries meet the applicable conditions specified in 50 C.F.R. § 216.24(h)(6) and (7) or in 16 U.S.C. § 1371(a)(2) with respect to bycatch of either Māui dolphins or other marine mammals. Accordingly, the West Coast North Island set-net and trawl net fisheries do not have a valid comparability finding in effect.

170.     In addition, the fisheries incidentally kill or seriously injure Māui dolphins and other marine mammals in excess of U.S. standards.

171.    The MMPA accordingly requires Defendants to ban the importation of seafood caught by the West Coast North Island set-net and trawl net fisheries for two independent reasons: because they do not meet the MMPA's statutory requirement and because they lack a valid comparability finding under the implementing regulations.

172.    Defendants have not banned the importation of seafood caught by the West Coast North Island set-net or trawl net fisheries.

173.    An import ban is a discrete, legally required final agency action that can be compelled under the APA. 5 U.S.C. § 706(1).

174.    Defendants' failure to implement the import ban constitutes "agency action unlawfully withheld or unreasonably delayed," for which this Court may order relief under the APA. *Id.*

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that the Comparability Finding violates the MMPA, its implementing regulations, and the APA;

2.    Vacate the Comparability Finding;

3.    Remand the Comparability Finding to NMFS;

4.    Declare that Defendants failed to ban imports from the West Coast North Island Fisheries as required by the MMPA, its implementing regulations, and the APA;

5.    Order Defendants to ban imports from the West Coast North Island Fisheries;

6.    Grant any injunctive relief necessary to effect an import ban from the West Coast North Island Fisheries;

7.    Maintain jurisdiction over this action until Defendants are in compliance with the MMPA, APA, and every order of this Court;

8.    Award Plaintiffs their costs and reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

9.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 4th day of December, 2024.

*/s/ Natalie Barefoot*
Natalie Barefoot
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T (415) 217-2000
nbarefoot@earthjustice.org

Sabrina Devereaux
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org

*/s/ Brett Sommermeyer*
Brett Sommermeyer
Catherine Pruett
Law of the Wild
7511 Greenwood Avenue North, #4214
Seattle, WA 98103
T (206) 774-0048
brett@lawofthewild.org
catherine@lawofthewild.org

*Attorneys for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc.*