## UNITED STATES COURT OF INTERNATIONAL TRADE

MĀUI AND HECTOR'S DOLPHIN
DEFENDERS NZ INC.,

                              *Plaintiff,*

    v.

NATIONAL MARINE FISHERIES
SERVICE, et al.,

                              *Defendants,*

GOVERNMENT OF NEW ZEALAND,

                              *Intervenor-Defendant.*

Case No. 1:24-cv-00218-JCG

Before: Judge Jennifer Choe-Groves

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON AGENCY RECORD

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................... 1

STATUTORY FRAMEWORK ............................................................................................... 2

FACTUAL BACKGROUND .................................................................................................. 6

    I.      New Zealand Export Fisheries Pose a Severe Threat to the Māui Dolphin and Other Marine Mammals. .............................................................................. 6

    II.     NMFS Continues to Authorize Imports from the New Zealand Fisheries. ............. 9

STANDARD OF REVIEW .................................................................................................... 11

ARGUMENT ......................................................................................................................... 12

    I.      NMFS Did Not Establish that New Zealand Meets a Comparable Standard to the MMPA's Zero Mortality Rate Goal. ......................................................... 13

    II.     NMFS Did Not Establish that Māui Dolphin Bycatch in the West Coast North Island Fisheries Will Have No More Than a Negligible Impact on the Population. ................................................................................................... 14

    III.    NMFS's Finding that New Zealand's Bycatch Limit Is Comparable to the PBR Standard Is Counter to the Evidence. ........................................................... 16

    IV.    NMFS Used an Arbitrarily High Population Estimate to Evaluate Whether the Bycatch Rate Exceeds PBR. ........................................................................... 19

    V.     NMFS's Finding that New Zealand's Monitoring Program Is Comparable to U.S. Standards Is Arbitrary and Capricious and Contrary to the Record. ......... 22

    VI.    NMFS Failed to Evaluate Whether New Zealand's Regulatory Program Provides for Comparable Marine Mammal Stock Assessments. .......................... 27

    VII.   NMFS Failed to Evaluate Whether Bycatch of Marine Mammals Other than Māui Dolphins Exceeds U.S. Standards. ..................................................... 28

    VIII.  The Proper Remedy Is Vacatur of the Unlawful Comparability Finding and an Order Compelling Defendants to Impose a Legally Required Import Ban. ...................................................................................................... 30

CONCLUSION ...................................................................................................................... 33

CERTIFICATE OF COMPLIANCE ..................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014) ...........................................................................27

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ...........................................................................................11

*Conservation Council for Haw. v. NMFS*,
    97 F. Supp. 3d 1210 (D. Haw. 2015) ....................................................................29

*Ctr. for Biological Diversity v. Ross*,
    480 F. Supp. 3d 236 (D.D.C. 2020) ......................................................................30

*Ctr. for Marine Conservation v. NMFS*,
    No. 99-00152, 2000 WL 33964303 (D. Haw. June 23, 2000)................................23

*Defs. of Wildlife v. Babbitt*,
    958 F. Supp. 670 (D.D.C. 1997) ..........................................................................26

*Dist. Hosp. Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015) ...............................................................................26

*Dow AgroSciences LLC v. NMFS*,
    707 F.3d 462 (4th Cir. 2013) ...............................................................................21

*Earth Island Inst. v. Evans*,
    No. 03-0007, 2004 WL 1774221 (N.D. Cal. Aug. 9, 2004) ...................................23

*Env't Law Initiative v. Dir.-Gen. of the Ministry of Primary Indus.*
    [2024] NZHC 3824 ........................................................................................9, 18

*Env't Law Initiative v. Minister of Oceans & Fisheries*
    [2025] NZHC ___ ...................................................................................................9

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
    864 F.3d 738 (D.C. Cir. 2017) ..............................................................................25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).............................................................................................10

*Ga. Aquarium, Inc. v. Pritzker*,
    135 F. Supp. 3d 1280 (N.D. Ga. 2015) .................................................................20

*\* Authorities upon which we chiefly rely are marked with an asterisk*

*Humane Soc'y of U.S. v. Kempthorne,*
  579 F. Supp. 2d 7 (D.D.C. 2008) ......................................................30

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.,*
  463 U.S. 29 (1983) ............................................................... *passim*

*Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality,*
  990 F.3d 818 (4th Cir. 2021) ...........................................................11

*N.C. Utilities Comm'n v. FERC,*
  42 F.3d 659 (D.C. Cir. 1994) ...........................................................24

*Nat. Res. Def. Council, Inc. v. Rauch,*
  244 F. Supp. 3d 66 (D.D.C. 2017) ...................................................26

*\*Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*),
  331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) .............................. *passim*

*Ninestar Corp. v. United States,*
  687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) .................................30

*Sea Shepherd N.Z. v. United States,*
  723 F. Supp. 3d 1374 (Ct. Int'l Trade 2024) .................................21

*\*Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*),
  606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ............................. *passim*

*Sea Shepherd N.Z. v. United States* (*Sea Shepherd II*),
  693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024) ............................10, 21

*In re Section 301 Cases,*
  570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) .................................27

*Sierra Club v. EPA,*
  671 F.3d 955 (9th Cir. 2012) ...........................................................21

*United States v. Weiss,*
  52 F.4th 546 (3d Cir. 2022) .............................................................28

*Util. Solid Waste Activities Grp. v. EPA,*
  901 F.3d 414 (D.C. Cir. 2018) .........................................................25

**Statutes**

5 U.S.C. § 706 .................................................................11, 30, 31, 32

6 U.S.C. § 203 ...................................................................................3

6 U.S.C. § 212 ...................................................................................3

16 U.S.C. § 1361 ................................................................................................2, 3

16 U.S.C. § 1362 .............................................................................................. *passim*

16 U.S.C. § 1371 .............................................................................................. *passim*

16 U.S.C. § 1372 ................................................................................................14

16 U.S.C. § 1386 ................................................................................................3, 27

16 U.S.C. § 1387 .............................................................................................. *passim*

**Regulations**

50 C.F.R. § 216.3 ................................................................................................17

50 C.F.R. § 216.24 ........................................................................................... *passim*

50 C.F.R. § 229.2 ................................................................................................13

**Federal Register**

81 Fed. Reg. 54390 (Aug. 15, 2016) ................................................................5

82 Fed. Reg. 43701 (Sep. 19, 2017) ................................................................6, 7

**Other Authorities**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .........................28

NMFS, *Criteria for Determing Negligible Impact under MMPA Section 101(a)(5)(E)*,
    Procedural Directive 02-204-02 (June 17, 2020) ....................................................15

**INTRODUCTION**

New Zealand's Māui dolphin is the rarest and most endangered dolphin in the world. Less than 50 mature dolphins remain. The primary cause of the dolphin's perilous status is capture and mortality in trawl nets and set nets fishing off the West Coast of New Zealand's North Island. Despite the clear threat to the Māui dolphin's existence, the New Zealand Government continues to allow these fishing methods in the Māui dolphin's habitat.

The U.S. Marine Mammal Protection Act (MMPA) requires Federal Defendants to ban the import of fish and fish products from any foreign commercial fishery that harms marine mammals in excess of what would be permitted in the United States. United States law would not allow the fishing practices that contribute to the decline of a marine mammal population, much less practices that place an endangered species like the Māui dolphin at risk of extinction. Yet Federal Defendants have not banned the import of fish from the New Zealand West Coast North Island set-net or trawl fisheries [hereinafter the New Zealand Fisheries]. The U.S. market continues to support these fisheries as a result.

This case challenges a 2024 finding [hereinafter the Comparability Finding] by Defendant National Marine Fisheries Service (NMFS) that the New Zealand Fisheries do not kill or harm Māui dolphins in excess of U.S. standards. In making the finding, NMFS failed to consider several U.S. marine mammal bycatch standards that New Zealand does not meet. For instance, the MMPA's negligible impact standard would prohibit the fisheries from killing more than one Māui dolphin every 77 years. New Zealand informed NMFS that its fisheries kill one Māui dolphin every 10 years. For those U.S. standards that NMFS did consider, the agency's assessment includes analytical and legal errors. In addition, NMFS completely failed to assess whether incidental mortality and harm of other marine mammals that are caught by the fisheries

exceeds U.S. standards, even though the Comparability Finding certifies that the two fisheries meet U.S. standards for bycatch of *all* marine mammals.

This is not the first time Federal Defendants have chosen to authorize imports despite an existential risk of harm to the Māui dolphin. In 2022, Judge Katzmann enjoined imports from the two New Zealand Fisheries because NMFS failed to establish that Māui dolphin bycatch was not in excess of U.S. standards. *Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*), 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022). New Zealand has not enacted any new measures since then to address that bycatch. Fishing continues within the Māui dolphin's habitat, and the dolphin's status has only grown more precarious.

With the 2024 Comparability Finding, NMFS again has contravened the MMPA's requirement to make a well-founded determination that New Zealand's regulatory program is comparable to *all* applicable U.S. standards for marine mammal protection. With such a critically low population, the Māui dolphin cannot afford a mistake by the U.S. agencies charged with ensuring that U.S. trade policy does not contribute to its demise. The Māui dolphin certainly cannot afford repeated mistakes.

Plaintiff Māui and Hector's Dolphin Defenders accordingly asks the Court to vacate the unlawful Comparability Finding and order Federal Defendants to promptly ban imports from the New Zealand Fisheries as the MMPA requires.

## STATUTORY FRAMEWORK

Congress enacted the MMPA to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities," and to ensure that these populations do not become "diminish[ed] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(1), (2). Congress intended to protect not just marine mammals within the United States, but also

those abroad, recognizing that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and … they should be protected and encouraged to develop to the greatest extent feasible." *Id.* § 1361(6).

To this end, the MMPA includes a provision designed to leverage the United States' position as a major seafood importer to protect marine mammal populations outside of U.S. waters. Section 1371(a)(2) of the MMPA [hereinafter the Import Provision] requires the Secretary of the Treasury[1] to ban the import of fish and fish products from foreign commercial fisheries that result "in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2). This provision holds foreign exporters of seafood accountable to comparable marine mammal protection standards as apply to U.S. fishers.

The term "United States standards" as used in the Import Provision encompasses, at a minimum, the provisions of the MMPA that are relevant to managing incidental mortality and serious harm to marine mammals from commercial fisheries.[2] NMFS_4659; *Sea Shepherd I*, 606 F. Supp. 3d at 1294–95 (identifying "statutory markers of 'United States standards'" with reference to MMPA requirements). As relevant in this case, the MMPA requires implementing: 1) a mandate to reduce bycatch to insignificant levels approaching zero; 2) bycatch limits based on scientifically established thresholds; 3) take reduction plans; 4) bycatch monitoring programs; and 5) stock assessments. 16 U.S.C. §§ 1386(a), 1387(b), (d), (f).

The MMPA's key metric for establishing bycatch limits and guiding mitigation actions is the Potential Biological Removal (PBR) level. *See, e.g.*, 16 U.S.C. §§ 1362(19), (20), 1387(f);

---

[1] The Homeland Security Act imposes a responsibility on the Department of Homeland Security to implement import bans. 6 U.S.C. §§ 203(1), 212(a)(1).
[2] NMFS also refers to this incidental mortality and harm as "bycatch." *See, e.g.*, NMFS_4652–53 (stating implementation of Import Provision is "intended to reduce the bycatch of marine mammals in foreign commercial fishing operations that export … to the United States").

NMFS_13833; *see also Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*), 331 F. Supp. 3d 1338, 1363 (Ct. Int'l Trade 2018) (finding "PBR level is also a marker of 'United States standards' for the purposes of the Imports Provision"). The MMPA defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20). PBR is a numerical value that is calculated as: the minimum population estimate of the stock, times one-half the maximum theoretical or estimated net productivity rate of the stock at a small population size, times a recovery factor of between 0.1 and 1.0. *Id.*; *see infra* p. 20 (discussing these inputs and equation in more depth). The PBR value effectively represents the tolerance that the U.S. government has for human-caused harm to marine mammal populations. *See, e.g.*, NMFS_1257 (explaining "PBR is an upper limit to mortalities not due to natural causes"). When such harm exceeds the PBR level, it indicates that the marine mammal stock will not be able to reach or maintain its optimum sustainable population, necessitating corrective action to reduce the harm. *E.g.*, 16 U.S.C. § 1387(f) (requiring implementation of take reduction plan to reduce incidental harm and mortality below PBR level within six months). NMFS thus uses the PBR value to evaluate several factors under the MMPA, such as bycatch limits, stock assessments, and monitoring requirements—both domestically and in the comparability finding process.

While PBR serves as a guiding standard for action, the MMPA imposes even higher standards for the management of endangered and "strategic" marine mammal stocks.[3] A

---

[3] A "stock" is a term of art defined by the MMPA that can mean an entire species or subspecies (as with the Māui dolphin, NMFS_8544), or just a subset. Specifically, a stock is "a group of marine mammals of the same species or smaller taxa in a common spatial arrangement, that interbreed when mature." 16 U.S.C. § 1362(11).

"strategic stock" is one that is either currently or likely to be listed under the Endangered Species Act (ESA), or where human-caused mortality exceeds PBR. *Id.* § 1362(19). Fisheries that pose a risk to these vulnerable stocks must abide by recovery plans, lower bycatch limits, and stricter monitoring requirements. *Id.* §§ 1371(a)(5)(E)(i), 1387(d)(4).

The Import Provision's plain text requires the government to ban imports if an export fishery's bycatch rate "is in excess of" what the bycatch limit would be under U.S. standards. *Id.* § 1371(a)(2). An export fishery also operates in excess of U.S. standards if it lacks regulatory measures comparable in effectiveness to those in the United States. *Id.*; *see* 50 C.F.R. § 216.24(h).

NMFS has promulgated regulations to assist in determining whether these conditions are met, based on the consideration of several mandatory factors. 81 Fed. Reg. 54390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.24(h)); *see Sea Shepherd I*, 606 F. Supp. 3d at 1311–15. NMFS reviews each foreign export fishery that may incidentally catch marine mammals and publishes what is known as a "comparability finding" if it finds the fishery is in compliance with the Import Provision. 81 Fed. Reg. 54390, 54391–93 (Aug. 15, 2016). Exporting nations can apply for a comparability finding by submitting "reasonable proof" of the effects that their export fisheries have on marine mammals and documentary evidence demonstrating that they comply with the Import Provision's standards. 16 U.S.C. § 1371(a)(2)(A); 50 C.F.R. § 216.24(h)(6)(i), (ii). To issue a positive comparability finding, NMFS must find that the exporting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." 50 C.F.R. § 216.24(h)(6)(iii)(B). NMFS must make certain specified findings and consider mandatory factors before making such

a finding. *Id.* § 216.24(h)(6)(iii), (h)(7); *see Sea Shepherd I*, 606 F. Supp. 3d at 1312. A comparability finding is operative for four years from its publication, unless otherwise indicated. 50 C.F.R. § 216.24(h)(8)(iv).

Any fishery without a "valid" comparability finding in effect is considered out of compliance with the Import Provision, and imports from these fisheries must be banned. *Id.* § 216.24(h)(1)(i), (ii), (h)(9); *see Sea Shepherd I*, 606 F. Supp. 3d at 1324 (explaining if "fisheries do not have valid comparability findings in effect, the importation of fish or fish products into the United States from them is per se in excess of U.S. standards … and thereby prohibited").

## FACTUAL BACKGROUND

I.  **New Zealand Export Fisheries Pose a Severe Threat to the Māui Dolphin and Other Marine Mammals.**

New Zealand's Māui dolphin is the rarest marine dolphin in the world. NMFS_4359. Less than 50 mature individuals remain following a steady population decline over the past five decades, which has averaged 3–4% per year. NMFS_4041, NMFS_4448, NMFS_1125. The remaining individuals are concentrated in coastal waters around New Zealand's North Island. NMFS_398. The Māui dolphin is a subspecies of the Hector's dolphin, with the latter found primarily in coastal waters around the South Island (although some Hector's dolphins have been identified off the North Island). NMFS_397.

In recognition of its imperiled status, NMFS listed the Māui dolphin as endangered under the ESA. 82 Fed. Reg. 43701 (Sep. 19, 2017). Accordingly, it is considered a "strategic stock" under the MMPA. *See* 16 U.S.C. § 1362(19)(C). The dolphin is also listed as "Critically Endangered" by the International Union for the Conservation of Nature and as "Nationally Critical" under the New Zealand Threat Classification System. NMFS_4358.

6

Capture and drowning in commercial fisheries has been and continues to be the primary cause of the Māui dolphin's decline. NMFS_4359. The dolphin is especially at risk of accidental entanglement in the set-net and trawl fisheries along the West Coast of the North Island. NMFS_411, NMFS_416, NMFS_3942. These New Zealand Fisheries catch and kill other marine mammal species as well, including bottlenose dolphins, common dolphins, orcas, long-finned pilot whales, New Zealand fur seals, and rough-toothed dolphins. NMFS_1145.

There is widespread agreement—including from NMFS—that the risk from set-net and trawl fishing must be eliminated for the Māui dolphin to avoid extinction, much less to recover. *See, e.g.*, 82 Fed. Reg. at 43708 ("[I]t is considered unlikely that this subspecies will recover unless sources of anthropogenic mortality are eliminated."); NMFS_4013 (stating the "highest priority should be assigned to management actions that immediately eliminate bycatch of Māui dolphins, including closure of any fisheries within the range of Māui dolphins that are known to pose a risk of bycatch to dolphins (i.e. set net and trawl fisheries)"); NMFS_4639 ("Given their small population size and critically endangered status, it is vital to ensure that recovery of Maui's [sic] dolphin is not hindered by continued catches in fishing operations."). Yet, the New Zealand Government has failed to implement a regulatory program that eliminates bycatch risk.

The New Zealand Government manages the Māui dolphin through a Threat Management Plan (TMP), which is a non-statutory "framework" of goals and objectives to inform management of bycatch risk to the subspecies. NMFS_3936. Under the TMP, New Zealand employs three mechanisms to manage bycatch risk: 1) spatial closures; 2) a fishing-related mortality limit; and 3) an electronic monitoring program.

First, New Zealand has closed some coastal areas to set-net and trawl fishing, but within only a subset of the Māui dolphin's habitat. NMFS_3947–48. The closures do not include

harbors or deeper waters where Māui dolphins have been found, or the northern or southern ends of its range.[4] *See* NMFS_4633–38; 2d Decl. of Prof. Elisabeth Slooten ¶ 14–16, *Sea Shepherd I*, No. 20-00112, ECF No. 49-2. Set-netting is particularly intensive in harbor habitat: roughly 98% of set-net fishing effort occurs within harbors. NMFS_1106 (fig. 12 showing harbor set-net fishing effort (yellow line) as proportion of "Total set net fishing effort" (gray line)). This poses an important "entanglement risk," NMFS_4639, that scientists emphasize is a "a cause for concern." NMFS_4454.

Second, New Zealand regulations specify a "fishing-related mortality limit" (FRML) of one Hector's or Māui dolphin within a defined "Māui dolphin habitat zone." NMFS_260–61, NMFS_3966. The delineated habitat zone covers only the northern two-thirds of the west coast of the North Island out to 12 nautical miles, omitting large areas where Māui dolphins are found. NMFS_10722; *see* Pls.' Prelim. Inj. Reply 34–35, *Sea Shepherd I*, No. 20-00112, ECF No. 64 (describing New Zealand's failure to protect Māui dolphins from bycatch in deeper waters and in northern and southern ends of their range). Additionally, the regulation does not identify a temporal metric for the limit, or the consequences if the limit is exceeded or if a serious but non-fatal injury occurs. `

Third, New Zealand implements an electronic monitoring program in which cameras record video of fishing effort on a portion of set-net and trawl vessels fishing in the Māui dolphin's habitat. NMFS_1089–1107. Set-net vessels less than eight meters in length and trawl vessels greater than 32 meters in length are excluded. NMFS_1255. Overall, less than 2% of set-netting effort and less than 45% of trawl effort in the dolphin's habitat is recorded. NMFS_1105–

---

[4] There also are no closures on the East Coast of the North Island where there have been "sporadic" sightings of dolphins resembling Māui dolphins. NMFS_254. However, genetic testing has not confirmed whether they are Māui dolphins or Hector's dolphins. NMFS_3901.

06. And an even smaller portion of effort is actually monitored to determine if a marine mammal has been captured because the New Zealand Government reviews only a subset of the footage. *See* NMFS_1255.

The inadequacy of these measures has been the subject of legal challenges in the New Zealand courts, with one recent ruling finding the New Zealand Government's approach to protected species management unlawful. *Env't Law Initiative v. Dir.-Gen. of the Ministry of Primary Indus.* [2024] NZHC 3824 (N.Z.), https://www.justice.govt.nz/jdo_documents/workspace___SpacesStore_92f6f13d_8a90_4b98_89 8f_68de984eb5c9.pdf, attached hereto as Ex. A; *see also* Statement of Claim, *Env't Law Initiative v. Minister of Oceans & Fisheries* [2025] NZHC ___ (N.Z.), https://static1.squarespace.com/static/60de62c0cd4622007f238e05/t/67f5d075dcde9c13622650ff /1744162935368/2025-04-01+SOC+vf.pdf, attached here to as Ex. B. As discussed below, the measures also fall well short of what U.S. law would require.

## II.    NMFS Continues to Authorize Imports from the New Zealand Fisheries.

The New Zealand Fisheries must have a valid comparability finding to export seafood to the United States because they incidentally catch Māui dolphins and other marine mammals. NMFS_13013, NMFS_13017. New Zealand first applied for a comparability finding for these fisheries in September 2020, *see* NMFS_10769, and NMFS issued a positive finding two months later, NMFS_10676–79. Two conservation organizations challenged that comparability finding in the CIT. Compl., *Sea Shepherd I*, No. 20-00112, ECF No. 5. In 2022, Judge Katzmann issued a preliminary injunction against the comparability finding and imports from the two fisheries, concluding that the comparability finding was likely unlawful in several ways: NMFS failed to consider all mandatory regulatory factors, NMFS failed to respond to comments raising the insufficiency of New Zealand's management program, and NMFS's evaluation of New

Zealand's monitoring program was contrary to the record. *Sea Shepherd I*, 606 F. Supp. 3d at 1310–23. The court also found there was a "likelihood of irreparable harm" to Māui dolphins absent an import ban. *Id.* at 1326–30.

New Zealand then applied for a new comparability finding for the trawl and set-net fisheries in November 2021. NMFS_1–1223. On January 24, 2024, NMFS granted the application and issued a positive comparability finding. NMFS_1232–34. NMFS stated the finding was based on its consideration of the 2021 application, supplemental information from New Zealand, and information provided by the plaintiffs and court documents in the *Sea Shepherd* case. NMFS_1224, NMFS_1233; *see also* Consent Mot. Complete Admin. R 1–3, ECF No. 24 (adding *Sea Shepherd* administrative record as "additional documents relied upon by NMFS for its 2024 Comparability Findings"). The 2024 Comparability Finding purports to find that New Zealand "has met the requirements under the MMPA and 50 CFR § 216.24(h)(6) for a comparability finding" for the two New Zealand Fisheries. NMFS_1230. The Comparability Finding expires on December 31, 2025. NMFS_1232.

The CIT subsequently dissolved its preliminary injunction in *Sea Shepherd* at the parties' request. *Sea Shepherd N.Z. v. United States* (*Sea Shepherd II*), 693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024). However, the court emphasized that "[t]he Māui dolphin remains critically endangered," and that its order "does not preclude future legal challenges to [NMFS's] new

10

comparability findings." *Id.* at 1367. Plaintiff Māui and Hector's Dolphin Defenders filed this

timely challenge to that Comparability Finding.[5]

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT

R. 56. "[I]n any action in which a party believes that the determination of the court is to be made

solely on the basis of the record made before an agency, that party may move for judgment in its

favor on all or any part of the agency determination." USCIT R. 56.1.

The CIT reviews challenges to a final agency action under the Administrative Procedure

Act (APA) to determine whether the action is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2); *see Sea Shepherd I*, 606 F. Supp. 3d at

1306. An action is arbitrary and capricious "if the agency has relied on factors which Congress

has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency, or is

so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43

(1983). A reviewing court must perform a "thorough, probing, in-depth review" of the action.

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). A court reviewing even

the most technical matter "must not reduce itself to a 'rubber-stamp' agency action."

---

[5] Plaintiff Māui and Hector's Dolphin Defenders has standing to bring this action on its own
behalf and on behalf of its members, as demonstrated by the declarations attached to this Motion.
*See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)
(articulating standards for associational standing); *Sea Shepherd I*, 606 F. Supp. 3d at 1307 n.38
(explaining why plaintiffs had standing to challenge 2020 comparability finding and failure to
ban imports from the New Zealand Fisheries); *NRDC*, 331 F. Supp. 3d at 1356–61 (same, in
challenge to imports from Mexico fisheries).

*Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 826 (4th Cir. 2021) (citation omitted).

Separately under the APA, a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The reviewing court asks whether "an agency failed to take a discrete agency action that it is required to take." *NRDC*, 331 F. Supp. 3d at 1353 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)).

## ARGUMENT

The 2024 Comparability Finding is rife with legal errors and omissions, and relies upon arbitrary and capricious analyses. First, NMFS never evaluated whether New Zealand has comparable standards to either the MMPA's zero mortality rate goal or the MMPA's negligible impact standard. Indeed, New Zealand has no such comparable standards, and the record shows that Māui dolphin bycatch rates far exceed each standard. Second, NMFS arbitrarily found that New Zealand has a comparable bycatch limit to PBR without considering significant ways in which the standards differ. Third, NMFS used an outdated, higher Māui dolphin population estimate to calculate an inflated PBR level and conclude that the level is not being exceeded. Fourth, NMFS made inaccurate assumptions and inapt comparisons when finding that New Zealand's monitoring program is comparable to U.S. standards. Fifth, NMFS provided no support for its conclusory assertion that New Zealand's stock assessment program is comparable to U.S. standards. Finally, NMFS completely neglected to evaluate whether bycatch of other marine mammals exceeds U.S. standards.

Because the Comparability Finding is invalid for these reasons, the MMPA requires Federal Defendants to ban imports from the New Zealand Fisheries. Further, the MMPA requires an import ban because Māui dolphin bycatch in the New Zealand Fisheries is in excess of U.S. standards, both numerically and due to the substantive absence of comparable regulatory

12

standards in the Fisheries. Federal Defendants have not executed their discrete, nondiscretionary duty to ban imports. Under the APA, the proper remedy is vacatur of the Comparability Finding and an order compelling Defendants to implement an import ban.

**I.    NMFS Did Not Establish that New Zealand Meets a Comparable Standard to the MMPA's Zero Mortality Rate Goal.**

The MMPA requires fisheries to reduce incidental mortality and serious injury of marine mammals to insignificant levels approaching zero. NMFS did not evaluate whether the New Zealand Fisheries meet a comparable standard. And New Zealand does not, in fact, have such a standard. The Comparability Finding accordingly fails to establish that the two fisheries meet an applicable U.S. standard.

The MMPA imposes an "immediate goal that the incidental mortality or serious injury of marine mammals occurring in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1387(a)(1). This mandate is a "statutory marker[]" of U.S. standards under the MMPA's Import Provision. *Sea Shepherd I*, 606 F. Supp. 3d at 1295; *see NRDC*, 331 F. Supp. 3d at 1355 ("Congress gave content to the concept of 'in excess of United States standards' when it provided in the statute that 'it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate.'" (citation omitted)). NMFS defines the upper limit of bycatch "that can be considered insignificant levels approaching a zero mortality and serious injury rate" with a numerical "insignificance threshold," which equals "10 percent of the Potential Biological Removal level for a stock of marine mammals." 50 C.F.R. § 229.2; *see also* NMFS_1257. For fisheries that do not meet the zero mortality rate goal level, the

MMPA requires NMFS to implement a take reduction plan with measures that will reduce the fisheries' bycatch to insignificant levels within five years. 16 U.S.C. § 1387(b)(4), (f)(2).

The Comparability Finding contains no assessment of whether New Zealand has an equivalent to the zero mortality rate goal; even though the Comparability Finding Application Final Report identifies that standard as a component of the U.S. regulatory program. *See* NMFS_1224–63. In fact, in response to the question of whether it has "an overarching regulation the goal of which is to reduce the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate," New Zealand answered "No" in its application. NMFS_1148. NMFS offered no response to this admission. NMFS's failure to establish or even evaluate whether New Zealand has an equivalent to the zero mortality rate goal is arbitrary and capricious and contrary to the MMPA.

Nor is there anything in the record demonstrating that New Zealand in fact has a comparable standard. NMFS estimated the Māui dolphin PBR to be 0.1 dolphins per year, NMFS_1261; *see infra* p. 20 (discussing this estimate), so the zero mortality rate goal (10% of 0.1) would be 0.01 mortalities per year—or no more than one dolphin every 100 years. New Zealand neither has a similarly strict numeric standard nor mandates responsive action if mortality exceeds such a standard. The fisheries thus allow bycatch in excess of an applicable U.S. standard.

II.     **NMFS Did Not Establish that Māui Dolphin Bycatch in the West Coast North Island Fisheries Will Have No More Than a Negligible Impact on the Population.**

For marine mammals listed under the ESA, like the Māui dolphin, the MMPA prohibits fisheries from incidentally harming those mammals if the bycatch rate exceeds a numerically defined "negligible impact" on the population. NMFS did not evaluate whether the New Zealand

Fisheries meet a comparable standard. New Zealand lacks such a standard, and record evidence shows that Māui dolphin bycatch levels far exceed the MMPA's negligible impact standard. The Comparability Finding thus fails to establish that the New Zealand Fisheries meet a second, applicable U.S. standard.

The MMPA prohibits any U.S. fishing vessel from incidentally capturing or harming a marine mammal without an authorization from NMFS. 16 U.S.C. § 1372(a)(2). For marine mammals listed under the ESA, NMFS may only authorize such fishing practices if it determines that "the incidental mortality and serious injury from [those] fisheries will have a negligible impact on such species or stock." *Id.* § 1371(a)(5)(E)(i). NMFS is also required to take immediate "emergency" action to protect ESA-listed marine mammals if incidental mortality and serious injury rates ever exceed the negligible impact standard. *Id.* § 1371(a)(5)(E)(iii).

NMFS implements the negligible impact standard using numeric formulas. *See* NMFS, *Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E)*, Procedural Directive 02-204-02 (June 17, 2020), https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf, attached hereto as Ex. C. First, NMFS calculates a "Total Negligible Impact Threshold," which represents the "maximum total amount of human-caused [mortality and serious injury] from all sources"—including from any fishery, ship strikes, research, human-caused disease, or other human source—"that NMFS would consider negligible for a given stock." *Id.* at 4 & n.3. For endangered species, this threshold by default uses the same calculation values as NMFS uses for the PBR level. *Id.* 4–5. If total human-caused mortality exceeds this threshold value, NMFS then evaluates whether bycatch in an individual commercial fishery exceeds a "Single Negligible Impact Threshold." *Id.* at 4. For endangered species, the Single Negligible Impact Threshold equals 13% of PBR. *Id.* at 5.

Nothing in the Comparability Finding assesses whether New Zealand has a standard comparable to the MMPA's negligible impact standard. NMFS's failure to establish or even evaluate whether New Zealand has such an equivalent is arbitrary and capricious and contrary to the MMPA.

The record indicates that New Zealand does not, in fact, have a comparable negligible impact standard. In addition, record evidence demonstrates that Māui dolphin bycatch rates in the New Zealand Fisheries far exceed what the U.S. negligible impact standard would allow. Applying the equations from NMFS's Procedural Directive, the Total Negligible Impact Threshold would be 0.10 (the same as the PBR for the Māui dolphin)—or no more than one human-caused Māui dolphin mortality or serious injury every ten years. *See* NMFS_1261. The New Zealand Government estimates that the total human-caused mortality of Māui dolphins is approximately 6.06 dolphins per year. NMFS_4511 (0.10 from commercial fisheries + 1.90 from toxoplasmosis + 4.06 from "other" (recreational fishing, aquaculture, oil spills, *see* NMFS_4507–08 (defining "other"))). Because the Total Negligible Impact Threshold is exceeded, mortality and serious injury in New Zealand Fisheries must be under the Single Negligible Impact Threshold of 0.013 (13% of the 0.10 PBR level)—or no more than one Māui dolphin death or serious injury every 77 years. New Zealand estimates total mortality and injury of Māui dolphins in the New Zealand Fisheries to be 0.10, NMFS_1261, NMFS_4701, roughly *seven* times what would be permitted under the U.S. standard. Yet New Zealand continues to authorize fishing practices that incidentally harm and kill Māui dolphins. The New Zealand Fisheries both lack a comparable standard to the negligible impact limit and incidentally kill and harm Māui dolphins in excess of what that bycatch limit would be under U.S. standards.

III.    **NMFS's Finding that New Zealand's Bycatch Limit Is Comparable to the PBR Standard Is Counter to the Evidence.**

In addition to the zero mortality and negligible impact levels, the MMPA requires an annual limit on the total bycatch of a marine mammal stock—PBR—that, if exceeded, requires NMFS to take specified corrective action. NMFS concluded New Zealand has a bycatch limit that is comparable to PBR. But NMFS arbitrarily failed to account for key differences in the standards.

As discussed above, PBR functions as a limit on total incidental injury and mortality to a marine mammal stock. When that numeric limit is exceeded, the MMPA requires NMFS to implement a "take reduction plan" with "measures [it] expects will reduce, within 6 months … , such mortality and serious injury to a level below the potential biological removal level." 16 U.S.C. § 1387(f)(5)(A).

The Import Provision regulations expressly require NMFS to evaluate whether a harvesting nation has a "bycatch limit" that is the equivalent of "the calculation of a potential biological removal level for a particular marine mammal stock … or comparable scientific metric," 50 C.F.R. § 216.3, and whether the nation implements measures to keep mortality and serious injury in an export fishery below that limit, *id.* § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*); *see also Sea Shepherd I*, 606 F. Supp. 3d at 1294 (stating PBR is a "marker of 'United States standards'" under the Import Provision). NMFS concluded in the Comparability Finding that New Zealand has a comparable bycatch limit to PBR for the Māui dolphin because New Zealand "set the Maui [sic] dolphin bycatch limit at one individual." NMFS_1258, NMFS_1260. The New Zealand regulations, read in full, actually set a "fishing-related mortality limit" (FRML) of one "Hector's dolphin or Māui dolphin *within the Māui dolphin habitat zone*." NMFS_3966 (emphasis added). The FRML falls far short of the PBR-based bycatch standard in four key respects.

First, the FRML's limit of one dolphin is ten times higher than NMFS's estimate of the 0.10 Māui dolphin PBR limit. NMFS_1261. The FRML not only allows mortality to Māui dolphins at far higher levels than would be permitted in the United States, but also at much higher levels than the population can sustain.

Second, unlike PBR, which NMFS calculates as animals per year, the FMRL does not specify a timeframe. *See*, *e.g.*, NMFS_1261 (tbl. 4) (comparing mean captures and deaths to PBR on an annual basis). It is unclear whether the FRML is one dolphin every year, every ten years, or some other timeframe. So there is no way to know how much time must elapse after a capture before the fishery will be deemed to be back in compliance with the FRML.

Third, the FRML by its own terms applies only to mortalities within the designated "Māui dolphin habitat zone." NMFS_3966. It does not limit Māui dolphin mortalities in other portions of the dolphin's habitat where fishing is allowed. Yet dolphin mortalities are equally harmful to the population regardless of where they occur. That principle is reflected in the MMPA, where any fishing-related death or serious injury of a marine mammal from a given stock in any location would count against the stock's PBR limit. *See* 16 U.S.C. § 1387(f)(5) (requiring measures if PBR is exceeded "[f]or any stock").

Fourth, New Zealand law does not mandate any corrective action if the FRML is exceeded. When the FRML is exceeded, the TMP gives the Fisheries Minister discretion to take

action, but he or she is not required to do so.[6] NMFS_2932. By contrast, when PBR is exceeded, the MMPA requires implementing a take reduction plan within a specified timeframe and with concrete measures to reach certain outcomes. In fact, the *Sea Shepherd* court identified this precise difference when concluding that the 2021 comparability finding "fail[ed] to address the discretionary quality of New Zealand's TMP." 606 F. Supp. 3d at 1317–19.

NMFS once again failed to address the key differences that make the FRML not comparable to PBR. Its conclusion that the bycatch limits are comparable is arbitrary and contrary to the Import Provision and its implementing regulations. *See State Farm*, 463 U.S. at 43 (stating action arbitrary if agency "entirely failed to consider an important aspect of the problem").

## IV.    NMFS Used an Arbitrarily High Population Estimate to Evaluate Whether the Bycatch Rate Exceeds PBR.

NMFS used an estimate of the Māui dolphin's PBR to conclude that the bycatch rate in the New Zealand Fisheries does not exceed that U.S. bycatch limit standard. *See* NMFS_1257–61. The MMPA specifies that the minimum population estimate of a stock must be used to calculate PBR. NMFS used an outdated population estimate for the PBR calculation that is higher than more recent, lower population estimates. As a result, NMFS measured the bycatch rate against an improperly high PBR limit.

---

[6] A "population management plan" under New Zealand law, by contrast, *would* impose a strict limit on fishing related mortality and require other conservation action. NMFS_2932. A New Zealand court recently found unlawful the New Zealand Government's failure to exercise its discretion to prepare and present population management plans. *Env't Law Initiative v. Dir.-Gen. of the Ministry of Primary Indus.* [2024] NZHC 3824 ¶¶ 19–20, 391 (N.Z.) ("[Population Management Plans] are more mandatory in character than [Threat Management Plans] and are better suited to assist the conservation of vulnerable species and those requiring immediate action.").

As noted above, the MMPA specifies that the PBR level is a product of the minimum population estimate of the stock, the maximum theoretical net productivity rate, and a recovery factor. 16 U.S.C. § 1362(20). NMFS applies a default net productivity rate of 0.04 for all cetaceans and a default recovery factor of 0.1 for endangered species.[7] NMFS_013840–41. Because those two values remain constant for a given stock (unless NMFS chooses to deviate from the default values, which it did not here), the PBR value is directly proportional to the minimum population estimate used.

The MMPA defines "minimum population estimate" as "an estimate of the number of animals in a stock that—(A) is based on the best available scientific information on abundance, incorporating the precision and variability associated with such information; and (B) provides reasonable assurance that the stock size is equal to or greater than the estimate." 16 U.S.C. § 1362(27).  NMFS's standard approach for calculating the minimum population estimate involves inputting an abundance estimate into an equation to account for uncertainty. *See* NMFS_13838–40. In this way, the minimum population estimate should be "more conservative (precautionary) compared to an 'actual' estimate." *Ga. Aquarium, Inc. v. Pritzker*, 135 F. Supp. 3d 1280, 1315 (N.D. Ga. 2015). NMFS stresses that it is important to use a reliable abundance estimate in the calculation. NMFS_13838–40. Typically, that is the "most recent" abundance estimate, accounting for potential abundance changes that have occurred since that estimate was made. *Id.*

NMFS compared the New Zealand Fisheries bycatch rates to an estimated PBR of 0.1 Māui dolphins. NMFS_1261 (tbl. 4). However, NMFS did not use the most recent abundance

---

[7] NMFS chose a default net productivity value at the low range of measured or theoretical values as a "risk-averse approach." NMFS_13840. *But see* NMFS_1417–21 (International Whaling Commission suggesting even lower value may be appropriate for Māui dolphin). The low recovery factor value reflects the fact that depleted, endangered populations take longer to recover, necessitating a lower bycatch limit. NMFS_13841.

estimate for that PBR calculation. It used an older estimate that conflicts with two more recent, smaller estimates. Although NMFS did not show its PBR calculations in the record, its PBR of 0.1, is the same PBR value New Zealand provided in its application that was calculated using a 2021 abundance estimate of 54 Māui dolphins, NMFS_5–6, NMFS_4701.[8] However, in August 2023, the International Whaling Commission's Scientific Committee agreed upon an estimate that there were 48 Māui dolphins in 2021. NMFS_4158. And in its January 2024 Decision Memorandum for the Comparability Finding, NMFS itself identified that "current estimates [of the population] are approximately 43 individuals." NMFS_1225. The *Sea Shepherd* court cited that same estimate in two 2024 opinions. *Sea Shepherd II*, 693 F. Supp. 3d at 1367; *Sea Shepherd N.Z. v. United States*, 723 F. Supp. 3d 1374, 1375 (Ct. Int'l Trade 2024).

The two lower estimates are in the administrative record and were before NMFS when it issued the Comparability Finding. NMFS needed to consider this information when choosing the abundance estimate for its PBR calculation. *See* 16 U.S.C. §1362(27) (requiring NMFS to use "best available scientific information on abundance, incorporating the precision and variability associated with such information"); 50 C.F.R. § 216.24(h)(6)(ii) ("In making [the comparability finding] determination, [NMFS] shall consider … relevant information readily available from other sources."); *see also State Farm*, 463 U.S. at 43 (explaining failure to "examine the relevant data" is arbitrary and capricious). Yet there is no indication in the record that NMFS considered either estimate for its PBR calculation or determined that they are less appropriate under the MMPA's standards than the value NMFS used. *See, e.g.*, *Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 473 (4th Cir. 2013) (explaining that when "data are either outdated or inaccurate,

---

[8] Because the net productivity rate and recovery factors are constant, NMFS could only obtain a PBR of 0.1 if it used the same abundance estimate of 54 that New Zealand used.

[agency] should, at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data"); *Sierra Club v. EPA*, 671 F.3d 955, 968 (9th Cir. 2012) ("We hold that EPA's failure to even consider the new data and to provide an explanation for its choice rooted in the data presented was arbitrary and capricious."). The MMPA requires more care than arbitrarily using an abundance estimate 25% higher than the most recent available estimate without any justification. And certainly more care is deserved for a critically endangered species.

If NMFS had used one of the more recent, lower abundance estimates, it likely would have been compelled to reach a different conclusion: that current Māui dolphin bycatch rates *do* exceed a bycatch limit comparable to PBR. Because the Comparability Finding estimates the total fisheries mortality and injury rate to be the same as the PBR value NMFS calculated—both 0.10, NMFS_1261 (tbl. 2)—using *any* abundance estimate below 54 would reduce the PBR level below that estimated bycatch rate.

NMFS instead concluded that the bycatch rate does not exceed an arbitrarily high PBR value. NMFS's assessment of this factor is arbitrary and capricious and contrary to the MMPA's best available science standard.

**V.    <u>NMFS's Finding that New Zealand's Monitoring Program Is Comparable to U.S. Standards Is Arbitrary and Capricious and Contrary to the Record.</u>**

NMFS concluded that New Zealand's monitoring program is comparable to U.S. standards because it monitors 90% of fishing effort in a portion of Māui dolphin habitat compared to a 10% monitoring standard for U.S. fisheries. However, the United States requires much higher monitoring levels when critically imperiled marine mammals may be captured— sometimes up to 100%. In addition, New Zealand's actual monitoring coverage is far less than the 90% value NMFS assumed. NMFS's findings on monitoring are thus arbitrarily based on an inapt comparison and an incorrect assumption.

The MMPA requires NMFS to "establish a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations," which must be sufficient to "obtain statistically reliable estimates." 16 U.S.C. § 1387(d). The level of monitoring required to obtain a statistically reliable estimate depends in part on the status of the affected marine mammal population. When a population is severely depleted, higher levels of monitoring are necessary because bycatch events are relatively rarer and more difficult to detect. *See* NMFS_13869–70 (showing higher recommended minimum observer coverage levels for stocks with lower PBRs, which, as discussed above, reflect small populations); Decl. of Dr. Timothy Ragen ¶¶ 40, 88–89, *Sea Shepherd I*, 606 F. Supp. 3d 1286 (No. 20-00112) (ECF No. 49-4) (describing need for higher observer coverage where PBR is low, such as for endangered species). Further, observer coverage as high as 100% may be necessary to ensure that bycatch limits are not exceeded for imperiled species, where even a small number of unreported deaths over the limit could have devastating consequences. *See, e.g.*, *Ctr. for Marine Conservation v. NMFS*, No. 99-00152, 2000 WL 33964303, at *2 (D. Haw. June 23, 2000) (requiring 100% coverage); *see also Earth Island Inst. v. Evans*, No. 03-0007, 2004 WL 1774221, at *22 (N.D. Cal. Aug. 9, 2004) (noting NMFS had "a 'high degree of confidence' in its mortality statistics because they are based on 100% observer coverage").

The Import Provision regulations specifically require NMFS to determine whether the harvesting nation implements a monitoring program with a comparable measure of "statistical reliability." 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS concluded that New Zealand's monitoring program for Māui dolphin bycatch is comparable to U.S. standards because NMFS believed New Zealand monitors 90% of fishing effort, which NMFS said exceeds a 10%

monitoring level that it asserted is the standard for U.S. fisheries. NMFS_1252–56. There are two fatal errors with this conclusion.

First, NMFS's use of a 10% standard is inapt. The Import Provision regulations require NMFS to consider "U.S. implementation of its regulatory program for *similar marine mammal stocks* and similar fisheries" when assessing the comparability of an export fishery. 50 C.F.R. § 216.24(h)(7)(i) (emphasis added); *see also id.* § 216.24(h)(7)(iv) (requiring consideration of "the population size and trend of the marine mammal stock"). But the 10% standard does not reflect monitoring requirements for an imperiled marine mammal stock similar to the Māui dolphin. The only record evidence that appears to justify the 10% number are monitoring requirements for fisheries that catch much more abundant marine mammal stocks than the Māui dolphin. *See* NMFS_4273–89, NMFS_4290–310. NMFS needed to instead compare New Zealand's program to U.S. monitoring practices when bycatch of a highly imperiled species is involved.

For the reasons discussed above, critically endangered species like the Māui dolphin implicate considerations requiring much higher monitoring levels than general-purpose programs. The MMPA gives "highest priority" for monitoring fisheries that catch ESA-listed marine mammals. 16 U.S.C. § 1387(d)(4)(A). More robust monitoring is needed for the small Māui dolphin population in order to obtain statistically reliable bycatch estimates. And where fisheries interactions with Māui dolphins may be rare, but just one death can have significant population-level effects, 100% of fishing effort must be monitored to be able to detect if a dolphin is caught in the fishery. *See* NMFS_10245 (New Zealand Government stating 100% monitoring is necessary to be able to close fisheries if a bycatch limit is exceeded). NMFS itself previously proposed that New Zealand implement 100% monitoring for set-net and trawl fisheries out to 20 nautical miles. NMFS_8575–76.

24

For the Comparability Finding, however, NMFS never considered whether these "important aspects" may require a higher monitoring level than 10%. *State Farm*, 463 U.S. at 42. It never assessed how New Zealand's monitoring program compares to U.S. monitoring programs for similarly situated, critically imperiled species, as 50 C.F.R. § 216.24(h)(7)(i) requires. *See Sea Shepherd I*, 606 F. Supp. 3d at 1311–12 (holding failure to "consider all mandatory regulatory factors" in 50 C.F.R. § 216.24(h)(7) arbitrary and capricious). Instead, NMFS compared Māui dolphin monitoring to U.S. data needs for healthy marine mammal populations—which is akin to using routine protocols for annual physicals to determine the level of care required for a critical emergency room patient. *Cf., e.g.*, *N.C. Utilities Comm'n v. FERC*, 42 F.3d 659, 666 (D.C. Cir. 1994) (finding action arbitrary because agency used wrong comparison). If NMFS had applied the relevant considerations related to the Māui dolphin's population size and status, it could not have assumed that 10% monitoring coverage is the appropriate comparison to New Zealand's program.

Second, NMFS's assumption that "New Zealand has attained 90% monitoring coverage (between its observer and [electronic monitoring] programs) within the [Māui dolphin habitat zone]" is arbitrary and contrary to the record evidence. NMFS_1256. The Comparability Finding cites no basis for that number, and New Zealand's application nowhere indicates that it has attained 90% coverage. *See* NMFS_1–1263 (application and decision documents). NMFS may not rely on a value that has no support in the record. *See, e.g.*, *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 432 (D.C. Cir. 2018) (finding rule arbitrary when there was "no evidence in the record supporting the [agency's] assumption" on which decision was based); *Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743–47 (D.C. Cir. 2017) (finding action arbitrary where asserted facts had no basis in record).

The 90% assumption is also contrary to the evidence that *is* in the record. The New Zealand Government submitted evidence that actual monitoring has covered less than 45% of trawl effort and less than 2% of set-net effort within the Māui dolphin habitat zone (which itself is just a truncated portion of the dolphin's habitat, *see supra* p. 8). NMFS_ 1105–06.[9] Even if there were record support that 90% of fishing effort is recorded by onboard cameras and/or observers, a much lower percentage is actually "monitored" for bycatch because New Zealand's regulators review only a small portion of the camera footage. *See* NMFS_1099 (noting review rates as low as 20% of footage from certain areas of the Māui dolphin's habitat). NMFS's assumption that New Zealand actually monitors 90% of fishing effort for Māui dolphin bycatch and, in turn, its conclusion that the program meets U.S. standards is arbitrary and capricious. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) ("[A]gencies do *not* have free rein to use inaccurate data."); *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 96 (D.D.C. 2017) ("Suffice it to say, it is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong."); *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 682 (D.D.C. 1997) (finding "agency's decisionmaking, based on glaringly faulty factual premises, was arbitrary and capricious").

Further, NMFS failed to consider how New Zealand's almost-exclusive use of electronic monitoring can make its monitoring program less statistically reliable than the human observers that U.S. MMPA monitoring programs employ. NMFS does not use electronic monitoring for

---

[9] Figure 10 shows the "Monitoring coverage of trawl vessels in the coastal portion of the Māui dolphin habitat zone"; the orange bar for 2021–2022 indicates the percentage of effort that was monitored ("% Observed"). Coverage may be even lower if the non-coastal portion of the Māui dolphin habitat zone is included in the percentage. Figure 12 shows the "Monitoring coverage of set net vessels in the Māui dolphin habitat zone (including harbours)"; the orange bar for 2021–2022 indicates the percentage of effort that was monitored ("% Observed").

marine mammals. NMFS_1253. And U.S. experts have cautioned that using electronic monitoring in place of human observers "would result in substantial data loss." NMFS_4404–05. NMFS's contrary assumption that New Zealand's electronic monitoring program is "more accurate and robust" than the U.S. human observer program is unsupported and fails to address electronic monitoring shortcomings in the record. NMFS_1256; *see State Farm*, 463 U.S. at 43.

NMFS compared an overestimate of New Zealand's monitoring coverage to an inappropriately low U.S. standard to conclude that New Zealand achieves U.S. standards for Māui dolphin monitoring. NMFS's determination failed to consider several important aspects of the problem and is contrary to the record.

## VI.  NMFS Failed to Evaluate Whether New Zealand's Regulatory Program Provides for Comparable Marine Mammal Stock Assessments.

The Import Provision regulations expressly require NMFS to determine whether New Zealand's program provides for marine mammal population assessments that are comparable to those required under the MMPA. 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*); *see* 16 U.S.C. § 1386(a) (requiring stock assessments); *Sea Shepherd I*, 606 F. Supp. 3d at 1295 (identifying stock assessments as a statutory marker of U.S. standards). Stock assessments for strategic stocks, such as the Māui dolphin, include enhanced requirements under the MMPA. 16 U.S.C. § 1386(a), (c). The record contains no evidence that NMFS evaluated whether New Zealand meets these standards.

The Comparability Finding simply states that New Zealand meets the U.S. stock assessment standard without any explanation or support. NMFS_1228, NMFS_1233. Such "conclusory statements that do not explain how a determination was reached are insufficient" for a comparability finding. *Sea Shepherd I*, 606 F. Supp. 3d at 1313 (cleaned up); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do;

an agency's statement must be one of reasoning." (cleaned up)). NMFS must explain the

"rational connection between the facts found and the choice made," *In re Section 301 Cases*, 570

F. Supp. 3d 1306, 1338 (Ct. Int'l Trade 2022), including ensuring that "reasonable proof" from

New Zealand and other readily available information supports its comparability findings, 16

U.S.C. § 1371(a)(2)(A); 50 C.F.R. § 216.24(h)(6)(ii). NMFS's failure to fully analyze and

explain the factual basis for its stock assessment conclusion is arbitrary and capricious. *See Sea

Shepherd I*, 606 F. Supp. 3d at 1315.

## VII.    NMFS Failed to Evaluate Whether Bycatch of Marine Mammals Other than Māui Dolphins Exceeds U.S. Standards.

The Comparability Finding certifies that the New Zealand Fisheries satisfy the Import

Provision. The Import Provision requires banning imports if a fishery causes the serious injury or

death of *any* marine mammal in excess of U.S. standards. NMFS assessed only whether the New

Zealand Fisheries catch Māui dolphins in excess of U.S. standards, even though New Zealand

submitted evidence that the Fisheries harm and kill other marine mammals. Because the

Comparability Finding lacks any findings on these other species, NMFS's certification that the

Fisheries comply with the Import Provision is arbitrary and contrary to the MMPA.

The Import Provision applies to all affected marine mammals generally without

restriction. 16 U.S.C.  § 1371(a)(2) (referring to "ocean mammals"); *see United States v. Weiss*,

52 F.4th 546, 552 (3d Cir. 2022) (stating "general terms should be interpreted generally"); A.

Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) (explaining

General Terms canon and stating, "Without some indication to the contrary, general words … are

to be accorded their full and fair scope"). Accordingly, both the Import Provision and the

implementing regulations specify that import decisions are to be made on a fishery-basis, as

opposed to a species-basis. 16 U.S.C. § 1371(a)(2) (identifying the subject of regulation as the

"commercial fishing technology"); 50 C.F.R. § 216.24(h)(1)(ii) (identifying the subject of import

bans as "a fishery"). For each fishery, NMFS must consider bycatch of "*each* marine mammal

stock or stocks that interact with the export fishery" when making a comparability finding. 50

C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (emphasis added); *accord id.* § 216.24(h)(7)(iii); *see also id.* §

216.24(h)(6)(iii)(B) (requiring NMFS to certify that harvesting nation has comparable regulatory

program "with respect to incidental mortality and serious injury of marine mammals"—*plural*—

"in the course of commercial fishing operations"). Neither the statute nor the regulations permit a

species-specific comparability finding. Nor would that make sense: a finding that bycatch of one

species in a fishery does not exceed U.S. standards would provide no assurance that bycatch of

other marine mammals in the fishery also meets U.S. standards. The MMPA requires banning

imports if bycatch of even one marine mammal species exceeds U.S. standards.

The Comparability Finding by its own terms certifies that "the West coast, North Island

multi-species set-net *fishery*; and the West coast, North Island multi-species trawl *fishery*" meet

"the requirements under the MMPA and [MMPA regulations] for a comparability finding."

NMFS_1230 (emphasis added). However, NMFS evaluated whether the bycatch of only Māui

dolphins in the two fisheries exceeds U.S. standards. *See generally* NMFS_1224–63.

New Zealand submitted evidence that that the West Coast North Island set-net fishery

kills bottlenose dolphins, common dolphins, orcas, long-finned pilot whales, New Zealand fur

seals, melon-headed whales, and rough-toothed dolphins. NMFS_1145. And it submitted

evidence that the West Coast North Island trawl fishery kills common dolphins, New Zealand fur

seals, pantropical spotted dolphins, and an "unknown" number of unspecified seals. *Id.* Despite

being presented with this evidence, NMFS did not evaluate or reach conclusions on New

Zealand's regulatory program to address that marine mammal bycatch or whether it exceeds U.S.

standards. Accordingly, the Comparability Finding arbitrarily and unlawfully certifies that the New Zealand Fisheries do not catch marine mammals in excess of U.S. standards without actually evaluating whether that is true for several marine mammal stocks. *See Sea Shepherd I*, 606 F. Supp. 3d at 1310–15 (finding failure to evaluate even one of the mandatory factors in 50 C.F.R. § 216.24(h)(7) for an affected stock renders comparability finding arbitrary and capricious); *cf. Conservation Council for Haw. v. NMFS*, 97 F. Supp. 3d 1210, 1224 (D. Haw. 2015) ("[W]hen NMFS does not actually analyze the impact on certain species and stocks, NMFS does not satisfy its burden of showing how it reached its conclusions with respect to those species and stocks.").

**VIII.**  **The Proper Remedy Is Vacatur of the Unlawful Comparability Finding and an Order Compelling Defendants to Impose a Legally Required Import Ban.**

Federal Defendants have declined to ban imports from the New Zealand Fisheries, in reliance on NMFS's 2024 Comparability Finding. The Court should vacate the Comparability Finding because it contains serious legal and analytical errors that violate the APA and MMPA. The Court should also, pursuant to the APA, compel Federal Defendants to implement an import ban because the MMPA imposes a nondiscretionary duty to impose such a ban where bycatch of Māui dolphins exceeds U.S. standards or where the New Zealand Fisheries lack a valid comparability finding.

First, as to the Comparability Finding, vacatur is "the default remedy for unlawful agency action under the APA, which states that courts should 'hold unlawful and *set aside* agency actions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1337 n.25 (Ct. Int'l Trade 2024) (quoting 5 U.S.C. § 706(2)) (emphasis and alteration in original). To the extent Federal Defendants or the New Zealand Government may ask the Court to take the "rare" step of

deviating from that remedy, *id.*, they "bear the burden to prove that vacatur is unnecessary," *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020). The seriousness of harm to the critically imperiled Māui dolphin would weigh heavily against any justification they may offer for remanding without vacatur. *See, e.g.*, *id.* at 245–46; *Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008); *see also* Decl. of Dr. Elisabeth Slooten ¶¶ 10–27 (Mar. 26, 2025), ECF No. 22-1 (describing risks to Māui dolphins absent an import ban); Decl. of Christine Rose ¶¶ 7–10, 14–18 (Mar. 26, 2025), ECF No. 22-5 (same).

Second, Section 706(1) of the APA directs a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Federal Defendants have unlawfully failed to implement the import ban against fish and fish products from the New Zealand Fisheries that the MMPA requires.

Section 706(1) applies when "an agency failed to take a discrete agency action that it is required to take." *NRDC*, 331 F. Supp. 3d at 1353 (quoting *Norton*, 542 U.S. at 64). The CIT in *NRDC* explained that an import ban under the MMPA's Import Provision is "both discrete and mandatory for purposes of the APA." *Id.* at 1353–56. It is discrete because it involves "the application of a single provision to a specific factual circumstance that could take the form of a rule or order." *Id.* at 1354–55. And it is mandatory because the MMPA's directive that the government "shall" ban imports that do not meet U.S. standards "demonstrate[es] that Congress left the Government with no discretion whether to act." *Id.* at 1353–54. By the plain language of the statute, the duty to ban imports arises at the time marine mammal bycatch in an export fishery contravenes U.S. standards. *Id.* at 1354–56. In addition, the implementing regulations specify that a fishery is deemed to catch marine mammals in excess of U.S. standards any time "a valid comparability finding is not in effect." 50 C.F.R. § 216.24(h)(1)(i).

There are two reasons Federal Defendants are legally required to impose an import ban. As described above, the Comparability Finding is unlawful and thus is not "valid." *See Sea Shepherd I*, 606 F. Supp. 3d at 1323–25 & nn.61–63. For one, regardless of whether the Court vacates the Comparability Finding, there is no "valid" comparability finding in effect because the Comparability Finding is arbitrary and contrary to law. *See id.* Of course, vacatur would reinforce the absence of a valid comparability finding. Further, the Comparability Finding only reaches conclusions with respect to Māui dolphin bycatch, so cannot reasonably be deemed to establish that incidental mortality and serious injury of other marine mammals caught by the New Zealand Fisheries does not exceed U.S. standards. Absent a valid comparability finding addressing all marine mammal bycatch, the regulations specify that New Zealand Fisheries must be deemed to incidentally kill and harm marine mammals in excess of U.S. standards, 50 C.F.R. § 216.24(h)(1)(i), which creates a mandatory duty to ban imports under the Import Provision, *NRDC*, 331 F. Supp. 3d at 1353–56.

A second, independent reason an import ban is legally required is that the New Zealand Fisheries result in "the incidental kill or incidental serious injury of ocean mammals in excess of United States standards" in substantive ways. 16 U.S.C. § 1371(a)(2). The bycatch rate of Māui dolphins is higher than both the zero mortality rate goal and negligible impact limit that would apply under U.S. standards. *See supra* Argument sections I, II.[10] Further, New Zealand does not

---

[10] This case is thus akin to *NRDC*, where the numeric bycatch rate of the vaquita porpoise exceeded the MMPA's PBR standard, so triggered an obligation to ban imports for purposes of APA section 706(1). 331 F. Supp. 3d at 1365, 1368. The court in *Sea Shepherd I*, by contrast, distinguished *NRDC* because NMFS had expressly rejected the *Sea Shepherd I* plaintiffs' assertion that Māui dolphin mortality exceeded NMFS's proffered PBR. 606 F. Supp. 3d at 1309 n.41. Here, as in *NRDC*, NMFS never made any finding on whether Māui dolphin bycatch is exceeding the numeric zero mortality rate goal or negligible impact limit. And the record evidence unambiguously establishes that incidental mortality and harm *is* in excess of those two U.S. standards.

have regulatory requirements that are comparable to either standard, among other standards. *See supra* Argument sections I–IV. Because bycatch exceeds these standards, the Import Provision unambiguously requires Federal Defendants to ban imports. They have unlawfully withheld taking that nondiscretionary action. *See* 5 U.S.C. § 706(1). Plaintiff asks the Court to order Federal Defendants to implement an import ban within the next 7 days, including submitting notice of such a ban for publication in the Federal Register.

## CONCLUSION

The existence of the Māui dolphin hangs in the balance as the U.S. government continues to allow fisheries that catch and kill the dolphin and other marine mammals to supply U.S. consumers. For the foregoing reasons, the Court should declare that the Comparability Finding for the New Zealand Fisheries violates the APA, MMPA, and MMPA regulations, vacate the Comparability Finding, and compel Federal Defendants to promptly ban seafood imports from the New Zealand Fisheries, as the MMPA requires.

Respectfully submitted this 25th day of April, 2025.

*/s/ Natalie Barefoot*
Natalie Barefoot
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T (415) 217-2000
nbarefoot@earthjustice.org

Sabrina Devereaux
Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org
ceaton@earthjustice.org

*/s/ Brett Sommermeyer*       
Brett Sommermeyer
Catherine Pruett
Law of the Wild
7511 Greenwood Avenue North, #4214
Seattle, WA 98103
T (206) 774-0048
brett@lawofthewild.org
catherine@lawofthewild.org

*Attorneys for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc.*

34

**CERTIFICATE OF COMPLIANCE**

This document complies with the word count limitations as provided for in the Court's

Standard Chambers Procedures 2(B) because it contains 10,194 words, excluding the parts of the

brief exempted by Standard Chambers Procedures 2(B)(1)(c).


*/s/ Natalie Barefoot*
Natalie Barefoot