## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————
                                                    )
MAUI AND HECTOR'S DOLPHIN                            )
DEFENDERS NZ INC.,                                  )
                                                    )
          *Plaintiff*,                              )
                                                    )
v.                                                  )          Before: Jennifer Choe-Groves, Judge
                                                    )
NATIONAL MARINE FISHERIES SERVICE,                  )          Court No. 24-00218
et al.,                                             )
                                                    )
          *Defendants*, and                         )
                                                    )
GOVERNMENT OF NEW ZEALAND,                          )
                                                    )
          *Defendant-Intervenor*.                   )
———————————————————————

## <u>RESPONSE BRIEF OF THE GOVERNMENT OF NEW ZEALAND</u>

Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
(202) 233-3760

***Counsel for the Government of New Zealand***

Dated:  May 27, 2025

TABLE OF CONTENTS

I.    THE GNZ MAINTAINS A STANDARD COMPARABLE TO THE U.S. STANDARD OF A ZERO MORTALITY RATE GOAL ................................................................6

    A.    The GNZ Maintains a Comparable Goal to the ZMRG ...........................................6

    B.    The GNZ'S Threat Management Plan Supports and Implements the GNZ's Comparable Goal ..........................................................................................................9

    C.    The GNZ's Abundance Estimates Support the GNZ's Comparable Goal ............10

    D.    The GNZ's Fishing-Related Mortality Limit Supports the GNZ's Comparable Goal ....................................................................................................................................10

    E.    Record Evidence Supports Achievement of the GNZ's Comparable Goal ...........11

    F.    NMFS Expressly Approved the GNZ's Comparable Goal.....................................11

    G.    The GNZ Is Progressing Towards Its Comparable Goal .......................................13

    H.    NMFS Approved the GNZ's Take Reduction Plan ................................................14

II.    THE GNZ MAINTAINS A STANDARD COMPARABLE TO THE MMPA'S NEGLIGIBLE IMPACT STANDARD ...............................................................................16

    A.    The Negligible Impact Standard Does Not Apply in the Circumstances Presented Here ..................................................................................................................................17

    B.    The MHDD's Alleged Bycatch Standard Is Impossible to Administer.................17

    C.    The GNZ Maintains Non-Discretionary Emergency Procedures if the Bycatch Standard of One Dolphin Is Exceeded ..................................................................................18

II.    THE GNZ'S "BYCATCH LIMIT" SATIFIES THE U.S. STANDARD .........................21

    A.    The U.S. Definition of the Potential Biological Removal Level ............................21

    B.    NMFS Calculation of the Potential Biological Removal Level.............................22

    C.    MHDD's Challenge to the GNZ's FRML Has No Merit .......................................23

    D.    MHDD's Reliance on Non-Fishing Related Causes of Mortality and Serious Injury Is Irrelevant ....................................................................................................................24

    E.    MHDD Wrongly Claims that the GNZ's FRML Does Not Specify a Timeframe for When Emergency Action Is Required................................................................................24

    F.    MHDD Wrongly Claims that Emergency Action Is Not Required If a Mortality or Serious Injury Occurs Outside the Māui Dolphin Habitat Zone.............................................25

    G.    The GNZ Must Take Corrective Action When the PBR Is Exceeded and to Ensure the FRML Is Not Exceeded ....................................................................................................25

IV.    NMFS CORRECTLY CALCULATED THE POTENTIAL BIOLOGICAL REMOVAL
       LEVEL, WHICH IT BASED ON THE MOST CURRENTLY  AVAILABLE
       ABUNDANCE ESTIMATE.................................................................................26

       A.    Definition of the PBR Level .................................................................26

       B.    Application of the PBR Formula to the Māui Dolphin Stock................................28

       C.    MHDD's Challenge to the NMFS PBR Determination Has No Merit.................28

V.     THE GNZ'S MONITORING PROGRAM IS COMPARABLE TO THE MMPA'S
       STANDARD FOR U.S. FISHERIES .................................................................33

       A.    The U.S. Monitoring Program Standard .................................................33

       B.    Summary of the GNZ's Monitoring Program.........................................35

       C.    NMFS Approval of the GNZ's Monitoring Program .............................39

       D.    MHDD's Challenges to NMFS Monitoring-Related Determination Have No Merit
             ...................................................................................................................40

VI.    THE GNZ'S STOCK ASSESSMENT IS COMPARABLE TO THE MMPA'S  U.S.
       STANDARD FOR STOCK ASSESSMENTS      ........................................50

VII.   NMFS EVALUATED WHETHER THE BYCATCH OF MARINE MAMMALS
       OTHER THAN MĀUI DOLPHINS WAS COMPARABLE TO THE U.S. STANDARD
       ...................................................................................................................54

CONCLUSION....................................................................................................56

WORD COUNT LIMITATION CERTIFICATE .......................................................57

TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages/s**

Center for Marine Conservation v. NMFS, 2000 WL 33964303 (D. Haw. 2000) ........................ 42

Earth Island Institute v. Evans, 2004 WL 11774221 (N.D. Cal., 2004) ........................................ 43

Gonzales v. West, 218 F.3d 1378 (Fed. Cir. 2000) ................................................................... 51

Medtronic, Inc. v. Daig Corp., 789 F.2d 903 (Fed. Cir. 1986) ........................................... 51

Natural Resources Defense Council, Inc. v. Ross, 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) . 26

Sea Shepherd New Zealand v. United States, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) .......... 4

Snyder v. Department of Navy, 854 F.3d 1366 (Fed. Cir. 2017) ....................................... 51

**Cases**

16 U.S.C. §1362 ................................................................................................... *passim*

16 U.S.C. §1371 ................................................................................................... *passim*

16 U.S.C. §1385 ......................................................................................................... 43

16 U.S.C. §1386 ................................................................................................... *passim*

16 U.S.C. §1387 ................................................................................................... *passim*


**Regulations**

50 C.F.R. § 17.11 .................................................................................................. 53

50 C.F.R. Part 216 ................................................................................................... 5

50 C.F.R. § 216.3 .................................................................................................... 14

50 C.F.R. § 216.24 ................................................................................................ 5,33

50 C.F.R. § 229.2 .................................................................................................... 14

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MAUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC.,      )<br>)<br>) | |
| *Plaintiff*,      )<br>) | |
| v.      )<br>) | Before: Jennifer Choe-Groves, Judge |
| NATIONAL MARINE FISHERIES SERVICE, et al.,      )<br>)<br>) | Court No. 24-00218 |
| *Defendants*, and      )<br>) | |
| GOVERNMENT OF NEW ZEALAND,      )<br>) | |
| *Intervenor-Defendant*.      )<br>) | |

## <u>RESPONSE BRIEF OF THE GOVERNMENT OF NEW ZEALAND</u>

The Government of New Zealand ("GNZ") has fully satisfied the requirements of the Marine Mammal Protection Act ("MMPA") and its implementing regulations, as documented in its 2021 Comparability Application, as well as in its initial 2020 Comparability Application, both of which relied upon thousands of pages of research studies, public comments, and dozens of scientific analyses. The National Marine Fisheries Service ("NMFS") approved the GNZ's 2021 Comparability Application ("2021 Comp. Applic.") in its January 24, 2024 Comparability Finding ("2024 Comp. Finding"). ECF No. 15-2, NMFS_001235-001263. <u>See also</u> January 2, 2024 NMFS Decision Memorandum. ECF No. 15-2, NMFS_001224-001231; and Notification of Issuance of Comparability Findings. 89 Fed. Reg. 4595 (Jan. 24, 2024). ECF No. 15-2, NMFS_001232-001234.

The GNZ has repeatedly demonstrated its commitment to ensuring that the Māui dolphin population thrives and recovers to the point that it is no longer endangered. To achieve that goal,

the GNZ has taken significant steps beginning in 2002 and continuing to this day to impose

commercial fishing restrictions, including bans on set net fishing and trawling within those areas

of the Māui dolphin's distribution where an encounter with a set net or trawl is most likely to

occur.  Moreover, it maintains a robust "take reduction plan," which is its Threat Management

Plan 2020, as well as a comprehensive and recently expanded monitoring program for those

portions of the West Coast North Island ("WCNI") set net and trawl fisheries where the greatest

residual risk of mortality or serious injury might exist.

Since 2012, there has not been a single documented instance of a Māui dolphin or

Hector's dolphin death or serious injury off the WCNI due to its capture by a set net or trawl.

2024 Comp. Finding at 16.  ECF No. 15-2, NMFS_001250.[1]  However, if just one dolphin death

should occur, the law requires that the GNZ immediately adopt additional measures necessary to

reduce bycatch below the potential biological removal level:

> The Minister of Fisheries does not have discretion to choose whether to act or not,
> but rather the Minister has the authority to quickly enact additional prohibitions
> considered necessary to ensure the bycatch limit is not exceeded.  Depending on
> the available information that moves the Minister to act, the Minister could
> prohibit trawl and/or set net fishing (or some other fishing method or all fishing)
> in the MDHZ or in a portion of MDHZ.

2024 Comp. Finding at 25-26.  ECF No. 15-2, NMFS_001259-001260.  (Emphasis added.)  The

requirement that the Minister must act to prevent additional mortality or serious injury is

comparable to the U.S. standard, as NMFS found.  Id. at 29.  NMFS_001263.  NMFS further

found that:

> New Zealand has indicated that it has a similar process for its Threat Management
> Plan for the Maui and Hector's dolphins.  New Zealand will do periodic reviews

---

[1] The subspecies of the 2012 dolphin death is unknown. The last confirmed death of a Māui
dolphin due to an encounter with a set net or trawl occurred in 2002, and it occurred in a set net.
2024 Comp. Finding at 29.  ECF No. 15-2, NMFS_001263.  The areas where both deaths
occurred were subsequently closed to set net fishing.

to ensure that the bycatch limit is not exceeded.  This is comparable in effectiveness to the U.S. process . . . . The MMPA does not require a shutdown of fisheries when bycatch is exceeded; as a result, New Zealand's review process exceeds the U.S. standards under the MMPA.

Id. at 28.  NMFS_001261-001262.

### U.S. STANDARDS UNDER THE MMPA AND IMPLEMENTING REGULATIONS

The Marine Mammal Protection Act of 1972, as amended, provides that:

In any event, it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate.  The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards.

16 U.S.C. § 1371(a)(2).  The "United States standards" referenced in this provision consist of the following:

(a)  A "stock assessment for each marine mammal stock which occurs in waters under the jurisdiction of the United States." 16 U.S.C. § 1386(a)(1-5).

(b) An estimate of "the potential biological removal level for the stock, describing the information used to calculate it, including the recovery factor."  16 U.S.C. § 1386(a)(6).  The MMPA defines the "PBR" as the "maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20).

(c) A "Zero Mortality Rate Goal" under which commercial fisheries "shall reduce incidental mortality and serious injury of marine mammals to insignificant levels approaching a zero mortality and serious injury rate within 7 years after the date of enactment of this section [April 30, 2001]."  However, "Fisheries which maintain

insignificant serious injury and mortality levels approaching a zero rate shall not be required to further reduce their mortality and serious injury rates."  19 U.S.C. § 1387(b)(1) and (b)(2).

(d) A "program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations" in order to "obtain statistically reliable estimates of incidental mortality and serious injury [and] determine the reliability of reports of incidental mortality and serious injury under subsection (e)."[2] Human observers may be placed on board vessels as necessary but are not required, especially when "the facilities on a vessel for quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized."  16 U.S.C. § 1387(d).

(e) A "take reduction plan" for "strategic stocks," like the Māui dolphin, whose purpose is "to reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock under Section 117."  19 U.S.C. § 1387(f)(2).

Judge Katzmann identified these five provisions as constituting "certain markers throughout the statute that illuminate the concept [of U.S. standards]."  Sea Shepherd New

---

[2] Subsection (e) of Section 1387 requires the owner or operator of a commercial fishing vessel subject to the MMPA to report to NMFS each instance of incidental mortality and injury of marine mammals in the course of commercial fishing operations within 48 hours of the end of each fishing trip on a standard postage-paid form containing specified information.  MHDD has not asserted that the GNZ failed to implement a reporting program that is comparable to this requirement.

4

Zealand v. United States, 606 F. Supp. 3d 1286, 1293-1296 (2022) ("Sea Shepherd").  NMFS

supplemented the MMPA's markers of "United States standards" through the promulgation of

regulations in 2016.  Id. at 1295.  See 50 C.F.R. Part 216, commonly referred to as the "Import

Provisions."

 The law does not require that a U.S. take reduction program or a U.S.

regulatory program eliminate 100% of the bycatch risk to a particular marine mammal stock:

> [The GNZ's regulatory program, including fishery-specific area restrictions] . . . is
> comparable to U.S. standards, which does not require that a Take Reduction Plan
> or the U.S. regulatory program eliminate 100% of the bycatch risk to a particular
> marine mammal stock.  The U.S. regulatory program seeks to target the greatest
> percentage of risk in the areas with the greatest overlap of fishing and the marine
> mammal distribution and mitigate that bycatch risk below the bycatch limit for
> that specific marine mammal.

Decision Memo at 6.  ECF No. 15-2, NMFS_001229.  (Emphasis added.)  MHDD's summary

judgment motion appears to seek a court order directing the GNZ to eliminate all risk, but that is

not what the MMPA requires.

 The law also does not require that a harvesting nation adopt a regulatory program that is

identical to a program that would be required to protect marine mammals found in U.S. fisheries.

Rather, the program must be "comparable in effectiveness," i.e., it must achieve "comparable

results" to a U.S. program.  Import Provisions, 81 Fed. Reg. at 54,390 and 54,391 (Aug. 15,

2016).  Thus, a harvesting nation need not duplicate each of the "conditions for a comparability

finding" listed in 50 C.F.R. § 216.24(h)(6)(iii):

 In using the term "comparable in effectiveness" NMFS means that "the regulatory

program effectively achieves comparable results to the U.S. regulatory program.  This approach

gives harvesting nations flexibility to implement the same type of regulatory program as the

United States or a program that is completely different but achieves the same results."  Import

Provisions, 81 Fed. Reg. at 54,401.

## ARGUMENT

**I.    THE GNZ MAINTAINS A STANDARD COMPARABLE TO THE U.S. STANDARD OF A ZERO MORTALITY RATE GOAL**

The zero mortality rate goal ("ZMRG") in 16 U.S.C. § 1387(b)(1) requires that

"Commercial fisheries shall reduce incidental mortality and serious injury of marine mammals to

insignificant levels approaching a zero mortality and serious injury rate within 7 years after the

date of enactment of this section" (which was April 30, 2001).  NMFS has stated that:

> it will consider the application of the ZMRG, or metrics/measures comparable in
> effectiveness to the ZMRG, to foreign fisheries providing the same flexibility to
> foreign fisheries as it has applied to analogous U.S. fisheries that have not met the
> ZMRG.

Import Provisions, 81 Fed. Reg. at 54,398 (Aug. 15, 2016).

MHDD argues that "NMFS did not establish that New Zealand meets a comparable

standard to the zero mortality rate goal."  MHDD Br. at 13.  This claim has three elements.  First,

"NMFS did not evaluate whether the New Zealand Fisheries meet a comparable standard."  Id.

Second, "New Zealand does not, in fact, have such a [comparable] standard."  Id.  And third, the

GNZ does not "mandate responsive action" if the mortality rate exceeds what the MHDD claims

is the allowable limit of one dolphin mortality or serious injury every 100 years.  Id. at 14.  Each

claim is demonstrably wrong.

### A.  The GNZ Maintains a Comparable Goal to the ZMRG

NMFS asked the GNZ whether it had a standard that was comparable to the ZMRG in the

following question, which mirrored the statutory requirement in Section 1387(b)(1) of the

MMPA, quoted above:

> Does your nation have an over-arching regulation the goal of which is to reduce the incidental kill or incidental serious injury permitted in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate?

The GNZ responded to this question with a two-page single spaced answer that explained that, although it literally did not have "an over-arching regulation" because its legal system does not work this way, it did adopt a standard comparable to the ZMRG in the following documents.

(a) the Fisheries Act 1996 ("Fisheries Act"), which the GNZ "considered the most appropriate legislative tool with which to manage fishing-related risks to the Māui dolphin because of its focus on monitoring and managing fishing activities and its impacts." See 2021 Comp. Applic. Part D: Q3, which summarizes the relevant provisions of the Fisheries Act.  ECF No. 15-2, NMFS_001148-001149.  The record contains the entire Fisheries Act at ECF No. 15-3, NMFS_002877-003430.

Section 8 requires the GNZ to avoid, remedy or mitigate any adverse effects of fishing on the aquatic environment (which includes Māui dolphins).  Comp. Applic. Part D:Q3.  ECF No. 15-2, NMFS_001148-001149.

Section 9, among other things, states that "associated or dependent species should be maintained above a level that ensures their long-term viability."  Id. at NMFS_012288.

Section 11 provides broad discretion to enact sustainability measures that may relate to catch limits, the areas from which any fish may be taken, and the fishing methods that may be used.  NMFS_012289-012290.

Section 15(2) interlinks with processes under the GNZ's own Marine Mammals Protection Act 1978 ("MMPA 1978"), and in the absence of a specific Population Management Plan established under the MMPA 1978, enables the Minister of

7

Fisheries to take such measures he or she considers necessary to avoid, remedy, or mitigate the effects of fishing-related mortality on any protected species. Measures include setting a limit on fishing-related mortality and recommending regulations to prohibit all or any fishing or fishing methods in an area. NMFS_012297-012298.

(b) The Marine Mammals Protection Act 1978, which requires that, "in the case of any threatened species, [the Minister] shall determine a level of fishing-related mortality which should allow the species to achieve non-threatened status as soon as reasonably practicable, and in any event within a period not exceeding 20 years." The record contains the GNZ's MMPA 1978 at ECF No. 15-2. NMFS_001652-001687.

(c) The GNZ's "Aotearoa New Zealand Biodiversity Strategy 2020," which set the following goals for marine species: (1) the number of fishing-related deaths of all protected marine species is decreasing towards zero by 2025; (2) the direct effects of fishing do not threaten protected marine species populations or their recovery by 2030; and (3) the mortality of non-target species from marine fisheries has been reduced to zero by 2050. Comp. Applic. Part D:Q3. ECF No. 15-2, NMFS_001149.[3]

---

[3] MHDD asserts that the GNZ answered "No" when NMFS asked the GNZ whether it maintained an "over-arching regulation" comparable to the ZMRG. MHDD Br. at 14. This assertion ignores the single-spaced two-page answer that followed the word "No" in which the GMZ identified the provisions of its law and policy statements that explained why its standard was comparable to the ZMRG standard. The GNZ further clarified its "No" answer in a December 14, 2021 letter to NMFS in which it stated that it did not want its "No" answer misinterpreted because the question that NMFS asked only permitted it to provide either a "Yes" or "No" answer. Therefore, "We have attached additional information to this letter to provide broader context on New Zealand's approach to this issue to help ensure that the answer that we were required to provide will not be misinterpreted." ECF No. 15, NMFS_000271-000272.

**B. The GNZ's Threat Management Plan Supports and Implements the GNZ's Comparable Goal**

In addition, the GNZ submitted its "Hector's and Māui Dolphin Threat Management Plan" ("TMP"), which contains additional information in support of its ZMRG goal. ECF No. 15-4, NMFS_003933-003952. The TMP states that, to achieve the desired population outcome for Māui dolphins, human-induced deaths need to be as near as practicable to zero. The vision of the TMP is that New Zealand's Māui dolphin and Hector's dolphin populations are resilient and thriving throughout their natural range.

The TMP's long-term goal is that Hector's and Māui dolphin subpopulations are thriving or increasing, supported by an enduring, cohesive and effective threat management program across New Zealand. The long-term goal is underpinned by four medium term goals. "Goal 1" is to ensure that known human-induced threats are managed within levels that allow subpopulations to thrive and recover. The goal is intended to help ensure that threats are managed at levels that allow the subpopulations to collectively achieve the overall desired outcome expressed in the vision statement. ECF No. 15-4, NMFS_ 003939-003940.

The TMP sets out population outcomes to help further define medium-term goal 1, and it establishes the maximum acceptable impact level for each human-induced threat for each sub-population. For Māui dolphins, the population outcome is: "Human impacts are managed to allow the population to increase to a level at or above 95% of the maximum number of dolphins the environment can support." A population outcome of 95% means that human-induced deaths need to be as near as practicable to zero. NMFS_003940.

The fisheries management specific objective is to ensure that dolphin deaths arising from fisheries threats do not: (1) exceed the maximum number of human-induced deaths that could occur to achieve the applicable population outcome with 95% certainty; (2) cause localized

depletion; or (3) create substantial barriers to dispersal or connectivity between populations. NMFS_003940. The TMP fisheries objective is achieved by ensuring that estimated annual deaths do not exceed the Population Sustainability Threshold – a comparable measure to PBR as discussed in Appendix D of the initial 2020 Comp. Applic. ECF No. 25-5, NMFS_010857-010861).

### C. The GNZ's Abundance Estimates Support the GNZ's Comparable Goal

Every five years, abundance estimate surveys are undertaken for Māui dolphins. Estimates support the GNZ's effort to track progress against TMP objectives and the Biodiversity Strategy goals. The most recent survey was completed in 2020/2021 by Constantine, et al. See ECF No. 15-4, NMFS_003868-003932. See also Māui Dolphins: Summary Information at 1-2. ECF No. 15, NMFS_000020-000021  The 2025/2026 survey will be carried out over two summer seasons in 2025/2026 and 2026/2027.

### D. The GNZ's Fishing-Related Mortality Limit Supports the GNZ's Comparable Goal

As a backstop measure, the GNZ has adopted a Fishing-Related Mortality Limit ("FRML"), which requires that a death of one Māui or Hector's dolphin in the defined habitat zone not be exceeded. See 2020 Comp. Applic. at 31-33. ECF No. 25-5, NMFS_010799-0010801. See also February 2023 "Supplementary Information – Limit on fishing-related mortality and distribution" at 3-6. ECF No. 15-2, NMFS_001110-001113. The FRML is not a PBR and, as applied in the Māui Dolphin Habitat Zone ("MDHZ"), does not have a time frame. The FRML of one dolphin that applies to the MDHZ on the West Coast North Island has not been met or exceeded. Therefore, fishing-related mortality is not affecting the Māui dolphin population's ability to recover to and/or maintain a level that is no more than 5% lower than what it would be in the absence of fishing.

### E.   Record Evidence Supports Achievement of the GNZ's Comparable Goal

Changes in fisheries risk over time (and figures that show the decline in estimated risk/mortality) are described in the 2020 Comp. Applic.  ECF No. 25-5, NMFS_010879-010881. The GNZ's 2021 Comparability Application contains two single-page documents that summarize the estimated bycatch reduction for the WCNI inshore set net fishery and the WCNI inshore trawl fishery.  See **Exhibit 1**.[4]

### F.   NMFS Expressly Approved the GNZ's Comparable Goal

The GNZ's Comparability Application in direct response to an inquiry from NMFS,[5] as well as its TMP, abundance estimates, and FRML, establish that NMFS considered whether the GNZ maintained a standard comparable to the MMPA's Zero Mortality Rate Goal.  No other conclusion can be drawn from the GNZ's public statement that its goal was to have the number of fishing-related deaths of all protected marine species decreasing towards zero by 2025. Moreover, the ZMRG is just that – a "goal," and NMFS has not specified when a foreign fishery must achieve that goal.  For that reason, MHDD has not identified a single instance in which NMFS has penalized either a U.S. or foreign fishery for failing to achieve the ZMRG. Moreover, NMFS has never closed a domestic or foreign fishery when the potential biological

---

[4] These documents do not appear to have been included in the administrative record that NMFS filed with the court, but the GNZ uploaded them to the NMFS online portal through which all Comparability Applications must be submitted.

[5] NMFS asked the GNZ the following question: Question 3: "Does your nation have an overarching regulation the goal of which is to reduce the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate?"  The GNZ answered it. 2021 Comp. Applic. Part D:Q3.  ECF No. 15-2, NMFS_001148.

removal rate has been exceeded.  2024 Comp. Finding at 23-24.  ECF No. 15.2, NMFS_001257-001258.

In addition, NMFS identified the GNZ's Fisheries Act as requiring the Minister to "take all reasonable steps to ensure that the fishing-related mortality level set by the relevant population management plan is not exceeded or may take such other measures as he or she considers relevant to further avoid, remedy, or mitigate any adverse effects of fishing on the relevant protected species."[6]  2024 Comp. Finding at 2.  ECF No. 15-2, NMFS_001236.

Furthermore, NMFS explained that the goal of the U.S. standard requiring a take reduction plan was to "help recover and prevent the depletion of strategic marine mammal stocks."  2024 Comp. Finding at 23.  ECF No. 15-2, NMFS_001257.  Moreover,

> the long-term goal is that, within five years, to reduce the incidental mortality and serious injury of marine mammals to insignificant levels *approaching* (emphasis added) a zero mortality and serious injury rate, taking into account the economics of the fishery, availability of existing technology, and the existing state of regional fishery management plans.

Id.  Similarly, the objectives of the GNZ's Threat Management Plan are to:

> ensure that dolphin deaths arising from fisheries threats do not exceed the population sustainability threshold (PST) with 95% certainty, cause localized depletion, create substantial barriers to dispersal between subpopulations, and allow localized subpopulations to recover and/or remain at or above 80% of their unimpacted status with 95% status.

---

[6] A "population management plan" is not in effect for Māui dolphins.  However, the 2024 Comp. Finding recognizes that:

> In the absence of a population management plan, the Minister may, after consultation with the Minister of Conservation, take such measures as he or she considers necessary to avoid, remedy, or mitigate the effect of fishing-related mortality on any protected species, and such measures may include setting a limit on fishing-related mortality.

NMFS_001236.

Id.  These statements, along with the GNZ's setting of the bycatch limit, which is legally binding under GNZ law, as well as the GNZ's extensive description of the fishing prohibitions and the NMFS reliance on the GNZ's Threat Management Plan 2020, leave no doubt that NMFS considered all of the ways that the GNZ intended to establish the U.S. standard of a zero mortality rate goal.

### G.  The GNZ Is Progressing Towards Its Comparable Goal

The remaining aspect of the MHDD's claim is whether the GNZ has taken the steps necessary to progress towards achieving the "goal" of zero mortality.  As explained above, "zero mortality" is not the U.S. standard under the MMPA.  Rather, fisheries must be progressing towards that goal.  There has not been a documented instance of a fishing-related death or serious injury of a confirmed Māui dolphin since 2002.  A dolphin death did occur in 2012, but it could not be confirmed as a Māui dolphin.[7]  Thus, there has been a "zero mortality" rate and a zero "serious injury" rate for at least the past 13 years and possibly the last 23 years.

No record evidence contradicts this fact, and MHDD cites none.  For that reason, NMFS found that, "Since the implementation of New Zealand's regulatory program governing these fisheries, there have been no observed Māui dolphin bycatch in either of these fisheries and no stranded Māui dolphin with the cause of death attributed to fishery interaction."[8]  2024 Comp. Finding at 16.  ECF No. 15-2, NMFS_001250.

---

[7] 2024 Comp. Finding at 29.  ECF No. 15-2.  NMFS_001263.
[8] Section 1387(b)(2) of 16 U.S.C. states that "Fisheries which maintain insignificant serious injury and mortality levels approaching a zero rate shall not be required to further reduce their mortality and serious injury rates."

### H.  NMFS Approved the GNZ's Take Reduction Plan

Nevertheless, MHDD claims that, "for fisheries that do not meet the zero mortality rate goal level, the MMPA requires NMFS to implement a take reduction plan with measures that will reduce fisheries' bycatch to insignificant levels within five years," thereby suggesting that the GNZ has failed to implement a take reduction plan ("TRP").  MHDD Br. at 13-14, citing 16 U.S.C. §§ 1387(b)(4) and 1387(f)(2).  This claim is wrong.

The Import Provisions define a TRP as "a plan to reduce the incidental mortality and serious injury of marine mammals during commercial fishing operations in accordance with section 118 of the Marine Mammal Protection Act of 1972, as amended."  50 C.F.R. § 229.2.  The Import Provisions define the term "take" in relevant part as: "to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill any marine mammal."  50 C.F.R. § 216.3.  Thus, a TRP necessarily requires a "plan" to prevent or at least reduce the "take," i.e., the bycatch, of Māui dolphins.

Despite MHDD's contrary suggestion, the GNZ does have a TRP to reduce bycatch, which is its "Hector's and Māui Dolphin Threat Management Plan 2020."  ECF No. 15, NMFS_000251-NMFS_000270.  NMFS discussed the TMP at length, thereby leaving no doubt that NMFS found that it satisfies the MMPA's take reduction plan requirement and, therefore, similarly satisfies the ZMRG.  Decision Memo at 6-7.  ECF No. 15-2, NMFS_001228-001229.  See also 2024 Comp. Finding at 23-29.  ECF No. 15-2, NMFS_001257-001263.  Important aspects of the TMP include:

> (1) Identification of the "threats" to Māui dolphins to include set net and trawl fishing along with eight other "human-induced" threats, such as the disease called toxoplasmosis.  NMFS_000256

14

(2) The "medium-term" goal of the TMP is to manage human impacts "to allow the population to increase to a level at or above 95% of the maximum number of dolphins the environment can support." NMFS_000258.

(3) A "fisheries management objective" is to ensure that "dolphin deaths arising from fisheries threats do not exceed the maximum number of human-induced deaths that could occur to achieve the applicable population outcome with 95% certainty." The maximum number of human-induced deaths that could occur while achieving the associated population outcome is also referred to as the population sustainability threshold. NMFS_000258.

(4) The "fishing protection measures" are listed for both set nets and trawls, which are "spatial closures [that] are the principal mechanisms to reduce the risk of bycatch." NMFS_000260. The areas where set nets and trawls are prohibited are shown in Appendix 1, Figures A1.1 and A1.2. NMFS_000265 and NMFS_000266.

(5) A "fishing related mortality limit" has been established that applies to both recreational and commercial fishermen. This limit is one individual Māui or Hector's dolphin within the defined Māui dolphin habitat zone. NMFS_000260 through NMFS_000261. The habitat zone is shown in Appendix 1, Figure A1.3 to the TMP. NMFS_000267.

(6) Regulations requiring the use of onboard cameras for commercial fishing vessels are described. NMFS_000261.

The 2024 Comparability Finding repeatedly identifies these elements of the TMP, thereby indicating NMFS approval of the TMP as being comparable to the U.S. take reduction plan standard. NMFS summarized its approval when it stated that "New Zealand has a bycatch

15

mitigation program in place that is comparable in effectiveness to the U.S. bycatch mitigation

program."  ECF No. 15-2, NMFS_001257.

## II.    THE GNZ MAINTAINS A STANDARD COMPARABLE TO THE MMPA'S NEGLIGIBLE IMPACT STANDARD

MHDD asserts that the GNZ does not maintain a standard comparable to the MMPA's

"negligible impact" standard and that NMFS did not evaluate whether the GNZ maintained a

comparable standard.  MHDD Br. at 14-15.  The MMPA defines the negligible impact standard

as follows:

> During any period of up to 3 consecutive years, the Secretary shall allow the incidental, but not the intentional, taking by persons using vessels of the United States or vessels which have valid fishing permits issued by the Secretary . . . while engaging in commercial fishing operations, of marine mammals from a species or stock designated as depleted because of its listing as an endangered species or threatened species . . . if the Secretary, after notice and opportunity for public comment, determines that –
>
> > (I)    the incidental mortality and serious injury from commercial fisheries <u>will have a negligible impact</u> on such species or stock;
> >
> > (II)    a recovery plan has been developed or is being developed for such species or stock pursuant to the Endangered Species Act of 1973; and
> >
> > (III)    where required under section 118, a monitoring program is established under subsection (d) of such section, vessels engaged in such fisheries are registered in accordance with such section, and a take reduction plan has been developed or is being developed for such species or stock.

16 U.S.C. § 1371(a)(5)(E)(i).

According to MHDD, the "Single Negligible Impact Threshold" for endangered species

"equals 13% of PBR," and 13% of the PBR of 0.10 equals 0.013.  MHDD Br. at 15-16.  MHDD

then alleges that NMFS failed to assess "whether New Zealand has a standard comparable to the

MMPA's negligible impact standard." Id. at 16.  Moreover, "Māui dolphin bycatch rates in the New Zealand Fisheries far exceed what the negligible impact standard would allow." Id.

In any event, MHDD has failed to demonstrate that the GNZ has exceeded the negligible impact standard, assuming that it applies, or that the GNZ fails to maintain a standard that is comparable to the negligible impact standard.  It has also failed to state what type of action would the GNZ have required if the standard was exceeded.

### A.  The Negligible Impact Standard Does Not Apply in the Circumstances Presented Here

The MMPA's "negligible impact" standard allows the incidental taking of a marine mammal if NMFS, after first providing notice and an opportunity for public comment, finds that the incidental taking will have a "negligible impact" as NMFS has defined that term.  However, the GNZ does not allow any incidental taking because the taking of just one Māui dolphin would automatically cause the negligible impact standard to be exceeded.  In other words, there is no circumstance in which NMFS would or could invoke the MMPA's incidental taking provision and its related "negligible impact" provision in order to permit the GNZ to authorize the incidental taking of a Māui dolphin. Thus, as a practical matter, the negligible impact standard does not apply to the facts of this case.

### B.  The MHDD's Alleged Bycatch Standard Is Impossible to Administer

It is literally impossible to administer a negligible impact bycatch rate that is less than one individual Māui dolphin.  In other words, only an entire dolphin can experience death or serious injury.  A tiny fraction of a dolphin, despite MHDD's claim, cannot be "incidentally caught."  Thus, the only way for the GNZ to prescribe what it must do if a single dolphin dies or is seriously injured is for it to devise laws and regulations that

require action when that occurs.  If that should occur, then the negligible impact standard is by definition exceeded since 1.0 exceeds 0.013.

### C. The GNZ Maintains Non-Discretionary Emergency Procedures if the Bycatch Standard of One Dolphin Is Exceeded

Authorized commercial fishing vessels must "report all incidental mortality and injury of marine mammals in the course of commercial fishing operations by mail or other means acceptable to the Secretary within 48 hours after the end of each fishing trip."  16 U.S.C. § 1387(e).  After mandatory reporting, the MMPA requires NMFS to "use the emergency authority granted under section 118 to protect such species or stock, and may modify any permit granted under this paragraph as necessary."  16 U.S.C. §1371(a)(5)(E)(iii).  The "emergency authority" is codified in 16 U.S.C. § 1387(g), captioned "Emergency Regulations," which provides that:

> (1) if the incidental mortality and serious injury of marine mammals from commercial fishing is having, or is likely to have, an immediate and significant adverse impact on a stock or species, the Secretary shall take actions as follows:
>
>> (A) In the case of a stock or species for which a take reduction plan is in effect, the Secretary shall –
>>
>>> (i)   prescribe emergency regulations that, consistent with such plan to the maximum extent practicable, reduce incidental mortality and serious injury in the fishery; and

Importantly, the statute does not prescribe any specific type of emergency regulation. Rather, the nature of the additional restrictions that must be adopted is left to NMFS discretion.

The GNZ maintains a program comparable to the emergency regulations standard in the U.S. where an incidental take of a Māui dolphin in the course of commercial fishing has more than a "negligible impact."  When that standard is exceeded, the GNZ's

regulations provide for "emergency" action comparable to that prescribed for mortality

and serious injury that may occur in a U.S. fishery.

Specifically, the GNZ's February 2023 "Supplementary Information – Limit on

fishing-related mortality and distribution," states that:

> The regulated limit on fishing-related mortality is not the primary means by which
> mortality and serious injury has already been reduced below the PBR.  The limit
> enables the Minister of Fisheries to quickly implement any <u>further</u> prohibitions
> that may – upon receipt of new or updated information – be deemed necessary to
> ensure the regulated limit is not exceeded.

ECF No. 15-2, NMFS_001110.

After reviewing this response, NMFS then asked the GNZ the following questions:

> For the Management Review Trigger, any new information on actions the
> Government of New Zealand would take under New Zealand law [or] regulations
> if there was a take of a Maui dolphin?

> - If a take of a Maui dolphin were to occur, can you provide examples of actions
>   that the Minister could take?
> - If actions are enacted, what conditions would need to be met to lift them or retract
>   them?
> - If a take occurs, is there a reconsideration of the regulatory program for required
>   actions versus discretionary actions?

The GNZ responded to these questions as follows in its April 2023 "Supplementary

Information to NOAA questions received March 2023:"[9]

> We emphasize, as explained in the February Supplementary Information, that <u>the
> Minister does not have discretion as to whether to act or not in the event of a
> Māui dolphin capture</u> (or other information that suggests that the limit on fishing
> related mortality may be exceeded).  Rather the Minister must act but has
> discretion as to what additional prohibitions they consider are necessary to ensure
> that the limit is not exceeded.

> <u>Under the law the Minister may prohibit all or any fishing or fishing methods in
> an area to ensure the limit is not exceeded.  Depending on the available
> information that moves the Minister to act, they could prohibit trawl fishing or set
> net fishing or both or some other fishing method or all fishing in the Māui dolphin</u>

---

[9] ECF No. 15-2, NMFS_001117-NMFS_001144.

> Habitat Zone or in a portion of the Zone.  The Minister must determine what is required to ensure the limit is not exceeded (i.e., address the threat that has arisen).
>
> To lift or retract a prohibition, the Minister would have to be satisfied that the removal of the prohibition(s) would not result in the limit on fishing-related mortality being exceeded.

ECF No. 15-2, NMFS_001122.  (Emphasis added.)  Thus, the GNZ clearly maintains a comparable program to the incidental take/negligible impact standard in the MMPA because, if the *de facto* negligible impact standard of one dolphin is exceeded, the GNZ, by law, must act.

The range of actions is comparable to those allowed under the MMPA's provision for the issuance of "emergency regulations" governing a U.S. fishery.  The MMPA and the Import Provisions do not specify any particular measures as constituting a U.S. standard, and they do not require the closure of a fishery if the incidental take has more than a negligible impact.  Rather, the authorities must "to the maximum extent practicable, reduce incidental mortality and serious injury in that fishery."  Similarly, the GNZ must "determine what is required to ensure that the [bycatch] limit [of one dolphin is not exceeded."

Finally, incidental take in a U.S. fishery is only allowed if NMFS determines that the impact is negligible.  However, in New Zealand, by definition, the fishing-related death or serious injury of a Māui dolphin has a more than a negligible impact.  Thus, the GNZ maintains a standard comparable to what pertains to U.S. fisheries.[10]

---

[10] In a misguided effort to bolster its "negligible impact" argument, MHDD contends that the PBR has been exceeded because "the total human-caused mortality of Māui dolphins is approximately 6.06 dolphins per year."  MHDD Br. at 16.  The plaintiff derives this estimate by including 1.90 estimated deaths from toxoplasmosis disease and another 4.06 estimated deaths from "other" activities, such as recreational fishing, aquaculture, and oil spills.  Id.  However, the MMPA solely governs incidental mortality and serious injury from commercial fishing, not these other types of causes.  For that reason, NMFS has not closed fisheries or implemented other types of restrictions when PBR has been exceeded due to "other" causes, i.e., causes other than

In summary, MHDD has misread the statute in terms of how, if at all, the incidental take and negligible impact standards apply to the two New Zealand fisheries. The incidental take of just one Māui dolphin immediately triggers the obligation of the GNZ to take "emergency" measures. Thus, GNZ achieves the same outcome as the negligible impact standard.

## III.    THE GNZ'S "BYCATCH LIMIT" SATIFIES THE U.S. STANDARD

Caption III of MHDD's Argument section is: "NMFS's Finding that New Zealand's Bycatch Limit Is Comparable to the PBR Standard Is Counter to the Evidence." MHDD Br. at 16. This claim reflects an erroneous conflation of two different, but related concepts. The first concept is determination of the bycatch limit.

### A.  The U.S. Definition of the Potential Biological Removal Level

The U.S standard for determination of the bycatch limit is the "potential biological removal level" ("PBR"). The MMPA defines the PBR in 19 U.S.C. § 1362(20) as "the maximum number of animals, not including natural mortalities that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." This provision includes a formula for its calculation, and the most recent guidance as to how to apply the formula is provided in a February 7, 2023 NMFS document entitled

---

commercial fishing. That is because the "take reduction team" that must be convened when PBR is exceeded is solely empowered to adopt measures to reduce mortality and serious injury attributable to commercial fishing operations. 16 U.S.C. § 1387(d). See, e.g., Atlantic Large Whale Take Reduction Plan Regulations, 86 Fed. Reg. 51,970 (Sept. 17, 2021); Atlantic Pelagic Longline Take Reduction Plan, 74 Fed. Reg. 23,349 (May 19, 2009); Bottlenose Dolphin Take Reduction Plan Regulations, 71 Fed. Reg. 24,776 (Apr. 26, 2006).

"Guidelines for preparing stock assessment reports pursuant to the Marine Mammal Protection Act."[11]

### B. NMFS Calculation of the Potential Biological Removal Level

After applying the formula based on information that the GNZ supplied concerning its abundance estimate, NMFS calculated the PBR as 0.10. This means that the PBR sets a bycatch limit of 0.10 dolphins per year. Stated differently, 1 dolphin every 10 years is the maximum number of Māui dolphins, not including natural, non-human induced, mortalities) that may be removed from a marine mammal stock that still allows that stock to reach or maintain its optimal sustainable population. 2024 Comp. Finding at 27. ECF No. 15-2, NMFS_001261. MHDD does not challenge the NMFS calculation of the PBR.

Separate from the PBR calculation is the way in which the GNZ regulates its "bycatch limit." When one dolphin is killed, application of the PBR formula means that the bycatch limit has been exceeded.[12] The GNZ manages risk using a Fishing Related Mortality Limit ("FRML")

> The fishing-related mortality limit for Hector's or Māui dolphins within the defined Māui dolphin habitat zone is set at one individual. This habitat zone extends along the mean high-water mark of the west coast of the North Island from Cape Egmont to Cape Reinga/Te Rerenga Wairua, including harbours and offshore to the 12 nautical mile Territorial Sea boundary (Appendix 1, Figure A1.3). The regulation of a fishing-related mortality limit gives the Minister for Oceans and Fisheries the power to promptly respond to a range of bycatch scenarios and take immediate action if necessary or to ensure that the limit on fishing-related mortality is not exceeded, such as in the unlikely event of a:
>
> • near miss capture
> • capture – released alive

---

[11] This document is available at: https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-GAMMS-IV-Revisions-clean-1-kdr.pdf. The 2016 version of this document was submitted in the Sea Shepherd case. See ECF No. 49-1 (Exhibit 11).

[12] The GNZ submitted to NMFS its bycatch estimates for the two WCNI fisheries, which demonstrated that they did not exceed the bycatch limit for Māui dolphins. ECF No. 15, NMFS_000005-000006.

- capture – resulting in death
- beachcast incident (where necropsy confirms death was a result of fishing).

The Minister may, by notice in the New Zealand Gazette, prohibit all or any fishing or fishing methods in an area for the purpose of ensuring that the limit on fishing-related mortality is not exceeded. The notice would include the specifics of any closure (the method(s) and area(s) to which it applies) and when it will begin.

ECF No. 15, NMFS_000261. (Emphasis added.) Thus, meeting the "one dolphin limit," i.e., the FRML, triggers the obligation of the GNZ to act.

## C. MHDD's Challenge to the GNZ's FRML Has No Merit

MHDD claims that the GNZ's fishing-related mortality limit "falls far short of the PBR-based bycatch standard in four key respects." MHDD Br. at 17. This is wrong because, as described above, the FRML's bycatch limit of one individual is identical to the equivalent PBR standard of one individual. Moreover, in its original 2020 Comparability Finding, NMFS stated that:

the GNZ, for the purpose of this comparability finding application, Is using and has calculated a PBR for Māui dolphins of 0.11 as its biological threshold or bycatch limit. Therefore, the standard used by the GNZ is PBR and is comparable to U.S. standards.

ECF. No. 25-5, NMFS_010938. The same is true for the GNZ's 2021 Comparability Application and the 2024 Comparability Finding at issue here – the GNZ applies the PBR standard as its bycatch standard and thereby satisfies the MMPA' s requirement.

MHDD nevertheless claims that the FRML "is ten times higher than NMFS's estimate of the 0.10 Māui dolphin PBR limit. MHDD Br. at 18. However, the FRML is not a rate, while the PBR is a rate. In other words, MHDD erroneously conflates two different concepts. Said another way, the GNZ cannot set a bycatch limit of 0.1 dolphins per year, so the FRML must be set at 1 individual dolphin.

23

**D. MHDD's Reliance on Non-Fishing Related Causes of Mortality and Serious Injury Is Irrelevant**

Similarly misleading is MHDD's assertion that "total human-caused mortality of Māui dolphins is approximately 6.06 dolphins per year." MHDD Br. at 16. This is irrelevant to the issue of whether the GNZ's commercial fishing restrictions and monitoring provisions comply with U.S. standards. Put another way, the MMPA does not address or regulate how a foreign government must deal with diseases, recreational fishing, aquaculture, oil spills or other non-commercial fishing causes of death or serious injury of marine mammals.

**E. MHDD Wrongly Claims that the GNZ's FRML Does Not Specify a Timeframe for When Emergency Action Is Required**

MHDD claims that "unlike PBR, which NMFS calculates as animals per year, the FMRL does not specify a timeframe. . . . It is unclear whether the FRML is one dolphin every year, every ten years, or some other timeframe. So, there is no way to know how much time must elapse after a capture before the fishery will be deemed to be back in compliance with the FRML." MHDD Br. at 18. This claim is incorrect because the GNZ has stated that:

> It Is Important to note that the fishing-related mortality limit is not an annual limit (i.e. it does not allow for one mortality each year); instead the limit is not time bound and any prohibition notified in the Gazette would apply until the notice was amended or revoked, unless otherwise specified. This means, in the event of a fishing-related incident or mortality, the measures would likely apply so long as necessary to ensure the PBR/PST is not threatened.

> It is expected that, while any response to an incident would be immediate, a subsequent review would be undertaken to confirm the appropriateness of ongoing measures. However, the immediate prohibitions notified in the Gazette would remain in place until the notice was amended or revoked or permanent measures were implemented in regulation.

2020 Comp. Applic. at 33. ECF No. 25-5, NMFS_010801.

**F.  MHDD Wrongly Claims that Emergency Action Is Not Required If a Mortality or Serious Injury Occurs Outside the Māui Dolphin Habitat Zone**

MHDD asserts that the bycatch limit of one individual applies only to mortalities within the designated "Maui dolphin habitat zone" and not to "other portions of the dolphin's habitat where fishing is allowed."  MHDD Br. at 18.  However, the <u>PBR applies to every Māui fishing-related mortality regardless of whether it occurs inside or outside the MDHZ.</u>  Although the FRML only applies to the MDHZ, Article 15(2) ("Fishing-related mortality of marine mammals and other wildlife") and Article 16 ("Emergency measures") of the Fisheries Act authorize the GNZ to respond to any bycatch outside the MDHZ, including by closing specified areas or restricting the use of certain types of fishing gear.  ECF No. 15-3, NMFS_002932-002933.  Moreover, one death of a Māui dolphin outside of the MDHZ would exceed the PBR and that would trigger the need for the GNZ to develop "Emergency Regulations" in conformity with the U.S. standard in 16 U.S.C. § 1387(g).

**G.  The GNZ Must Take Corrective Action When the PBR Is Exceeded and to Ensure the FRML Is Not Exceeded**

MHDD asserts that "New Zealand law does not mandate any corrective action if the FRML is exceeded."  Rather, the Fisheries Minister allegedly has "discretion to take action, but he or she is not required to do so."  In supposed contrast, when fishing-related mortality exceeds the PBR, the "MMPA requires implementing a take reduction plan within a specified timeframe and with concrete measures to reach certain outcomes.  MHDD Br. at 18-19.

However, the GNZ has demonstrated above that the GNZ <u>must act</u> to ensure the FRML is not exceeded, which is when the PBR is exceeded.  <u>See</u> February 2023 "Supplementary Information – Limit on fishing-related mortality and distribution" at 5-6.  ECF No. 15-2, NMFS_001112-001113.  The U.S. standard does not require more since it similarly permits take

reduction plans when PBR is exceeded, and the MMPA does not specify any particular type of restriction or limitation that must be implemented through a take reduction plan.

IV.    **NMFS CORRECTLY CALCULATED THE POTENTIAL BIOLOGICAL REMOVAL LEVEL, WHICH IT BASED ON THE MOST CURRENTLY AVAILABLE ABUNDANCE ESTIMATE**

    **A.  Definition of the PBR Level**

The MMPA defines the term "potential biological removal level" as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."  16 U.S.C. § 1362(20).  In <u>Natural Resources Defense Council, Inc. v. Ross</u>, __ CIT __, 331 F. Supp. 3d 1338, 1363 (2018), Judge Katzmann held that the PBR level was a "marker" of U.S. standards under the MMPA and that the MMPA "contains multiple provisions which direct NOAA Fisheries to limit marine mammal bycatch on the basis of PBR."  Thus, calculation of the PBR for the Māui dolphin stock is the precondition for a comparability finding because it establishes the maximum permissible level of incidental bycatch attributable to commercial fishing activity.

Section 1362(20) of 16 U.S.C. defines the PBR level as the product of the following three factors:

    (1) the minimum population estimate of the stock of Māui dolphins;

    (2) one-half the maximum theoretical or estimated net productivity rate of the stock at a small population size; and

    (3) a recovery factor between 0.1 and 1.0.

Expressed as a formula, PBR = $N_{min}$ x $0.5(R_{max})$ x $F_r$. <u>See also</u> "Guidelines for Preparing Stock Assessment Reports Pursuant to the 1994 Amendments of the MMPA (February 2016 Revisions)" ("Guidelines") at 5-7. ECF No. 25-7, NMFS_012816-012818.

"N" equals the abundance estimate for a particular stock. $N_{min}$ equals the lowest 20th percentile of the abundance estimate, which "(A) is based on the best available scientific information on abundance, incorporating the precision and variability associated with such information; and (B) provides reasonable assurance that the stock size is equal or greater than the estimate." 16 U.S.C. § 1362(27).

$0.5$ x $R_{max}$ is defined as one-half of the theoretical maximum net productivity rate of the stock at a small population size. <u>Guidelines</u> at 7.

$F_r$ is a "recovery factor" between 0.1 and 1.0 that:

allocates a proportion of expected net production towards population growth and compensates for uncertainties that might prevent population recovery, such as biases in the estimation of $N_{min}$ and $R_{max}$ or errors in the determination of stock structure.

<u>Id.</u> at 7-8.

The Guidelines specify a default value for $R_{max}$ of 0.04 (i.e., 4 percent) for cetaceans to be "consistent with a risk-averse approach." Guidelines at 7. The 0.04 figure means that the maximum amount by which the Māui dolphin population can increase is 4% per year. This is the population's inherent growth potential. The statutory requirement that the 0.04 value be multiplied by 0.5 (50 percent) means that prior to setting a recovery factor, fisheries impacts can take a maximum of one-half of the population's inherent growth potential. Then, by setting a low recovery factor for $F_r$, the permissible level of fisheries impact is reduced even further.

For endangered species like the Māui dolphin, the default recovery factor must be specified as 0.1.  Id.  A default recovery factor of 0.1 means that a maximum of 5% of the population's inherent growth potential (i.e., $R_{max}$ x 0.5 x 0.1) can be taken by fisheries impacts.

### B.  Application of the PBR Formula to the Māui Dolphin Stock

The only element of the PBR formula that is variable for Māui dolphins is the value selected for $N_{min}$.  That is because NMFS has fixed the value for $R_{max}$ at 0.04 and has fixed the value for the recovery factor at 0.1.  The GNZ submitted a value for $N_{min}$ of 51.  This value was based on an abundance survey conducted by Constantine, et al. in 2020-2021 on behalf of the GNZ.  This survey estimated the abundance of the dolphin population at 54 individuals with a 95% confidence level that the actual number of dolphins was between 48 and 64 individuals.  ECF No. 15-4, NMFS_003868-003932.  The $N_{min}$ variable was determined as being 51.  Application of the PBR formula to Māui dolphins yields a PBR of 0.102, determined as 51 x 0.5 x 0.04 x 0.1, which NMFS then rounded to 0.10.  2024 Comp. Finding at 27.  ECF No. 15-2, NMFS_001261.  MHDD does not challenge the accuracy of this calculation.  Rather, it challenges the abundance estimate that GNZ used in the formula.

The 0.10 PBR limit means that the incidental mortality or serious injury of Māui dolphins cannot exceed 1 individual dolphin every 10 years.  Thus, if just one dolphin dies or is seriously injured through a human-induced reason, then the PBR has been exceeded, and action must be taken to prevent additional mortality or serious injury.

### C.  MHDD's Challenge to the NMFS PBR Determination Has No Merit

#### 1.  The Value of "N" and "$N_{min}$"

NMFS accepted the value that GNZ submitted for "N," i.e., the current abundance estimate of 54 individuals above one year of age, and the value for $N_{min}$ of 51 after considering the analysis of Constantine, et al. (2021) cited above, entitled "Estimating the abundance and

effective population size of Māui dolphins (*Cephalorhynchus hectori maui*) in 2020-2021 using

microsatellite genotypes, with retrospective matching to 2001."   NMFS stated that:

> The GNZ has an abundance estimate for Māui dolphins which follows a
> scientifically sound process to estimate abundance and has plans to undertake a
> stock assessment survey to update that abundance estimate.  Based on NMFS'
> analysis, the GNZ meets the condition to have an abundance estimate for a marine
> mammal stock, and their system for Māui dolphin abundance estimation is
> comparable in effectiveness to U.S. standards.

89 Fed. Reg. at 4,596.  ECF No. 15-2, NMFS_001233.

This study satisfies the MMPA's "reasonable proof" standard because it was based on a

detailed analysis of the results of genetic sampling of Māui dolphins that was carried out from

2020 through 2021:

> Here we report the results from continued genetic monitoring of the Nationally
> Critical Māui dolphin subspecies (Cephalorhynchus hectori maui) during 2020
> and 2021, following the same methods as previously reported for surveys
> conducted in 2001–2007, 2010–2011 and 2015–2016.  Our primary objectives
> were to estimate the abundance and effective population size of Māui dolphins in
> 2020–2021 and to document the movements of individuals of this subspecies and
> migrant Hector's dolphins (C. h. hectori) using DNA profiles derived from biopsy
> samples.  We also matched the DNA profiles from biopsy samples collected
> during the 2020–2021 surveys with all other samples collected since 2001,
> including necropsy samples from beachcast individuals.

ECF No. 15-4, NMFS_003872.

MHDD challenges the GNZ's use of the abundance estimate in this study to derive PBR,

including the value of 51 for $N_{min}$.  First, NMFS allegedly failed to consider an August 2023

estimate by the International Whaling Commission's Scientific Committee "that there were 48

Māui dolphins in 2021."  Id.  Second, NMFS failed to consider the allegedly "current" estimate

of NMFS itself that there were 43 individual dolphins, not 54.  MHDD asserts that NMFS

"needed to consider this information when choosing the abundance estimate for its PBR

calculation." MHDD Br. at 21.  However, the two alleged population abundance estimates have

no factual or legal basis, as we now demonstrate.

### 2. MHDD's Reliance upon a "Recommendation" by the International Whaling Commission's Scientific Committee Is Misplaced

The IWC's Scientific Committee ("SC") did not conduct any study which counted or

estimated the number of dolphins, as the GNZ's own study did over the course of 2020-2021.

Rather, the SC relied upon the same study that the GNZ conducted and that NMFS then used to

calculate PBR.  However, the Scientific Working Group of the SC then made a so-called

"mortality correction" to the GNZ's abundance estimate.  It then "**recommended** that its new,

mortality-corrected abundance estimate for Māui dolphins of 48 (95% CI 40-57) be endorsed as

a "Category 3" estimate. (Bold font used in the original.)

The IWCSC defines a Category 3 estimate as follows:

An estimate which is informative, but not acceptable for inclusion in [Categories] (1A), (1B) or (2).  This category includes estimates with an unquantified bias which is likely to be too severe to allow inclusion in Category 2, as well as relatively unbiased estimates that are adequate to provide some general indication of abundance while still not qualifying for (1A) or (1B).  Such estimates may be used when fitting population models, but are not for use as estimates in actual implementations of IWC management procedures (i.e., the RMP CLA or AWMP SLAs).[13]

The following conclusions flow directly from these category definitions and the SC's

commentary.  First, the Scientific Working Group ("SWG") relied on the same Constantine, et al.

---

[13] The categories of abundance estimates used by the IWC are found in the October 2023 Appendix 3 to Annex D, entitled "Report of the Standing Working Group on Abundance Estimates, Stock Status and International Cruises.  See **Exhibit 2**.  Categories 1A, 1B, and 2 constitute abundance estimates that are far more reliable than Category 3, estimates.  For example, a Category 1A estimate is "acceptable for use in in-depth assessments or for providing management advice."

abundance estimate that the GNZ and NMFS relied upon but then adjusted it to reflect a "mortality correction" that some of its members apparently deemed appropriate.

Second, the SWG only made a "recommendation."  MHDD has not provided evidence that this recommendation has been adopted by the International Whaling Commission itself. Even if the IWC had adopted the recommendation, it would not bind NMFS, and it would not constitute the best available scientific evidence since MHDD has not shown that there was agreement within the IWC or that a "mortality correction" was appropriate.

Third, the SWG recommended that the "mortality-corrected abundance estimate . . . be endorsed as Category 3 because it anticipates that fully integrated analysis will be provided to the Committee in the future."  The IWC defines a Category 3 abundance estimate as merely "informative, but not acceptable for inclusion" in estimates that are deemed more reliable, i.e., Categories 1A, 1B, and 2 estimates.

Fourth, the IWC maintains an online "Table of Accepted Abundance Estimates."  This Table is available at: https://iwc.int/about-whales/estimate.  Undersigned counsel's visit to this online Table on May 7, 2025 did not list the SC's recommended abundance estimate with its "mortality correction."  Accordingly, it appears that the IWC has not modified its abundance estimate in the manner that MHDD claims, nor is that estimate relevant to the calculation of PBR.

### 3. MHDD's Reliance upon a "Current Estimate" of Approximately 43 Individual Dolphins Repeats and Reflects a Typographical Error Contained in the NMFS Decision Memorandum

On the second page of the Decision Memorandum that accompanied its 2024 Comparability Finding, the following sentence appears:

> In 1970, scientists estimated that the Māui dolphin population numbered approximately 200 animals; however, current estimates are approximately 43

individuals (95% CI 57-75) with the population declining at the rate of 3-4% per year between 2001 and 2021.

ECF No. 15-2, NMFS_001225.  <u>The number 43 is a typographical error</u>.  It should read as being 63 because, if there is a 95% CI, i.e., a 95% confidence interval, then the actual number of dolphins necessarily must range between 57 and 75 individuals.  Thus, it cannot possibly be 43 since 43 falls well outside the 95% CI of 57 to 75.

Further proof of this conclusion is found in the abundance estimate of Baker, et al. in 2016 (at 2), which found as follows:

> For the 2015-2016 surveys, the census abundance of Māui dolphins, excluding the two Hector's dolphins, was estimated to be 63 individuals of age 1 year or older (95% CL = 57,75), using a two-sample, closed-population model.  This estimate is comparable to, but slightly larger than the previous estimate of N = 55 (95% CL = 48, 69) based on the genotype surveys in 2010-2011.

ECF No. 25-5, NMFS_011414.  <u>See also</u> 2020 Comp. Finding at 18, which lists the Baker, et al. abundance estimate of 57-75 individuals with an "N" of 63.  ECF No. 25-5, NMFS_010936.  However, NMFS did not rely on the 2015-2016 abundance estimate since the 2020-2021 estimate was the most recently available abundance estimate.

### 4.  NMFS Relied on the Most Recent Abundance Survey to Determine PBR

MHDD has not submitted any abundance survey, much less a scientifically based survey, that provides a basis for rejecting the Constantine, et al. survey that the GNZ conducted, and the NMFS relied upon to calculate PBR.  Therefore, the Court should reject MHDD's assertion that if the NMFS had "used one of the more recent, lower abundance estimates, it likely would have been compelled to reach a different conclusion: that current Māui dolphin bycatch rates *do* exceed a bycatch limit comparable to PBR."  MHDD Br. at 22 (Italics in original).

Finally, even accepting that either of the two alleged abundance estimates was credible, MHDD has failed to show that a recalculated PBR using either estimate has been exceeded.

## V.    THE GNZ'S MONITORING PROGRAM IS COMPARABLE TO THE MMPA'S STANDARD FOR U.S. FISHERIES

### A.  The U.S. Monitoring Program Standard

The MMPA requires a U.S. fishery to "establish a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations."  16 U.S. C. §1387(d)(1).  The purposes of this program are to: (1) "obtain statistically reliable estimates of incidental mortality and serious injury" and (2) "determine the reliability of reports of incidental mortality and serious injury."  Id. at § 1387(d)(1)(A) and (B). Vessel owners and operators in the U.S. are required to report each incident of mortality by mail or other means acceptable to the Secretary within 48 hours after the end of each fishing trip.  Id. at § 1387(e).  Obtaining "statistically reliable estimates of incidental mortality and serious injury of marine mammals is a "key U.S. standard for the monitoring program."  2024 Comp. Finding at 18.  ECF No. 15-2, NMFS_001252-001253.[14]

As part of a monitoring program, NMFS has the discretion to "place observers on board vessels as necessary."  Id. at § 1387(d)(2).[15]  However, NMFS "is not required to place an observer on a vessel" in a U.S. fishery if it finds that "the facilities on a vessel for quartering of an observer or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel, would be jeopardized."  Id. at § 1387(d)(6)(B).

---

[14] The requirement of statistically reliable estimates in each monitoring program is also found in 50 C.F.R. § 216.24(h)(6)(iii)(C)(4).

[15] Subsections (d)(3) and (d)(4) of Section 1387 provide guidance to NMFS as to how observers, if required, should be employed.

Where observers are used, NMFS regards "10% human observer coverage for commercial fishing fleets" as sufficient to obtain statistically reliable estimates.[16]  2024 Comp. Finding at 19.  ECF No. 15-2, NMFS_001253.  U.S. standards do not require the use of on-board cameras to conduct monitoring even though a small number of pilot and operational programs that NMFS has authorized in U.S. fisheries have demonstrated that on-board cameras can provide equal or better results than human observers.  See, e.g., Winter 2023 "Electronic Monitoring for Sectors," stating that "EM systems are successfully used in a wide variety of [U.S.] fisheries, including in Alaska, the West Coast, and the Atlantic pelagic longline fishery (bluefin tuna bycatch monitoring).  Some fishermen find EM to be less expensive and less intrusive than human at-sea monitors."  ECF No. 15-5, NMFS_004443-004444.  See also "Examining the Potential of Electronic Monitoring to Address Gaps in Protected Species Bycatch Data Collection."  ECF No. 15-5, NMFS_004386-004428.

> EM could improve monitoring of protected species bycatch and interactions and help evaluate the effectiveness of existing bycatch mitigation measures and safe handling procedures as well as provide critical information needed to develop new mitigation measures.

Id. at NMFS_004391.

### B.  Summary of the GNZ's Monitoring Program

The GNZ's monitoring program consists of three elements: (1) vessel logbooks (100% self-reporting by vessels); (2) electronic monitoring through on-board video cameras; and (3) human observers.  All commercial fishing vessels operating in the WCNI fisheries are subject to

---

[16] The 10% monitoring standard is intended to achieve a 30% coefficient of variation ("CV") precision level, but this level is subject to available funding.  For direct comparison, a 30% CV level translates into approximately a 10% human observer level for commercial fishing fleets. 2024 Comp. Finding at 19.  ECF No. 15-2, NMFS_001253.

one or more of these requirements, and the bycatch of a marine mammal must be reported on the same day that it occurs.  See GNZ's 2020 Application for a Comparability Finding, ECF No. 25-5, NMFS_010814.

The GNZ explained the observer and on-board camera aspects of its monitoring program in Section 4 and Appendix F of its 2020 Comparability Application.  ECF No. 25-5, NMFS_010813-010815 and NMFS_020866-010873, respectively.  The GNZ subsequently informed NMFS that it had expanded its monitoring program requirements in its December 2022 "Supplementary Information – Monitoring Programme" submission.  ECF No. 15-2, NMFS_001086-001107.

To understand the extent of its required monitoring coverage, the GNZ first explains what it means when it uses differing terms to refer to the spatial patterns of dolphin occurrence.  The term "habitat" refers to suitable living space for dolphins, which is primarily a function of turbid, i.e., cloudy, water and the availability of prey.  A habitat can exist with or without dolphins actually present.  The term "habitat" should be distinguished from the terms "range" and "distribution."  The terms are not interchangeable.

The term "distribution" means the relative or absolute density of dolphins in every location.  The term "range" represents the alongshore distance inhabited by a particular dolphin during its lifetime.  The term "zone" is used where discrete boundaries are required, for example to define administrative areas, such as the MDHZ.  2020 Comp. Applic. at Appendix C.  ECF No. 25-5, NMFS_10836.

Māui dolphins typically inhabit shallow waters close to shore. They are most abundant between Manukau Harbor and Port Waikato within 4 nautical miles of the coastline with a lower

number of sightings out to 7 nautical miles and very occasional sightings further offshore.  Id. at NMFS_010844.

The GNZ has defined the MDHZ as extending along the mean high-water mark of the West Coast North Island from Cape Egmont to Cape Reinga, including harbors and offshore to the 12 nautical mile Territorial Sea boundary.  The MDHZ is estimated to cover approximately 96.4% (summer) and 87.8% (winter) of the Māui dolphin distribution.  Id. at NMFS_010799. Since the preponderance of dolphins are estimated to inhabit the MDHZ, the GNZ has focused its monitoring requirements on that zone:

> The expanded monitoring coverage area covers the entirety of the Māui dolphin habitat zone, including the northern tail of Māui dolphin distribution (fisheries statistical areas 047) and harbours (e.g., fisheries statistical areas 043 and 44) both of which were previously not included in the camera monitoring area (Figure 7). The previous electronic monitoring regulations only enabled review of footage from fisheries statistical areas 040-042 and 046.
>
> In addition, it covers the "transition zone" that extends from Cape Egmont to Wellington (as described in the 2020 Comparability Application).  There is no evidence of a current resident *Cephalorhynchus* spp. population in the transition zone, but historical evidence suggests there may have been a small resident population in the past.

Supplementary Information – Monitoring Program at 11.  ECF No. 15-2, NMFS_001096.  The updated electronic monitoring regulations cover all set net vessels greater than or equal to 8 meters in overall length, and all trawl vessels less than or equal to 32 meters in overall length. Id. at NMFS_001098.  Trawl vessels exceeding 32 meters in length "operate as part of the deepwater fleet in areas well outside of Māui dolphin habitat and are subject to high levels of observer coverage."  Id. at 14.  ECF No. 15-2, NMFS_001099.

Under the GNZ's expanded monitoring requirements, all set net and trawl vessels that meet the size requirements will carry and operate cameras.  From the footage that is captured,

different review levels will be applied depending on the risk and importance of any protected species interactions.  Id. at NMFS_001099.

In addition to the areas that the GNZ had previously closed to set net and trawl fishing, the GNZ "continues to monitor set net and trawl vessels that operate outside the closed areas, focusing on areas where the greatest residual risk remains."  Id. at NMFS_001088.  These areas are informed by the GNZ's "Spatially Explicit Fisheries Risk Assessment" ("SEFRA"), which "applies the estimated catchability of Māui dolphins by set net and trawl across the areas where fishing effort and dolphin distribution are estimated to overlap."  Id.  The GNZ used the results of the SEFRA model to increase the spatial areas that previously had been closed to set net and trawl fishing, effective October 1, 2020.

The "highest levels of [monitoring] coverage have been targeted in the areas that pose the greatest residual risk to the dolphins":

> Trawl coverage has been targeted at 100% in the "core distribution area," a subset of the broader Māui dolphin habitat zone where monitoring coverage for trawl has been targeted at 50-70% of effort.  Set net is prohibited in the "core distribution area" and monitoring coverage has been targeted at 100% of the coastal portion of the Māui dolphin habitat zone (excluding harbours).

Id. at NMFS_001089.  The Supplementary Information submission then explains how the GNZ's expanded monitoring program informs the statistical reliability of estimates of bycatch used in the SEFRA model.  Id. at NMFS_001089-001091.  For example, "Data on bycatch is collected through the observer program, which is then used to estimate total bycatch.  This is the same practice used in U.S. fisheries."  Id. at NMFS_001089-001090.  Moreover,

> By using the SEFRA method the observer coverage required to obtain a statistically robust captures estimate is focused on areas where the risk is most likely to occur.  This neutralizes the effects of spatial bias arising from spatially non-random or unrepresentative fisheries observer coverage.

Id. at NMFS_001090.

The GNZ updated its monitoring regulations effective November 30, 2022.  As a result:

The monitoring coverage area has been expanded along the entire coast from Cape Reinga to the Cook Strait, and

All set net vessels greater than or equal to 8 meters in overall length, and all trawl vessels less than or equal to 32 meters in overall length are required to carry and operate on-board cameras.

Under the caption "Spatial Coverage," the GNZ explained that:

The expanded monitoring coverage area covers the entirety of the Māui dolphin habitat zone, including the northern tail of Māui dolphin distribution (fisheries statistical area 047) and harbours (e.g., fisheries statistical areas 043 and 044) both of which were previously not included in the camera monitoring area.  The previous electronic monitoring regulations only enable review of footage from fisheries statistical areas 040-042, 045 and 046.

In addition, it covers the "transition zone" that extends from Cape Egmont to Wellington (as described in the 2020 Comparability Application).  There is no evidence of a current resident *Cephalorhynchus* spp. population in the transition zone, but historical evidence suggests there may have been a small resident population in the past.

Id. at NMFS_001096.

In addition, the GNZ's April 2023 "Supplementary Information to NOAA questions received March 2023" contains an extensive discussion of all aspects of the GNZ's enhanced monitoring requirements.  ECF No. 15-2, NMFS_001133-001144.  This discussion comprehensively covers the following subjects: reporting requirements for commercial fishermen; reporting tools that provide real-time information about the entire fishing fleet's activities; the extent of required electronic monitoring; the extent of human observer coverage; the extent of monitoring coverage both inside and outside the MDHZ; the required levels of monitoring coverage; and the camera footage review process and footage review levels.  This discussion leaves no doubt that the GNZ maintains a monitoring program that is at least comparable to the U.S. monitoring standard.

### C.  NMFS Approval of the GNZ's Monitoring Program

After reviewing all the GNZ's monitoring-related submissions and supporting documents, NMFS provided an extensive analysis in which it concluded that the GNZ maintained a program comparable to that required for U.S. fisheries.  2024 Comp. Finding at 18-22.  ECF No. 15-2, NMFS_001252-001256.  It found that, to obtain statistically reliable estimates of mortality and serious injury, "a 10% human observer coverage level [is required] for commercial fishing fleets.  NMFS_001253.

U.S. standards do not require on-board cameras, although several pilot programs are in operation or are being developed, and seven programs are operational in U.S. fisheries.  Rather, "the U.S. monitoring program consists of logbooks (self-reporting) and at-sea monitoring through observers."  Id.  Importantly, observers are not required for vessels under 26 feet (8 meters) in length.  Moreover, "NMFS generally does not deploy observers or electronic monitoring on [these smaller] vessels" due to concerns about observer safety and health, as well as interference with safe operation of the vessel.  Id.

NMFS has concluded that:

New Zealand's monitoring program is required under its Marine Mammal Protection Act 1978, the Fisheries (Reporting) Regulations 2017, and the Fisheries (Electronic Monitoring) Regulations 2017.  The amendment to the Fisheries (Electronic Monitoring) Regulation 2017 from 2022 outlines the scope and coverage of the electronic monitoring program.  In addition to the fishing restrictions as outlined for all of New Zealand's fisheries, New Zealand expanded the electronic monitoring (EM) coverage along the entire coast of the North Island west coast, and the video camera monitoring area now includes the entirety of the Maui Dolphin Habitat Zone (MDHZ) from the northern extent of Cape Reinga down to the end of the southern extent at Wellington.  These EM expansions focused on the areas outside of the core Maui dolphin distribution area where the greatest residual risk for Maui dolphin bycatch remained prior to the expansion.  The MDHZ is located on the west coast of the North Island (including harbours) from the coast out to 12 nm.  The MDHZ covers approximately 90-95% of Maui dolphin habitat over its entire distribution.

39

2024 Comp. Finding at 20.  ECF No. 15-2, NMFS_001254.  NMFS then provided a Table 1

showing the extent of electronic monitoring and observer coverage for both the WCNI set net

fishery and the WCNI trawl fishery.  For the "set net fleet" in the MDHZ, there was 100%

monitoring coverage, with the exception of harbors.  For the trawl fleet in the MDHZ, there was

20-70% coverage outside the prohibition area.  For the trawl fleet, there was 25-50% coverage

by the observer program.[17]  Trawlers operate in coastal waters and are prohibited in harbors.

NMFS then summarized the reasons for its approval of the GNZ's monitoring program as

follows:

> New Zealand has attained 90% monitoring coverage for its fisheries (between its
> observer and EM programs) within the MHDZ to observe for marine mammal
> bycatch because EM is capable of observing marine mammal bycatch 100% of
> the time.  In summary, New Zealand's 90% monitoring coverage through its
> monitoring program is more accurate and robust than NMFS' 10% monitoring
> coverage through its observer program and these levels exceed the requirements
> of the MMPA for statistically reliable bycatch estimates

NMFS_001256.

### D.  MHDD's Challenges to NMFS Monitoring-Related Determination Have No Merit

First, MHDD misstates the NMFS monitoring standard for U.S. fisheries by asserting that

the standard is not 10% coverage, but rather, "the United States requires much higher monitoring

levels when critically imperiled marine mammals may be captured – sometimes up to 100%."

MHDD Br. at 22.  MHDD cites no statutory or regulatory authority that requires a "much higher

---

[17] NMFS approved the GNZ's monitoring program despite the fact that the GNZ did not require
monitoring by those vessels fishing exclusively within harbors that were less than 26 feet (8
meters) in length because such vessels "are usually between 12 and 20 feet (four to six meters) in
length, are unable to carry an observer or an on-board camera due to concerns for both human
health and safety and safe vessel operation.  2024 Comp. Finding at 21. ECF No. 15-2,
NMFS_001255.  Thus, NMFS reasonably invoked the statutory exception for under 8-meter
vessels because it found that the conditions for that exception were met.

monitoring level than 10%," and neither the MMPA nor the Import Provisions contain such a standard.

Second, the U.S. standard is 10% coverage for human observers only: "the United States only uses observers to attain approximately 10% monitoring coverage for its fisheries to document marine mammal bycatch."  2024 Comp. Finding at 22.  ECF No. 15-2, NMFS_001256.  Neither the MMPA nor the Import Provisions prescribe a standard for on-board camera monitoring.   However, the GNZ's human observer plus on-board video cameras (EM) requirement results in 90% monitoring coverage within the MDHZ.  Id.

Third, although the U.S. monitoring standard does not require the use of on-board cameras, such cameras are now being used in U.S. fisheries on a pilot program basis, as well as on a limited operational basis.  Comp. Finding at 19.  ECF No. 15-2, NMFS_001253.  Importantly, an on-board camera "is capable of observing marine mammal bycatch 100% of the time."  2024 Comp. Finding at 22.

Fourth, MHDD asserts that NMFS has recommended "higher [than 10%] minimum observer coverage for stocks with lower PBRs, which, as discussed above, reflect small populations."  MHDD Br. at 23.  In support of this assertion, MHDD cites an excerpt from a NMFS document entitled "Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act."  ECF No. 25-8, NMFS_013831-013873.  This document includes a "Table 6" that lists "Guidelines for Minimum Observer Sample Size Requirements."  NMFS_013869.  Although MHDD claims that this document shows "higher recommended minimum observer coverage levels for stocks with lower PBRs," it omits the fact that Table 6 shows a sharply declining observer requirement as the length of the observer program, measured in years, increases.

Thus, Table 6 shows that, for a stock with a PBR of 1, 80% coverage is required in year 1 on the program, but only 40% coverage is required in year 2, which then decreases steadily from 40% in year 3 through year 9. MHDD does not attempt to show that the GNZ's monitoring program does not meet these guidelines, even assuming that they are requirements, not "guidelines" subject to NMFS discretion. Moreover, the GNZ has achieved 90% monitoring coverage in the MDHZ as a result of the increased monitoring requirements that have taken effect since 2022. 2024 Comp. Finding at 22. ECF No. 15-2, NMFS_001256.

<u>Fifth</u>, MHDD cites the Declaration of Timothy Ragan, which the plaintiffs in the <u>Sea Shepherd</u> lawsuit submitted. However, the cited paragraphs of the Ragan declaration do not identify any monitoring standard other than the 10% standard. ECF No. 49-4, paras. 40, 88-89. Rather, Ragan generally stated that the 10% standard was too low, without identifying what he thought the standard should be, much less that the GNZ's monitoring program failed to meet that (unspecified) standard.

<u>Sixth</u>, MHDD asserts that two district court decisions hold that "observer coverage as high as 100% may be necessary to ensure that bycatch limits are not exceeded for imperiled species, where even a small number of deaths over the [bycatch] limit could have devastating consequences." MHDD Br. at 23. The first decision, <u>Center for Marine Conservation v. NMFS</u>, 2000 WL 33964303 (D. Haw. 2000), involved interactions between Hawaii-based longline fishing vessels and sea turtles. An environmental group sought injunctive relief to obtain spatial and temporal closures of various areas, as well as observer coverage on each longline vessel.

The court first modified its initial grant of injunctive relief in the decision that the MHDD cites and therein held that "all vessels that discharge pelagic longline sets will be required to carry a NMFS-approved observer." However, the court once again modified its original

injunction in an August 4, 2000 decision, in which it held that "not less than 10% of all vessels fishing within [a described area] must carry a NMFS-approved observer" and within three months after entry of the court's order, not less than 20% of vessels fishing in this same area must carry an approved observer.

The case is obviously distinguishable. First, sea turtles are reptiles, not marine mammals. Second, the case was not brought under the MMPA. Rather, it was brought under the National Environmental Policy Act. Third, longlines are not set nets or trawls, and they may require different types of monitoring for that reason. Fourth, the court did not discuss whether any particular standard of monitoring or observer coverage applied under the NEPA. Fifth, the court did not compare any party's contentions concerning whether the amount of observer coverage that they sought was "comparable" to any NEPA observer standard, much less to the MMPA's monitoring standard. Finally, the court recognized that in certain circumstances, far less than 100% observer coverage was appropriate. This decision is irrelevant for each of these reasons.

Equally irrelevant is Earth Island Institute v. Evans, 2004 WL 11774221 (N.D. Cal., 2004). That case involved compliance with the Dolphin Protection Consumer Information Act ("DPCIA"), 16 U.S.C. § 1385, not the MMPA, in an area known as the eastern tropical Pacific Ocean ("ETP"). This Act aimed to protect dolphins in the ETP through the use of information disclosure. Specifically, the Act provided that tuna fish for sale in the United States could only display the "dolphin safe" label if the tuna was not caught using purse seine nets intentionally deployed on or to encircle dolphins. Thus, the decision does not discuss any aspect of the comparability of a foreign government's program to ensure compliance with the MMPA's standards. The court's reference to the "high degree of confidence" that NMFS had in its mortality statistics because they were based on 100% observer coverage related to NMFS

43

defense of its implementation of the DPCIA, and not to any standard that the DPCIA required or that the MMPA required.

Seventh, MHDD asserts that "NMFS's use of a 10% [observer monitoring] standard is "inapt" because "critically endangered species like the Māui dolphin implicate considerations requiring much higher monitoring levels than general-purpose programs." MHDD Br. at 24. This is just an opinion of counsel that ignores the statutory test for determining whether the GNZ has implemented a monitoring regime comparable to the U.S. standard. Specifically, MHDD ignores the statutory requirement that monitoring programs be designed to obtain "statistically reliable estimates of incidental mortality and serious injury." 16 U.S.C. §1387(d).

Eighth, MHDD has not attempted to demonstrate that the GNZ's monitoring program fails to obtain statistically reliable estimates of mortality and serious injury. In contrast, the GNZ provided information that demonstrated the statistical reliability of its estimates generated by its monitoring program in its December 2022 Supplementary Information – Monitoring Program submission at 4-7. ECF No. 15-2, NMFS_001089-001092. MHDD offers no challenge to this information.

Ninth, MHDD asserts that the GNZ has stated that "100% monitoring is necessary to be able to close fisheries if a bycatch limit is exceeded." MHDD Br. at 24. In support, MHDD cites an excerpt from a GNZ document entitled "Protecting Hector's and Māui dolphins; Supporting Information and Rationale." ECF No. 25-4, NMFS_10212-10331. The goal of this 120-page compilation of information, updated on June 17, 2019, was "to provide supporting technical information and analysis for the consultation document [entitled] "Protecting Hector's and Māui Dolphins." NMFS_010216. The quotation from that document that MHDD relies upon appears under the caption "Trigger point(s)," which reads in full as follows:

Depending on whether additional measures are chosen, and the extent of those measures, agencies consider that implementation of regulatory trigger points should be considered.  As an alternative to zero-risk reduction measures, a mix of measures could be introduced to reduce risk to levels that Ministers consider acceptable, but which still provide for a reasonable level of use.  Alongside these measures a regulatory framework could be put in place that immediately halted all fishing activity by set-net or trawl vessels operating within a defined area (potentially the same as the most risk averse option proposed in this document) for a period until notified of the ability to fish again or further controls were implemented, including a full closure of the area if determined appropriate.  <u>This option would require 100% monitoring of vessels using trawl or set net in areas of risk.</u>

ECF No. 25-4, NMFS_10245.  (Emphasis added.)  This document was prepared in 2019, i.e., well before the GNZ adopted its enhanced monitoring requirements, beginning in 2022.  Those requirements satisfy the "option" proposed in the "Trigger point(s)" discussion because, as NMFS found, 100% monitoring is required:

Looking at the annual measures of effort by vessel and location allows New Zealand to identify areas of high risk of Maui dolphin bycatch.  New Zealand is then able to factor in these considerations when determining levels of monitoring within the MDHZ to get to the appropriate level of coverage needed to monitor Maui dolphin bycatch.  Under the recent changes to the expansion of the EM program, there will be 100% monitoring for all inshore trawl vessels in the MDHZ and 100% monitoring coverage on all coastal set net vessels north of Whanganui.

2024 Comp. Finding at 21.  ECF No. 15-2, NMFS_001255.  Thus, NMFS expressly recognized that the GNZ's enhanced monitoring program required 100% monitoring in the identified "areas of high risk."

<u>Tenth,</u> MHDD asserts that "NMFS itself previously proposed that New Zealand implement 100% monitoring for set-net and trawl fisheries out to 20 nautical miles."  MHDD Br. at 24.  This proposal appeared in a 4-page document entitled "NMFS Suggested Options for New Zealand's Consideration."  ECF No. 25-2, NMFS_008574-008577.  Then, under the caption "U.S. Draft Proposals (Note these options have not received official clearance and are for

45

discussion purposes only)," the 100% monitoring proposal appeared, and this proposal was linked to a trigger that would be pulled "in the event that one Māui is bycaught."  Here again, NMFS gave no indication that 100% monitoring was required under the MMPA or even suggested in the absence of the bycatch limit having been exceeded.

Eleventh, MHDD asserts that "NMFS never considered whether these 'important aspects' may require a higher monitoring level than 10%."  MHDD Br. at 25.  That claim is incorrect because NMFS concluded that the GNZ's combined observer/on-board camera monitoring system attained 90% monitoring coverage within the MDHZ.

Twelfth, MHDD finds fault with the NMFS conclusion that the GNZ's monitoring program achieved 90% coverage.  MHDD Br. at 26.  Rather:

> The New Zealand Government submitted evidence that actual monitoring has covered less than 45% of trawl effort and less than 2% of set net effort within the Māui dolphin habitat zone (which itself is just a truncated portion of the dolphin's habitat."

In support of this allegation, MHDD cites NMFS_001105-001106, and in footnote 9 to its Brief, MHDD claims that Figure 10 and Figure 12 purportedly show much lower monitoring coverage than NMFS found.

However, the so-called "much lower monitoring coverage" does not reflect the enhanced monitoring requirements that the GNZ implemented beginning in 2022.  Moreover, the seemingly low coverage figures reflect that the GNZ has not required on-board cameras or human observers in its WCNI harbors.  Trawls are prohibited in harbors.  Moreover, almost all

set net vessels that operate in harbors are less than 8 meters in length, which the MMPA exempts from the U.S. monitoring standard for reasons that the GNZ has satisfied.[18]

In addition, the public frequently operates recreational vessels within harbors and observes harbors from shore, which provides additional assurance that dolphin sightings and any bycatch in harbors will be reported. The GNZ took this fact into account in its Comparability Application. See December 2022 Supplementary Information – Monitoring Programme at 6-10. ECF No. 15-2, NMFS_001091-001095. There, the GNZ explained its reliance on public sightings within harbors and the high levels of public presence in harbors, as well as why its SEFRA model accounted for the presence of Māui dolphins in harbors despite extremely low observed occurrences, as well as the circumstances that justified not requiring observers on vessels less than 8 meters in length.[19]

Thirteenth, MHDD complains that "only a small portion of the camera footage" captured by on-board cameras is actually reviewed to determine if any bycatch occurred. MHDD Br. at 26. However, MHDD overlooks the fact that on-board cameras are used to confirm the accuracy of the daily reports of bycatch that every licensed fishing vessel must submit. Moreover, "Within 12 nautical miles of the coast from Cape Reinga (the northern boundary of the Māui dolphin habitat zone) to Whanganui 100% of footage will be reviewed to verify that there are no Māui dolphin captures." Id. at NMFS_001099. For the area "Between 12 and 17 nautical miles off the coast from Cape Reinga to the Cook Strait, a baseline of 20% of events will be reviewed to

---

[18] Four set net vessels longer than 8 meters operate in harbors, but they do not do any fishing. Rather, they are "motherships" to which under 8-"meter vessels bring their catch.

[19] The GNZ's June 2019 "Spatial risk assessment of threats to Hector's and Māui dolphins" at 17-18 explains how the GNZ took into account the relative abundance of dolphins in North Island harbors when estimating the risk of bycatch, including its reliance on public sightings. ECF No. 15-5, NMFS_004478-004479.

verify that there are no Māui dolphin interactions <u>with an ability to review more footage if needed</u>." <u>Id.</u> (Emphasis added.) MHDD does not cite any U.S. standard that specifies the percentage of camera footage that should be reviewed, but in any event, the camera footage is a backstop to the required vessel logbook reporting of every interaction with any marine mammal.

<u>Finally</u>, MHDD asserts that NMFS "failed to consider how New Zealand's almost-exclusive use of electronic monitoring can make its monitoring program less statistically reliable than the human monitors that U.S. MMPA monitoring programs employ." MHDD Br. at 26. Moreover, "U.S. experts [allegedly] have cautioned that using electronic monitoring in place of human observers would result in substantial data loss." MHDD Br. at 27. Neither of these statements is accurate, and MHDD is forced to distort and mischaracterize the results of a NMFS study entitled "Examining the Potential of Electronic Monitoring to Address Gaps in Protected Species Bycatch Data Collection" by extracting from a 42-page study a single sentence, which it took out of context. <u>See</u> ECF No. 15-5, NMFS_004386-004428. This document shows that electronic monitoring ("EM"), including onboard cameras, is growing in the U.S. at a "modest pace" and is:

> creating an opportunity to ensure critical data types needed for estimating bycatch and developing bycatch reduction measures . . . . EM has the potential to improve monitoring of protected species bycatch and interactions, and help evaluate the effectiveness of bycatch mitigation measures.

<u>Id.</u> at 1, NMFS_04390.

The authors of this study reviewed each ongoing U.S. monitoring programs and concluded that "we were able to identify possible national monitoring priorities with the potential to improve protected species bycatch estimates in multiple regions." <u>Id.</u> Moreover,

> if observer coverage is too low or nonexistent due to limited resources for monitoring, and/or sampling designs are not appropriate, protected species bycatch estimates may be biased. In addition, when bycatch events are rare,

> extrapolations using rational estimators may systematically under- or
> overestimated bycatch. Therefore, fishery managers and scientists are looking for
> new tools to expand data collection and improve protected species bycatch
> estimates.

Id. at 2, NMFS_004391. It is unnecessary to provide additional excerpts from this study to

demonstrate that the authors concluded that electronic monitoring makes a valuable contribution

to the protection of marine mammals. In fact, the study identifies numerous "potential EM

applications" and recommends the adoption or expansion of EM in the Greater Atlantic, West

Coast, Pacific Islands, Alaska, and Southeast regions. Id. at 16-17, NMFS_004405-004406.

Seen in this light, MHDD's sole reliance on a statement from the "regional experts from

Alaska" to the effect that "transition to increased EM deployment (and decreased human

observer effort) would result in substantial data loss" is an outlier from the study's overall

conclusion that additional use of EM would improve the chances of more accurate estimates of

bycatch of protected species. Moreover, even the Alaska experts stressed the utility of using

cameras in unobserved fisheries to collect marine mammal bycatch data.

Needless to add, the study did not evaluate the nature and extent of the GNZ's use of on-

board cameras in the WCNI fisheries. Rather, Alaskan "regional experts" were commenting on

their own experience in Alaska, and MHDD makes no effort to relate that experience to the

GNZ's on-board camera requirements. The GNZ does not assert that human observers are not

useful under certain conditions and circumstances, but the NMFS study makes it clear that the

same is true of on-board cameras.

Nevertheless, the GNZ has made substantial use of observers, as it explained in its 2020

Comparability Application:

> Government fisheries observers are used to monitor interactions between fishing
> vessels and protected species, including Hector's and Māui dolphins, and to
> collect data used to estimate annual bycatch (captures and mortality). There have

been no observed bycatch events of Cephalorhynchus spp. dolphins off the West
Coast North Island.  Given the small size of the Māui dolphin population, and
low encounter rate (based on its spatial distribution and extensive fisheries
closures), observer coverage within the Māui dolphin distribution is primarily
used as a means of ensuring any interaction is detected so that any management
response can occur quickly (i.e. the use of the fishing-related mortality limit).

Because of the very low likelihood of interactions the level of monitoring
coverage needs to be high to reliably detect any non-zero capture rate.  Fishery
observers have previously been deployed on a proportion of vessels across the
commercial set net and trawl fishing fleets on a risk-basis (refer Appendix F).  In
the last three complete fishing years, the percent of fishing days observed in the
target set net area has averaged 95%, and 90% in the target trawl coverage area.

Since 1 October 2012, in the target observer coverage areas for Māui dolphins,
there have been 879 set net and 1403 trawl fishing days observed (i.e. does not
include sea days where no fishing occurred).  In that time, there have been no
observed interactions with Cephalorhynchus spp. dolphins, and only two sightings
of Cephalorhynchus spp. dolphins in closed areas while the vessels were in transit
to fishing grounds further offshore.  Fisheries observers will continue to be used
as required to provide the high level of monitoring required within the Māui
dolphin habitat zone. Fisheries observers are currently used on:

> • Coastal set net and trawl vessels not covered by the on-board camera
requirement; and

> • On some vessels that carry on-board cameras to support verification of
the camera monitoring programme.

2020 Comp. Applic. at 47.  ECF No. 25-5, NMFS_010815,

## VI.    THE GNZ'S STOCK ASSESSMENT IS COMPARABLE TO THE MMPA'S U.S. STANDARD FOR STOCK ASSESSMENTS

MHDD claims that NMFS issued a "conclusory statement" that the GNZ maintained a

stock assessment comparable to that required of U.S. fisheries, but did not explain how it reached

this determination.  MHDD Br. at 27-28.  This assertion is incorrect because where NMFS

referenced an element of the stock assessment requirement and how the GNZ fulfilled that

requirement, there can be no dispute that it considered the evidence that the GNZ provided and

found that it was comparable to the MMPA's U.S. stock assessment standard.

50

In addition, an administrative agency is presumed to consider everything in the administrative record.  For example, in <u>Gonzales v. West</u>, 218 F.3d 1378, 1381 (Fed. Cir. 2000), the Federal Circuit found that "absent specific evidence indicating otherwise, all evidence contained in the record at the time of [an agency's] determination. . . must be presumed to have been reviewed by [that agency]."  Similarly, in <u>Medtronic, Inc. v. Daig Corp.</u>, 789 F.2d 903, 906 (Fed. Cir. 1986), the court held that there is a presumption "that a fact finder reviews all the evidence presented unless he explicitly expresses otherwise."  <u>See also</u> <u>Snyder v. Department of Navy</u>, 854 F.3d 1366, 1373 (Fed. Cir. 2017):

> The mere fact that the AJ did not recount these arguments as thoroughly as Ms. Snyder would like does not mean that the AJ did not sufficiently consider them. <u>See</u>, <u>e.g.</u>, <u>Synopsys, Inc. v. Mentor Graphics Corp.</u>, 814 F.3d 1309, 1322 (Fed. Cir. 2016) (noting that an agency is "not require[d] ... to address every argument raised by a party or explain every possible reason supporting its conclusion.").

Thus, MHDD's argument that NMFS failed to consider various issues is belied by all the scientific information and independent studies that the GNZ submitted to NMFS as we now describe with respect to each required element of a stock assessment.

(1) <u>Geographic range:</u>

The GNZ described the geographic range, including seasonal and temporal variations, in two documents that NMFS expressly referenced in its 2024 Comparability Finding.  These documents are the 168-page "Spatial risk assessment of threats to Hector's and Māui dolphins (*Cephalorhynchus hectori*)" and the 61-page document captioned "Estimating the abundance and effective population size of Māui dolphins (*Cephalorhynchus hectori maui*) in 2020-2021 using microsatellite genotypes with retrospective matching to 2001."  <u>See</u> ECF No. 15-5, NMFS_004456-004629 and ECF No. 15-4, NMFS_003868-003932, respectively.

NMFS referred to and relied upon these documents.  See, e.g., 2024 Comp. Finding at 28,

where NMFS discusses at length the GNZ's "Spatially Explicit Fisheries Risk Assessment"

("SEFRA") model.  The model, among other things, states (at 1) that:

> As an input to the SEFRA model, the summer and winter spatial densities of
> Hector's and Māui dolphins were estimated using a habitat model fitted to
> Hector's dolphins aerial survey observations and using turbidity and prey species
> presence as habitat-based predictors.  Spatial predictions arising from the habitat
> model were independently validated using public and commercial fisheries
> observer sightings, i.e., the public sightings of Māui dolphins and fishery observer
> sightings of Hector's dolphins, almost perfectly matched the Hector's dolphin
> habitat model spatial prediction.  Boat-based public sightings were also used to
> estimate the relative density of Māui dolphins in harbours of the West Coast North
> Island; these estimates were low, consistent with prior information from acoustic
> monitoring devices.

ECF No. 15-5, NMFS_004462.

   (2) Minimum population estimate, current and maximum productivity rates, and current
       population trend:

NMFS calculated the potential biological removal rate at 0.10.  2024 Comp. Finding at

27.  ECF No. 15-2, NMFS_001261.  MHDD does not dispute that the GNZ provided its

population estimate and the derived $N_{min}$ to NMFS for use in the PBR calculation.[20]

   (3) Estimate of annual human-caused mortality and serious injury by source:

Estimates of annual human-caused mortality by source are contained in the GNZ's

SEFRA study.  ECF No. 15-5, NMFS_004456-004629.  See also "Review of the Māui's Dolphin

Threat Management Plan-Discussion Paper."  ECF No. 25-4, NMFS_009815-009826.  This

document lists a significant number of non-fishing, but human-induced threats, including seismic

surveying, seabed mineral exploitation, commercial marine tourism, vessel traffic, pollution

---

[20] The GNZ also provided the "current population trend" in its abundance survey, entitled
"Estimating the abundance and effective population size of Māui dolphins in 2020-2021 using
microsatellite genotypes with retrospective matching to 2001."  NMFS_003868-003932.

(including oil spills and plastic debris), coastal development (including construction and dredging); scientific interactions; shooting; and climate change.  The NMFS 2020 Decision Memo (at 7) expressly referenced the SEFRA study.  ECF No. 25-5, NMFS_010915.

(4) Description of commercial fisheries that interact with the stock:

The West Coast North Island set net and trawl fisheries, which are the only commercial fisheries that "interact" with Māui dolphins, were first described in the GNZ's 2020 Comparability Application at 38-41.  ECF No. 25-5, NMFS_010806-010809.    The 2024 Comparability Finding identifies these two fisheries by their Fishery ID numbers, which are 1969 and 1977.  NMFS also refers to the "West Coast North Island multi-species set-net fishery" and the "West Coast North Island multi-species trawl fishery."  89 Fed. Reg. 4,595.  ECF No. 15-2, NMFS_001232.

(5) Categorization of the stock as a "strategic stock":

The MMPA defines a strategic stock to include a stock that is listed as an endangered species under the Endangered Species Act of 1973.  16 U.S.C. § 1362(19).  There is no dispute that the Māui dolphin is listed as an endangered species under this Act.  See 50 C.F.R. § 17.11(h).

(6) Estimate of the PBR for the stock:

The GNZ provided the abundance information necessary to calculate the PBR, and NMFS then made that calculation.

In summary, the GNZ provided the information that comprises a stock assessment under the MMPA, and NMFS expressly considered it.

**VII.    NMFS EVALUATED WHETHER THE BYCATCH OF MARINE MAMMALS OTHER THAN MĀUI DOLPHINS WAS COMPARABLE TO THE U.S. STANDARD**

MHDD claims that the that the Comparability Finding lacks evidence demonstrating that NMFS considered whether New Zealand's West Coast North Island set net and trawl fisheries killed or seriously injured marine mammals <u>other than</u> Māui dolphins.  MHDD Br. at 28-30. This claim is erroneous.

 First, the record contains a summary that NMFS prepared from data that the GNZ submitted through the online portal (through which Comparability Applications must be submitted) showing, for each marine mammal species that interacts with the WCNI fisheries, the following information:  mammal name; location of stock; average annual estimated mortality; average annual mortality plus serious injury; population abundance estimate; bycatch limit; and whether the bycatch limit is currently exceeded.  ECF No. 15-2, NMFS_001052-001067.  The GNZ submitted similar information pertaining to all of New Zealand's fisheries, not just the two WCNI fisheries, to NMFS.  <u>See</u> ECF No. 25-2, NMFS_004701-004764.

Second, MHDD omits mention of the fact that the Comparability Finding identifies five marine mammal species, i.e., the Antarctic blue whale, fin whale, sei whale, southern right whale, and sperm whale as "Section 118(f)(3) stocks."  This provision, codified as 16 U.S.C. § 1387(f)(3), provides that:

> If there is insufficient funding available to develop and implement a take reduction plan for all such stocks that interact with commercial fisheries listed under subsection (c)(1)(A)(i) or (ii), the Secretary shall give the highest priority to the development and implementation of take reduction plans for species or stocks whose level of incidental mortality and serious injury exceeds the potential biological removal level, those that have a small population size, and those which are declining rapidly.

NMFS found that these five "Section 118(f)(3) stocks," which inhabit "nearly all" of New Zealand's export fisheries, have had <u>zero</u> "total mortality + serious injury" and, therefore, have not exceeded their respective bycatch limits. 2024 Comp. Finding at 4 and Table 1. ECF No. 15-2, NMFS_001238. Moreover, there is no record evidence that any of these five species "have a small population size" or "are declining rapidly," nor has the MHDD asserted that either of these conditions exist that would otherwise require a take reduction plan.

Moreover, "bycatch mitigation measures" have been implemented for these five species. The two fishery ID numbers that denominate the WCNI set net and trawl fisheries are 1969 and 1977. In those fisheries, the following measures have been implemented: time and area closures; MPA/fishing closures; fishing practices (move on, net tending, soak time, etc.); safe handling and release practices; marine mammal ID guides; avoidance of areas of high activity, including rookeries (for protected sea birds) and foraging; good offal management; and gear operational procedures. 2024 Comp. Finding at 6-7. ECF No. 15-2, NMFS_001241-001242. Also, the same monitoring procedures that apply to Māui dolphins apply to all marine mammals.

Third, NMFS prepared a table listing, among other things: (1) each of the marine mammal species that have been estimated to overlap with, or have been observed or reported in the WCNI fisheries; (2) the estimate bycatch of each species; (3) the monitoring program used to calculate bycatch; (4) the monitoring program in use by the fishery; (5) mitigation measures; and (6) the bycatch percent reduction from mitigation. ECF No. 15-2, NMFS_001145. The table summarizes information that the GNZ submitted through the NMFS online portal as part of its 2021 Comparability Application. The table shows that PBR was not exceeded for any marine mammal species in the WCNI set net and trawl fisheries.

In summary, the record demonstrates that NMFS expressly considered those additional species for which the MMPA requires protection from mortality or serious injury.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the MHDD's motion for summary judgment, decline to order an import ban, and find that the GNZ's program for protecting Māui dolphins is comparable to the program required by the U.S. standards established in the MMPA and the Import Provisions.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

Trade Pacific PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760
wconnelly@tradepacificlaw.com

Counsel for the New Zealand Government

Date submitted: May 27, 2025.

## **<u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION</u>**

This brief contains 16,925 words and, therefore, complies with the 17,000-word

limitation contained in the Court's May 27, 2025 Order.

<u>/s/ Warren E. Connelly</u>
Warren E. Connelly

EXHIBIT 1

# West coast North Island Inshore set net

## 1   Reduction in Māui dolphin bycatch

The 2020 Comparability Application best describes the estimated reduction in mean annual deaths from the most recent fisheries restrictions that took effect off the west coast North Island in 2020.

Adoption of these new measures under the Hector's and Māui dolphin Threat Management Plan represents an approximate reduction in estimated mean annual deaths of Māui dolphins of 42% from the west coast North Island inshore set net fishery (Table 1).

**Table 1.** Estimates of fisheries bycatch (captures and deaths) of Māui dolphins from commercial set net. Estimates include the 95% credible intervals.

| | | Commercial set net |
|---|---|---|
| Pre 1 Oct. 2020 | Mean annual captures (CI 5th to 95th percentile) | 0.044 (0.030-0.063) |
| | Mean annual deaths (CI 5th to 95th percentile) | 0.083 (0.049-0.135) |
| Post 1 Oct. 2020 | Mean annual captures (CI 5th to 95th percentile) | 0.026 (0.017-0.037) |
| | Mean annual deaths (CI 5th to 95th percentile) | 0.048 (0.028-0.081) |

# West coast North Island Inshore trawl

## 1   Reduction in Māui dolphin bycatch

The 2020 Comparability Application best describes the estimated reduction in mean annual deaths from the most recent fisheries restrictions that took effect off the west coast North Island in 2020.

Adoption of these new measures under the Hector's and Māui dolphin Threat Management Plan represents an approximate reduction in estimated mean annual deaths of Māui dolphins of 52% from the west coast North Island inshore trawl fishery (Table 1).

**Table 1.** Estimates of fisheries bycatch (captures and deaths) of Māui dolphins from commercial trawl. Estimates include the 95% credible intervals.

| | | Commercial trawl |
|---|---|---|
| **Pre 1 Oct. 2020** | Mean annual captures (CI 5th to 95th percentile) | 0.013 (0.004-0.028) |
| | Mean annual deaths (CI 5th to 95th percentile) | 0.016 (0.005-0.037) |
| **Post 1 Oct. 2020** | Mean annual captures (CI 5th to 95th percentile) | 0.006 (0.002-0.013) |
| | Mean annual deaths (CI 5th to 95th percentile) | 0.008 (0.002-0.017) |

EXHIBIT 2

# Annex D

# Report of the Standing Working Group on Abundance Estimates, Stock Status and International Cruises

## 1. INTRODUCTORY ITEMS

Participants: Givens (Convenor), New (Co-convenor), Aguilar Arakaki, Allison, Baba, Babey, Bell, C., Bell, E., Biuw, Bouzouma, Branch, Brandão, Braulik, Brownell, Butterworth, Calambokidis, Cañadas, Castro, Charlton, Chauca Huánuco, Choi, Cipriano, Citta, Collins, Constantine, Cooke, Cubaynes, Diallo, Domit, Doniol-Valcroze, Donovan, Doumbouya, Fewster, Fiogbe, Fortuna, Fyfe, Gallego, Galletti, Genov, Goetz, Gushcherov, Hansen, Hielscher, Iida, Iñíguez Bessega, Jaramillo Legorreta, Jiménez, Jones, L., Katara, Katsumata, Kelly, Kinzey, Kitakado, Lang, Leal, Leaper, Lee, K-L, Lee, M-K, Leslie, Lundquist, Mallette, Matsuoka, Miller, Minton, Mizroch, Murase, Nelson, O'Loughlin, Øien, Olson, Palka, Panigada, Park, Pastene, Peltier, Porter, Punt, Reeves, R., Reeves, S., Ridoux, Robbins, Rogan, Salvador, Scheimreif, Schubert, Scordino, Seakamela, Sigurðsson, Simmonds, Slooten, Solvang, Soro, Stack, Staniland, Sucunza, Suydam, Tai, Tamura, Taylor, Tulloch, Vazquez, Vermeulen, Wade, Walløe, Weinrich, Weller, Wilberg, Wilson, Witting, Yasokawa, Yoo, Yoshida, Zerbini.

### 1.1 Opening remarks

The convenor, Givens, welcomed the participants to the meeting, recalling that the Scientific Committee (SC) had agreed in 2016 to form the Standing Working Group (SWG) for Abundance Estimates, Stock Status, and International Cruises (ASI) to ensure that abundance estimates used by the SC receive a consistent level of formal review. Since then, ASI has worked to develop a suitable review process and has undertaken many such reviews.

It had quickly become apparent that the workload for ASI was greater than could be accomplished during the annual SC meeting. Accordingly, in 2019 the SC agreed to form the Abundance Steering Group (ASG) to coordinate an intersessional review process. The ASG held a pre-meeting to SC69A during 21-23 April, and its report (SC/69A/REP/02, hereafter 'the ASG Report') informed ASI discussion this year.

Givens thanked the participants for contributing their expertise to the meeting, and he offered special thanks to the 25 independent reviewers (listed in the ASG Report) whose thoughtful reviews, voluntarily contributed intersessionally, were an important basis for ASG and ASI recommendations.

### 1.2 Election of the Chair

Givens was elected Chair. New was elected Co-chair.

### 1.3 Appointment of Rapporteurs

Kelly and Doniol-Valcroze were appointed rapporteurs. Givens thanked them for their continuing commitment to helping ensure the success of ASG and ASI, and the outstanding work they contribute each year.

### 1.4 Adoption of the agenda

The agenda, as adopted, is given as Appendix 1.

### 1.5 Documents available and online schedule

In addition to the ASG Report, the following documents were available: Bradford *et al.* (2021), Brandão *et al.* 2023, Calambokidis and Barlow (2020), Constantine *et al.* (2021), Eguchi *et al.* (2022), Hamabe *et al.* 2023, Harris *et al.* (2022), Jackson *et al.* (2015), Jackson *et al.* (2016), Monnahan *et al.* (2019), Palka (2006), Palka (2020), Romero *et al.* (2022), SC/69A/ASI/01/Rev1, SC/69A/ASI/02, SC/69A/ASI/03/Rev2, SC/69A/ASI/04-09, SC/69A/ASI/10/Rev1, SC/69A/ASI/11-14, SC/69A/ASI/15/Rev1, SC/69A/ASI/16-18 SC/69A/ASI/19/Rev2, SC/69A/ASI/20-21, SC/69A/IST/01 and SC/69A/REP/01-04. Reviews of documents presenting abundance estimates were also available and have been archived by the Secretariat.

**Appendix 3**

**CATEGORIZATION OF ABUNDANCE ESTIMATES REVIEWED BY ASI**

The categories used by the Committee to classify and potentially endorse estimates of abundance (or other data/information from abundance surveys) are as follows.

**Category 1A:** An estimate which is acceptable for use in in-depth assessments or for providing management advice using the RMP, AWMP or other modelling or analysis. This (and category 1B) may include estimates with minor or possibly competing small biases (e.g. assuming $g(0)=1$ when it may be slightly less), provided that these biases are recognised.

**Category 1B:** An estimate which pertains to a 'very small' population, and is acceptable for providing management advice in that context, which includes situations where no sophisticated modelling or analysis is required.

**Category 2:** An estimate which may be acceptable for 'conservative' management (e.g., in the AWMP where the user objective is expressed as an absolute number of catches/strikes with no need to eventually maximise catches/strikes, or in an assessment of whether a given level of bycatch will lead to recovery or further depletion of a population). The estimate may be subject to considerable negative bias for reasons such as limited spatial coverage (compared to the range of the population for the season in question) or lack of correction factor(s) (e.g. related to $g(0)$).

**Category 3:** An estimate which is informative, but not acceptable for inclusion in (1A), (1B) or (2). This category includes estimates with an unquantified bias which is likely to be too severe to allow inclusion in Category 2, as well as relatively unbiased estimates that are adequate to provide some general indication of abundance while still not qualifying for (1A) or (1B). Such estimates may be used when fitting population models, but are not for use as estimates in actual implementations of IWC management procedures (i.e., the RMP CLA or AWMP SLAs).

**Category 4:** This category, for survey data, is for cases when too few sightings (or recapture data) were obtained to provide an endorsable abundance estimate, because whales were scarce in the surveyed area. However, the survey design and analysis were of sufficient quality to provide reliable information about the (low) number of whales in the area, and these data could be used for fitting population models or in-depth assessments despite not yielding a reliable abundance estimate. Because the RMP allows the use of abundance estimates with few or zero sightings, Category 4 also includes abundance estimates derived from Category 4 data, specifically for use with the RMP.

**Category P:** A preliminary estimate, not suitable for use at the time of review, but which may provide an acceptable estimate once finalised. It will be omitted from published tables until finalised and assigned a category from (1) to (4).

**Category NS:** An estimate reviewed by the Scientific Committee, but agreed not to be suitable for acceptance due to factors such as: insufficient data (including inadequate coverage achieved of the area planned to be surveyed); insufficient methodological information presented; concerns about survey design; concerns about conduct or interpretation of analyses; lack of an appropriate measure of uncertainty; failure to account for large potential biases; or assumptions that are unreasonable or clearly violated. These will be omitted from published tables.

**Category X1:** Category 1A or 1B estimates that have been superseded by revised estimates. They will be omitted from published tables.

**Category ND:** An estimate which was not discussed. Used to indicate estimates which have not been discussed by the Scientific Committee, but which may be discussed in future. They will be omitted from published tables.