## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., )<br><br>    Plaintiff, )<br><br>    v. )<br><br>NATIONAL MARINE FISHERIES SERVICE, et. al., )<br><br>        Defendants, )<br><br>    and )<br><br>NEW ZEALAND GOVERNMENT, )<br><br>    Defendant-Intervenor. ) | Court No. 24-00218 |

### <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment on the agency record, defendant's and defendant-intervenor's responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the National Marine Fisheries Service's comparability findings for Government of New Zealand's regulated fisheries: West Coast North Island multi-species set-net fishery, and West Coast North Island multi-species trawl fishery are sustained; and it is further

ORDERED that judgment is entered in favor of the defendants.

Dated:_____, 2025        _____
        New York, New York                                        JUDGE

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> NATIONAL MARINE FISHERIES SERVICE, et. al., ) <br><br> Defendants, ) <br><br> and ) <br><br> NEW ZEALAND GOVERNMENT, ) <br><br> Defendant-Intervenor. ) | Court No. 24-00218 |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S <br> MOTION FOR JUDGMENT ON THE AGENCY RECORD

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:

MARK HODOR
Office of General Counsel
National Oceanic & Atmospheric Admin.
Silver Spring, MD

JOSHUA W. MOORE
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 305-2312
Email: Joshua.w.moore@usdoj.gov

May 27, 2025

*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT PURSANT TO RULE 56.1 ............................................................1

I.    Administrative Determination Under Review ...................................................1

II.   Issues Presented For Review ...........................................................................2

BACKGROUND ...................................................................................................2

I.    The Marine Mammal Protection Act (MMPA) And MMPA Imports Rule ......................2

     a. The MMPA ............................................................................................ 2

     b. MMPA Imports Rule ............................................................................. 4

II.   The Sea Shepherd Petition and NMFS's First Comparability Finding ...........................6

III.  NMFS's Second Comparability Finding .........................................................9

     a. NMFS Finds GNZ's Regulatory Program Comparable In Effectiveness to U.S.
     Standards ................................................................................................ 11

IV.   Dissolution of the Preliminary Injunction In *Sea Shepherd* and Filing of this Lawsuit ....13

SUMMARY OF THE ARGUMENT .................................................................14

ARGUMENT .......................................................................................................18

I.    Standard Of Review .........................................................................................18

II.   MHDD Misstates the Requirements of the MMPA and MMPA Imports Rule ................20

III.  NMFS's Comparability Finding with Respect to the Māui Dolphin Was Not Arbitrary
     and Capricious or Contrary to Law ................................................................. 22

     a.  Zero Mortality Rate Goal ..................................................................... 22

     b.  Negligible Impact Standard .................................................................26

     c.  Bycatch Limit And Evidence Of A Regulatory Plan To Reduce Bycatch
     Below The Bycatch Limit .........................................................................28

     d.  Population Estimates .............................................................................32

e.  Monitoring Program.................................................................................34

f.  Marine Mammal Stock Assessments....................................................40

IV.  NMFS Found GNZ's Regulatory Program Was Comparable In Effectiveness As It Relates To Other Marine Mammals That Interact With The Two Fisheries At Issue.......41

V.  Should The Court Find For MHDD, The Proper Remedy Is Remand .............................43

CONCLUSION.................................................................................................................47

CERTIFICATE OF COMPLIANCE ...............................................................................48

# TABLE OF AUTHORITIES

**CASES**                                                                       **PAGE(S)**

*Canadian Lumber Trade All. v. United States*,
 517 F.3d 1319 (Fed. Cir. 2008) ............................................................. 19

*Ctr. for Marine Conservation v. NMFS*,
 No. 99-00152, 2000 WL 33964303 (D. Haw. June 23, 2000) ............... 38

*Earth Island Inst. v. Evans*,
 No. 03-0007, 2004 WL 1774221 (N.D. Cal. Aug. 9, 2004) ................. 38

*F.C.C. v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) ............................................................................. 19

*Gonzales v. West*,
 218 F.3d 1378 (Fed. Cir. 2000) .......................................................... 41

*I.N.S. v. Orlando Ventura*,
 537 U.S. 13 (2002) ............................................................................... 44

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976) ............................................................................. 20

*Marsh v. Oregon Nat. Res. Council*,
 490 U.S. 360 (1989) ................................................................. 16, 19, 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ......................................................................... 19, 22

*Natural Resources Defense Council, Inc. v. Ross*,
 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ...................................... 46

*Norton v. Southern Utah Wilderness Alliance*,
 542 U.S. 55 (2004) ............................................................................... 45

*Sea Shepherd New Zealand v. United States*,
 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ...................................... 8, 9

*Sea Shepherd New Zealand v. United States*,
 693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024) ...................................... 13

*Sea Shepherd New Zealand v. United States*,
 469 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2020) ............................ 46

*SmithKline Beecham Corp. v. Apotex Corp.*,
 439 F.3d 1312 (Fed. Cir. 2006) .......................................................... 11

## STATUTES

5 U.S.C. § 706 ................................................................................................ 32, 45

16 U.S.C. § 1361 .................................................................................... 3, 20, 27, 45

16 U.S.C. § 1362 .......................................................................................... 3, 4

16 U.S.C. § 1371 ................................................ 3, 4, 5, 20, 21, 24, 27, 29, 45, 47

16 U.S.C. § 1373 ............................................................................................... 4

16 U.S.C. § 1382 .............................................................................................. 46

16 U.S.C. § 1386 .................................................................................... 3, 12, 41

16 U.S.C. § 1387 ................................................................... 3, 13, 22, 23, 32, 38, 43

28 U.S.C. § 1581 .............................................................................................. 18

28 U.S.C. § 2640 .............................................................................................. 18

## REGULATIONS

50 C.F.R. § 216 ................................................................................................ 10

50 C.F.R. § 216.3 .............................................................................................. 29

50 C.F.R. § 216.24 ........................................................... 4, 5, 9, 22, 29, 35, 40, 45

50 C.F.R. § 229.2 .............................................................................................. 23

## FEDERAL REGISTER

81 Fed. Reg. 54,390 (Aug. 15, 2016) ...................................................................... 4

82 Fed. Reg. 43,701 (Sep. 19, 2017) .................................................................... 44

84 Fed. Reg. 32,853 (July 10, 2019) ....................................................................... 6

85 Fed. Reg. 71,297 (Nov. 9, 2020) .................................................................... 7, 8

88 Fed. Reg. 80,193 (Nov. 17, 2023) ...................................................................... 5

89 Fed. Reg. 4595 (Jan. 24, 2024) .................................................................... 2, 10

## OTHER AUTHORITIES

NMFS, Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E),
        Procedural Directive 02-204-02 (June 17, 2020)........................................ 27

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., )<br>)<br>            Plaintiff,        )<br>)<br>        v.                )<br>)<br>NATIONAL MARINE FISHERIES SERVICE, et. al., )<br>)<br>            Defendants,    )<br>)<br>        and               )<br>)<br>NEW ZEALAND GOVERNMENT, )<br>)<br>    Defendant-Intervenor. ) | Court No. 24-00218 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.1 of the United States Court of International Trade, and the Court's scheduling order, ECF No. 31, defendants respectfully submit this response to the motion for judgment on the agency record (Motion) filed by plaintiff, Māui and Hectors' Dolphin Defenders, Inc. (MHDD).

**STATEMENT PURSANT TO RULE 56.1**

**I.    Administrative Determination Under Review**

MHDD challenges the National Marine Fisheries Service's issuance of comparability findings for Government of New Zealand's regulated fisheries: West Coast North Island multi-species set-net fishery, and West Coast North Island multi-species trawl fishery. *See Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection*

*Act—Notification of Issuance of Comparability Findings*, 89 Fed. Reg. 4595 (Jan. 24, 2024)

(NMFS_001232) and accompanying Decision Memorandum (NMFS_001224-63).  The

comparability findings are valid from February 21, 2024, through December 31, 2025, unless

revoked or revised by NMFS in a subsequent action.[1] NMFS_001232.

## II.    Issues Presented For Review

1.   Whether National Marine Fisheries Service's issuance of comparability findings for

Government of New Zealand's regulated fisheries, West Coast North Island multi-species set-net

fishery, and West Coast North Island multi-species trawl fishery, was arbitrary and capricious or

contrary to law.

2.   Whether MHDD has satisfied its heavy burden to establish entitlement to an injunction

banning the importation of fish and fish productions from Government of New Zealand's West

Coast North Island multi-species set-net fishery, and West Coast North Island multi-species

trawl fishery.

## BACKGROUND

## I.    The Marine Mammal Protection Act (MMPA) And MMPA Imports Rule

### a.   The MMPA

The Marine Mammal Protection Act (MMPA) was enacted in 1972 and contains

provisions to address the incidental mortality and serious injury of marine mammals in both

domestic and foreign commercial fisheries.  In enacting the MMPA, Congress expressed its

"sense . . . that [marine mammal species] should be protected and encouraged to develop to the

greatest extent feasible commensurate with sound policies of resource management and that the

---

[1] As NMFS previously explained, it intends to issue "new comparability finding for New Zealand's West Coast North Island set-net and trawl fisheries, which will supersede the 2024 comparability finding at issue in this case" by September 1, 2025.  ECF No. 21, Motion to Stay Proceedings at 2-3.

primary objective of their management should be to maintain the health and stability of the marine ecosystem."  16 U.S.C. § 1361(6).

16 U.S.C. §§ 1386 & 1387 frame the elements governing the incidental mortality and serious injury of marine mammals in commercial fisheries, including:  calculation of the Potential Biological Removal[2] (PBR) level for each marine mammal population, 16 U.S.C. § 1362(20); "stock assessments" that report on population status and the effects of fisheries on the population, 16 U.S.C. § 1386(a); reporting or monitoring of marine mammals incidentally killed or seriously injured in commercial fishing operations, 16 U.S.C. §1387(d); preparation of a take reduction plan for strategic stocks of marine mammals incidentally killed or injured in commercial fishing operations at levels at or above PBR level, 16 U.S.C. § 1387(f); and emergency rulemaking if a fishery is having "an immediate and significant adverse impact on a marine mammal stock." 16 U.S.C. § 1387(g).

With respect to foreign fisheries, the MMPA provides that the "Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2).  The MMPA directs that the Secretary of Commerce shall "insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products

---

[2] PBR "means the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population.  The potential biological removal level is the product of the following factors: (A) The minimum population estimate of the stock. (B) One-half the maximum theoretical or estimated net productivity rate of the stock at a small population size. (C) A recovery factor of between 0.1 and 1.0."  16 U.S.C. § 1362(20).

exported from such nation to the United States."[3]  16 U.S.C. § 1371(a)(2)(A); *see* 16 U.S.C. §

1362(12)(A) (defining "Secretary").

      b.  <u>MMPA Imports Rule</u>

The MMPA neither defines "United States standards" nor does it identify any specific

measures that NMFS must consider in the context of evaluating a foreign nation's commercial

fishing operations pursuant to section 1371(a)(2)(A).  Congress entrusted the Executive Branch

with authority to implement the MMPA through regulatory action "on the basis of the best

scientific evidence available and in consultation with the Marine Mammal Commission."  16

U.S.C. § 1373(a).  NMFS is required to follow notice and comment rulemaking procedures,

including publishing certain information before conducting a rulemaking.  16 U.S.C. § 1373(d).

In 2016, NMFS promulgated regulations to implement the import provisions of the

MMPA. *See Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*, 81

Fed. Reg. 54,390 (Aug. 15, 2016) (MMPA Imports Rule), NMFS_003705.  In general, the

MMPA Imports Rule establishes procedures and conditions for NMFS's evaluation of a

harvesting nation's regulatory program addressing marine mammal incidental mortality and

serious injury in export fisheries and to determine whether the harvesting nation's program is

comparable in effectiveness to the U.S. regulatory program.  As relevant here, the MMPA

Imports Rule establishes a multi-step process setting forth conditions that nations must meet in

order to export fish and fish products to the United States.

First, NMFS must identify and publish a list of foreign fisheries (LOFF) that export fish

and fish products to the United States and classify these fisheries based on the frequency of

marine mammal interactions. 50 C.F.R. § 216.24(h)(3)-(4).

---

[3] The Secretary of Commerce has delegated this authority to National Oceanic and Atmospheric Administration's National Marine Fisheries Service.

Second, foreign nations on the list that seek to export fish and fish products to the U.S. must submit an application for a comparability finding for each of its fisheries, with documentary evidence showing that the foreign nation has met certain conditions, including "reasonable proof as to the effects on marine mammals of the commercial fishing technology in use in the fishery for fish or fish products exported from such nation to the United States." Id. § 216.24(h)(6).  To allow foreign nations time to develop regulatory programs that comply with the comparability requirements, the MMPA Imports Rule established a five-year exemption period, which was scheduled to end on January 1, 2022.[4]  Id. § 216.24(h)(2)(ii).  At the expiration of the exemption period, U.S. importation will be limited to fish harvested in an export fishery for which a valid comparability finding is in effect. Id. § 216.24(h)(1)(i).

To obtain a comparability finding, the harvesting nation must establish that it "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." Id. § 216.24(h)(6)(iii)(B).  In making this finding, NMFS evaluates, among other things, whether the harvesting nation maintains marine mammal stock assessments that estimate population abundance, mandatory reporting of takes of marine mammals, and calculation of bycatch limits.  Id. § 216.24(h)(6)(iii)(C).  Ultimately, NMFS is required to find that a harvesting nation maintains a regulatory program that "includes, or effectively achieves comparable results" to the U.S. program.  NMFS_003706; see also 16 U.S.C. § 1371(a)(2).

Third, NMFS will determine, based on the submissions by the harvesting nations, whether to issue a comparability finding.  If it cannot, NMFS will notify the harvesting nation

---

[4]  This was later extended through December 31, 2025.  See 88 Fed. Reg. 80193 (November 17, 2023).

that it is preliminarily denying a comparability finding and provide the nation an opportunity to refute the preliminary denial. *Id.* § 216.24(h)(8)(iii). Before reaching a final determination granting or denying a comparability finding, NMFS must consider the information it receives from the harvesting nation in response to a preliminary denial. *Id.* § 216.24(h)(8)(iii)(B).

Fourth, if NMFS denies a comparability finding, it will specify the fish and fish products that will be subject to import prohibitions and, in cooperation with the Secretaries of the Treasury and Homeland Security, identify and prohibit the importation of fish and fish products into the United States, 30 days after the publication of a Federal Register notice. *Id.* § 216.24(h)(9).

## II.    The Sea Shepherd Petition and NMFS's First Comparability Finding

Citing the Final Rule's "emergency rulemaking" authority, two environmental organizations (collectively "Sea Shepherd") submitted a petition to NMFS on February 6, 2019, seeking emergency rulemaking banning the importation of all fish and fish products sourced using fishing activities that resulted in the incidental kill or incidental serious injury of Māui dolphins in excess of United States standards. NMFS_004768-70. NMFS denied Sea Shepherd's petition because the "Government of New Zealand [wa]s implementing a regulatory program comparable in effectiveness to the United States..." *Notification of the Rejection of the Petition To Ban Imports of All Fish and Fish Products From New Zealand That Do Not Satisfy the Marine Mammal Protection Act*, 84 Fed. Reg. 32,853 (July 10, 2019) (2019 Notice), NMFS_010193.

Sea Shepherd thereafter filed a complaint in this Court alleging that the United States had unlawfully withheld agency action by failing to ban the importation of commercial fish in the Māui dolphin's range, and that NMFS acted arbitrarily by denying Sea Shepherd's petition for

emergency rule making.  Sea Shepherd's complaint focused almost exclusively on the alleged

harm to the Māui dolphin. *See Sea Shepherd New Zealand et al v. United States et al.*, No. 20-

112, ECF No. 1.

Meanwhile, on June 24, 2020, the Government of New Zealand (GNZ) announced new

fishing measures to reduce Māui dolphin bycatch and submitted an application for a

comparability finding.  Those new measures included a Threat Management Plan and the

"Fisheries (Hector and Māui Dolphin) Amendment Regulations of 2020" amending the Fisheries

Act of 1996, published on August 20, 2020, which came into effect on October 1, 2020 (2020

Regulations).  The United States moved for a remand to allow NMFS to issue comparability

findings for GNZ.  *Sea Shepherd*, No. 20-112, ECF No. 17.  On remand, Sea Shepherd filed a

new petition for emergency rule making to ban the importation of fish and fish products due to

the alleged harm caused to the Māui dolphin as a result of their importation.  *See* NMFS_010680.

NMFS published its comparability findings in the Federal Register, denying Sea Shepherd's

petition and concluding that New Zealand's regulatory regime was comparable in effectiveness

to United States standards.  *See Implementation of Fish and Fish Product Import Provisions of*

*the Marine Mammal Protection Act-Notification of Rejection of Petition and Issuance of*

*Comparability Findings*, 85 Fed. Reg. 71,297 (Nov. 9, 2020) (*Final Results*), NMFS_010909.

In its comparability finding, NMFS first determined which export fisheries from its List

of Foreign Fisheries would "have more than a remote likelihood of incidental mortality or

serious injury of Māui dolphin within their range on the west coast of the North Island," and

concluded that two fisheries met that standard because they "overlap the Māui dolphin

distribution": West coast, North Island multi-species set-net fishery, and West coast, North

Island multi-species trawl fishery.[5]  NMFS_010939-40.  NMFS explained that the West coast, North Island multi-species set-net fishery "comprises two main sub-fleets: coastal set-net vessels, and harbor set-net vessels," while the West coast, North Island multi-species trawl fishery is an "inshore trawl fishery."  *Id.*  As it relates to these two fisheries, NMFS found that GNZ's regulatory program (1) prohibited the intentional killing of marine mammals in the course of commercial fishing operations, (2) met the condition to have an abundance estimate for a marine mammal stock that was comparable in effectiveness to U.S. standards, (3) had a fishing vessel register that was comparable to U.S. standards, (4) because they used as their bycatch limit the potential biological removal as calculated by NMFS, their standard was comparable to U.S. standards, (5) GNZ's self-reporting and fisheries observer monitoring program is comparable in effectiveness to or exceeded U.S standards, (6) and had bycatch estimates that were comparable in effectiveness to U.S. standards.  *See* NMFS_0010909-960.

Sea Shepherd thereafter filed an amended complaint and subsequent motion for preliminary injunction.  *Sea Shepherd*, No. 20-112, ECF No. 46.  The thrust of Sea Shepherd's amended complaint was that New Zealand set net and trawl fisheries are incidentally taking Māui dolphins in excess of U.S. standards.  On November 28, 2022, the Court issued a preliminary injunction banning the importation into the United States of certain fish and fish products from New Zealand's West Coast North Island commercial set-net and trawl fisheries operating within Māui dolphin habitat.  *See Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022).

---

[5] As a general matter, "trawl" fishing refers to a method of fishing where a net is towed through the water to capture fish.  *See* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls; NMFS_001254.  In contrast, "set net" fishing, also known as gillnets, hang like vertical walls in the water and capture fish by the gills as they try to swim through the mesh of the net.  *See* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-gillnets; NMFS_001254

In relevant part, the Court found that Sea Shepherd had shown a likelihood of success on the merits of its claim that NMFS had acted arbitrarily and in issuing comparability findings to two New Zealand fisheries, and Sea Shepherd was likely to succeed on the merits of their second claim that NMFS violated the Administrative Procedure Act (APA) in denying their petition for emergency rulemaking. *Id.* at 1323–25. As it relates to NMFS's November 9, 2020 comparability finding, the *Sea Shepherd* Court found that (1) NMFS failed to "consider all mandatory regulatory factors," (2) NMFS failed to respond to comments regarding the discretionary quality of New Zealand's Threat Management Plan, and (3) NMFS failed to fully explain its conclusion that New Zealand "has a sufficiently high level of observer coverage to detect interactions or bycatch and obtain an unbiased statistically-reliable bycatch estimate" for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(C)(4). *Id.* at 1311–23.

## III.  **NMFS's Second Comparability Finding**

In response to the injunction, the Government of New Zealand submitted supplemental documentary evidence for its two fisheries subject to the injunction to support its application for comparability findings. *See* NMFS_001224-26. GNZ's supplemental documentary evidence and application addressed the *Sea Shepherd* Court's ruling as well as provided additional documentary evidence regarding changes it had made to its regulatory program as well as providing updated figures where available. In relevant part, GNZ explained that (1) the Māui dolphin threat management plan was not discretionary in nature, NMFS_001112, (2) GNZ's existing laws (i.e., the Fisheries Act) are clear that the Minister of Fisheries must take some affirmative action when fishing-related mortality is exceeded but has discretion to determine what additional prohibitions on fishing are necessary, NMFS_001112, NMFS_001122; (3) it had expanded its monitoring program (e.g., improved the scope and coverage of the electronic

monitoring program across the Māui dolphin habitat zone), NMFS_001089-1107 (4) it further

clarified its bycatch estimates, NMFS_000023, NMFS_001125-26, and (5) provided additional

evidence regarding its abundance estimates and plans to keep bycatch under limit,

NMFS_000255, NMFS_001108-16.

In response to GNZ's supplemental application, NMFS "reconsidered" the comparability

findings it had previously issued on November 9, 2020, relying on "GNZ's 2021 application,

supplemental evidence submitted by the GNZ, information provided by the Plaintiffs, and court

documents."[6]  NMFS_001224, NMFS_001235.  As a result of that reconsideration, on January

24, 2024, NMFS published notice of its issuance of new positive comparability findings for West

coast, North Island multi-species set-net fishery; and the West coast, North Island multi-species

trawl fishery.  *See* NMFS_001224-63 (*2024 Comparability Finding*).[7]  NMFS concluded that

New Zealand's regulatory program is either comparable in effectiveness to or exceeds U.S

standards.  NMFS_001230 (". . . the GNZ's regulatory program, including the fishery-specific

area restrictions are either comparable in effectiveness to or exceed U.S. standards.").

Given the Māui dolphin's status as an endangered species, the history of the litigation,[8]

and the *Sea Shepherd* Court's injunction, NMFS naturally focused much of its attention in its on

---

[6]  Because NMFS was reconsidering its earlier comparability findings based on
supplemental evidence submitted by GNZ, NMFS necessarily incorporated its prior 2020
Comparability Finding into the 2024 Comparability Finding.  *See* 50 C.F.R. § 216(h)(8)(vii)
("Discretionary Review of Comparability Findings").  The 2020 Comparability Finding, and
associated record documents, are included in the record before this court.  *See, e.g.*
NMFS_010909-960 (2020 Comparability Finding).

[7]  NMFS conducted this rulemaking under its rulemaking authority.  89 Fed. Reg. 4595
(citing 16 U.S.C. § 1387(g)).

[8]  Indeed, the only reason these two fisheries are subject to this comparability finding is
because NMFS found that these fisheries were the only fisheries determined to have a remote
likelihood of harm to the Māui dolphin.  *See* NMFS_010939-40 (2020 Comparability Finding).

how GNZ's regulatory program compares to U.S. standards as it relates to the Māui dolphin.  *See* NMFS_001226-30 ("summary of NMFS' analysis" focused largely, although not exclusively, on Māui dolphin).  In addition, NMFS's "Comparability Finding Application Final Report," which contained a more robust analysis of GNZ's regulations, analyzed GNZ's regulatory program for comparableness as it relates to *all* marine mammals that interact with the two fisheries at issue. *See* NMFS_001235-63 ("Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report" focused on GNZ regulatory program as it relates to marine mammals generally).

    a.  <u>NMFS Finds GNZ's Regulatory Program Comparable In Effectiveness to U.S. Standards</u>

First, as relevant here,[9] NMFS compared GNZ's monitoring plan to how the U.S. addresses monitoring across its various commercial fisheries and found them comparable in effectiveness.  NMFS also concluded that GNZ's monitoring program exceeded in various way U.S. standards because, unlike the U.S., (1) GNZ had a vessel monitoring system that reports vessel location that is monitored in real-time and "requires its fishermen to report both catch and marine mammal bycatch information within a day"; and (2) GNZ used a combination of observer and electronic monitoring, the latter of which consists of cameras on boats which is "capable of observing marine mammal bycatch 100% of the time" within the Māui dolphin habitat zone. NMFS_001256.  As a result, NMFS found that New Zealand has "attained 90% monitoring coverage (between its observer and EM programs)" to "observe for marine mammal bycatch,"

        [9]  MHDD does not challenge several aspects of NMFS's decision, including NMFS's conclusion that (1) New Zealand bans intentional mortality and serious injury of marine mammals, and that (2) GNZ's vessel registration system is comparable to U.S. standards.  *See* NMFS_001227-28.  MHDD has therefore waived any challenge that NMFS acted arbitrarily or capriciously as it relates to those findings.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (citation omitted) ("Our law is well established that arguments not raised in the opening brief are waived.").

and this monitoring program is "more accurate and robust" than the U.S. monitoring coverage and "exceed[s] the requirements of…the MMPA for statistically reliable bycatch estimates." NMFS_001256.

NMFS next reviewed the evidence in the record and concluded that GNZ had a population abundance estimate for the Māui dolphin that was scientifically supported.  NMFS concluded, based off the evidence in the record, that the population estimate for the Māui dolphin was 54 individuals.[10]  NMFS_001225.  NMFS also concluded that New Zealand's system for stock assessment estimation is comparable in effectiveness to United States standards and that New Zealand's abundance and range estimates for Māui dolphin follow scientifically-sound processes per the stock assessment guidelines implementing 16 U.S.C. § 1386.  NMFS_001228; NMFS_000002 (GNZ's application describing population abundance estimate for Hector's dolphins), NMFS_000020 (GNZ's application describing population abundance estimate for Māui dolphins).

NMFS next reviewed GNZ's regulatory and statutory scheme and concluded that GNZ's existing fisheries laws and regulations adequately address commercial fishing and its risks to marine mammals.  *See* NMFS_001224, NMFS_001263.  NMFS found there was sufficient evidence that GNZ had established a bycatch limit for marine mammals that was comparable in effectiveness to U.S. standards.  NMFS_001228.

In relation to Māui dolphins, NMFS explained that because GNZ used the PBR established by NMFS, NMFS necessarily found that GNZ has a bycatch limit comparable in effectiveness to the PBR standard.  NMFS further found that GNZ's regulatory program "will

---

[10]  In its decision memorandum, NMFS incorrectly stated that the population estimate was "43."  NMFS_001225.  That was a typographical error; NMFS intended to use a population estimate number of 54.  *See* Attachment A, Declaration of Alexa Cole.

result in Māui dolphin bycatch below PBR and concentrate the fisheries restrictions in the areas with the greatest risk, specifically those areas where fishing activities overlap with the Māui dolphin population." NMFS_001229. NMFS found that GNZ's regulations contain a management review trigger comparable to take reduction plans under the MMPA, *see* 16 U.S.C. § 1387(f)(9), under which NMFS (or New Zealand) may monitor and revisit take reduction plans (or threat management plans in the case of New Zealand) in the event of serious injury or death to a Māui dolphin or in the event of some other adverse interaction or concern. NMFS_001260-61. Furthermore, in the event of an unforeseen capture of a Māui dolphin, GNZ has established a "backstop measure" of one fishing-related capture. NMFS_000023.

## IV.    Dissolution of the Preliminary Injunction In *Sea Shepherd* and Filing of this Lawsuit

After NMFS issued its 2024 Comparability Finding, GNZ moved to dissolve the injunction in the *Sea Shepherd*, which the Court granted on April 1, 2024 because "NMFS's issuance of the new comparability findings, which supersede the administrative actions underlying the preliminary injunction, constitutes a 'significant change in factual conditions and law.'" *Sea Shepherd New Zealand v. United States*, 693 F. Supp. 3d 1364, 1367 (Ct. Int'l Trade 2024). The Court specifically explained that it was not suggesting "any view on those new comparability findings." *Id.*

Nearly 11 months after NMFS published notice of its 2024 Comparability Finding, MHDD filed the instant complaint. Its complaint contains three "causes of action." First, MHDD claims that the 2024 Comparability Finding "with Respect to the Māui Dolphin Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA." Complaint, ECF No. 4 (Compl.) at 32-34. Second, MHDD claims that the 2024 Comparability Finding "with Respect to Bycatch of Other Marine Mammals Is Arbitrary and Capricious and

Contrary to Law, in Violation of the MMPA and APA." Compl. at 34-35. Third, MHDD claims that "Defendants Failed to Ban the Importation of Fish from the West Coast North Island Fisheries as Required by the MMPA." Compl. at 35-37.

MHDD asks this Court to "declare that NMFS's Comparability Finding is arbitrary and capricious and contrary to law, in violation of the MMPA and APA; declare that Defendants have unlawfully failed to ban imports from the two New Zealand fisheries; vacate and remand the Comparability Finding; and order Defendants to promptly ban imports from those fisheries." Compl. at 4. MHDD declined to move for a preliminary injunction, and the parties proceeded to file the administrative record and brief motions for judgment on the agency record.

## SUMMARY OF THE ARGUMENT

Throughout its brief, MHDD fundamentally misunderstands how NMFS manages its domestic fisheries and, in particular, how it conducts comparability findings under the MMPA and its implementing regulations. MHDD repeatedly argues that GNZ does not "meet an applicable [U.S.] standard," and therefore NMFS's comparability finding is flawed. But the MMPA and implementing regulations do not require that GNZ's statutory and regulatory scheme "meet the same standards" that the U.S. imposes through the MMPA and its implementing regulations. Rather, the question that the MMPA requires NMFS to ask is whether GNZ's regulatory program is "comparable in *effectiveness* to U.S. standards."

NMFS concluded, based on the evidence in the record, that GNZ's regulatory program was comparable in effectiveness. MHDD challenges several aspects of that decision, arguing that NMFS failed to establish that GNZ has a regulatory regime that is comparable in effectiveness to the U.S. standards. But none of its unpersuasive contentions overcome NMFS's reasoned decision, which was based on a thorough consideration of the entire agency record.

14

*First*, NMFS specifically found that GNZ's regulatory scheme is comparable in effectiveness to this U.S. standard of a zero mortality rate goal (ZMRG). NMFS_010938-39 (finding GNZ "objective is comparable in effectiveness to" ZMRG). While GNZ's ZMRG standard may not be *exactly* the same as the U.S. standard, NMFS reasonably relied on the evidence submitted and concluded that it was comparable in effectiveness to U.S. standard.

*Second*, NMFS established that GNZ's regulatory regime protects endangered species in a way that is comparable in effectiveness to the U.S. "negligible impact" standard. While GNZ does not regulate endangered species in the same way as the U.S.—it does not provide affirmative permits for incidental take—NMFS found that GNZ's robust regulatory scheme and implementation of its TMP and other measures appropriately protect the Māui dolphin and is comparable in *effectiveness* to U.S. standards for similar endangered species.

*Third*, NMFS found that because GNZ had agreed to use NMFS's calculated PBR, it had necessarily met the standard for a comparable bycatch limit. MHDD's arguments to the contrary rest on a confusion between the PBR calculation and the "fishing-related mortality limit" or FRML. As GNZ explained, the FRML is "not a primary tool to manage the risk of bycatch of Māui dolphins," but rather "a fishing-related mortality limit has been established as a backstop measure." NMFS_000023. Next, MHDD's arguments that the FRML is not "comparable" to U.S. standards because it *only* applies within the Māui dolphin habitat zone—despite covering "approximately 90-95% of Māui dolphin habitat over its entire distribution" NMFS_001254—is without merit. MHDD does not explain what other portions of Māui dolphin habitat to which it is referring nor does it explain why limiting the FRML to the "Māui dolphin habitat zone" is not comparable to U.S standards. Finally, MHDD's arguments that GNZ's Threat Management Plan (TMP) is not comparable to U.S. standards because it is not "mandatory" is contradicted by

record evidence.  As NMFS found, if there is a bycatch of the Māui dolphin, the "Minister of

Fisheries does not have discretion to choose whether to act or not, but rather the Minister has the

authority to quickly enact additional prohibitions considered necessary to ensure the bycatch

limit is not exceeded."  NMFS_001259-60; *see also* NMFS_001112 (GNZ application).  NMFS

therefore fully explained why the TMP was not discretionary in nature and that explanation is

supported by evidence in the record.

*Fourth*, NMFS properly weighed the scientific evidence in the record and reasonably

concluded that the Māui dolphin population estimate was 54 individuals.  While MHDD may

disagree with that conclusion and point to evidence in the record showing a different population

estimate, NMFS's conclusion was supported by scientifically sound evidence in the record.  This

Court should defer to NMFS on these types of matters that require a "high level of technical

expertise." *Cf. Marsh*, 490 U.S. at 377.

*Fifth*, NMFS thoroughly examined GNZ's monitoring program and found it comparable

in effectiveness to, or in some cases exceeded, U.S. standards.  NMFS_001227-28,

NMFS_001086-107 (GNZ's Supplementary Information regarding its monitoring program).

MHDD's arguments that NMFS—the agency *responsible* for implementing the MMPA

monitoring requirements in the U.S.—misunderstood the U.S. monitoring standards is without

merit.  NMFS properly found that the U.S. does not have a defined monitoring percentage, but

that because it uses human observers, it generally is only able to obtain 10 percent monitoring

coverage.  While MHDD believes it may be desirable to have higher coverage, the MMPA does

not require it.  Next, NMFS properly found that GNZ has approximately 90 percent monitoring

coverage based on a *combination* of electronic monitoring and human observers in the Māui

dolphin habitat zone.  Record evidence supports this conclusion.  And even assuming that the 90

percent coverage number was not supported—it is—NMFS properly explained why GNZ's robust monitoring program is comparable in effectiveness to U.S. standards.  *See* NMFS_001252-56.

*Sixth*, NMFS *specifically* found that "GNZ has an abundance estimate for Māui dolphins, which follows a scientifically-sound process to estimate abundance," and based on "NMFS' analysis the GNZ meets the condition to have an abundance estimate for a marine mammal stock, and its system for Māui dolphin abundance estimation is comparable in effectiveness to U.S. standards."  NMFS_001228.  MHDD's arguments that NMFS failed to adequately make this finding are plainly without merit.

Next, contrary to MHDD's assertions, while the Māui dolphin was naturally a focus of NMFS's finding, NMFS did in fact analyze GNZ's regulatory program for comparableness as it relates to *all* marine mammals that interact with the two fisheries at issue.  Indeed, the vast majority of steps that GNZ has taken to protect the Māui dolphin apply with equal force to other marine mammals.  For example, New Zealand's gear restrictions, time/area closures, and other measures naturally offer similar protections to other marine mammal species or stocks that overlap with the fisheries in question.  NMFS_000260 (Threat Management Plan description of fishing protection measures), NMFS_001214 (GNZ's application).  And NMFS's comparability finding, as well as record evidence, support the conclusion that GNZ's regulatory regime is comparable in effectiveness as it relates to marine mammals that interact with the two fisheries at issue here.  NMFS_001052-001067 (evidence concerning total average annual mortality, population abundance estimates, and bycatch limit exceedances for multiple marine mammal species and stocks).

Finally, even assuming that MHDD could satisfy its heavy burden here, the proper remedy would be remand. This is so for two reasons. First, vacating NMFS' comparability finding would not grant MHDD the relief it seeks—an import ban—because the MMPA and MMPA Imports Rule require a negative comparability finding before an import ban can be imposed. Second, this court's review under the APA is limited. Congress, in enacting the APA, did not intend that section 706(1) swallow section 706(2) by allowing litigants to bypass administrative action by seeking Court orders compelling specific results. MHDD did not file an emergency petition with NMFS (like the *Sea Shepherd* plaintiffs) nor did MHDD participate in the administrative proceeding below. Therefore, MHDD cannot compel any outcome to a proceeding that Congress entrusted to NMFS in the first instance.

## ARGUMENT

### I.    Standard Of Review

In any action brought under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the matter as provided in section 706 of title 5." 28 U.S.C. § 2640(e). Under that standard, the Court will "'hold unlawful and set aside [agency] action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008) (quoting 5 U.S.C. § 706(2)) (citing *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1354 (Fed. Cir. 2006)).

While the Court "'[m]ay not supply a reasoned basis for the agency's action that the agency itself has not given,' [it] will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194,

196 (1947), *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 285, 286 (1974));

*see also F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 514 (2009) (same).  The Court

will look to "the record considered as a whole," in determining whether a decision is supported

by substantial evidence.  *Id.* at 44.  Normally, an action would only be held arbitrary and

capricious if "the agency has relied on factors which Congress had not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs.*, 463

U.S. at 43.  Put another way, "[u]nder what we have called this 'narrow' standard of review, we

insist that an agency 'examine the relevant data and articulate a satisfactory explanation for its

action.'"  *F.C.C. v. Fox*, 556 U.S. at 513 (quoting *Motor Vehicle Mfrs*., 463 U.S. at 43).

This deference to agency expertise reaches its apex in matters involving scientific and

technical decisions made by expert agencies.  "Because analysis of the relevant documents

'requires a high level of technical expertise, ' we must defer to 'the informed discretion of the

responsible federal agencies.'"  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989)

(quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).  Indeed, "'[w]hen examining this

kind of scientific determination . . . a reviewing court must generally be at its most deferential.'"

*Id*. (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc*., 462 U.S.

87, 103 (1983)).

## II.    MHDD Misstates the Requirements of the MMPA and MMPA Imports Rule

As explained above, the overarching purpose of the MMPA is that marine mammal

species "should be protected and encouraged to develop to the greatest extent feasible

commensurate with sound policies of resource management and that the primary objective of

their management should be to maintain the health and stability of the marine ecosystem." 16 U.S.C. § 1361(6). The standards outlined in the MMPA—including monitoring requirements, stock assessments, bycatch limits, and take reduction plans—are what Congress thought would best achieve the ultimate goal of protecting and encouraging the development of marine mammals. But Congress recognized that these standards were not the *only* plausible approach to protecting and encouraging the development of marine mammals. The text of the MMPA import section makes this point abundantly clear—"The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology **which results in** the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2) (emphasis added). In other words, the MMPA—and subsequently MMPA Imports Rule—takes a results-oriented approach as it relates to NMFS's determination as to whether to allow the importation of fish and fish products from foreign nations. NMFS is not required to find that a harvesting nation maintains the *same* standards as the United States; rather, NMFS is required to find that a harvesting nation maintains a regulatory program that is *effectively comparable* to U.S. standards. *See* 16 U.S.C. § 1371(a)(2); NMFS_003705 (*Final Rule*). NMFS explained in its *Final Rule* implementing the MMPA Imports Rule that the MMPA Import Provisions do not require a nation to implement each condition so long as the harvesting nation's regulatory program is *comparable in effectiveness to the U.S. regulatory program*, meaning that the regulatory program effectively achieves comparable results to the U.S. regulatory program. *See* NMFS_003716 (MMPA Imports Rule) ("In using the terms 'comparable in effectiveness' NMFS means that the regulatory program effectively achieves comparable results to the U.S. regulatory

program.").  The MMPA and MMPA Imports Rule therefore provide foreign nations flexibility in crafting regulatory programs to protect marine mammals.

As explained above, this approach is both mandated by the plain language of the MMPA and its implementing regulations.  It also takes into account the practical realities of issuing comparability findings to various foreign sovereign nations, each of which has its own unique regulatory scheme governing marine mammals.  As NMFS explained, "this [results-oriented] approach gives harvesting nations flexibility to implement the same type of regulatory program as the United States or a program that is completely different but achieves the same results." NMFS_003716 (Final Import Rule Response to Comment 36).

Throughout its brief, MHDD misstates this fundamental aspect of how NMFS manages its domestic fisheries under the MMPA and, in particular how it conducts comparability findings under section 101(a)(2).  MHDD repeatedly argues that GNZ does not "meet an applicable [U.S.] standard" (*See, e.g.*, MHDD Br. at 13, 15, 26, 27, 29, and 31), and therefore NMFS's comparability finding is flawed.  But by asking the wrong questions, MHDD comes to the wrong conclusions.  The MMPA and implementing regulations do not require—as MHDD proposes— that GNZ's statutory and regulatory scheme "meet the same standards" that the U.S. imposes through the MMPA and its implementing regulations.  Rather, the question that the MMPA requires NMFS to ask is whether GNZ's regulatory program is "comparable in *effectiveness* to U.S. standards."  *See also* NMFS_3718 (MMPA Imports Rule) (Response to Comments 45-47 that address additional considerations and flexibility built into the comparability finding process).  NMFS concluded, based on the evidence in the record, that GNZ's regulatory program met that standard.[11]

---

[11] This is not to say that GNZ's regulatory program does not, in fact, meet U.S. standards.

**III.**    **NMFS's Comparability Finding with Respect to the Māui Dolphin Was Not Arbitrary and Capricious or Contrary to Law**

NMFS found GNZ had met the requirements under the MMPA and 50 C.F.R. § 216.24(h)(6) for a comparability finding for the West coast, North Island multi-species set-net fishery; and the West coast, North Island multi-species trawl fishery.  NMFS_001230.  MHDD challenges several aspects of that decision, but none of its unpersuasive contentions overcome NMFS's reasoned decision, which was based on a consideration of the entire agency record. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (court will uphold decision if "agency's path may reasonably be discerned.").

a.    Zero Mortality Rate Goal

The MMPA explains that "it shall be the immediate goal that the incidental mortality or serious injury of marine mammals occurring in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate..."  16 U.S.C. § 1387(a)(2).  The zero mortality rate goal (ZMRG) is exactly as described—a ***goal*** that commercial fisheries should approach.  As stated in the conference report that accompanied the original inclusion of the ZMRG in section 101(a)(2) of the Act (H. R. Conf. Rep. No. 92-1488 at 23 (1972)): "...the objective of regulation would be to approach as closely as is feasible the goal of zero mortality and injury to marine mammals.... It may never be possible to achieve this goal, human fallibility being what it is, but the objective remains clear."

If NMFS finds that the rate of incidental mortality and serious injury of marine mammals in a commercial fishery is not at insignificant levels approaching a zero mortality and serious injury rate, then the MMPA directs NMFS to "take appropriate action," such as implementing a

"Take Reduction Plan."[12]  16 U.S.C. § 1387(b)(4), (f).  NMFS defines "insignificant levels approaching a zero mortality and serious injury rate" with a numerical "insignificance threshold," which equals "10 percent of the Potential Biological Removal level for a stock of marine mammals." 50 C.F.R. § 229.2; *see also* NMFS_1257.  NMFS further explains that "[t]en percent of PBR is a level of mortality and serious injury incidental to commercial fisheries that, by itself, would allow a population to equilibrate to a level within 90 percent of its carrying capacity and would be considered insignificant to the population." NMFS_003716 (Final Imports Rule) (Response to Comment 33).

Contrary to MHDD's claims, NMFS concluded that GNZ's regulatory scheme had a comparable ZMRG goal, and NMFS's evaluation is supported by substantial evidence in the record.  NMFS previously reviewed GNZ's regulations as part of its 2020 Comparability Finding and concluded that, for the Māui dolphin, the regulations and TMP "effectively restricts the allowable level of fisheries related mortality to *zero* given the high risk of extinction." NMFS_010938 (emphasis in original).  NMFS explained that "[t]his objective is comparable in effectiveness to the U.S. standard of the MMPA that 'the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a *zero* mortality and serious injury rate.'"  NMFS_010938-39 (quoting 16 U.S.C. § 1371(a)(2) (emphasis in original)).  GNZ has not withdrawn any of the regulations that supported NMFS's finding in 2020 and, indeed, as discussed below, have only

---

[12] While the long-term goal of take reduction plans is to reduce incidental mortality and serious injury to insignificant levels approaching a zero mortality and serious injury rate, the plans also are to take into account the economics of the involved fisheries and the technological limitations for achieving the goal.  *See* 16 U.S.C. § 1387(f).  That is, the zero mortality rate goal is not intractable but simply requires continued vigilance to reduce mortality and serious injury to the greatest extent possible, keeping in mind competing economic and technological factors.

added to that goal with the addition of other programs designed to reduce incidental mortality to approaching zero.

And NMFS's conclusion is supported by evidence in the record.  As GNZ explained in its application, it manages marine mammals through its Fisheries Act 1996 and Marine Mammal Protection Act 1978.  The Fisheries Act states that "associated or dependent species should be maintained above a level that ensures their long-term viability," NMFS_012288, and allows the Minister of Fisheries to "take such measures he or she considers necessary to avoid, remedy, or mitigate the effects of fishing-related mortality on any protected species."  NMFS_012297-98.  Furthermore, GNZ's MMPA requires the Minister of Fisheries to "determine a level of fishing-related mortality which should allow the species to achieve non-threatened status as soon as reasonably practicable, and in any event within a period not exceeding 20 years," and, "in the case of any other marine mammal, shall determine a level of fishing-related mortality which should neither cause a net reduction in the size of the population nor seriously threaten the reproductive capacity of the species."  NMFS_001258.

As it relates specifically to the Māui dolphin, the goal of GNZ's 2020 Hector's and Māui Dolphin TMP was that "[h]uman impacts are managed to allow the population to increase to a level at or above 95% of the maximum number of dolphins the environment can support. A population outcome of 95% means that human-induced deaths need to be as **near as practicable to zero**."  NMFS_000258 (emphasis added); *see also* NMFS_000022.  Furthermore, GNZ explained that "[t]he fisheries objectives as they relate to Māui dolphins means that with 95 percent confidence, the population is able to recover to and/or maintain a level that is no more than 5 percent lower than what it would be in the absence of fishing, regardless of the extent to which the population is being affected by other threats (for example, disease)."  NMFS_001124.

The TMP requires action by the Minister of Fisheries should there be any bycatch of the Māui dolphin. *See* NMFS_001259-60.

GNZ has recently further expanded this goal by recently releasing "Te Mana o te Taiao – the Aotearoa New Zealand Biodiversity Strategy 2020," a non-statutory government document which has a three part goal: "First, fishing related deaths of protected marine species decreasing towards zero by 2025. Second, the direct effects of fishing do not threaten protected marine species populations or their recovery by 2030. Finally, the mortality of non-target species from marine fisheries has been reduced to zero by 2050." NMFS_000272.

While GNZ does not define its ZMRG the same way as the U.S. does—i.e. "10 percent of the [PBR] level for a stock of marine mammals"— it is not required to do so in order to obtain a positive comparability finding. Rather, GNZ has couched its ZMRG equivalent as a separate metric—an objective that is "95% of the maximum number of dolphins the environment can support." As NMFS reasonably found, this objective is comparable in effectiveness to the U.S. standard of the MMPA.[13] NMFS_010938-39 (2020 Comparability Finding); NMFS_001260 (also finding that "New Zealand law requires commercial fishing regulators to reduce bycatch below the bycatch limit and secondarily to keep it as low as possible as soon as practicable or within 20 years, which is similar to the U.S. regulatory standard.").

MHDD incorrectly points to GNZ's response of "No" in response to the question of whether it has "an overarching regulation the goal of which is to reduce the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate," as

---

[13] And GNZ appears to have been making progress on the goal. NMFS found that, "[s]ince the implementation of New Zealand's regulatory program governing these fisheries, there have been no observed Māui dolphin bycatch in either of these fisheries and no stranded Māui dolphin with the cause of death attributed to fishery interaction." NMFS_001250.

evidence that GNZ lacks a comparable standard. MHDD Br. at 14 (citing NMFS_001148).  But

in so doing, MHDD ignores the fact that GNZ *specifically* addressed this issue in a letter to

NMFS and provided supporting information with its application.  *See* NMFS_000271-72,

NMFS_001148-49.  The letter explained that the above question "limits the context of the

question to 'an overarching regulation' and only permits a yes/no answer with no provision for

clarification."  NMFS_000272.  As discussed above, that information including the Fisheries

Act, the GNZ MMPA, the Te Mana o te Taiao – the Aotearoa New Zealand Biodiversity

Strategy 2020, as well as information in its 2020 TMP, which NMFS found to support the

conclusion GNZ's regulatory regime is comparable in effectiveness to U.S. standards as it relates

to the ZMRG.

> b.  Negligible Impact Standard

For species listed as "endangered" under the Endangered Species Act (ESA), the MMPA

directs that NMFS shall authorize the incidental take of marine mammals in commercial fishing

operations if it determines that the following criteria have been met:  (1) incidental mortality and

serious injury from commercial fisheries will have a "negligible impact" on the affected

species/stock, (2) a "recovery plan has been developed or is being developed for such species or

stock," and (3) a "monitoring program is established," "vessels engaged in such fisheries are

registered," and a "take reduction plan has been developed or is being developed for such species

or stock."  16 U.S.C. § 1371(a)(5)(E).  Once NMFS determines that each requirement has been

met, it shall "issue an appropriate permit for each authorization granted."  *Id.*

The MMPA does not define "negligible impact."  NMFS has produced a guidance

document explaining how it approaches calculating negligible impact as a numerical value

through a series of complicated equations; however, included in that guidance is also a definition

of "negligible impact,"—which, albeit referring to a slightly different provision of the MMPA, was the "only regulatory definition of negligible impact for implementing the MMPA"—as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." ECF No. 30-3, NMFS, Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E), Procedural Directive 02-204-02 at 2 (June 17, 2020), https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf (citing 50 C.F.R. § 216.103).

MHDD alleges that NMFS failed to establish that Māui Dolphin bycatch will have no more than a negligible impact on the population. MHDD Br. at 15. But, as explained above, MHDD fundamentally misunderstands the scope of NMFS's comparability analysis and the requirements of the MMPA. *See* MHDD Br. at 15 (arguing that NMFS's "Comparability Finding thus fails to establish that the New Zealand Fisheries meet a second, applicable U.S. standard."). The question is not whether GNZ manages endangered species in the exact same way as the U.S. does, but whether GNZ's regulations are effectively comparable to U.S. standards with regard to protection of endangered species.

Here, instead of focusing on affirmatively providing permits for incidental take like the U.S., GNZ takes a separate approach through implementation of its TMP and other measures. The goal of GNZ's TMP is that "[t]he fisheries objectives as they relate to Māui dolphins means that with 95 percent confidence, the population is able to recover to and/or maintain a level that is no more than 5 percent lower than what it would be in the absence of fishing, regardless of the extent to which the population is being affected by other threats (for example, disease)." NMFS_001124. GNZ further seeks to manage human impacts "to allow the population to increase to a level at or above 95% of the maximum number of dolphins the environment can

support. A population outcome of 95% means that human-induced deaths need to be as near as practicable to zero." NMFS_000258. Furthermore, GNZ has established a "backstop measure" of one fishing-related capture of a Māui dolphin, which if exceeded would trigger additional regulatory measures to prevent further captures. NMFS_000023; NMFS_001259. Also, GNZ has prescribed a variety of measures to reduce the risk of bycatch of Māui dolphin and collect information through a robust monitoring scheme. NMFS_001224-30; NMFS_010909-010960; NMFS_001235-001263. GNZ's strategy, including its management measures, coincide closely with the elements of Sections 101(a)(5)(E) and 118 of the MMPA, which address steps the U.S. pursues to manage the impacts of commercial fisheries on marine mammal stocks whose conservation status is similar to Maui dolphin. Similar to the ZMRG, as explained above, NMFS already found this regulatory regime to be comparable in effectiveness to the ZMRG, which is equivalent to 10 percent of PBR. As MHDD points out in its brief, the "negligible impact" standard here would be 13 percent of PBR—i.e., a *higher* number than the ZMRG standard. But because NMFS already found GNZ's regulatory regime to be comparable in effectiveness to the ZMRG standard, it would necessarily be comparable to the "negligible impact" standard.

In short, GNZ's robust regulatory scheme appropriately protects the Māui dolphin and is comparable in effectiveness to U.S. standards as outlined in 16 U.S.C. § 1371(a)(5)(E).[14]

c. Bycatch Limit And Evidence Of A Regulatory Plan To Reduce Bycatch Below The Bycatch Limit

The MMPA and the import regulations require that NMFS determine that the exporting nation "maintains a regulatory program that provides for, or effectively achieves comparable results" as it relates to both evidence of a bycatch limit and evidence of a regulatory plan to

---

[14] While not disputed by MHDD, NMFS also found that GNZ's regulatory program has a "monitoring program," "vessels engaged in such fisheries are registered," and the equivalent of a "take reduction plan has been developed" for the Māui dolphin. *See* NMFS_001227-30.

reduce bycatch below the bycatch limit. 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii), (5), (6).  A "bycatch limit" is defined as "the calculation of a potential biological removal level for a particular marine mammal stock…or comparable scientific metric established by the harvesting nation..."  50 C.F.R. § 216.3.  As both the import regulations and definitions make clear, an exporting nation may calculate a bycatch limit in a different manner than the U.S. does as long as it (1) achieves the same results, and (2) is a "scientific metric."  *See* 50 C.F.R. § 216.24(h)(6)(iii)(C), 50 C.F.R. § 216.3.

MHDD claims that NMFS's conclusion that GNZ has a "comparable bycatch limit" is unsupported by substantial evidence.  MHDD is wrong.  First, NMFS calculated the PBR for the Māui Dolphin to be 0.10.  NMFS_00125.  Despite MHDD's claims, NMFS fully explained the calculation used to calculate the PBR.  *See* NMFS_010935-37.  And NMFS explained that New Zealand's regulations involve the calculation of a Population Sustainability Threshold (PST), which differs slightly from PBR in its calculations, but is overall comparable to the PBR. NMFS_001258; NMFS_010936; *see* NMFS_000303 (GNZ application explaining difference between PST and PBR).

Ultimately, GNZ adopted a PBR of 0.10 for purposes of its comparability application and, for that reason, NMFS analyzed New Zealand's protections through the prism of a PBR of 0.10 to assess whether that country's regulations are comparable with United States standards. *See* NMFS_001111 n.4 ("New Zealand used PBR (as calculated under the US standards) for the purposes of its 2020 and 2021 Comparability Applications"); NMFS_001261 (analyzing GNZ application using PBR of .1).

Because GNZ used the PBR established by NMFS, NMFS necessarily found that GNZ has a bycatch limit and process for establishing such as comparable in effectiveness to the PBR

standard.  NMFS_001260-61.  MHDD's remaining arguments confuse two distinct aspects of GNZ's regulations—the PST calculation and the "fishing-related mortality limit" or FRML.  As explained above, the PST functions similarly to the PBR.  *See* NMFS_001258.  As GNZ explained, the FRML is "not a primary tool to manage the risk of bycatch of Māui dolphins," but rather "a fishing-related mortality limit has been established as a backstop measure." NMFS_000023.  The two numbers function in different ways and speak to different realities— the PST speaks to the statistical analysis while the FRML speaks to the actual reality of a confirmed bycatch.

With regard to the FRML, MHDD makes several arguments, none of which have merit. First, MHDD argues that the FRML does not specify a timeline and therefore is not comparable to the U.S. bycatch limit.  But again, MHDD is confusing the bycatch limit and the FRML limit. The bycatch limit is a statistical reference point that assumes an amount of incidental capture over a defined period of time.  But there is no timeline on the FRML—a "backstop" measure— because any bycatch would require GNZ to respond under its regulations and its TMP.  As GNZ explained:

> It is important to note that the fishing-related mortality limit is not an annual limit (i.e. it does not allow for one mortality each year); instead the limit is not time bound and any prohibition notified in the Gazette would apply until the notice was amended or revoked, unless otherwise specified.  This means, in the event of a fishing-related incident or mortality, the measures would likely apply so long as necessary to ensure the PBR/PST is not threatened.

NMFS_010801 (GNZ 2020 Comparability Application).

Second, MHDD argues the FRML "only" applies within the Māui dolphin habitat zone , and does not limit mortalities in other portions of the dolphin's habitat where fishing is allowed. But MHDD does not explain what other portions of Māui dolphin habitat it is referring to nor does it explain why limiting the FRML to the "Māui dolphin habitat zone" is not comparable to

U.S standards.  In contrast, GNZ provided substantial evidence and NMFS found that the Māui

dolphin habitat zone is the stock's "core" area and that the MDHZ is located "on the west coast

of the North Island (including harbors) from the coast out to 12 [nautical miles]. The MDHZ

covers approximately 90-95% of Māui dolphin habitat over its entire distribution."

NMFS_001254.  As GNZ further explained in its application, the MDHZ "is estimated to cover

approximately 96.4% (summer) and 87.8% (winter) of the Māui dolphin distribution."

NMFS_000023-24; *see also* NMFS_000009 (map of MDHZ), NMFS_010776-78 (showing

validated Māui/Hector dolphin sightings).  It was not unreasonable, therefore, that NMFS based

its conclusions on the substantial evidence that the MDHZ is the Māui dolphin's core range.

Third, MHDD argues that GNZ's TMP "does not mandate any corrective action if the

FRML is exceeded."  This is an overly simplistic reading of GNZ's regulations and the 2020

TMP.  New Zealand created and implemented its Hector's and Māui Dolphin Threat

Management Plan (TMP) in 2020, which is a combination of a take reduction plan and an

Environmental Assessment or Impact Analysis.  The 2020 TMP reviews what is known about

the marine mammal stock, the threats to that stock, and estimates the levels of mortality

associated with each threat.  A TMP includes options or regulatory measures to reduce incidental

mortality and serious injury in commercial fisheries below set targets and management

objectives.  These are the same elements contained in a take reduction plan—pursuant to the

MMPA, take reduction plans set goals (e.g., reducing incidental mortality and serious injury

below PBR within six months of implementation) and if, upon implementation, those targets are

not met, NOAA reconvenes the take reduction team to adopt additional measures.  *See* 16 U.S.C.

§ 1387(f).

NMFS explained that the TMP objectives are: "ensure that dolphin deaths arising from fisheries threats do not exceed the population sustainability threshold (PST) with 95% certainty, cause localized depletion, create substantial barriers to dispersal between subpopulations, and allow localized subpopulations to recover and/or remain at or above 80% of their unimpacted status with 95% certainty." NMFS_001258. Furthermore, the "TMP set the Māui dolphin bycatch limit at one individual and enacted fishing prohibitions for the set net and inshore trawl fisheries in the MDHZ. This bycatch limit is legally binding under New Zealand's Fisheries Act 1996 and the Marine Mammal Protection Act of 1978." NMFS_001258-59. As NMFS found, because GNZ had set a bycatch limit for the Māui dolphin, "[t]he Minister of Fisheries **does not have discretion to choose whether to act or not**, but rather the Minister has the authority to quickly enact additional prohibitions considered necessary to ensure the bycatch limit is not exceeded." NMFS_001259-60 (emphasis added); *see also* NMFS_001112 (GNZ application). [15] NMFS therefore fully explained why the TMP was not discretionary in nature and that explanation is not arbitrary or capricious.

    d.  <u>Population Estimates</u>

NMFS reviewed the evidence in the record and concluded that GNZ's process for determining a population abundance estimate for Māui dolphin is comparable in effectiveness to the U.S. regulatory program. NMFS concluded, based off the evidence in the record, that the

---

[15] MHDD seemingly invites this Court to wade into New Zealand law by citing to two cases from New Zealand. *See* ECF Nos. 30-1, 30-2. As an initial matter, this is extra-record evidence that was not in front of the agency at the time the agency made its finding and so should not be considered by the Court. *See* 5 U.S.C. § 706 (courts evaluate agency action upon "the whole record or those parts of it cited by a party."). In the alternative, even if the Court were to take "judicial notice" of the cases, it should stay its hand and not wade into interpreting New Zealand judicial opinions which *purport* to interpret New Zealand law.

population estimate for the Māui dolphin was 54 individuals.[16]  NMFS_001225; NMFS_003868, 3873 (study entitled "Estimating the abundance and effective population size of Māui dolphins (Cephalorhynchus hectori Māui) in 2020–2021 using microsatellite genotypes" which estimated the Māui dolphin population at "54 individuals aged 1 year or order…(95% confidence interval (CI) = 48-66).").  This study satisfies the MMPA's "reasonable proof" standard because it was based on a detailed analysis of the results of genetic sampling of Māui dolphins that was carried out from 2020 through 2021.[17]  NMFS_001228 (2024 Comparability finding describing abundance estimate as following a "scientifically-sound process to estimate abundance"); NMFS_003868-932.

MHDD claims that NMFS used an "older estimate" that "conflicts with two more recent, smaller estimates."  One of the more "recent" estimates MHDD cites is the estimate of 43 Māui dolphins that NMFS incorrectly included in its decision memorandum.  But that estimate is nowhere to be found in the administrative record *beside* in the decision memorandum (which, as explained in the attached declaration, was plainly a typographical error).  The estimate was therefore not "in the administrative record" before NMFS at the time the decision was made.

The only other estimate to which MHDD points that *is* in the record is an estimate that was included in a report of a pre-meeting workshop of International Whaling Commission's Scientific Committee (IWC-SC).  That pre-meeting workshop estimated the Māui dolphin population at 48 individuals.  *See* NMFS_004041.  While the IWC-SC workshop was from 2023, the report cites to the 2021 Constantine et al. study—i.e. the study used by GNZ and NMFS to

---

[16]  In its decision memorandum, NMFS incorrectly stated that the population estimate was "43."  NMFS_001225.  This was a typographical error and NMFS intended to use a population estimate number of 54.  *See* Attachment A, Declaration of Alexa Cole.

[17]  MHDD does not challenge the underlying scientific rigor of the analysis, only that it is not the most "recent" study.  MHDD Br. at 21-22.

conclude that the Māui dolphin population estimate was 54 individuals—as a "new abundance estimate." NMFS_004041. In other words, the IWC-SC estimate is not "more recent" than the 2021 Constantine et al. study, but rather appears to have relied on the Constantine et al. study used by NMFS. It appears that the IWC-SC came to a different conclusion based on that study. However, even the IWC-SC report did not fully endorse its estimate of 48 Māui dolphins—as it explained, that 48 individual estimate "might be used for fitting population models *but is not suitable for use in implementations of IWC management procedures*." NMFS_004041 (emphasis added). NMFS was aware of the ICW-SC at the time it issued its decision,[18] but based on IWC-SC's own hesitation regarding the 48 number and other evidence in the record, NMFS reasonably weighed the evidence and decided to rely on the 2021 Constantine et al study, which was scientifically sound (a point that MHDD does not challenge). While MHDD may disagree with that conclusion, NMFS properly exercised its judgment and weighed the evidence. Its decision to rely on the 2021 Constantine et al study was not arbitrary or capricious. Indeed, it is this type of weighing of the scientific evidence that is best left to the agency, who are experts in this matter. *Cf. Marsh*, 490 U.S. at 377 ("Because analysis of the relevant documents 'requires a high level of technical expertise, 'we must defer to 'the informed discretion of the responsible federal agencies'").

e.  <u>Monitoring Program</u>

The MMPA Imports Rule requires NMFS to determine whether a harvesting nation has implemented "monitoring procedures in the export fishery designed to estimate incidental

---

[18]  NMFS was clearly aware of the International Whaling Commission's Scientific Committee as it cited to that committee—albeit for a different proposition—as part of its decision memorandum. *See* NMFS_001262.

mortality or serious injury in the export fishery," that are comparable in effectiveness to U.S. standards. 50 C.F.R. § 216.24(h)(6)(iii)(C)(4).

MHDD argues that NMFS's finding that GNZ monitoring program was comparable in effectiveness to US standards was counter to the evidence before NMFS.  MHDD Br. at 22-26. MHDD arguments are without merit.

NMFS thoroughly examined GNZ's monitoring program and found it comparable in effectiveness to U.S. standards.  It first found that GNZ uses two types of monitoring programs: an at-sea monitoring program (observers and electronic monitoring (EM)) and vessel logbooks (self-reporting).  NMFS_001254.  For at sea-monitoring, NMFS found that "United States and New Zealand use comparable standards for deploying observers on commercial fishing vessels. Both nations take observer health and safety along with vessel operational safety into consideration when determining deployments of observers."  NMFS_001256.

NMFS next found that GNZ's monitoring program adequately covered the entirety of the MDHZ.  NMFS_001256.  In addition, the monitoring program covers the "transition zone" on the edge of the MDHZ, despite there being "no evidence of a current resident [Māui dolphin] population in the transition zone, but historical evidence suggests there may have been a small resident population in the past."  NMFS_001096 (GNZ Comparability Application). And, NMFS explained:

> Fishing effort within the Māui Dolphin Habitat Zone (MDHZ) has been declining while monitoring effort has been increasing since the MDHZ fishing prohibitions went into effect….Since the 2020-2021 fishing year, fishing effort has been reduced by 71% for the trawl fleet and 97% for the set net fleet while 50% of trawl effort and 90% of set net effort were monitored.  In 2022, the GNZ…expanded the electronic monitoring program to include the entire MDHZ...

NMFS_001228; *see* NMFS_001210-11 (showing set net prohibitions in MDHZ); NMFS_001215 (showing trawling prohibitions in MDHZ).

NMFS further explained that vessels less than 8 meters and over 32 meters in length are excluded from GNZ's monitoring program.  NMFS_001255.  However, NMFS found that GNZ had provided reasonable explanations for this.  For vessels under 8 meters, NMFS explained that this was because, similar to U.S. standards, these vessels are unable to carry an observer or an on-board camera due to concerns for both human health and safety and safe vessel operations.  NMFS_001255.  Furthermore, vessels over 32 meters are "part of the deep-water fleet and operate in areas well outside of the Māui dolphin distribution area and are already subject to high levels of observer coverage that would detect any by catch of Māui dolphins as a statistically-reliable estimate."  NMFS_001255.  GNZ's monitoring program is supplemented by its Spatially Explicit Fisheries Risk Assessment (SEFRA) model, which "uses the likelihood of an encounter between the protected species and a fishing event that uses their overlap in space and time to create the bycatch estimate."  NMFS_001262 ("to inform the model for the Maui dolphin bycatch estimate, New Zealand uses total fishing effort (which includes set net vessels inside harbors and unobserved/cryptic mortality)").  As GNZ explained, "the risk posed by these small [under 8 meter] vessels is captured in our estimates of fisheries bycatch which is informed by the SEFRA model."  NMFS_001089.

NMFS further found that GNZ's monitoring program exceeded U.S. standards because, unlike the U.S., (1) GNZ had a vessel monitoring system that reports vessel location that is monitored in real-time and "requires its fishermen to report both catch and marine mammal bycatch information within a day"; and (2) GNZ used an expanded EM program consisting of cameras on boats which is "capable of observing marine mammal bycatch 100% of the time" within the Māui dolphin habitat zone.  NMFS_001256.  NMFS explained that the vast majority

of this video will be reviewed.[19]  "For the set net fleet, 100% review of all footage will take place

regardless of distance from shore. For the trawl fleet, 100% review of footage will take place for

trawls within 12 nautical miles of the coast and 20% review of footage will take place for trawls

between 12-17 nautical miles."  NMFS_001255.

As a result, and after thorough review of the entire record, NMFS found that New

Zealand has "attained 90% monitoring coverage (between its observer and EM programs)" to

"observe for marine mammal bycatch," and this monitoring program is "more accurate and

robust" than the U.S. monitoring coverage, which is only 10% of monitoring, and "exceed[s] the

requirements of section 118 of the MMPA for statistically reliable bycatch estimates."

NMFS_001256.

MHDD argues that NMFS's claim that the U.S. standard for monitoring marine mammals

as only 10 percent is incorrect and that the figure should be closer to 100 percent.  MHDD Br. at

23-24.  MHDD's contentions are without merit.

As an initial matter, the MMPA does not require any specific level of monitoring.

Rather, it requires "to the extent practicable" that NMFS "allocate observers among commercial

fisheries" with the "highest priority" given to "commercial fisheries that have incidental

mortality or serious injury of marine mammals from stocks listed as endangered species."  16

U.S.C. § 1387(d)(4).  NMFS is also given discretion to "place observers on board vessels as

necessary," *id.* § 1387(d)(2), and NMFS's decisions about monitoring efforts related to marine

mammal bycatch are based on a variety of factors, including availability of funding, necessity of

observer coverage, and safety of both the observer and fish vessels, *id.* §§ 1387(d) and

1387(f)(3).  Consistent with this statutory framework, and as NMFS explained that, as a general

---

[19] MHDD's citation to a 20 percent review level, *see* MHDD Br. at 26, is incorrect
because that figure solely relates to the review of video from the "transition zone," in which
there is "no evidence of a current [Māui dolphin] population."  NMFS_001255; NMFS_001096.

matter, "the United States does not use its EM programs for monitoring marine mammal bycatch so the United States only uses observers to attain approximately 10% monitoring coverage for its fisheries to document marine mammal bycatch." NMFS_001256.

MHDD's citations to the contrary are without merit. MHDD cites two cases to support its position that a 100 percent monitoring is required. But neither of those cases concerned the MMPA and are therefore plainly inapplicable to NMFS's analysis of whether GNZ has a monitoring program that is comparable in effectiveness to U.S. standards *under the MMPA*. *See* MHDD Br. at 23; *Ctr. for Marine Conservation v. NMFS*, No. 99-00152, 2000 WL 33964303 (D. Haw. June 23, 2000) (case concerning interpretation of National Environmental Policy Act); *see also Earth Island Inst. v. Evans*, No. 03-0007, 2004 WL 1774221 (N.D. Cal. Aug. 9, 2004) (case concerning interpretation of Dolphin Protection Consumer Information Act). While MHDD may believe that 100% observer coverage is *preferred*, it is not required under the MMPA, and therefore is not the correct standard by which to measure whether GNZ's program is comparable in effectiveness.

However, even assuming that the 10 percent figure NMFS used was not the appropriate measure of comparability, GNZ's 90 percent monitoring coverage plainly is comparable in effectiveness to U.S. coverage. MHDD argues that NMFS erred in citing to this 90 percent figure because it is "nowhere" to be found in GNZ's application. MHDD Br. at 25-26. But NMFS explained that the 90 percent figure was a combination of both "observer and [Electronic Monitoring]." NMFS_001256; NMFS_010915 (2020 Comparability Finding). And the record supports this figure. *See* NMFS_000010-19. NMFS's citation to two charts (figures 10 and 12) on NMFS_001105–06 is a misinterpretation of what those charts show. Indeed, the *other* two charts located on those pages (figures 9 and 11), demonstrate that coverage is precisely at 90

percent.  NMFS_001105-06.  The coverage in figures 10 and 12 is a reflection of the fact that trawls are prohibited in harbors and many of the set net vessels that operate in harbors are less than 8 meters in length and therefore do not have EM and cannot have observer coverage. Furthermore, as NMFS explained, it is very unlikely that Māui dolphins reside in the harbors because there have been no human sightings of the dolphins in the harbors and a detailed acoustic monitoring program demonstrated that there were almost no dolphins located within the harbors.  NMFS_001260; *see also* NMFS_001129 (chart showing confirmed sightings of Māui dolphins); NMFS_001130 (explaining acoustic monitoring process).

    And even assuming for argument's sake that the 90 percent number were not supported by the record evidence, as detailed in the preceding paragraphs, NMFS fully explained why GNZ's monitoring program as a whole far exceeds U.S. standards, which do not require a certain amount of observer coverage.  *See also* NMFS_001252-56.  MHDD fails to seriously grapple with the fulsome nature of GNZ's monitoring program (in contrast, NMFS explained the program in full detail) and fails to explain how NMFS's conclusion that GNZ's monitoring is comparable to U.S. standards in creating statistically reliable estimates of incidental mortality and serious injury of marine mammals is arbitrary or capricious.

    Finally, MHDD argues that NMFS failed to consider that electronic monitoring is less "statistically reliable" than human monitors that the U.S. uses.  MHDD Br. at 26-27.  But GNZ does not use solely EM; rather, as NMFS found, GNZ uses *both* human observers and electronic monitoring.  NMFS_001254.  NMFS explained that New Zealand utilizes a significant number of on board observers on vessels fishing in the Māui dolphin zone and will continue to use on board observers in the small remainder of that zone in which fishing will be allowed under the 2020 Regulations.  NMFS_010935 ("As the likelihood of interactions is very low, the level of

monitoring coverage must be high enough to reliably detect any non-zero capture rate. In the last three complete fishing years, the percent of observed fishing days on fishing vessels in the target set-net area has averaged 95%, and 90% in the target trawl coverage area.").  As NMFS explained, "[t]he overall EM program acts as a strong incentive for commercial fishers to report any marine mammal interactions accurately and in a timely fashion."  NMFS_001255.  And while EM is not currently used for marine mammals domestically, the U.S. is "starting to utilize electronic monitoring (EM) by using on-board video cameras for fishery management decisions."  NMFS_001253.  Indeed, MHDD's record cite *supports* the use of both human observers and electronic monitoring.  NMFS_004404-05 (respondents "recommended maintaining the current hybrid approach" of using both human observers and EM.).

        f.    Marine Mammal Stock Assessments

        The MMPA Imports Rule requires, as a condition for a comparability finding, that the harvesting nation maintains a regulatory program that provides for, or achieves comparability results in regards to marine mammal assessments that estimate population abundance for marine mammal stocks that are incidentally killed or seriously injured in the export fishery.  50 C.F.R. § 216.24(h)(6)(iii)(C)(1).

        MHDD claims that NMFS found that GNZ has comparable marine mammal stock assessments without any discussion of that finding.  MHDD Br. at 27-28.  But NMFS specifically found that "GNZ has an abundance estimate for Māui dolphins, which follows a scientifically-sound process to estimate abundance," and based on "NMFS' analysis the GNZ meets the condition to have an abundance estimate for a marine mammal stock, and its system for Māui dolphin abundance estimation is comparable in effectiveness to U.S. standards" per

NMFS's stock assessment guidelines.[20]  NMFS_001228; NMFS_001244; *see also* NMFS_010909 (2020 Comparability Finding).  In addition, the GNZ plans to undertake additional stock assessment surveys to update its estimates.  NMFS_001228; *see also* NMFS_001052 (GNZ informed NMFS it would conduct a new stock assessment for Māui dolphin in 2025).

Record evidence plainly supports NMFS's conclusion, and MHDD does not contest this fact.  *See Gonzales v. West*, 218 F.3d 1378, 1381 (Fed. Cir. 2000) ("[A]bsent specific evidence indicating otherwise, all evidence contained in the record at the time of the [agency]'s determination ... must be presumed to have been reviewed by [the agency], and no further proof of such review is needed." (citations omitted)).

GNZ provided a description of the geographic range of the affected stock, including any seasonal or temporal variation in such range in various supporting documents.  *See* NMFS_004456; NMFS_003858.  NMFS also relied upon GNZ's use of its SEFRA model, which stated, "the summer and winter spatial densities of Hector's and Māui dolphins were estimated using a habitat model" which "were independently validated using public and commercial fisheries observer sightings." NMFS_004462 (SEFRA model analysis); *see also* NMFS_001262 (2024 Comparability Finding).  NMFS also cited to the extensive observer coverage, electronic monitoring, public sightings, and acoustic monitoring which supports GNZ's geographic range of the affected stock.  *See* NMFS_001259-60.  GNZ also provided evidence of a minimum population estimate, which is discussed above and which NMFS found scientifically sound.

**IV.    NMFS Found GNZ's Regulatory Program Was Comparable In Effectiveness As It Relates To Other Marine Mammals That Interact With The Two Fisheries At Issue**

---

[20]  16 U.S.C. § 1386 outlines the stock assessment report requirements.

MHDD claims that in issuing its comparability finding, NMFS erred because it focused *too much* on the Māui dolphin and failed to address other marine mammals that may interact with the two fisheries at issue.  MHDD Br. at 28-30.  MHDD argues that NMFS failed to properly analyze GNZ's regulatory program to determine if it was comparable in effectiveness for all marine mammals that interact with the two fisheries at issue in this case.

But, as explained above, given the Māui dolphin's status as an endangered species, the history of the litigation, and the *Sea Shepherd* Court's injunction, NMFS naturally focused much of its attention on how GNZ's regulatory program compares to U.S. standards as it relates to the Māui dolphin.  *See* NMFS_001226-30.  Regardless, MHDD's claim lacks merit.  This is because while the Māui dolphin was naturally a focus of NMFS's finding, NMFS did in fact analyze GNZ's regulatory program for comparableness as it relates to *all* marine mammals that interact with the two fisheries at issue.  *See* NMFS_001235-63.  Indeed, the vast majority of steps that GNZ has taken to protect the Māui dolphin apply with equal force to other marine mammals. For example, GNZ's monitoring efforts—which are comparable in effectiveness to U.S. standards—apply with equal force to other marine mammals besides the Māui dolphin. Similarly, New Zealand's gear restrictions, time/area closures, and other measures naturally offer similar protections to other marine mammal species or stocks that overlap with the fisheries in question.  NMFS_000260 (Threat Management Plan description of fishing protection measures), NMFS_001214 (GNZ's application), NMFS_001230 ("Unlike the United States, New Zealand primarily uses closures to mitigate bycatch risk rather than gear modifications.  These closures . . . are comparable, or exceed, what is required for U.S. fishermen for similar fisheries.").

NMFS plainly reviewed the evidence in the record as it relates to marine mammals.  GNZ provided specific detailed information showing marine mammals affected by the West Coast

North Island trawl and set net fisheries, average annual mortality, and PBR.  NMFS_001052-001067 (evidence concerning total average annual mortality, population abundance estimates, and bycatch limit exceedances for multiple marine mammal species and stocks); *see also* NMFS_010808-09 (2020 Comparability Application showing which marine mammals interact with two fisheries at issue); NMFS_010940 (2020 Comparability finding citing to NMFS_010808-09).  Importantly, none of the species listed had a bycatch limit that was exceeded.  NMFS_001052-53.

Furthermore, NMFS *specifically* found that GNZ prioritizes fisheries for mitigation in response to reported bycatch of strategic species (other than the Māui dolphin), similar to the prioritization scheme envisioned under the MMPA.[21]  NMFS_001238; *see also* NMFS_003705 (Final Rule – Response to Comment 11 "The MMPA does prioritize action for those stocks defined as 'strategic,' and the agency hopes that nations would also prioritize actions for threatened and endangered species and those for which bycatch is unsustainable.").  For the "strategic" stock, NMFS cited statistics showing that there was zero "total mortality + serious injury" and therefore had not exceeded their bycatch limits.  NMFS_001238; NMFS_001052; *see also* NMFS_010808-010809 (marine mammals affected by the West Coast North Island trawl and set net fisheries.).  And NMFS cited to evidence showing that "bycatch mitigation measures" had been implemented for these five species for the two fisheries at issue here (Fishery IDs 1969 and 1977, *see* NMFS_001235). NMFS_001241-42.

In short, NMFS's conclusion that GNZ's regulatory program was comparable in effectiveness for all marine mammals was supported by the record evidence.

V.    **Should The Court Find For MHDD, The Proper Remedy Is Remand**

---

[21] NMFS refers to this stock as "Section 118(f)(3)" stock, which is a reference to MMPA, 16 U.S.C. § 1387(f)(3).  That section provides that, where there is insufficient funding to develop a TRP, NMFS shall give the "highest priority" to certain species or stock who are at risk.

Should the Court find for Plaintiff on Counts I or II, the proper course of action would be to remand the case back to NMFS for further findings. *I.N.S. v. Orlando Ventura*, 537 U.S. 13, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands"). MHDD's request for this Court to (1) vacate NMFS's comparability finding, and (2) impose an import ban would require this Court to go beyond its statutory mandate and impermissibly impose itself into the agency's actions.

First, the Court should not vacate an agency finding if it finds the agency's explanation insufficient. Rather, if the record "does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Lorion*, 470 U.S. at 744. Accordingly, the correct course would be a remand for further explanation as opposed to a final judgment setting aside the comparability findings. And while defendants certainly recognize the endangered nature of the Māui dolphin—indeed, NMFS has listed the Māui dolphin as "endangered" under the ESA, *see* 82 Fed. Reg. 43701 (Sep. 19, 2017)—MHDD's claim that the Māui dolphin will come to additional harm absent a vacatur is without evidentiary support. Not only does the record evidence suggest that the Māui dolphin may be *rebounding* in population, but the two fisheries at issue here have had a comparability finding—and therefore have been able to export fish to the United States—*for over 15 months*. And during that entire time, there has been no reported bycatch of a Māui dolphin.

And in any event, setting aside the comparability findings would not automatically result in an import ban as MHDD desires. Section 1371(a)(2) of the MMPA compels a finding before

imposition of any embargo. The relevant language states that "[t]he Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). Imposing a "ban" thus requires findings regarding "the incidental kill or incidental serious injury" associated with "commercial fishing technology" used in exporting countries. *Id.* The import regulations further clarify that a ban is to be imposed only in the case in which NMFS "has denied or terminated a comparability finding for a fishery." 50 C.F.R. § 216.24(h)(9)(i). Only in that case does the Government "identify and prohibit the importation of fish and fish products into the United States from the harvesting nation caught or harvested in that fishery." *Id.* Indeed, the lack of a finding trigger would result in an immediate embargo on all imported fish and fish products subject to piecemeal lifting.

Second, under the APA, the Court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). But contrary to MHDD's apparent contentions, Congress, in enacting the APA, did not intend that section 706(1) swallow section 706(2) by allowing litigants to bypass administrative action by seeking Court orders compelling specific results. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (SUWA). Section "706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Id.* (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947) (emphasis by Court)). Put another way, under the APA, a "failure to act is not the same thing as a denial. The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request." *Id.* at 63 (internal quotation marks omitted).

Accordingly, rather than possessing the right to any outcome, MHDD, at most, could compel agency action through emergency rulemaking pursuant to section 706(1). "Where, as here, the court would have to 'conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions,' remand is required for further investigation and explanation by the expert agency." *Sea Shepherd New Zealand v. United States*, 469 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2020) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Applying that well-established rule here, MHDD cannot compel any outcome to a proceeding that Congress entrusted to NMFS in the first instance.[22] Congress granted NMFS broad, plenary authority to administer the MMPA, directing that "[t]he Secretary, in consultation with any other Federal agency to the extent that such agency may be affected, shall prescribe such regulations as are necessary and appropriate to carry out the purposes of this subchapter." 16 U.S.C. § 1382(a). 50 C.F.R. § 216.24(h) sets forth the standards and procedures for complex determinations whether fish "have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371. NMFS made this determination under its MMPA Imports Rule. NMFS_001225; NMFS_001232.

---

[22] *Natural Resources Defense Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1369 (Ct. Int'l Trade 2018), does not compel a different result. In that case, which involved a request for preliminary injunction to enjoin imports of certain fish and fish products from Mexico, NMFS had not conducted any rulemaking and the Court used its equitable powers in a case in which "no action ha[d] occurred." *Id.* at 1351. To the extent the Court finds that *NRDC v. Ross* supports MHDD's argument, we respectfully disagree with the *NRDC* holding for the reasons explained in this section.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment on the agency record and enter judgment in favor of defendants.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

/s/  Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

OF COUNSEL:                           /s/  Joshua W. Moore
MARK HODOR                            JOSHUA W. MOORE
Office of General Counsel             Trial Attorney
National Oceanic & Atmospheric Admin. Department of Justice
Silver Spring, MD                     Civil Division
                                      Commercial Litigation Branch
                                      P.O. Box 480, Ben Franklin Station
                                      Washington, DC 20044
                                      Tel.: (202) 305-2312
                                      Email: Joshua.w.moore@usdoj.gov

May 27, 2025                          Attorneys for Defendants

47

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this response contains 13,956 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Joshua W. Moore</u>