## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., | |
| *Plaintiff,* | Case No. 1:24-cv-00218-JCG |
| v. | Before: Judge Jennifer Choe-Groves |
| NATIONAL MARINE FISHERIES SERVICE, et al., | |
| *Defendants,* | |
| GOVERNMENT OF NEW ZEALAND, | |
| *Intervenor-Defendant.* | |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON AGENCY RECORD

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

TABLE OF ACRONYMS ............................................................................................... v

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.      NMFS Failed to Establish that New Zealand's Regulatory Program Is
          Comparable in Effectiveness to the MMPA's Zero Mortality Rate Goal. .............. 2

    II.     NMFS Failed to Establish that Māui Dolphin Bycatch in the New Zealand
          Fisheries Will Have No More than a Negligible Impact on the Population. ........... 6

    III.    New Zealand Lacks a Bycatch Limit with Comparable Effectiveness to
          PBR. ....................................................................................................................... 9

    IV.    NMFS Failed to Account for Recent, Lower Population Estimates When
          Calculating PBR.................................................................................................... 13

    V.     NMFS's Monitoring Conclusion Relied on a Factually Incorrect
          Assumption and an Arbitrary Comparison that Ignores the Māui Dolphin's
          Vulnerability. ........................................................................................................ 17

    VI.    NMFS Failed to Adequately Evaluate Whether New Zealand Has a
          Comparable Stock Assessment. ........................................................................... 22

    VII.   NMFS Failed to Show that Bycatch of Other Marine Mammals Does Not
          Exceed U.S. Standards. ........................................................................................ 23

    VIII.  The APA Compels Vacatur of the Comparability Finding and an Order
          that Defendants Carry Out Their Nondiscretionary Duty to Impose an
          Import Ban. ............................................................................................................ 26

CONCLUSION .............................................................................................................. 30

CERTIFICATE OF COMPLIANCE .............................................................................. 32

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anglers Conservation Network v. Pritzker,*
    809 F.3d 664 (D.C. Cir. 2016) ..............................................................................28

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 (Fed. Cir. 2009)..............................................................................15

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States,*
    483 F. Supp. 3d 1253 (Ct. Int'l Trade 2020) ........................................................27

*Ctr. for Biological Diversity v. Zinke,*
    900 F.3d 1053 (9th Cir. 2018) .........................................................................14, 17

*Diamond Sawblades Mfrs. Coal. v. United States,*
    650 F. Supp. 2d 1331 (Ct. Int'l Trade 2009) ...........................................................3

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015).................................................................................15

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016)...............................................................................................14

*Gerber v. Norton,*
    294 F.3d 173 (D.C. Cir. 2002) ..................................................................3, 22, 25

*Haw. Longline Ass'n. v. NMFS,*
    281 F. Supp. 2d 1 (D.D.C. 2003) ............................................................................3

*Invenergy Renewables LLC v. United States,*
    476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ........................................................15

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .....................................................................................9

*Lopez v. Davis,*
    531 U.S. 230 (2001)...............................................................................................12

*\*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983)...............................................................................6, 13, 14, 21

*Nat. Res. Def. Council, Inc. v. Lutnick,*
    No. 24-00148, 2025 WL 900438 (Ct. Int'l Trade Mar. 25, 2025).........................27

*\* Authorities upon which we chiefly rely are marked with an asterisk*

*Nat. Res. Def. Council, Inc. v. Rauch*,
    244 F. Supp. 3d 66 (D.D.C. 2017) ......................................................................21

*\*Nat. Res. Def. Council, Inc. v. Ross*,
    331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ..............................................28, 29

*New Orleans v. SEC*,
    969 F.2d 1163 (D.C. Cir. 1992) .........................................................................15

*Ninestar Corp. v. United States*,
    687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) .....................................................27

*Norton v. S. Utah Wilderness All.* (*SUWA*),
    542 U.S. 55 (2004).......................................................................................29, 30

*Nw. Coal. for Alternatives to Pesticides v. EPA*,
    544 F.3d 1043 (9th Cir. 2008) ..........................................................................24

*Oceana, Inc. v. Ross*,
    363 F. Supp. 3d 67 (D.D.C. 2019) ....................................................................16

*Oceana, Inc. v. Ross*,
    483 F. Supp. 3d 764 (N.D. Cal. 2020) ..............................................................14

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019).............................................................................................28

*Sea Shepherd N.Z. v. United States*,
    469 F. Supp. 3d 130 (Ct. Int'l Trade 2020) ......................................................29

*\*Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*),
    606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ............................................ *passim*

*Sea Shepherd N.Z. v. United States* (*Sea Shepherd II*),
    693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024) .................................................3, 16

*Sea Shepherd N.Z. v. United States*,
    723 F. Supp. 3d 1374 (Ct. Int'l Trade 2024) .....................................................16

*Sierra Club v. EPA*,
    671 F.3d 955 (9th Cir. 2012) ......................................................................14, 22

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) .........................................................................26

*Vietnam Veterans of Am. v. CIA*,
    811 F.3d 1068 (9th Cir. 2016) ..........................................................................30

**Statutes**

16 U.S.C. § 1361 ..................................................................................................................1

16 U.S.C. § 1362 ................................................................................................................16

16 U.S.C. § 1371 ...............................................................................................7, 9, 27, 28

16 U.S.C. § 1386 ................................................................................................................23

16 U.S.C. § 1387 ..................................................................................................................5

**Regulations**

50 C.F.R. § 216.3 ...............................................................................................................10

50 C.F.R. § 216.24 .......................................................................................................... *passim*

## TABLE OF ACRONYMS

| | |
|---|---|
| FRML | Fishing-Related Mortality Limit |
| GNZ | Government of New Zealand |
| MDHZ | Maui Dolphin Habitat Zone |
| MHDD | Maui and Hector's Dolphin Defenders |
| MMPA | Marine Mammal Protection Act |
| NMFS | National Marine Fisheries Service |
| PBR | Potential Biological Removal |
| PST | Population Sustainability Threshold |
| TMP | Threat Management Plan |
| ZMRG | Zero Mortality Rate Goal |

# INTRODUCTION

Less than 50 Māui dolphins remain on Earth. The Government of New Zealand (GNZ) submitted evidence to the National Marine Fisheries Service (NMFS) that its West Coast North Island trawl and set-net fisheries (the New Zealand Fisheries) are killing and seriously injuring Māui dolphins at a rate far in excess of what would be permitted in the United States. Yet NMFS found that the New Zealand Fisheries are not exceeding U.S. standards. NMFS and GNZ (collectively, Defendants) now attempt to defend that finding largely by raising theoretical ways in which GNZ *could* address bycatch, without showing that GNZ *must* take or *is* taking such action or that NMFS even evaluated the various shortcomings in the efficacy of GNZ's approach.

The U.S. Marine Mammal Protection Act (MMPA) does not permit such a discretionary, casual approach to preventing catastrophic bycatch of a critically imperiled marine mammal. The reason the MMPA's bycatch standards typically have specific definitions and are phrased in mandatory terms is precisely so that they are effective at achieving important bycatch reduction objectives. While GNZ's measures need not be identical to the United States', they must be at least equally effective at achieving the same results. The 2024 Comparability Finding fails to establish that GNZ does so. NMFS's post hoc attempts to rehabilitate that finding only demonstrate the carelessness with which it approached its task of ensuring that the New Zealand Fisheries do not pose excessive risk to the Māui dolphin or other marine mammals.

The 2024 Comparability Finding is not just contrary to law, but also contrary to the basic principles underlying the MMPA. The MMPA does not permit fisheries bycatch to cause a marine mammal stock to "diminish below its optimum sustainable population" or "cease to be a significant functioning element in the ecosystem." 16 U.S.C. § 1361(2). GNZ's regulatory program permits both. The picture the 2024 Comparability Finding paints ignores this stark

reality: in the years since NMFS's previous comparability finding, the Māui dolphin population has continued to decline at a rate of 3-4% per year. NMFS_1225. Despite that, the 2024 Comparability Finding rolls out a red carpet into U.S. markets for the New Zealand Fisheries to profit off extinction, in contravention of the MMPA.

The Māui dolphin has no time to lose. Yet NMFS squanders precious moments with its post hoc rationalizations, neglect of relevant data, and failure to articulate a rational basis for its conclusions. It did the same thing in 2020. Aside from the further decline of the Māui dolphin population, not much has changed since then. The Court should deny NMFS a third bite at the apple while imports continue, and should order the defendant agencies to immediately implement the ban that the MMPA requires.

## ARGUMENT

**I.**    **NMFS Failed to Establish that New Zealand's Regulatory Program Is Comparable in Effectiveness to the MMPA's Zero Mortality Rate Goal.**

The MMPA requires both setting a zero mortality rate goal (ZMRG) of 10% of the potential biological removal (PBR) level and taking action when that level is exceeded to achieve the goal within five years. *See* Pl.'s Mot. Summ. J. 13-14, ECF No. 30 (Pl.'s Br.). NMFS admittedly did not assess this standard in the 2024 Comparaibility Finding as required. *See* Def's Resp. Pl.'s Mot. 23, ECF No. 37 (NMFS Br.). Although Defendants now contend post hoc that GNZ has a comparable zero mortality *objective*—it does not—they fail to show that GNZ requires mandatory action to achieve that objective. An aspirational goal without requirements to achieve that goal lacks the effectiveness of the U.S. ZMRG standard.

NMFS cannot point to any part of its 2024 Comparability Finding where it evaluated the ZMRG standard. It instead asserts its 2020 Comparability Finding made a ZMRG determination. NMFS Br. 23-24. However, the 2024 Comparability Finding nowhere indicates it was

incorporating any previous ZMRG determinations. Judge Katzmann previously rejected NMFS's argument that it could "implicitly" consider necessary elements of a comparability finding. *Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*), 606 F. Supp. 3d 1286, 1313 & n.46 (Ct. Int'l Trade 2022) ("While incorporation by reference is not per se arbitrary and capricious, conclusory statements and citations that do not explain how a determination was reached are insufficient." (citations omitted) (cleaned up)); *see also Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("When a statute requires an agency to make a finding as a prerequisite to action, it must do so."). Moreover, the 2020 Comparability Finding was enjoined at the time of the 2024 finding, so it would have been arbitrary for NMFS to assume the 2020 ZMRG finding "continue[d] to 'govern.'" *Diamond Sawblades Mfrs. Coal. v. United States*, 650 F. Supp. 2d 1331, 1351-52 (Ct. Int'l Trade 2009); *see Haw. Longline Ass'n. v. NMFS*, 281 F. Supp. 2d 1, 31-36 (D.D.C. 2003) (finding new decision arbitrary and capricious because "it rested on the conclusions of the vacated and unlawful" decision without reevaluating merits of prior analysis). In fact, Judge Katzmann found the 2024 Comparability Finding "supersede[d]" the prior findings as a necessary condition for lifting the injunction. *Sea Shepherd N.Z. v. United States* (*Sea Shepherd II*), 693 F. Supp. 3d 1364, 1367 (Ct. Int'l Trade 2024). NMFS cannot now "effectively require the Court to revisit" the superseded finding after the prior case was dismissed. *Haw. Longline Ass'n*, 281 F. Supp. 2d at 36.

Even accepting NMFS's claim that it could and did *sub silentio* adopt its earlier conclusion, the 2024 Comparability Finding fails to address relevant new material. NMFS represents that, in that new finding, it "reconsidered" the 2020 Comparability Finding based on GNZ's 2021 application, as well as other new material. NMFS Br. 10 (quoting NMFS_1224). GNZ's 2021 application indicated that, "no," GNZ does not have a zero mortality rate standard.

NMFS_1148. NMFS needed to actually reconsider its ZMRG determination based on that and the other new information. The record contains no indication that it did so.

In any case, the 2020 conclusion is arbitrary and contrary to the record because GNZ does not maintain a comparable standard to the ZMRG in two respects. First, the ZMRG has a specific, regulatorily defined meaning: 10% of PBR, equaling 0.01 mortalities per year (or one per hundred years) for the Māui dolphin. *See* Pl.'s Br. 13. GNZ does not even try to limit bycatch rates to that extent. The 2020 Comparability Finding cites only a memorandum indicating a general goal to "effectively restrict the allowable level of fisheries related mortality to zero." NMFS_10938. There is no evidence the general goal was meant to be as stringent as a 0.01 mortality rate. *See* 50 C.F.R. § 216.24(h)(ii)(6) (requiring "documentary evidence demonstrating that the harvesting nation has met the conditions" for a comparability finding). Likewise, GNZ's Fisheries Act seeks to achieve only "long-term viability," and GNZ's Marine Mammal Protection Act aims only for "species to achieve non-threatened status," neither of which means reducing mortality to near zero. *See* NMFS Br. 24 (post hoc claim that these laws support its 2020 finding). Defendants also cite a general biodiversity strategy document, which is not in the record so was not considered by NMFS for any purported ZMRG finding. *Id.* at 25; Resp. Br. of GNZ 8, ECF No. 36 (GNZ Br.). Notably, neither Defendant asserts the strategy imposes any restrictions on Māui dolphin bycatch or any legally binding obligations whatsoever.

Defendants point to just one numeric objective in GNZ's regulatory scheme, claiming the Threat Management Plan's (TMP) objective to manage human impacts "to allow the population to increase to a level at or above 95% of the maximum number of dolphins the environment can support" is comparable to the ZMRG. NMFS Br. 24 (quoting NMFS_258); GNZ Br. 9-10 (citing NMFS_3940). But as GNZ explains, that objective in the fisheries context is meant only to

ensure that "annual deaths do not exceed the Population Sustainability Threshold [PST]—a comparable measure to PBR." GNZ Br. 10. Because ZMRG equals one-tenth the PBR (and accordingly, one-tenth the similarly calculated PST), the TMP's alleged zero-mortality objective allows *ten times* the fishing-related mortality as the MMPA's ZMRG. It cannot rationally be deemed a comparable goal.

Second, and more significantly, the MMPA's ZMRG is not just a goal, but also requires implementing actionable measures on a defined timeline to achieve that goal. 16 U.S.C. § 1387(b)(4), (f)(2). Defendants cite no comparably effective GNZ requirements. NMFS vaguely claims the "TMP requires action" of some sort in the event of Māui dolphin bycatch. NMFS Br. 25; *see also* GNZ Br. 12-16. However, the *Sea Shepherd I* court rejected that theory, explaining the TMP "does not *require* New Zealand to do anything on any particular timeframe following a fishery-related interaction with a Māui dolphin," in contrast to the MMPA's mandatory Take Reduction Plan requirements. 606 F. Supp. 3d at 1315-19 & n.54; *see also infra* p. 12 (discussing why TMP does not require action).[1] GNZ contends that its Fishing-Related Mortality Limit (FRML) "supports" the allegedly comparable mortality objective. GNZ Br. 10. As discussed below, the FRML does not even limit mortality to PBR, much less one-tenth of PBR. *See infra* pp. 10-11. GNZ simply does not require measures to achieve a comparable bycatch rate as the ZMRG.

GNZ nonetheless asserts that there has been a zero-mortality rate "for at least the past 13 years and possibly the last 23 years." GNZ Br. 13. However, the *Sea Shepherd I* court explained

---

[1] GNZ contends that NMFS "approv[ed] of the TMP as being comparable to the U.S. take reduction plan standard," but the 2024 Comparability Finding contains no such determination. GNZ Br. 15. If it did, the determination would be arbitrary and capricious for the reasons discussed in *Sea Shepherd I.*

this same assertion did not meet "minimal standards of rationality" as a factual matter because not all deaths can be detected under GNZ's monitoring program. 606 F. Supp. 3d at 1327 n.64; *see also infra* p. 18 (discussing these monitoring shortcomings). Even if GNZ's assertion were factually true, the mortality rate still vastly exceeds the ZMRG of one dolphin per hundred years: *at least* four Māui dolphin deaths have been attributed to entanglement since 2001 alone. NMFS_10866-68.

GNZ's purported "comparable goal" is not nearly as strict as the ZMRG level. GNZ lacks comparable mandatory requirements to implement measures that will achieve that goal. And the actual rate of mortality and serious injury far exceeds the ZMRG level.

## II.    NMFS Failed to Establish that Māui Dolphin Bycatch in the New Zealand Fisheries Will Have No More than a Negligible Impact on the Population.

The MMPA prohibits fisheries from incidentally harming or killing endangered marine mammals unless that bycatch will have no more than a negligible impact on the stock. *See* Pl.'s Br. 14-16. While the ZMRG is a goal that the government must take action towards meeting, the negligible impact standard is a strict limit on bycatch of endangered marine mammals that cannot be exceeded. NMFS never evaluated whether GNZ achieves this limit—13% of PBR, equaling 0.013 mortalities per year (or one dolphin every seventy-seven years)—for the endangered Māui dolphin. *Id.*

NMFS's arguments on this issue consist entirely of impermissible "*post hoc* rationalizations" and should be rejected on that basis alone. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983). The absence of any rationale in the record is particularly concerning for this requirement, where Congress heightened the U.S. standard for limiting bycatch of marine mammals that are at risk of extinction. This is precisely the type of standard that NMFS must ensure is met when an export fishery catches a critically endangered

marine mammal like the Māui dolphin. *See* NMFS Br. 27 (acknowledging NMFS was required to evaluate "whether GNZ's regulations are effectively comparable to U.S. standards *with regard to protection of endangered species*" (emphasis added)). Yet NMFS completely ignored the MMPA's special treatment of imperiled species.

NMFS's post hoc rationalizations are also without merit. First, NMFS cites the TMP's "goal" of limiting bycatch to have 95% confidence that the population is able to recover. NMFS Br. 27-28; *accord* GNZ Br. 9-10, 12. As discussed, that objective only strives to meet PST/PBR level, which is nearly eight times higher than the negligible impact limit. *See supra* pp. 4-5. It is also just a goal, not a strict limit.

Second, NMFS cites the "backstop" FRML measure. NMFS Br. 28. As also discussed, the FRML does not even require bycatch levels to be below PBR, much less 13% of PBR. *See* Pl.'s Br. 18; *infra* pp. 10-11. It in no way has comparable effectiveness in ensuring bycatch impacts are negligible.

Finally, NMFS claims that because the ZMRG standard is 10% of PBR and the negligible impact standard is 13% of PBR, GNZ necessarily meets the latter standard because NMFS purportedly found it meets the former. NMFS Br. 28. Not so. For one, Māui dolphin bycatch rates—estimated at 0.10 dolphins per year, NMFS_1261 (tbl. 2)—far exceed both the 0.01 ZMRG and 0.013 negligible impact levels, so *neither* standard is being met. Second, NMFS ignores the difference in how the two standards operate. The ZMRG is a "goal," NMFS Br. 22, albeit one that requires action towards achieving that goal. By contrast, the negligible impact standard is a strict limit that, if exceeded, 1) categorically bars NMFS from allowing that incidental harm to continue, and 2) requires immediate protective action. *See* 16 U.S.C. § 1371(a)(5)(E).

GNZ also makes several post hoc arguments for why it meets the negligible impact standard. First, it claims the standard cannot apply here because "the GNZ does not allow any incidental taking." GNZ Br. 17. Yet GNZ reported in its comparability application that it *does not* prohibit incidental bycatch of marine mammals. NMFS_4697 (Part D question 2), NMFS_4766 (answer to question 2: "N"). And GNZ's brief cites no law prohibiting incidental taking or imposing penalties on fishers who commit a take. Further, GNZ *does* allow incidental taking of Māui dolphins by authorizing trawl and set-net fisheries to operate where GNZ knows they incidentally catch Māui dolphins. The FRML by its own terms authorizes fishers to incidentally kill one Māui dolphin before GNZ will even consider taking action.

Second, GNZ asserts the negligible impact limit is impossible to administer because its value is less than one for Māui dolphins. GNZ Br. 17-18. The standard is actually quite workable. A negligible impact level of 0.013 equates to no more than one dolphin death every 77 years. That means once a dolphin is killed, an agency could not authorize fisheries to incidentally catch the dolphin for the next 76 years. That is no different than the way an annual limit of "one" is the equivalent of "one animal per 365 days." By GNZ's logic, it could not set such an annual limit because it is not possible to set a bycatch limit of 0.0027 animals per day (1/365).

Finally, GNZ cites various *discretionary* actions it asserts are comparable to the actions NMFS must take if the negligible impact level is being exceeded. *Id.* at 18-21. GNZ still has provided no evidence—statutory or regulatory—that it "by law, must act" to implement sufficiently protective measures if any bycatch limit is exceeded. *Id.* at 20. Further, the NMFS actions are made mandatory by a much lower, specific threshold (bycatch exceeding 13% of PBR) compared to GNZ's discretionary actions (if "deemed necessary" to prevent the FRML from being exceeded). *See id.* at 19 (quoting NMFS_1110). While there may be discretion in the

*types* of methods NMFS may employ, NMFS is strictly required to immediately reduce bycatch below the lower negligible impact level and then maintain that negligible level. 16 U.S.C. § 1371(a)(5)(E)(i). By contrast, GNZ's Minister of Fisheries has discretion to retract any measures if "satisfied" that the much higher FRML would not be exceeded. NMFS_1122.

Defendants' attempts to muster record evidence they claim "could be read to support" a finding on the negligible impact standard "cannot cure" NMFS's failure to make that finding in the first place. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Moreover, GNZ admits that "the fishing-related death or serious injury of a Māui dolphin has a more than a negligible impact." GNZ Br. 20. GNZ estimates that the bycatch rate is 0.10, or one dolphin every ten years. NMFS_1052. So the New Zealand Fisheries are currently having more than a negligible impact under even GNZ's interpretation of the standard. And they are having more than a negligible impact under NMFS's numerical definition of the standard (0.013).

## III.   New Zealand Lacks a Bycatch Limit with Comparable Effectiveness to PBR.

PBR also functions as a hard limit on bycatch. But it is the default level for all marine mammals, so it is more lenient than the strict negligible impact limit for endangered species. NMFS's evaluation of whether GNZ meets even this bycatch limit was in error. *See* Pl.'s Br. 16-19. While GNZ and NMFS appear to disagree on what metric functions as GNZ's bycatch limit, neither the PST (per NMFS) nor the FRML (per GMZ) is comparable in efficacy to PBR.

NMFS says GNZ has a comparable bycatch limit "[b]ecause GNZ used the PBR established by NMFS." NMFS Br. 29-30. However, GNZ expressly indicated it was using PBR only "for the purposes of its 2020 and 2021 Comparability Applications," NMFS_1111; there is no evidence it uses it to manage its fisheries.

GNZ explains it *does* use its FRML "bycatch limit of one individual" for fisheries management. GNZ Br. 22-23. Yet NMFS appears to indicate that the PST is the bycatch limit,

9

claiming it "functions similarly to the PBR." NMFS Br. 30 (asserting Māui and Hector's Dolphin Defenders (MHDD) "confuse[d]" the FRML with "the bycatch limit"). But PST is not an *actionable* bycatch limit like PBR, even if the two metrics use a similar mathematical calculation. *See* NMFS_11040 (indicating "management action to reduce risk should be *considered*" if PST is exceeded (emphasis added)). *But see* NMFS_4060 (explaining PST calculation is less precautionary than PBR). NMFS even acknowledges that PST is only a "statistical *analysis*" while the FRML applies "to the actual reality of a confirmed bycatch." NMFS Br. 30 (emphasis added). That is, the FRML is the applicable bycatch limit in the New Zealand Fisheries. Insofar as NMFS misunderstood GNZ's "bycatch limit" to be the PST or PBR instead, its conclusion that GNZ has a comparable bycatch limit necessarily is arbitrary and capricious.

The FRML may be GNZ's "bycatch limit," but it is neither a "comparable scientific metric" to PBR nor a true limit. 50 C.F.R. § 216.3. In fact, the FRML is not even a "scientific metric." NMFS Br. 29. One way in which the FRML is not comparable to PBR is its lack of a time dimension. *See* Pl.'s Br. 18. NMFS proves this point by distinguishing the FRML from the PST metric on the basis that "there is no timeline on the FRML." NMFS Br. 29-30. GNZ emphasizes the functional difference: "the FRML is not a rate, while PBR is a rate." GNZ Br. 23. Simply put, Defendants agree that the FRML is not comparable to PBR in these respects. That matters because PBR allows no more than one dolphin mortality *per ten years*; whereas the absence of a timeline on the FRML means GNZ could reset it multiple times when it is exceeded over a ten-year period, thereby allowing far more than just one dolphin mortality in that period. *See supra* p. 8 (discussing why there is no practical barrier to setting a bycatch limit of 0.1 dolphins per year). Even if GNZ imposed corrective measures after the FRML was exceeded,

there are no binding requirements specifying how long those measures must remain in place, much less any requirement that they remain in place for ten years to prevent additional dolphin deaths and ensure the bycatch rate does not exceed 0.1. *Cf.* NMFS_10801 (GNZ asserting measures would apply only "so long as necessary"). So the FRML in practice would allow bycatch to far exceed the PST/PBR value of 0.1. It is not comparable to PBR. *Contra* GNZ Br. 23 (claiming "the FRML's bycatch limit of one individual is identical to the equivalent PBR standard of one individual").

GNZ also does not apply *any* limit on Māui dolphin bycatch outside of the geographically delimited Māui Dolphin Habitat Zone (MDHZ), unlike the widely applicable PBR. Pl.'s Br. 18; *see* GNZ Br. 25 (acknowledging "the FRML only applies to the MDHZ," in contrast to PBR, which would apply "regardless whether [a mortality] occurs inside or outside the MDHZ"). While NMFS claims it is unclear "what other portions of Māui dolphin habitat" are not covered by the FRML, it goes on to acknowledge that the MDHZ where the FRML applies encompasses just "96.4% (summer) and 87.8% (winter) of the Māui dolphin distribution." NMFS Br. 30-31 (quoting NMFS_23-24). NMFS was aware that as much as 12.2% or more of the Māui dolphin's distribution lacks any bycatch limit so it needed to assess whether that geographic limitation undermines comparability to PBR. NMFS did not do so. Limiting bycatch only within a delimited portion of a marine mammal's distribution is not as effective as limiting bycatch regardless where it occurs.[2]

Even if the FRML applied in a comparable temporal and geographic manner as PBR, the FRML lacks the effectiveness of PBR because the FRML does not mandate implementing

---

[2] GNZ's brief makes a post hoc claim it would need to take action if there is a Māui dolphin death outside the MDHZ, but cites nothing in support. GNZ Br. 25.

protective measures if it is exceeded. *See* Pl.'s Br. 18-19. Defendants repeatedly conflate GNZ's *authority* to act with a *requirement* to act. *See, e.g.*, NMFS Br. 31-32; GNZ Br. 25; *cf. Lopez v. Davis*, 531 U.S. 230, 241 (2001) (contrasting authority to act when statute uses "may" with requirement to act when statute uses "shall"). In doing so, they ignore that the *Sea Shepherd I* court already concluded that the TMP "does not *require* New Zealand to do anything on any particular timeframe following a fishery-related interaction with a Māui dolphin in excess of PBR." 606 F. Supp. 3d. at 1318 & n.53 (also noting GNZ "purposefully retained the TMP's discretionary quality" with the FRML). That "contrasts with the MMPA's mandatory directive" that NMFS "'*shall* develop and implement a take reduction plan' with measures to reduce … mortality and/or serious injury to levels below PBR within six months" when PBR has been exceeded. *Id.* (cleaned up) (quoting 16 U.S.C. § 1387(f)(1), (5)). Since the ruling, there has been no change in New Zealand law creating any mandatory duty.

The only new information is a wholly unsupported assertion by GNZ that "the Minister of Fisheries does not have discretion to choose whether to act or not." NMFS_1112. GNZ cited no legal basis when it made that assertion, nor does GNZ or NMFS cite any legal basis for it in their briefs. Rather, GNZ indicated the Minister lacks discretion because the FRML "*enables*"— not requires—the Minister to "quickly implement any *further* prohibitions that may … *be deemed necessary*." *Id.* (first and third emphases added). And "the Minister has discretion as to what additional prohibitions they consider are necessary." *Id.* Being "enabled" to implement prohibitions that are entirely within the Minister's discretion in no way means the Minister lacks discretion on whether to act. The 2024 Comparability Finding's assumption that "the Minister

does not have discretion" lacks any record support. NMFS_1229; *see State Farm*, 463 U.S. at 43.[3]

Neither the PST nor the FRML provides a numeric, actionable bycatch limit comparable to PBR. *See* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*5*), (*6*). Nor does GNZ have a mandatory requirement to implement measures to reduce take below a bycatch limit. *See id.* § 216.24(h)(6)(iii)(C)(*3*)(*ii*). NMFS's conclusion that GNZ applies a functionally comparable bycatch limit as the generally applicable PBR is arbitrary and capricious.

## IV. NMFS Failed to Account for Recent, Lower Population Estimates When Calculating PBR.

NMFS arbitrarily used a population estimate of 54 Māui dolphins to calculate PBR, ignoring lower population estimates of 43 and 48 dolphins. *See* Pl.'s Br. 19–22. NMFS asks the Court to defer to its "informed discretion" in weighing the scientific evidence and using the higher estimate. NMFS Br. 34 (citation omitted). But the problem is NMFS's discretion was not "informed." The agency never weighed those other estimates or explained why the higher estimate was more appropriate. Defendants' post hoc efforts to attack the lower estimates are irrational and only emphasize the complete absence of any such consideration by NMFS in the record.

MHDD explained why the MMPA, its implementing regulations, and the Administrative Procedure Act (APA) required NMFS to consider other available abundance estimates and reach an informed conclusion about which represents the "best available scientific information on

---

[3] Given the lack of evidence, the only logical way to interpret GNZ's assertion is that the Minister is required to choose *whether* to exercise his or her discretion to implement measures when the FRML is exceeded. The act of deciding whether to implement measures is not the same as implementing measures. The Minister could choose to "conceivably do nothing." *Sea Shepherd I*, 606 F. Supp. at 1319. In doing so, the Minister has "acted" by making a decision, but that action is not of comparable efficacy to the MMPA "under which doing nothing is decisively not an option." *Id.*

abundance" for use in the PBR calculation. Pl.'s Br. 21-22 (quoting 16 U.S.C. § 1362(27))
(citing 50 C.F.R. § 216.24(h)(6)(ii) and cases). NMFS is unable to point to any indication in the
record that it even considered the other values, much less "provide[d] an explanation for its
choice" of the higher abundance estimate. *Sierra Club v. EPA*, 671 F.3d 955, 968 (9th Cir.
2012); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[W]here the
agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and
capricious and so cannot carry the force of law."); *Oceana, Inc. v. Ross*, 483 F. Supp. 3d 764,
782 (N.D. Cal. 2020) (finding fishing limit arbitrary because record did "not demonstrate that the
NMFS actually considered" whether scientific information it disregarded was inferior). That
failure alone is arbitrary and capricious and contrary to the MMPA's best available science
mandate.

  NMFS and GNZ now offer two post hoc, incorrect rationalizations for why it would have
been reasonable to disregard the International Whaling Commission Scientific Committee's
(IWC-SC) abundance estimate of 48 Māui dolphins. *See State Farm*, 463 U.S. at 50; *Ctr. for
Biological Diversity v. Zinke*, 900 F.3d 1053, 1069 (9th Cir. 2018) (explaining wildlife agency
"cannot rely on its briefing in this case to explain why [its] Finding relied on [one] study rather
than the [other] study" that it had not considered). First, NMFS asserts that the IWC-SC's 2023
estimate is not more recent than the estimate of 54 dolphins that NMFS used from a 2021 study
(Constantine et al.) because the IWC-SC was only reaching a different conclusion based on that
study. NMFS Br. 34. This is misleading. Constantine et al. cautioned that their 54-dolphin
estimate was "likely biased upwards due to mortality during the intervening year" while data
were being collected. NMFS_3899. NMFS's own guidance requires applying "appropriate
correction factors" to such estimates that "are thought to be biased" before NMFS may use the

14

estimate. NMFS_13838. NMFS did not do so or even consider the bias before using the estimate

to calculate PBR. *See New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("[A]n

agency's reliance on a report or study without ascertaining the accuracy of the data contained in

the study or the methodology used to collect the data 'is arbitrary… .'" (citation omitted)). The

IWC-SC, on the other hand, did what NMFS's guidance requires. As GNZ explains, the IWC-SC

reviewed Constantine et al. and, after considering the study's methodology, recommended a

"new, *mortality-corrected* abundance estimate for Māui dolphins of 48." GNZ Br. 30 (emphasis

added) (quoting IWC, *Report of the Scientific Committee, Annex D: Report of the Standing*

*Working Group on Abundance Estimates, Stock Status and International Cruises* at 3 (2023))[4];

*see* NMFS_4041. While both Constantine et al. and the IWC-SC interpreted the same underlying

data, the IWC-SC's abundance estimate is, in fact, more recent than Constantine et al.'s. NMFS

needed to at least consider this updated estimate, particularly given the bias in the estimate

NMFS did use. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (stating

---

[4] NMFS included the main body of the *Report of the Scientific Committee* in the administrative record, but not its annexes. NMFS_1270-1396, NMFS_4108-4234. GNZ attached two pages of Annex D to its brief, but not the page with this quoted language. That page (3) also explains that the Scientific Working Group "concluded that a mortality correction should be applied [to Constantine et al.'s abundance estimate] to improve comparability with the currently accepted estimates of Māui dolphins included in the IWC Table of Agreed Abundance Estimates."

The entire *Report of the Scientific Committee* with its annexes should be part of this Court's record review, not just the portion that NMFS selected: if the Report was "before the agency," so were its annexes. *See Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1355-56 (Ct. Int'l Trade 2020) (explaining court must review "the whole record"). In addition, if the Court considers GNZ's exhibit or quotes from Annex D, it should consider the entire document (attached herewith as Exhibit A). Alternatively, the Court may properly consider Annex D as extra-record evidence because omission of the IWC-SC's explanation of its estimate would "preclude[] effective judicial review" of NMFS's asserted rationale that it had a valid basis to disregard the IWC-SC's estimate as unreliable. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (citation omitted); *see also* 50 C.F.R. § 216.24(h)(6)(ii) (requiring NMFS to consider such "relevant information readily available from other sources").

"agencies have an obligation to deal with newly acquired evidence in some reasonable fashion" (citation omitted)).

Second, NMFS and GNZ imply the IWC-SC estimate is unreliable because the IWC-SC recommended placing it into a category that includes certain limitations on how it may be used in IWC management procedures. GNZ Br. 30; NMFS Br. 34. This ignores that the IWC-SC rejected the 54-dolphin estimate and determined a 48-dolphin estimate is *more appropriate* for IWC use. *See Oceana, Inc. v. Ross*, 363 F. Supp. 3d 67, 81 (D.D.C. 2019) ("The agency cannot rationally reject one data source largely because of its small sample size and yet embrace another source with an even smaller sample size."). It also ignores that the reason for the recommendation was not because the 48-dolphin estimate was unreliable, but because a "fully integrated analysis will be provided to the Committee in the future." GNZ Br. 31 (quoting Annex D). In any case, the IWC-SC's estimate at a minimum "provid[es] a general indication of abundance," NMFS_4041, and may be used to calculate PBR while "incorporating the precision and variability associated with such information," 16 U.S.C. § 1362(27). By ignoring evidence from an international team of experts that the stock size is actually 48 dolphins, NMFS failed to "provide[] reasonable assurance that the stock size is equal to or greater than" its "minimum population estimate" of 51 dolphins (derived from the abundance estimate of 54 dolphins). *Id.*

Next, NMFS asserts its estimate of 43 Māui dolphins in the decision memorandum "was plainly a typographical error." NMFS Br. 33. If the error was so obvious, neither NMFS's nor GNZ's counsel noticed to bring the alleged error to Judge Katzmann's attention as he twice cited that document to caution that only 43 dolphins remain. *See Sea Shepherd II*, 693 F. Supp. 3d at 1367-68; *Sea Shepherd N.Z. v. United States*, 723 F. Supp. 3d 1374, 1375 (Ct. Int'l Trade 2024). Judge Katzmann also cited an IUCN Red List source from 2023 (which is not in the

administrative record here) as a basis for the 43-dolphin value, suggesting the decision memorandum's estimate was not an outlier.

The record gives no indication whatsoever that NMFS "properly exercised its judgment and weighed the evidence" to rationally reject lower abundance estimates when it used a value of 54 to calculate PBR. NMFS Br. 34; *see Zinke*, 900 F.3d at 1068 ("Although [the agency] is free to choose among experts, it must acknowledge that it is doing so."). NMFS's arbitrary choice matters because, as MHDD explained, using a lower abundance estimate in the equation would reduce the PBR value from the 0.1 that NMFS calculated and thus result in the current bycatch rate of 0.1 exceeding PBR. Pl.'s Br. 22; *contra* GNZ Br. 32. Indeed, the fact that the bycatch rate is virtually equal to generally applicable PBR level only demonstrates the extreme riskiness of GNZ's management approach to protecting a critically endangered dolphin and NMFS's acceptance of that approach.

## V.     **NMFS's Monitoring Conclusion Relied on a Factually Incorrect Assumption and an Arbitrary Comparison that Ignores the Māui Dolphin's Vulnerability.**

NMFS made two fatal errors when evaluating GNZ's monitoring program. *See* Pl.'s Br. 22-27. It compared it to U.S. monitoring standards for relatively healthy marine mammal populations, rather than for endangered stocks that implicate very different considerations. And it assumed GNZ is monitoring 90% of fishing effort in the MDHZ when record evidence shows that is patently false. In response, Defendants only attack strawmen and offer post hoc rationalizations, which cannot and do not rescue NMFS's improper analysis.

The Comparison. MHDD does not contend that the MMPA prescribes a 100% monitoring level, as Defendants imply. Rather, the MMPA requires monitoring to be statistically reliable. Pl.'s Br. 23. What makes a monitoring program statistically reliable depends on the circumstances. Accordingly, NMFS must consider the relevant factors when setting monitoring

requirements for a given situation. As MHDD explained, NMFS policies, caselaw, and both GNZ's and NMFS's own recommendations for Māui dolphin monitoring identify several factors that need to be considered when evaluating a program to monitor bycatch of a critically endangered animal. *Id.* These include fundamental statistical standards (e.g., data reliability when capture events are rare), as well as management principles (e.g., ensuring a non-zero capture rate will be detected). *Contra* NZ Br. 42-44 (attempting to distinguish caselaw on the facts rather than the principles); NMFS Br. 38 (same). Notably, NMFS does not contest the relevance of these factors. *See* NMFS Br. 37 (acknowledging "necessity of observer coverage" is an important factor). However, it also does not argue that it did consider any of these factors when choosing a 10% monitoring level for its comparison. This despite the *Sea Shepherd I* court identifying the need for NMFS to explain why GNZ's monitoring coverage is "high enough to reliably detect any non-zero capture rate" of Māui dolphins. 606 F. Supp. 3d at 1327 n.64; *see* Pl.'s Br. 23-24 (raising non-zero capture issue (citing NMFS_8575-76, NMFS_10245)). NMFS's analysis of GNZ's monitoring program failed to take into account these factors, which are not only relevant but also required under the NMFS's duty to consider similar marine mammal stocks in its comparability analysis. *See* 50 C.F.R. § 216.24(h)(7)(i).

NMFS suggests that its inapt comparison does not matter because "GNZ's 90 percent monitoring coverage plainly is comparable in effectiveness to U.S. coverage." NMFS Br. 38. NMFS offers no explanation for why this is so obvious when it did not even acknowledge that U.S. coverage differs for imperiled species. NMFS also continues to incorrectly assume that GNZ *has* 90% coverage. That assumption is wrong now and it was wrong when NMFS issued the 2024 Comparability Finding.

The 90% Coverage Assumption. NMFS still cannot point to an evidentiary source for the assumption that 90% of fishing effort in the MDHZ is monitored. *See* Pl.'s Br. 25-26. It cites only the assumption itself in the 2024 Comparability Finding, NMFS_1256, and an assumption in the 2020 Comparability Finding that 90-95% of fishing *days*—a different metric, the use of which the *Sea Shepherd I* court found to be arbitrary, 606 F. Supp. 3d at 1322-23—are monitored, NMFS_10915. NMFS nonetheless claims that "the record supports this figure." NMFS Br. 38 (citing NMFS_10-19). It cites an outdated GNZ submission that actually undermines the 90% figure because it shows that both the target and actual coverage for trawl fishing in the MDHZ was only 50-70% at the time. NMFS_10, NMFS_15, NMFS_19.

GNZ's comparability application shows that actual coverage rates in the MDHZ have only declined and are far lower than 90%. *See* Pl.'s Br. 26 (citing NMFS_1105-06). This is not a "misinterpretation." NMFS Br. 38. Figure 10 shows a decline in "[m]onitoring coverage of trawl vessels in the coastal portion [i.e., not including harbors, where trawls are prohibited] *of the Māui dolphin habitat zone*." NMFS_1105 (emphasis added). Figure 12 shows less than 2% "[m]onitoring coverage of set net vessels *in the Māui dolphin habitat zone* (including harbours)." NMFS_1106 (emphasis added). These figures include total monitoring from the "combination of observers and on-board cameras." NMFS_1104 n.7.

NMFS attempts to dismiss Figure 10 because "trawls are prohibited in harbors." NMFS Br. 39. True, but the figure shows 40% monitoring coverage of actual fishing effort in the MDHZ where trawls *are* permitted. NMFS next attempts to dismiss Figure 12 because most of the unobserved set-net fishing occurs in harbors where, according to NMFS, "there were *almost no dolphins*." *Id.* (emphasis added); *see also* GNZ Br. 46-47. *But see* NMFS_4035 (IWC calling into question reliability of GNZ's information on harbor distribution). However, the MDHZ

19

"includes harbors," NMFS_1254, so the absence of monitoring there undermines NMFS's assumption that 90% of fishing effort "within the MDHZ" is monitored, NMFS_1256.[5] Figure 12's percentage of set-netting that is monitored in the entire MDHZ is an apt comparison to evaluate whether NMFS's 90% coverage assumption is correct. What's more, "almost no dolphins" means there are at least some dolphins in harbors, so there is a meaningful risk that one may be caught in an unobserved set net. Unless the fisher acts against their own self-interest and reports a capture that, according to GNZ, would cause an exceedance of the FRML, GNZ likely would never know about the capture to consider a response to the FRML exceedance.

NMFS claims that Figures 9 and 11, instead, support its 90% coverage assumption, but those figures represent focused monitoring coverage in only certain *portions* of the MDHZ: trawling between Maunganui Bluff and Pariokariwa Point to seven nautical miles offshore and set-netting outside of harbors, respectively. NMFS Br. 38-39 (citing NMFS_1105-06). The 2024 Comparability Finding was considering monitoring coverage "within the MDHZ" as a whole. NMFS_1256. NMFS cannot point to any record support that 90% of fishing effort in the MDHZ is monitored by any combination of observers or cameras. The record shows that only 1%-45% of fishing effort in the MDHZ has any sort of monitoring.

In addition, the percentage of fishing effort that is truly *monitored* by GNZ is further reduced because GNZ reviews only a portion of camera footage. *See* Pl.'s Br. 26. For the substantial amount of fishing effort that is recorded but not reviewed, the outcome is essentially

---

[5] NMFS and GNZ justify the lack of monitoring in harbors because most set-net vessels are smaller than 8 meters, and the U.S. does not put human observers on vessels that small. However, NMFS has explained that electronic monitoring could be used for "vessels too small to carry observers." NMFS_4410. In any event, the issue here is not whether exempting small vessels is comparable to U.S. standards, but that the exemption means NMFS's coverage assumption is factually incorrect.

the same as if no camera had been placed onboard in the first place: in both situations, GNZ does not watch the activity to look for instances of bycatch. NMFS has no response to this issue in its brief. It similarly has no rational response to its failure to consider other factors that undermine the statistical reliability of electronic monitoring. *See id.* at 26-27. It instead focuses on GNZ's use of human observer coverage to downplay those issues, NMFS Br. 39-40, but fails to acknowledge that there was almost no human observer coverage by 2021, *see* 2d Decl. of Elisabeth Slooten ¶¶ 46-49 & tbl. 1, *Sea Shepherd*, No. 20-cv-00112 (Ct. Int'l Trade Dec. 11, 2020) (ECF No. 49-2). While electronic monitoring may be a reasonable monitoring mechanism in some circumstances, *e.g.*, NMFS Br. 40; GNZ Br. 34, 38-39, NMFS needed to consider how the method's shortcomings diminish its effectiveness for the circumstances involving the Māui dolphin here.

NMFS generally attempts to confuse the question by discussing a litany of *other* monitoring considerations that are not in dispute. *See* NMFS Br. 34-39 (citing "fulsome nature of GNZ's monitoring program"). But at bottom, NMFS compared an incorrect estimate of monitoring coverage in the New Zealand Fisheries to an arbitrary U.S. coverage standard, so its comparability conclusion is necessarily arbitrary and capricious. *See State Farm*, 463 U.S. at 43; *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 96 (D.D.C. 2017) ("Suffice it to say, it is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong."). NMFS's errors mean it failed to address whether GNZ's program provides the *function* of monitoring needed in this circumstance involving bycatch of a highly endangered species.

**VI.    NMFS Failed to Adequately Evaluate Whether New Zealand Has a Comparable Stock Assessment.**

NMFS asserts it adequately evaluated GNZ's stock assessment process because it found GNZ "follows a scientifically-sound process to estimate abundance." NMFS Br. 40 (quoting NMFS_1228). NMFS points to no explanation in the record for why it believed that was so. *See* Pl.'s Br. 27-28. And NMFS still fails to address that GNZ does not review its Māui dolphin abundance estimate as frequently as would be required under the MMPA.

NMFS first asserts it conducted an adequate evaluation because the 2024 Comparability Finding contains a conclusory statement making a finding on this factor. NMFS. Br. 40-41 (citing NMFS_1228, NMFS_1244). Such "conclusory statements and citations that do not explain how a determination was reached are insufficient" for a comparability finding. *Sea Shepherd I*, 606 F. Supp. 3d at 1313 (cleaned up).

Unable to point to any explanation in the record for how the determination was reached, NMFS claims that "record evidence plainly supports [its] conclusion." NMFS Br. 41. NMFS cites the 2020 Comparability Finding, but 1) the 2024 Comparability Finding did not incorporate that previous finding, *see supra* 2-3, and 2) the 2020 Finding evaluated a 2015-16 survey, NMFS_10924, and could not account for the more recent 2021 Constantine et al. survey or the IWC-SC's critique and revision of that survey, *supra* pp. 14-16; *see Sierra Club*, 671 F.3d at 968 (finding action "arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled data"). NMFS also cites record evidence concerning the "SEFRA" model analysis. NMFS Br. 41. However, "stating that [something] was considered … is not a substitute for considering … it." *Gerber*, 294 F.3d at 185 (cleaned up). Had NMFS actually evaluated whether the SEFRA model meets the stock assessment standards, it would have seen that the model is used to predict bycatch "risk," not assess populations,

NMFS_4462, and that both NMFS's scientists and the IWC-SC have criticized the model's methodologies and inputs on distribution and abundance, *see* NMFS_4029-107, NMFS_3973-4001.

NMFS also failed to address—in its 2024 Comparability Finding or its brief—that the MMPA requires not only *a* stock assessment, but that NMFS review such stocks assessments "at least annually" for "strategic stocks" like the endangered Māui dolphin. 16 U.S.C. § 1386(c). While NMFS notes "GNZ plans to undertake additional stock assessment surveys" in the future, NMFS Br. 41, that vague plan does it meet the MMPA's explicit annual requirement, *see* GNZ Br. 10 (explaining GNZ undertakes such surveys every five years). NMFS's conclusory stock assessment finding failed to assess these important factors and information and failed to articulate a rational connection to the facts.

**VII.  NMFS Failed to Show that Bycatch of Other Marine Mammals Does Not Exceed U.S. Standards.**

Defendants do not contest that NMFS was required to analyze and make findings on bycatch of all marine mammal stocks caught by the New Zealand Fisheries. *See* Pl.'s Br. 28-29. They claim that NMFS did so, but are unable to point to any such findings in the 2024 Comparability Finding on the eight species the fisheries are known to catch, any documented analysis supporting such hypothetical findings, or even any awareness by NMFS that it was certifying the New Zealand Fisheries with respect to these other marine mammal stocks. Instead, Defendants hunt for morsels in the record in an attempt to claim that NMFS implicitly reached determinations on other marine mammals. *But see Sea Shepherd I*, 606 F. Supp. 3d at 1313 n.46 (explaining NMFS may not evaluate factors only "implicitly"). The excerpts they marshal fall far short of what is legally required for a comparability finding.

The Import Provision regulations require NMFS to make several findings and consider several mandatory factors. *Id.* at 1311-12 (citing 50 C.F.R. § 216.24(h)(6)(iii), (h)(7)). NMFS acts arbitrarily and capriciously when it does "not consider all mandatory regulatory factors when issuing comparability findings." *Id.* at 1315. Here, NMFS did not evaluate most, if not all, of these factors with respect to marine mammals other than the Māui dolphin; for example, whether GNZ applies a comparable actionable bycatch limit for each species or conducts comparable stock assessments. So even if NMFS did implicitly conclude that GNZ's regulatory program is comparable in effectiveness as it relates to these other species—which is highly doubtful—the conclusion would be arbitrary and capricious for failure to evaluate all the mandatory factors.

The scarce bit of evidence Defendants present only reinforces the absence of any rational evaluation. NMFS cites the 2024 Comparability Finding generally, NMFS Br. 42 (citing NMFS_1235-63), but that includes no reference to any of the eight marine mammals that the New Zealand Fisheries are known to catch: bottlenose dolphins, common dolphins, rough-toothed dolphins, pantropical spotted dolphins, orcas, long-finned pilot whales, melon-headed whales, or New Zealand fur seals (nor "other seals"), *see* Pl.'s Br. 29 (citing NMFS_1145). NMFS then says it "plainly reviewed the evidence in the record as it relates to marine mammals." NMFS Br. 42-43. Its only support for this assertion is that it included evidence submitted by GNZ in the record, *id.* (citing NMFS_1052-67, NMFS_10808-09), which is the point: NMFS needed to actually evaluate and make findings on that evidence of bycatch once it was aware of it. "Reviewing" data—assuming NMFS even did that—is not the same as analyzing and reaching comparability *findings* on that evidence. *See Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052 (9th Cir. 2008) (explaining decision document must

"provide enough information to demonstrate a rational connection between the factors that the [agency] examined and the conclusions it reached"); *Gerber*, 294 F.3d at 185. Whether NMFS may have made any findings for five *other* species that have no "observed" captures in the New Zealand Fisheries does nothing to address bycatch of the eight species that the Fisheries *are known* to catch. *See* NMFS Br. 43 (citing NMFS_1235, NMFS_1238, NMFS_1241-42); GNZ Br. 54-55.

Perhaps in recognition that it failed to address all affected marine mammals, NMFS defends its focus on the Māui dolphin and a makes post hoc claim that many of the measures to protect that species would also help other species. NMFS Br. 42. That theory appears nowhere in the record and, in any case, does not address all the mandatory regulatory factors for the other species.

GNZ contends it submitted information showing "that PBR was not exceeded for any marine mammal species." GNZ Br. 54-55 (citing NMFS_1145, NMFS_1052-67). Of course, NMFS never made such a finding, as required, and non-exceedance of PBR is not the only condition that must be met for a comparability finding under 50 C.F.R. § 216.24(h). GNZ also fails to acknowledge that the bycatch limit in its cited tables is the "*global*" limit (for New Zealand fur seals, it is the New Zealand and Australia combined limit). NMFS_1052-67. The fact that bycatch rates in the two New Zealand Fisheries do not exceed the global limits does not meet the Import Rule regulations' requirements. Export fisheries must have comparable bycatch measures for "transboundary" (i.e., global or multinational) marine mammal stocks as the United States. 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*iii*). Under U.S. standards for such stocks, NMFS must either compare "all sources" of mortality and serious injury globally to the PBR for the stock's entire range, or compare U.S. sources of mortality and serious injury to a more limited

PBR based on relative abundance of the stock "under U.S. jurisdiction." NMFS_13854. The tables GNZ cites instead compare mortality and serious injury from just the two New Zealand Fisheries to the PBR for the stocks' entire ranges: an improper mismatch. Under GNZ's logic, dozens of nations could each kill one fewer animal than the global PBR and all would meet U.S. standards, even though total bycatch would be multitudes higher than the PBR.

There is no evidence that NMFS made comparability findings with respect to the marine mammal species the New Zealand Fisheries are known to catch, other than the Māui dolphin. Its certification that the Fisheries do not kill or seriously injure *any* marine mammal in excess of U.S. standards therefore is arbitrary and contrary to law.

## VIII.   The APA Compels Vacatur of the Comparability Finding and an Order that Defendants Carry Out Their Nondiscretionary Duty to Impose an Import Ban.

Section 706 of the APA governs the remedy in this case. Section 706(2) requires the Court to "set aside"—i.e., vacate—the 2024 Comparability Finding if found arbitrary and capricious or contrary to law. And section 706(1) requires the Court to compel discrete action by the defendant agencies that they are legally required to take—imposing an import ban on the New Zealand Fisheries. *See* Pl.'s Br. 30-33. NMFS's attempts to evade these standards fail. NMFS should not be given yet another chance to try explaining why U.S. law would allow fisheries to place the Māui dolphin at imminent risk of extinction in order to permit the New Zealand Fisheries to continue supplying U.S. consumers.

NMFS contends the proper remedy under section 706(2) is remand of the Comparability Finding. NMFS Br. 44-45 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). To be sure, remand is one component of the necessary remedy here. *See* Compl. 37, ECF No. 4 (Prayer for Relief #4). But the "ordinary practice" under the APA requires also vacating the unlawful Comparability Finding during remand. *United Steel v. Mine Safety & Health Admin.*,

925 F.3d 1279, 1287 (D.C. Cir. 2019); *see Ninestar Corp. v. United States*, 687 F. Supp. 3d

1308, 1337 n.25 (Ct. Int'l Trade 2024) ("[R]emand without vacatur remains a rare remedy.");

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 483

F. Supp. 3d 1253, 1272 (Ct. Int'l Trade 2020) (citing *Lorion* and explaining "court may …

allow[] [action] to remain in effect" during remand only "in certain circumstances"). NMFS

makes no argument to meet its heavy burden to deviate from that default remedy. *See* Pl.'s Br.

30-31 (citing cases).[6] Nor does NMFS cite any authority for its suggestion that the APA's default

remedy somehow becomes improper if it would not "automatically result in an import ban."

NMFS Br. 44-45.

      NMFS also is incorrect that vacatur would not require an import ban. The *Sea Shepherd I*

court held that the "lack of valid comparability findings renders any imports from [a fishery] per

se in excess of U.S. standards under (h)(1)(i), unlawful under (h)(1)(ii)(A), and thereby

prohibited under both NOAA's Imports Regulation, 50 § C.F.R. 216.24(h)(1)(i)-(ii), and the

Import Provision of the MMPA, 16 U.S.C. § 1371(a)(2)." 606 F. Supp. 3d at 1325 & n.63

(rejecting government's argument that "an import ban would be required only if [NMFS] were to

issue a negative comparability finding" (cleaned up)). NMFS offers no compelling argument that

the *Sea Shepherd I* case was wrongly decided.[7] Vacatur would leave the New Zealand Fisheries

---

[6] NMFS's claim that the Māui dolphin population is "*rebounding*" defies its own findings and
borders on absurd. NMFS Br. 44; *see* NMFS_1225 (2024 Comparability Finding acknowledging
"current estimates [show] … the population declining at a rate of 3-4% per year"); NMFS_10910
(same in 2020 Comparability Finding).

[7] NMFS catastrophizes that this would mean "an immediate embargo on all imported fish and
fish products" until NMFS has individually approved each fishery. NMFS Br. 45. That ignores
that all other fisheries remain exempt from the Import Provision until January 1, 2026, and
NMFS has committed to making decisions on all fisheries by that date. *See Nat. Res. Def.
Council, Inc. v. Lutnick*, No. 24-00148, 2025 WL 900438, at *3-4 & n.4 (Ct. Int'l Trade Mar. 25,
2025) (also explaining why the New Zealand and certain Mexican fisheries required a
comparability finding sooner).

without *any* comparability findings, rendering them "per se in excess of U.S. standards" and requiring an import ban. *Id.*

Section 706(1) requires compelling the Secretaries of the Treasury and Homeland Security to implement an import ban because the Import Provision creates a discrete, nondiscretionary duty to do so when an export fishery is in violation of that provision. *Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1353 (Ct. Int'l Trade 2018) ("'Shall' is mandatory language, demonstrating that Congress left the Government with no discretion whether to act."). That is the case whether the violation is "per se" due to the absence of a valid comparability finding or is because bycatch in fact exceeds U.S. standards. *See* Pl.'s Br. 32-33 (arguing both reasons).

NMFS argues the most the Court may do is "compel agency action through emergency rulemaking," whereby NMFS would make a new determination as to whether the New Zealand Fisheries qualify for a comparability finding. NMFS Br. 46. There are three problems with that position.

First, the Import Provision expressly places a duty directly on the Secretary of the Treasury (as well as the Secretary of Homeland Security, *see* Pl.'s Br. 3 n.1) to impose a ban when bycatch exceeds U.S. standards. 16 U.S.C. § 1371(a)(2) ("The Secretary of the Treasury shall ban the importation … ." ). It does not "entrust[]" that duty "to NMFS in the first instance." NMFS Br. 46. It does not say the Secretary of the Treasury shall ban imports "*if* NMFS makes findings" that bycatch exceeds U.S. standards. NMFS's argument impermissibly reads a conditional phrase into the Import Provision that is not there. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." (citation omitted) (cleaned up)); *cf. Anglers Conservation Network v.*

*Pritzker*, 809 F.3d 664, 671-72 (D.C. Cir. 2016) (finding no mandatory duty because statute

expressly indicated the "duty arises only if '*the Secretary determines* … that a fishery is

overfished'" (citation omitted) (alterations in original)). *Contra* NMFS Br. 44-45 (asserting the

Import Provision "compels a finding before imposition of any embargo"). As the *Ross* court

explained, the duty to impose a ban arises once standards have been exceeded and does not need

to wait until NMFS makes a regulatory determination. 331 F. Supp. 3d at 1354. The existence of

regulatory procedures for NMFS to make a comparability determination "cannot negate

mandatory language in a statute." *Id.*

   The New Zealand Fisheries already are (and certainly will be upon vacatur)

unambiguously "in excess of U.S. standards" because "a valid comparability finding is not in

effect." 50 C.F.R. § 216.24(h)(1)(i); *see Sea Shepherd I*, 606 F. Supp. 3d at 1323-25 & nn.61-63

(explaining fishery lacks a "valid" comparability finding if existing comparability finding is

arbitrary or contrary to law). Separately, they already are substantively in violation of the Import

Provision because reported bycatch rates exceed at least the ZMRG and negligible impact limits.

The nondiscretionary duty to implement an import ban lies with the Secretaries of the Treasury

and Homeland Security *right now* for either reason.[8] No further action is required by NMFS.[9]

   Second, the Supreme Court has been clear that courts can directly compel "a prohibition

or taking of other compulsory or restrictive action (sanction)." *Norton v. S. Utah Wilderness All.*

---

[8] NMFS's reliance on *Sea Shepherd New Zealand v. United States*, 469 F. Supp. 3d 1330, 1337
(Ct. Int'l Trade 2020), is misplaced. That order concerned a request for *voluntary* remand
because NMFS had received new information, not a remedy following a decision on the merits.
*Id.* at 1332. Moreover, the New Zealand Fisheries were exempt from the Import Provision at the
time, so there was no statutory duty to impose an import ban. *Compare id.* at 1337, *with Sea
Shepherd I*, 606 F. Supp. 3d  at 1324 n.60 (later decision explaining that GNZ waived the Import
Provision's grace period).
[9] Insofar as NMFS may be implicated under section 706(1), it is only in its role to assist
implementation of the ban. *See* 50 C.F.R. § 216.24(h)(9)(iii).

(*SUWA*), 542 U.S. 55, 62 (2004) (citation omitted) (cleaned up). Ordering agencies to impose the Import Provision's specifically required trade sanction is not impermissibly "directing how" they should act. NMFS Br. 45; *cf. Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1079 (9th Cir. 2016) ("But discretion in the manner in which the duty may be carried out does not mean that the Army does not have a duty to perform a 'discrete action' within the meaning of § 706(a) and *SUWA*.").

Finally, NMFS's proposition would restrict remedy under section 706(1) to only a directive that the offending agency make a new decision that may be reviewed again under section 706(2). Such an remedy is precisely what remand is under section 706(2). Congress did not intend section 706(2) to swallow section 706(1) by allowing an agency to seek remand instead of performing its nondiscretionary legal duty. *See* 33 *Wright & Miller's Federal Practice & Procedure* § 8384 (2d ed. 2025) (contrasting "vacate and remand" with section 706(1) remedies).

The APA conveys a statutory mandate on courts to vacate arbitrary or unlawful agency actions and to compel legally required action. Vacating the unlawful Comparability Finding and ordering the defendant agencies to execute the Import Provision's nondiscretionary requirement to ban imports from fisheries that catch Māui dolphins in excess of U.S. standards is precisely what the APA requires.

## CONCLUSION

For the reasons above and in MHDD's Motion for Judgment, the Court should declare the 2024 Comparability Finding arbitrary, capricious, and contrary to law, vacate the 2024 Comparability Finding, and compel Federal Defendants to execute their nondiscretionary duty to ban seafood imports from the New Zealand Fisheries.

Respectfully submitted this 10th day of June, 2025.

*/s/ Natalie Barefoot*
Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T (415) 217-2000
nbarefoot@earthjustice.org

Sabrina Devereaux
Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org
ceaton@earthjustice.org

*/s/ Brett Sommermeyer*
Brett Sommermeyer
Catherine Pruett
Law of the Wild
7511 Greenwood Avenue North, #4214
Seattle, WA 98103
T (206) 774-0048
brett@lawofthewild.org
catherine@lawofthewild.org

*Attorneys for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc.*

31

**CERTIFICATE OF COMPLIANCE**

This document complies with the word count limitations as provided for in the Court's Standard Chambers Procedures 2(B) because it contains 9,815 words, excluding the parts of the brief exempted by Standard Chambers Procedures 2(B)(1)(c).


*/s/ Natalie Barefoot*
Natalie Barefoot