Slip Op. 25-113

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., | |
|       **Plaintiff,** | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION FISHERIES, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, AND UNITED STATES DEPARTMENT OF COMMERCE, | **Before: Jennifer Choe-Groves, Judge**<br><br>**Court No. 24-00218** |
|       **Defendants,** | |
| and | |
| NEW ZEALAND GOVERNMENT, | |
|       **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Vacating and remanding the National Marine Fisheries Service's 2024 decision memorandum for the Government of New Zealand's regulated West coast, North Island multi-species set-net and trawl fisheries.]

Dated: August 26, 2025

Natalie N. Barefoot, Earthjustice, of San Francisco, CA, Sabrina Devereaux and Christopher D. Eaton, Earthjustice, of Seattle, WA, argued for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc. With them on the brief was Brett Sommermeyer, Law of the Wild, of Seattle, WA. Catherine E. Pruett, Law of the Wild, of Seattle, WA, also appeared.

Joshua W. Moore, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., Zachary Simmons, Attorney, United States Customs and Border Protection, of New York, N.Y., and Mark Hodor, Counsel, Office of General Counsel, National Oceanic and Atmospheric Administration, of Silver Spring, MD, argued for Defendants National Marine Fisheries Service, National Oceanic and Atmospheric Administration Fisheries, United States Department of the Treasury, United States Department of Homeland Security, and United States Department of Commerce. With them on the brief were Yaakov M. Roth, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C. Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., also appeared.

Warren E. Connelly, Trade Pacific PLLC, of Washington, D.C., argued for Defendant-Intervenor New Zealand Government. With him on the brief were Kenneth N. Hammer and Robert G. Gosselink, Trade Pacific PLLC, of Washington, D.C.

Choe-Groves, Judge: Plaintiff Māui And Hector's Dolphin Defenders NZ

Inc. ("Plaintiff") filed this action pursuant to 28 U.S.C. § 1581(i)(1)(C) contesting

the National Marine Fisheries Service's ("NMFS") Issuance of Comparability

Findings for the Government of New Zealand's Set-Net and Trawl Fisheries –

Decision Memorandum, dated January 2, 2024 ("Decision Memorandum"), related to the West coast, North Island multi-species set-net fishery, and the West coast, North Island multi-species trawl fishery.

Before the Court is Plaintiff's Motion for Summary Judgment.  Pl.'s Mot. Summ. J. ("Plaintiff's Motion" or "Pl.'s Br."), ECF No. 30.  Defendants NMFS, National Oceanic and Atmospheric Administration Fisheries, U.S. Department of Treasury, U.S. Department of Homeland Security, and the U.S. Department of Commerce (collectively, "Defendants") filed Defendants' Response to Motion for Judgment on the Agency Record.  Defs.' Resp. Mot. J. Agency R. ("Defs.' Resp."), ECF No. 37.  Defendant-Intervenor Government of New Zealand ("Defendant-Intervenor") filed Defendant-Intervenor's Response to Motion for Judgment on the Agency Record.  Def.-Interv.'s Resp. Mot. J. Agency R. ("Def.-Interv.'s Resp."), ECF No. 36.  Plaintiff filed a Reply in Support of Plaintiff's Motion for Summary Judgment on the Agency Record.  Pl.'s Reply Br. Supp. Pl.'s Mot. Summ. J. Agency R. ("Pl.'s Reply Br."), ECF No. 38.  The Court held oral argument on June 13, 2025.  Oral Argument (June 13, 2025), ECF No. 39.

For the reasons discussed below, the Court vacates and remands the Decision Memorandum to NMFS for further consideration and explanation.

## ISSUES PRESENTED

The Court reviews the following issues:

1.    Whether NMFS' determinations in the Decision Memorandum are
      arbitrary, capricious, an abuse of discretion, or otherwise not in
      accordance with law; and

2.    Whether the proper remedy includes vacatur and an order for NMFS
      to implement an import ban.

## BACKGROUND

Recognizing that certain species and populations of marine mammals may
be at risk of depletion or extinction due to human activity, Congress enacted the
Marine Mammal Protection Act ("MMPA") in 1972 to protect marine mammals
and establish the Marine Mammal Commission.  Marine Mammal Protection Act,
16 U.S.C. §§ 1361–1423(h).  Under the statute, the Secretary of the Treasury is
required to ban the importation of commercial fishing products that were caught
with fishing technology that "results in the incidental kill or incidental serious
injury of ocean mammals in excess of United States standards."  16 U.S.C.
§ 1371(a)(2).  In 2016, NMFS promulgated regulations for the import provisions of
the MMPA.  Fish and Fish Product Import Provisions of the Marine Mammal
Protection Act ("Import Provisions"), 81 Fed. Reg. 54,390 (Nat'l Oceanic &
Atmospheric Admin. Aug. 15, 2016).

Sea Shepherd filed a petition in 2019 with NMFS seeking emergency
rulemaking to ban the importation of fish and fish products sourced using fishing

practices that resulted in the incidental kill or serious injury of Māui dolphins in

excess of United States standards.  Citing regulatory efforts implemented by New

Zealand deemed comparable in effectiveness to United States standards, NMFS

denied the petition.  <u>Notification of the Rejection of the Petition to Ban Imports of</u>

<u>All Fish and Fish Products From New Zealand that do not Satisfy the Marine</u>

<u>Mammal Protection Act</u>, 84 Fed. Reg. 32,853 (Nat'l Oceanic & Atmospheric

Admin. July 10, 2019).  Sea Shepherd appealed the administrative rejection to the

U.S. Court of International Trade.  <u>Sea Shepherd New Zealand v. United States</u>,

Court No. 20-00112.

The United States moved for a remand in the then-pending litigation to

allow NMFS to issue a new comparability finding in light of new fishery measures

implemented by the Government of New Zealand, which the court granted.  <u>Sea</u>

<u>Shepherd New Zealand v United States</u>, 44 CIT __, 469 F. Supp. 3d 1330 (2020).

During the remand proceedings, Sea Shepherd filed a new petition seeking to ban

the importation of fish and fish products based on the harm to Māui dolphins.

NMFS denied Sea Shepherd's petition again and determined that New Zealand's

regulations were comparable to United States standards.  <u>Implementation of Fish</u>

<u>and Fish Product Import Provisions of the Marine Mammal Protection Act—</u>

<u>Notification of Rejection of Petition and Issuance of Comparability Findings</u>, 85

Fed. Reg. 71,297 (Nat'l Oceanic & Atmospheric Admin. Nov. 9, 2020).

NMFS' comparability finding identified two fisheries with more than a remote likelihood of incidental mortality or serious injury to Māui dolphins: West coast, North Island multi-species set-net fishery and West coast, North Island multi-species trawl fishery.  Id.  Sea Shepherd amended its complaint in the litigation and filed a motion for a preliminary injunction.  First Suppl. Compl. (Nov. 24, 2020), Court No. 20-00112, ECF No. 46.  In November 2022, the court entered an injunction banning the importation of multiple varieties of fish from New Zealand's West coast North Island multi-species set-net and trawl fisheries.  Sea Shepherd New Zealand v. United States ("Sea Shepherd"), 46 CIT __, 606 F. Supp. 3d 1286 (2022).

Following the court's injunction, the Government of New Zealand provided additional information regarding its fisheries in support of its application for a comparability finding, and NMFS issued a new positive comparability finding in the January 2024 Decision Memorandum.  Decision Memorandum (Jan. 2, 2024), NMFS_1224[1]; Implementation of Fish and Fish Product Import Provisions of Marine Mammal Protection Act—Notification of Issuance of Comparability Findings, 89 Fed. Reg. 4595 (Nat'l Oceanic & Atmospheric Admin. Jan. 24, 2024), NMFS_1232.  Because the January 2024 Decision Memorandum superseded the

---

[1] Citations to the administrative record reflect the page number (NMFS_#) filed in this case, ECF Nos. 15, 15-1, 15-2, 15-3, 15-4, 15-5, 25, 25-1, 25-2, 25-3, 25-4, 25-5, 25-6, 25-7, 25-8, 25-9.

earlier comparability finding, the court terminated the preliminary injunction in

April 2024.  Sea Shepherd New Zealand v. United States, 48 CIT __, 693 F. Supp.

3d 1364 (2024).  The instant case was filed in December 2024.

**JURISDICTION AND STANDARD OF REVIEW**

The U.S. Court of International Trade has jurisdiction pursuant to 28 U.S.C.

§ 1581(i)(1)(C), which grants the Court with jurisdiction over "any civil action

commenced against the United States, its agencies, or its officers, that arises out of

any law of the United States providing for" "embargoes or other quantitative

restrictions on the importation of merchandise for reasons other than the protection

of the public health or safety."  28 U.S.C. § 1581(i)(1)(C).  The Court reviews

actions brought under § 1581(i) by applying the standards provided in 5 U.S.C.

§ 706.  Id. § 2640(e).  Under that standard, the Court will hold unlawful and set

aside an agency action that is determined to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Agency action is arbitrary and capricious when the agency "relied on factors

which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency," or the action "is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise."

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("State Farm"), 463

U.S. 29, 43 (1983).  An arbitrary and capricious review is a "narrow" inquiry that

looks to whether the agency considered the relevant data and articulated a

satisfactory explanation for its action.  F.C.C. v. Fox Tele. Stations, Inc., 556 U.S.

502, 513 (2009).  The agency must articulate a "rational connection between the

facts found and the choice made."  Burlington Truck Lines, Inc. v. United States,

371 U.S. 156, 168 (1962).

    A motion for judgment on an agency record may be filed when "a party

believes that the determination of the court is to be made solely on the basis of the

record made before an agency," and the party "move[s] for judgment in its favor

on all or any part of the agency determination."  USCIT R. 56.1(a).

## DISCUSSION

    Plaintiff seeks vacatur of the Decision Memorandum, arguing that NMFS

failed to evaluate properly whether programs adopted by the Government of New

Zealand were comparable to the standards imposed by the United States, failed to

utilize the best available data, failed to support its determinations adequately, and

ignored the impact on marine mammals other than Māui dolphins.  Pl.'s Br. at 12–

13.  Defendants argue that Plaintiff's position is based on a misinterpretation of the

MMPA and its implementing regulations, and that the Decision Memorandum was

supported by record evidence.  Defs.' Resp. at 14–18.  Defendants contend that if

the Court decides the motion in favor of Plaintiff, the proper remedy is remand

without vacatur.  Id. at 18.

## I.    The 2024 Decision Memorandum

For the reasons discussed below, the Court concludes that NMFS'

determinations in the Decision Memorandum are arbitrary and capricious.  At the

outset, the Court observes that the 2024 Decision Memorandum is a cursory seven-

page document that is replete with conclusory statements and cites minimal record

evidence.

### A.    Standard of Comparability Findings

In addressing the incidental taking of marine mammals, the MMPA

provides:

> In any event it shall be the immediate goal that the incidental kill or
> incidental serious injury of marine mammals permitted in the course of
> commercial fishing operations be reduced to insignificant levels
> approaching a zero mortality and serious injury rate.  The Secretary of
> the Treasury shall ban the importation of commercial fish or products
> from fish which have been caught with commercial fishing technology
> which results in the incidental kill or incidental serious injury of ocean
> mammals in excess of United States standards.

16 U.S.C. § 1371(a)(2).  Harvesting nations are required to demonstrate that they

have in place "a regulatory program governing the incidental mortality and serious

injury of marine mammals in the course of commercial fishing operations in its

export fishery that is *comparable in effectiveness* to the U.S. regulatory program."

Import Provisions, 81 Fed. Reg. at 54,391 (emphasis added).  In determining

whether a harvesting nation's regulatory program is comparable in effectiveness to
the relevant United States program, NMFS considers "whether the harvesting
nation maintains a regulatory program that includes, or effectively achieves
comparable results, as certain conditions specified" in 50 C.F.R.
§ 216.24(h)(6)(iii).  Id. at 54,391; see 50 C.F.R. § 216.24(h)(6)(iii).  In its Import
Provisions, the National Ocean and Atmospheric Administration explained that
"'comparable in effectiveness' . . . means that the regulatory program effectively
achieves comparable results to the U.S. regulatory program.  This approach gives
harvesting nations flexibility to implement the same type of regulatory program as
the United States or a program that is completely different but achieves the same
results."  Import Provisions, 81 Fed. Reg. at 54,401.

## B.    Zero Mortality Rate Goal

Plaintiff contends that the Decision Memorandum did not establish that the
programs implemented by the Government of New Zealand were comparable to
the zero mortality rate goal of the MMPA.  Pl.'s Br. at 13–14.  In response,
Defendants and Defendant-Intervenor assert that NMFS did determine that New
Zealand's regulatory scheme had a comparable goal, and this determination was
supported by record evidence.  Defs.' Resp. at 22–26; Def.-Interv.'s Resp. at 6–16.

A goal of the MMPA is that "the incidental mortality or serious injury of
marine mammals occurring in the course of commercial fishing operations be

reduced to insignificant levels approaching a zero mortality and serious injury

rate . . . ." 16 U.S.C. § 1387(a)(1); see id. § 1387(b). The "Zero Mortality Rate

Goal" has been recognized by the court as a United States standard within the

context of the MMPA. Sea Shepherd, 46 CIT at __, 606 F. Supp. 3d at 1295

(recognizing the Zero Mortality Rate Goal as a "statutory marker" of "United

States standards."); Nat. Res. Def. Council, Inc. v. Ross ("NRDC"), 42 CIT __, __,

331 F. Supp. 3d 1338, 1355 (2018) ("Congress gave content to the concept of 'in

excess of United States standards' when it provided in the statute that 'it shall be

the immediate goal that the incidental kill or incidental serious injury of marine

mammals permitted in the course of commercial fishing operations be reduced to

insignificant levels approaching a zero mortality and serious injury rate.'").

NMFS' regulations provide for an "insignificance threshold" representing "the

upper limit of annual incidental mortality and serious injury of marine mammal

stocks by commercial fisheries that can be considered insignificant levels

approaching a zero mortality and serious injury rate." 50 C.F.R. § 229.2. The

insignificance threshold "is estimated as 10 percent of the Potential Biological

Removal level for a stock of marine mammals." Id. The "Potential Biological

Removal level" is "the maximum number of animals, not including natural

mortalities, that may be removed from a marine mammal stock while allowing that

stock to reach or maintain its optimum sustainable population." Id.

The Decision Memorandum described New Zealand's regulatory scheme as establishing a bycatch limit of one Māui or Hector's Dolphin.  Decision Memorandum at 5.  The objectives of New Zealand's Threat Management Plan were to "ensure that dolphin deaths arising from fisheries threats do not exceed the population sustainability threshold [] with 95% certainty" and "allow localized subpopulations to recover and/or remain at or above 80% of their unimpacted status with 95% certainty." Id. at 6.  NMFS determined that New Zealand's program was "comparable, or exceeds, what is required for U.S. fishermen for similar fisheries." Id. at 7.

NMFS did not address the Zero Mortality Rate Goal directly in the Decision Memorandum, did not explain how a bycatch limit of one dolphin over an undisclosed time period was comparable, nor explained how the objectives to prevent deaths of dolphins from exceeding the population sustainability threshold and to allow the dolphin population to remain at 80% of its unimpacted status were comparable in effect to reducing mortality and serious injuries to zero.  In fact, there appears to be contrary record evidence that NMFS did not address: in response to the question on its application for a comparability finding, "[d]oes your nation have an overarching regulation the goal of which is to reduce the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations to insignificant levels approaching a zero mortality

and serious injury rate," the Government of New Zealand responded "no."  Gov't

New Zealand's Comparability Appl. Part D: Q3 (Apr. 2023) at 1, NMFS_1148.

Defendants cite to NMFS' 2020 Denial of Petition for Rulemaking and

Issuance of a Comparability Finding for the Government of New Zealand's

Fisheries–Decision Memorandum ("2020 Decision Memorandum"), in which

NMFS determined that "[t]he management objective [of New Zealand's program]

is to effectively restrict the allowable level of fisheries related mortality to zero

given the high risk of extinction."  2020 Decision Memorandum (Oct. 27, 2020) at

20, NMFS_10938 (internal quotation omitted); see Defs.' Resp. at 23.  NMFS did

not address its prior comparability finding or its prior analysis of the Zero

Mortality Rate Goal in the 2024 Decision Memorandum.

In making a determination, an agency "must examine the relevant data and

articulate a satisfactory explanation for its action including a rational connection

between the facts found and the choice made."  State Farm, 463 U.S. at 43 (internal

quotation omitted).  NMFS failed to address the Zero Rate Mortality Goal in its

Decision Memorandum.  In reaching its general determination that the New

Zealand program was comparable to United States standards, the Court concludes

that NMFS did not support its determination of the existence of a policy of

reducing incidental mortality rates to zero with substantial record evidence and did

not provide a sufficient explanation for its determination.

The Decision Memorandum contained minimal citations to record evidence. On the issue of "Evidence that New Zealand Bans International Mortality and Serious Injury of Māui Dolphins," the Decision Memorandum merely stated that, "[b]ased on information provided by the GNZ, its Marine Mammal Protection Act of 1978 and the Fisheries Act of 1996 prohibit the intentional killing of marine mammals in the course of commercial fishing operations and are comparable to U.S. standards." Decision Memorandum at 4. This language was conclusory and unaccompanied by any record evidence to support NMFS' determination.

In addition, NMFS failed to address the responses in the Government of New Zealand's comparability application that were seemingly inconsistent with NMFS' comparability determination.

The Court concludes that NMFS' determination that the New Zealand program was effectively comparable in results to the United States' Zero Mortality Rate Goal was arbitrary and contrary to law, and remands the Decision Memorandum to the agency for further explanation of this issue.

### C.    Negligible Impact Standard

Plaintiff argues that NMFS failed to assess whether New Zealand utilized a standard comparable to the negligible impact standard required by the MMPA. Pl.'s Br. at 14–15. Defendants and Defendant-Intervenor respond that NMFS determined that New Zealand's regulatory programs for endangered species were

effectively comparable to United States standards and NMFS supported the

determination with record evidence.  Defs.' Resp. at 26–28; Def.-Interv.'s Resp. at

16–21.

        The MMPA aims to protect species listed as "endangered" or "threatened"

under the Endangered Species Act by directing NMFS to prohibit the incidental

taking of such species by commercial fishing operations unless NMFS determines

that "the incidental mortality and serious injury from commercial fisheries will

have a negligible impact on such species or stock."  16 U.S.C. §§ 1371(a)(5)(E)(i)–

1371(a)(5)(E)(i)(I).  Additionally, NMFS must determine whether "a recovery plan

has been developed or is being developed for such species or stock," and find that

"a monitoring program is established," "vessels engaged in such fisheries are

registered," and a "take reduction plan has been developed or is being developed

for such species or stock."  Id. §§ 1371(a)(5)(E)(i)(II)–1371(a)(5)(E)(i)(III).

        The MMPA does not define "negligible impact."  To determine a negligible

impact limit, NMFS developed numeric formulas and equations that are calculated

when implementing the provisions in the MMPA that call for a negligible impact

assessment.  See NMFS, Criteria for Determining Negligible Impact under MMPA

Section 101(a)(5)(E), Procedural Directive 02-204-02 at 2 (June 17, 2020),

https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf (last visited Aug.

25, 2025).

The Decision Memorandum did not mention the negligible impact standard.

NMFS did not cite to any record evidence indicating that NMFS calculated the

applicable negligible impact limit or examined whether New Zealand employed a

comparable method for assessing the impact of incidental death or serious injury to

the Māui dolphin population.

The Government of New Zealand argues that the negligible impact standard

did not apply because the incidental taking of any Māui dolphin was prohibited.

Def.-Interv.'s Resp. at 17.  Defendant-Intervenor does not cite to any law

prohibiting incidental taking and actually reported in its comparability application

that it did not prohibit the incidental bycatch of marine mammals.  Gov't New

Zealand's Comparability Appl. Part D: Q3 at 1.  Absent a prohibition on incidental

takings by the Government of New Zealand, NMFS was required to evaluate

whether New Zealand applied the negligible impact standard or an effective

equivalent.  See 16 U.S.C. § 1371(a)(5)(E)(i).

Defendants contend that New Zealand's regulatory regime for endangered

species was comparable in effectiveness to the negligible impact standard, citing to

the entire Decision Memorandum and its attached MMPA Import Provisions

Comparability Finding Application Final Report ("Application Final Report") to

claim that the regulatory measures within were indicators of comparability.  Defs.'

Resp. at 27–28; see Application Final Report (2023), NMFS_1235.  The measures

Defendants reference, including the Threat Management Plan or the management

trigger, were not supported in the Decision Memorandum with citations to record

evidence or an explanation that amounts to a determination on the negligible

impact standard.  Id.  For example, the "management trigger" was the Government

of New Zealand's response to a single, fishing-related death that permitted the

Minister of Fisheries "to immediately impose additional fishing restrictions,

including prohibiting all or any fishing or fishing methods" in certain areas

associated with the Māui dolphin's habitat.  Decision Memorandum at 4.  The

Decision Memorandum did not explain how invoking a mitigation measure after

the death of a dolphin was effectively comparable to a standard that determined

whether to prohibit incidental takings in the first place.  Further, the Court finds no

mention of the applicable United States negligible impact limit in the Decision

Memorandum, and it is entirely unclear whether the reference to the management

trigger was intended to be read as a determination on the negligible impact

standard.  Most of Defendants' remaining arguments and explanations in their

litigation briefs, however plausible, are not contained in the Decision

Memorandum.  See Defs.' Resp. at 28; U.H.F.C. Co. v. United States, 916 F.2d

689, 700 (Fed. Cir. 1990) ("Post-hoc rationalizations of agency actions first

advocated by counsel in court may not serve as the basis for sustaining the

agency's determination.").

NMFS is required to provide explanations that articulate a connection between the record evidence and the determinations.  See State Farm, 463 U.S. at 43.  The Decision Memorandum failed to address the negligible impact standard or identify the record evidence that supported NMFS' determination that New Zealand's standards for managing endangered species were effectively comparable to the United States negligible impact standard.  The Court concludes that NMFS' determination that New Zealand's programs were comparable in results to the negligible impact standard was arbitrary and not in accordance with law, and remands the Decision Memorandum to the agency for further explanation of this issue.

### D.    Bycatch Limit

Plaintiff argues that NMFS' determination that New Zealand's bycatch limit was comparable to the Potential Biological Removal standard was arbitrary and contrary to the MMPA and its implementing regulations.  See Pl.'s Br. at 16–19.  Plaintiff avers that NMFS erred because New Zealand's regulations used a "Fishing Related Mortality Limit" that was not comparable to NMFS' Potential Biological Removal level because the Fishing Related Mortality Limit differed in several ways: (1) the Fishing Related Mortality Limit was ten times higher than NMFS' estimate of the Potential Biological Removal level; (2) the Fishing Related Mortality Limit did not specify how much time must elapse after a dolphin capture

before a fishery is compliant again; (3) the Fishing Related Mortality Limit only

applied to mortalities within a designated dolphin habitat zone; and (4) the Fishing

Related Mortality Limit did not mandate any corrective action when the limit was

exceeded. Id. at 17–19; see Fishing (Fishing-related Mortality Limits of Marine

Mammals and Other Wildlife) Regulations 2022 (Nov. 28, 2022) at 3,

NMFS_3966. Defendants and Defendant-Intervenor contend that New Zealand's

bycatch limit was calculated with a comparable metric and that New Zealand's

Threat Management Plan included measures to reduce incidental mortality or

serious injury below the limit. Defs.' Resp. at 28–32; Def.-Interv.'s Resp. at 21–

26. Defendants argue further that the Fishing Related Mortality Limit was not the

primary tool to manage bycatch risk, but merely a backstop measure. Defs.' Resp.

at 30–31.

　　　The MMPA and implementing regulations require NMFS to evaluate

whether a harvesting nation has a "bycatch limit" and whether the harvesting

nation implements measures in an export fishery to "reduce the total incidental

mortality and seriously injury" of a marine mammal stock below that bycatch limit.

50 C.F.R. §§ 216.24(h)(6)(iii)(C)(3)(ii)–216.24(h)(6)(iii)(C)(5). A "bycatch limit"

is defined as "the calculation of a potential biological removal level for a particular

marine mammal stock . . . or comparable scientific metric." Id. § 216.3. The

"potential biological removal level" is "the maximum number of animals, not

including natural mortalities, that may be removed from a marine mammal stock

while allowing that stock to reach or maintain its optimum sustainable population."

Id. § 229.2.

The Decision Memorandum stated that New Zealand "established a bycatch

limit of one Māui/Hector's dolphin."  Decision Memorandum at 5.  The Decision

Memorandum described New Zealand's regulatory program as providing the

Minister of Fisheries with the "authority to quickly enact additional prohibitions

considered necessary to ensure the bycatch limit is not exceeded."  Id. at 5–6.  New

Zealand's Threat Management Plan aimed to "ensure that dolphin deaths arising

from fisheries threats do not exceed the population sustainability threshold [] with

95% certainty, cause[] localized depletion, create substantial barriers to dispersal

between subpopulations, and allow localized subpopulations to recover and/or

remain at or above 80% of their unimpacted status with 95% certainty."  Id. at 6.

NMFS determined that New Zealand's regulatory program was comparable in

effectiveness to United States standards because it resulted in Māui dolphin

bycatch below the Potential Biological Removal level and reduced bycatch risk by

concentrating fisheries restrictions in areas where fishing activities overlapped with

the Māui dolphin population.  Id. at 6–7.

The Decision Memorandum did not address how New Zealand calculated a

bycatch limit of one dolphin and NMFS did not explain whether New Zealand's

bycatch calculation method involved a comparable scientific metric to the Potential

Biological Removal level.  See id. at 5; 50 C.F.R. § 216.3.  In addition, the

Decision Memorandum failed to address the Fishing Related Mortality Limit and

whether it was related to the bycatch limit.  Although the Decision Memorandum

stated that New Zealand's Threat Management Plan aimed to keep dolphin deaths

below a "population sustainability threshold," Decision Memorandum at 6, the

Decision Memorandum cited no record evidence, nor contained further discussion

of this threshold, how it was calculated, or whether it was related to the bycatch

limit.  In addressing the bycatch limit, the Decision Memorandum described the

Threat Management Plan as supported by a "Spatially Explicit Fisheries Risk

Assessment [] model" that "allows for improved statistical estimation of

commercial fisheries risks to protected species" and can "inform statistically robust

capture estimates."  Id.  NMFS provided no citations to record evidence supporting

the existence of such a model, nor is it clear whether this model was used to

calculate the bycatch limit.

Defendants contend that New Zealand calculated the Potential Biological

Removal level under United States standards for the 2020 and 2021 comparability

applications, and that these applications addressed the Fishing Related Mortality

Limit and the comparability of the population sustainability threshold to the

Potential Biological Removal level.  See Defs.' Resp. at 29–32.  Despite

Defendants' arguments made in their litigation briefs, these post hoc arguments are

not persuasive because NMFS did not reference these applications to explain its

determinations on the bycatch limit.

Because NMFS neglected to identify any record evidence in the Decision

Memorandum to support its determinations on bycatch, NMFS failed to provide a

satisfactory explanation.  See F.C.C., 556 U.S. at 513.  Further, NMFS failed to

address the Fishing Related Mortality Limit and the population sustainability

threshold, despite its statutory obligation to consider the important aspects of the

decision before it.  See State Farm, 463 U.S. at 43.  The Court concludes that

NMFS' determination that the New Zealand program was effectively comparable

in results to the United States bycatch limit and regulatory plan to reduce bycatch

was arbitrary and not in accordance with law, and the Court remands the Decision

Memorandum to the agency for further explanation of this issue.

### E.    Population Estimate

Plaintiff contends that NMFS erred in determining that the bycatch rate in

New Zealand Fisheries did not exceed the United States bycatch limit standard

because NMFS measured the bycatch limit against a Potential Biological Removal

level that NMFS calculated using an outdated, Māui dolphin population estimate.

Pl.'s Br. at 19–22.  Defendants and Defendant-Intervenor aver that NMFS'

decision to use an older Māui dolphin population estimate was not arbitrary or

capricious because NMFS examined different population studies and relied on the

most scientifically sound estimate.  Defs.' Resp. at 32–34; Def.-Interv.'s Resp. at

26–32.

The MMPA establishes that the Potential Biological Removal level is the

product of the following factors: (1) the minimum population of the stock; (2) one-

half the maximum theoretical or estimated net productivity rate of the stock at a

small population size; and (3) a recovery factor between 0.1 and 1.0.  16 U.S.C.

§§ 1362(20)–1362(20)(C).  Because NMFS used its default net productivity rate of

0.04 for cetaceans and its default recovery factor of 0.1 for endangered species,

only the minimum population of the stock required determination.  See NMFS

Guidelines for Preparing Stock Assessment Reports Pursuant to the MMPA (Feb.

7, 2023) at 8–9, NMFS_13840–41.  The MMPA defines "minimum population

estimate" as "an estimate of the number of animals in a stock that—(A) is based on

the best available scientific information on abundance, incorporating the precision

and variability associated with such information; and (B) provides reasonable

assurance that the stock size is equal to or greater than the estimate."  16 U.S.C.

§§ 1362(27)–1362(27)(B).

The Decision Memorandum stated that "current estimates [of the Māui

dolphin population] are approximately [54] individuals . . . with the population

declining at the rate of 3–4% per year between 2001 and 2021."  Decision

Memorandum at 2.[2]  NMFS never explained how this population estimate was

determined or why NMFS considered it to be the "best available scientific

information on abundance."  See 16 U.S.C. § 1362(27).  Despite Defendants' post

hoc assertion in their litigation briefs that the population estimate was derived from

a scientific study entitled "Estimating the Abundance and Effective Population

Size of Māui Dolphins (*Cephalorhynchus hectori Māui*) in 2020–2021 Using

Microsatellite Genotypes, With Retrospective Matching to 2001," the Decision

Memorandum failed to reference this study.  See Defs.' Resp. at 33; Constantine,

et al. – Estimating the Abundance and Effective Population Size of Māui Dolphins

(*Cephalorhynchus hectori Māui*) in 2020–2021 Using Microsatellite Genotypes,

With Retrospective Matching to 2001 (Oct. 2021), NMFS_3868.  Plaintiff cites

contrary record documents, specifically a second scientific study on the record

from 2023 by the International Whaling Commission Scientific Committee, which

stated that in 2021 the Māui dolphin population was 48 dolphins.  See Pl.'s Br. at

21; Report of the Workshop on Hector's and Māui Dolphins in New Zealand:

Consideration of Spatial Risk Assessment of Threats, NMFS_4029.  The Decision

Memorandum contained no indication that NMFS evaluated these studies when

---

[2] The Decision Memorandum stated that the Māui dolphin population was
estimated to be 43 dolphins, but Defendants explained in this litigation that this
number was a typographical error and NMFS intended to report the population as
54 dolphins.  See Declaration of Alexa Cole, ECF No. 37-1.

choosing a population estimate for its Potential Biological Removal level

calculation.  Still more problematic is that the Decision Memorandum's only

mention of a specific dolphin population estimate was placed in an introductory

section that provided general background information on the Māui Dolphin, and

apparently contained a typographical error with an incorrect number.  See Decision

Memorandum at 2.  In its section addressing evidence of a population abundance

estimate, the Decision Memorandum stated simply that New Zealand "follows a

scientifically-sound process to estimate abundance" and "[b]ased on NMFS'

analysis, the [Government of New Zealand] meets the condition to have an

abundance estimate for a marine mammal stock, and its system for Māui Dolphin

abundance estimation is comparable in effectiveness to U.S. standards."  Id. at 5.

This conclusory language was not accompanied by any record citations, an

elaboration on New Zealand's "scientifically sound process," evidence of the

applicable United States standards, or any of NMFS' calculations for the Potential

Biological Removal level.

     Defendants assert that "it is this type of weighing of the scientific evidence

that is best left to the agency, who are experts in the matter."  Defs.' Resp. at 34.

Still, an agency must consider the relevant data and provide a satisfactory

explanation for its choice.  F.C.C., 556 U.S. at 513.  The Decision Memorandum

contained no citations to the scientific studies NMFS weighed purportedly when

determining the Potential Biological Removal level.  <u>See</u> Defs.' Resp. at 33–34.

The Court concludes that NMFS' decision to rely on a Māui dolphin population

estimate of 54 dolphins was arbitrary and did not address contrary record evidence

of 48 dolphins from the 2023 Whaling Commission Scientific Committee, and the

Court remands the Decision Memorandum to the agency for further explanation of

this issue.

## F.    Monitoring Program

Plaintiff argues that NMFS erred in determining that New Zealand's

monitoring program was comparable to United States standards because NMFS did

not compare New Zealand's program to United States monitoring practices when

bycatch of a critically endangered species was involved.  Pl.'s Br. at 22–27.

Plaintiff asserts that New Zealand's 90% monitoring coverage estimate was too

high and contrary to evidence on the record, while the United States' 10% measure

of monitoring comparability contained in the Application Final Report was too

low.  <u>Id.</u>  Plaintiff avers further that NMFS erred in determining that New

Zealand's electronic monitoring of Māui dolphin bycatch was comparable to the

United States human observer program.  <u>Id.</u>  Defendants and Defendant-Intervenor

contend that NMFS' determinations were correct because the MMPA does not

require any specific amount of monitoring coverage, and the record evidence

indicated that New Zealand's monitoring covered the entire Māui dolphin habitat

zone.  Defs.' Resp. at 34–40; Def-Interv.'s Resp. at 33–50.  Defendants and

Defendant-Intervenor argue that the 90% coverage estimate resulted from a

combination of human observer monitoring and electronic monitoring that

produced a statistically reliable monitoring system, comparable in effectiveness to

United States standards.  Defs.' Resp. at 34–40; Def-Interv.'s Resp. at 33–50.

The MMPA requires NMFS to "establish a program to monitor incidental

mortality and serious injury of marine mammals during the course of commercial

fishing operations."  16 U.S.C. § 1387(d).  An objective of the monitoring program

is to acquire "statistically reliable estimates" of incidental mortality and serious

injury.  Id. § 1387(d)(1)(A).  To conduct monitoring, observers may be placed on

board fishing vessels to conduct the following tasks: (1) record incidental mortality

and injury or bycatch; (2) record the number of marine mammal sightings; and (3)

conduct other scientific investigations.  Id. §§ 1387(d)(2)–1387(d)(2)(C).  In

allocating observers among commercial fisheries, the "highest priority" shall be

given to commercial fisheries that have incidental mortality or serious injury of

marine mammals that are from species listed as "endangered" or "threatened"

under the Endangered Species Act.  Id. § 1387(d)(4)(a).  The implementing

regulations require NMFS to determine whether a harvesting nation has a

monitoring program in export fisheries that provides estimates of incidental

mortality or serious injury to marine mammal stocks.  50 C.F.R.

§ 216.24(h)(6)(iii)(C)(4).  The estimates must be statistically reliable, and the

overall monitoring program must be effectively comparable to United States

monitoring standards.  Id.

      The Decision Memorandum described New Zealand's monitoring program

as an at-sea monitoring program comprised of observers and electronic monitoring,

and a self-reporting program comprised of vessel logbooks.  Decision

Memorandum at 4.  New Zealand's Māui Dolphin Habitat Zone covers

approximately 90–95% of the Māui dolphin habitat and the Government of New

Zealand requires electronic monitoring for the entirety of the Māui Dolphin Habitat

Zone.  Id. at 4–5.  NMFS determined that New Zealand's observer and self-

reporting programs were comparable in effectiveness to United States standards

and exceeded the requirements of the MMPA.  Id. at 4.

      It is clear, however, that the Decision Memorandum never addressed the

United States monitoring standards that NMFS determined were exceeded by New

Zealand's monitoring program.  The Decision Memorandum merely expressed a

conclusion, without explaining what United States standards applied and how the

New Zealand standards were comparable.  The Application Final Report stated that

the United States monitors approximately 10% of its fisheries, but did not explain

how that estimate was determined and whether NMFS considered the higher

priority that must be given to monitoring efforts for an endangered species such as

the Māui dolphin.  Application Final Report at 18–20, 22.  Additionally, NMFS did

not support its determination that New Zealand's monitoring covered 90% of

fishing activity in the Māui Dolphin Habitat Zone with citations to record

evidence, or address contrary record evidence of monitoring charts that instead

suggested that the coverage estimate could be anywhere from 50–70%, to as low as

2%.  See Māui Dolphin: Supplementary Information – Monitoring Programme

(Dec. 2022) at 20–21, NMFS_1105–06.  NMFS failed to explain why electronic

monitoring was statistically reliable or comparable in effectiveness to United

States standards.  Rather, the Decision Memorandum stated that the Government of

New Zealand amended its Fisheries (Electronic Monitoring) Regulation to expand

electronic monitoring to the entire Māui dolphin Habitat Zone and required all

vessels capable of carrying a camera to use one during fishing operations.

Decision Memorandum at 5.  NMFS did not include a citation to the relevant

regulation.  Nor did it cite any evidence that the United States used electronic

monitoring for marine mammals and collecting bycatch data, or evidence that

electronic monitoring accomplished the same monitoring tasks that the MMPA

expected of human observers.  See 16 U.S.C. § 1387(d)(2).

      Defendants aver that NMFS "thoroughly examined [New Zealand's]

monitoring program" and conducted a "thorough review of the entire record."

Defs.' Resp. at 35, 37.  It is apparent to the Court, however, that NMFS did not

support its determinations or address potentially contrary record evidence

regarding the extent of New Zealand's monitoring coverage.  Thus, the Decision

Memorandum does not indicate that NMFS considered all relevant aspects when

assessing the comparability of New Zealand's monitoring program.  See State

Farm, 463 U.S. at 43.  The Court concludes that NMFS' determination that New

Zealand's monitoring program was comparable to United States standards was

arbitrary and not in accordance with law, and remands the Decision Memorandum

to the agency for further explanation of this issue.

### G.    Marine Mammal Stock Assessments

Plaintiff contends that NMFS failed to explain or support its determination

that New Zealand's regulatory programs met United States stock assessment

standards.  Pl.'s Br. at 27–28.  Defendants and Defendant-Intervenor assert that

NMFS evaluated New Zealand's stock assessment process properly and relied on

ample record evidence to support the comparability determination, including

descriptions of the geographic range of the affected stock, data collected through

the monitoring program, and New Zealand's "Spatially Explicit Fisheries Risk

Assessment" model.  Defs.' Resp. at 40–41; Def.-Interv.'s Resp. at 50–53.

The MMPA requires NMFS to conduct stock assessments for each marine

mammal stock found in the waters under United States jurisdiction.  16 U.S.C.

§ 1386(a); see also Sea Shepherd, 46 CIT at __, 606 F. Supp. 3d at 1295

(recognizing stock assessments as a statutory marker of United States standards).

There are several components to a stock assessment, such as a description of the

geographic range of affected stock, a minimum population estimate, a description

of commercial fisheries that interact with the stock, an estimate of the potential

biological removal level for the stock, and an estimate of the annual human-caused

mortality and serious injury of the stock.  16 U.S.C. §§ 1386(a)–1386(a)(6).  For

stocks designated as "strategic stocks," NMFS shall conduct a stock assessment

annually and assess the factors causing a decline or impeding recovery of the

stock.  Id. § 1386(a)(3), § 1386(c).  The implementing regulations direct NMFS to

determine whether a harvesting nation conducts or achieves comparable results to

"marine mammal assessments that estimate population abundance for marine

mammal stocks in waters under the harvesting nation's jurisdiction that are

incidentally killed or seriously injured in the export fishery."  50 C.F.R.

§ 216.24(h)(6)(iii)(C)(1).

The Decision Memorandum stated that New Zealand followed a

"scientifically-sound process" to estimate Māui dolphin abundance and planned to

undertake a stock assessment survey to update that estimate.  Decision

Memorandum at 5.  NMFS determined that New Zealand's system for Māui

dolphin abundance estimation was effectively comparable to United States

standards.  Id.

Despite these conclusory statements, the Decision Memorandum did not

describe New Zealand's process for estimating abundance or how it compared to

the components of a United States stock assessment.  NMFS provided no

explanation of how New Zealand's plan to undertake a stock assessment at an

undisclosed frequency was comparable to the United States standard of conducting

annual stock assessments for species such as the Māui dolphin.  See 16 U.S.C.

§ 1386(c).  The Decision Memorandum stated that "[b]ased on [NMFS'] analysis,

including a review of the literature indicating the absence of far-ranging migratory

movements by Māui dolphins, we conclude that the few sightings of dolphins off

the east coast of the North Island are consistent with transient dolphins moving

through the area rather than a resident population."  Decision Memorandum at 5.

These vague conclusions do not comport with the statutorily required components

of a stock assessment, such as a description of the fisheries that interact with the

stock or an estimate of the annual human-caused mortality and serious injury of the

stock.  See 16 U.S.C. § 1386(a).

This Court has previously held that "conclusory statements and citations that

do not explain how a determination was reached are insufficient."  In re Section

301 Cases, 46 CIT __, __, 570 F. Supp. 3d 1306, 1338 (2022).  Defendants and

Defendant-Intervenor cite to case law from the U.S. Court of Appeals for the

Federal Circuit to support their assertion that an agency is presumed to have

reviewed record evidence and NMFS does not need to provide proof of such review.  Defs.' Resp. at 41 (citing Gonzales v. West, 218 F.3d 1378, 1381 (Fed. Cir. 2000) ("[A]bsent specific evidence indicating otherwise, all evidence contained in the record at the time of the [agency]'s determination . . . must be presumed to have been reviewed by [the agency], and no further proof of such review is needed.")); Def.-Interv.'s Resp. at 51 (same).  This presumption of review does not excuse NMFS from its statutory obligation to articulate a "rational connection between the facts found and the choice made."  Burlington Truck Lines, Inc., 371 U.S. at 168.  Even assuming that NMFS reviewed the record, the Decision Memorandum did not provide an explanation from NMFS indicating which parts of the record were relevant to NMFS' comparability determination. See F.C.C., 556 U.S. at 513.

The Court concludes that NMFS' determination that New Zealand's stock assessments were comparable to United States standards was arbitrary and not in accordance with law, and remands the Decision Memorandum to the agency for further explanation of this issue.

### H.    Bycatch of Marine Mammals Other than Māui Dolphins

Plaintiff argues that the Decision Memorandum was arbitrary and contrary to the MMPA's implementing regulations because NMFS evaluated only Māui dolphin bycatch rather than bycatch of other species implicated by record

evidence.  Pl.'s Br. at 28–30.  Defendants and Defendant-Intervenor argue that

New Zealand's regulatory programs and monitoring efforts applied with equal

force to other marine mammals and afforded the same protections that the Māui

dolphin received.  Defs.' Resp. at 41–43; Def.-Interv.'s Resp. at 54–56.

The MMPA aims to protect all "ocean mammals" generally and contains

few species-specific restrictions.  16 U.S.C. § 1371(a)(2)(A).  The implementing

regulations require import decisions to be made with regard to a fishery, rather

than a specific species.  50 C.F.R. § 216.24(h)(1)(ii).  When issuing a

comparability finding, NMFS must evaluate the incidental death or serious injury

of "each marine mammal stock or stocks that interact with the export fishery in

relation to the bycatch limit for each stock," id. at § 216.24(h)(6)(iii)(C)(6), and

assess whether the harvesting nation's regulatory program is comparable "with

respect to incidental mortality and serious injury of marine mammals in the course

of commercial fishing operations," id. at § 216.24(h)(6)(iii)(B).

To produce the Decision Memorandum, NMFS evaluated the West coast,

North Island multi-species set-net fishery, and the West coast, North Island multi-

species trawl fishery, and assessed whether bycatch of the Māui dolphin exceeded

United States standards.  See Decision Memorandum.

New Zealand submitted documents evidencing bycatch of several marine

mammal species that interacted with its fisheries, including dolphins, orcas,

whales, and seals.  New Zealand Fishery Information, NMFS_1145.  NMFS did

not address this evidence in the Decision Memorandum or evaluate whether

bycatch for these species exceeded United States standards.  Rather, the Decision

Memorandum characterized its determinations as NMFS' "response to the

[Government of New Zealand's] renewed request to NMFS to issue comparability

findings for the two fisheries based on additional documentary evidence regarding

its regulatory program to reduce mortality and serious injury of *Māui dolphin*[*s*] in

the West coast, North Island multi-species set-net fishery and the West coast,

North Island multi-species trawl fishery."  Decision Memorandum at 3 (emphasis

added).  Thus, it appears to the Court that NMFS made its determinations with

regard to a specific species, rather than follow the regulatory requirement to

consider bycatch evidence of each marine mammal species that interacted with the

fisheries.  See 50 C.F.R. § 216.24(h)(6)(iii)(C)(6).

Defendants and Defendant-Intervenor contend that New Zealand's

protections for the Māui dolphin, such as monitoring or gear restrictions, applied

with equal force to all marine mammals and that this determination was supported

by record evidence, including the 2020 Decision Memorandum, New Zealand's

2020 comparability application, and New Zealand's Marine Mammal Summary.

Defs.' Resp. at 42–43; Def.-Interv.'s Resp. at 54–55; see New Zealand Marine

Mammal Summary, NMFS_1052; New Zealand Species Mortality, NMFS_1053;

Māui Dolphins: Application for Comparability Finding (Sept. 1, 2020) at 40–41,

NMFS_10808–09; 2020 Decision Memorandum at 22.  In the Decision

Memorandum, however, NMFS did not cite to any of these documents or to its

prior analysis of which marine mammals interacted with the fisheries it assessed.

The Decision Memorandum's background section contained only information on

the Māui dolphin and never indicated that the determinations to follow would be

made with regard to the several other marine mammal stocks for which bycatch

information was submitted.  See Decision Memorandum at 2.

    NMFS' determination that New Zealand's regulatory programs protected all

marine mammals was unsupported by record evidence.  The Decision

Memorandum did not address record documents indicating bycatch for several

marine mammal species, and NMFS failed to make determinations for these

species that accounted for the regulatory factors it must assess when issuing a

comparability finding.  See State Farm, 463 U.S. at 43.  The Court concludes that

NMFS' determination that New Zealand's fisheries did not kill or seriously injure

marine mammals in excess of United States standards was arbitrary and not in

accordance with law, and remands the Decision Memorandum to the agency for

further explanation.

## II.    Remedy

Plaintiff asks the Court to vacate the Decision Memorandum pursuant to

5 U.S.C § 706(2)(A) and to compel Defendants to impose an import ban on fish

and fish products from New Zealand's West coast, North Island multi-species set-

net fishery, and the West coast, North Island multi-species trawl fishery pursuant

to 5 U.S.C § 706(1).  Pl.'s Br. at 30–33.  Defendants contend that if the Court

decides the motion in favor of Plaintiff, the proper remedy is to remand the case to

NMFS for further consideration of its determinations.  Defs.' Br. at 43–46.

Section 706(1) applies when a plaintiff seeks to "compel agency action

unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  "Agency

action" is defined as "an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof, or failure to act."  Id. at § 551(13).  Due to the discrete

nature of the first five agency actions enumerated in § 551(13) and a court's power

to compel action unlawfully withheld, a claim under § 706(1) "can proceed only

where a plaintiff asserts that an agency failed to take a discrete agency action that it

is required to take."  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64

(2004) (emphasis omitted).

By contrast, § 706(2)(A) states that a reviewing court shall "hold unlawful

and set aside agency action, findings, and conclusions found to be" "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A).  Although remand with vacatur is the default remedy for

agency actions deemed unlawful under § 706(2)(A), courts may remand agency

action without vacatur in certain circumstances.  Nat'l Org. of Veterans' Advocs.,

Inc. v. Sec'y of Veterans Affs. ("NOVA"), 260 F.3d 1365, 1380 (Fed. Cir. 2001);

Ninestar Corp. v. United States, 48 CIT __, __, 687 F. Supp. 3d 1308, 1327 n.25

(2024); see also Int'l Union v. Fed. Mine Safety & Health Admin., 920 F.2d 960,

966 (D.C. Cir. 1990) (concluding that a court may remand without vacatur "where

the failure lay in lack of reasoned decision-making [or] where the order was

otherwise arbitrary and capricious.").  In determining whether to remand without

vacatur, the reviewing court should consider two factors: (1) "the seriousness of

the order's deficiencies"; and (2) "the disruptive consequences of an interim

change that may itself be changed."  NOVA, 260 F.3d at 1380 (quoting A.L.

Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995)).

     Plaintiff's challenge to the Decision Memorandum concerns the sufficiency

of an agency's action, rather than whether the agency unlawfully withheld or

unreasonably delayed action in the first instance.  Accordingly, § 706(2)(A)

governs the review and remedy in this case.

     The Court concludes that the Decision Memorandum is arbitrary and not in

accordance with law, and considers now whether to order vacatur and remand, or

depart from the default remedy and order remand without vacatur.  The Court's

earlier analysis of the Decision Memorandum revealed that NMFS failed to

consider the relevant aspects of the problem that were statutorily required, failed to

support its determinations with record evidence, and failed to provide satisfactory

explanations for its determinations.  The deficiencies in the Decision Memorandum

are severe.  NOVA, 260 F.3d at 1380.  Additionally, neither Defendants nor

Defendant-Intervenor raise any potentially "disruptive consequences" that could

arise from the Court ordering the vacatur and remand of the Decision

Memorandum.  Id.  Therefore, this case does not merit a departure from the

standard remedy, and the Court concludes that the proper remedy is to vacate and

remand the Decision Memorandum.

      Plaintiff argues that if the Decision Memorandum is vacated, the Court

should compel Defendants to implement an import ban pursuant to § 706(1).  Pl.'s

Br. at 30–33.  The MMPA directs that "[t]he Secretary of the Treasury shall ban

the importation of commercial fish or products from fish which have been caught

with commercial fishing technology which results in the incidental kill or

incidental serious injury of ocean mammals in excess of United States standards."

16 U.S.C. § 1371(a)(2).  The implementing regulations state that a ban shall be

imposed when NMFS issues a negative comparability finding or determines that

there is no valid comparability finding in place.  50 C.F.R. § 216.24(h)(9)(i); see

also Sea Shepherd, 46 CIT at __, 606 F. Supp. 3d at 1325 (concluding that a

comparability finding granted arbitrarily and capriciously is not a valid

comparability finding).  Imposing an import ban requires NMFS to "identify and

prohibit the importation of fish and fish products into the United States from the

harvesting nation caught or harvested in that fishery."  50 C.F.R. § 216.24(h)(9)(i).

The court held previously that an import ban under the MMPA's implementing

regulations is "both discrete and mandatory for purposes of the APA."  NRDC, 42

CIT at __, F. Supp. 3d at 1353–55.

As noted earlier, this case is governed by § 706(2)(A) because it concerns

the review of an agency action, and the Court does not conclude that NMFS has

unlawfully withheld or unreasonably delayed the performance of an action it is

required to take legally such that § 706(1) applies.  Although Plaintiff cites to

NRDC to support its assertions that this Court should compel an import ban, the

Court notes that the circumstances of this case differ.  In NRDC, the court granted

a preliminary injunction banning the importation of fish and fish products from

certain Mexican fisheries after finding that NMFS failed to conduct any emergency

rulemaking to protect an endangered turtle species.  NRDC, 42 CIT at __, F. Supp.

3d at 1347–51.

Here, because NMFS issued a Decision Memorandum with a positive

comparability finding for the New Zealand fisheries, rather than denying or

terminating a comparability finding for a fishery, the agency was not required to

implement an import ban.  See 50 C.F.R. § 216.24(h)(9)(i).  This Court's

conclusion that the Decision Memorandum is arbitrary and not in accordance with

law may merit the implementation of an import ban going forward, if the agency

continues to rely on an arbitrary and unlawful Decision Memorandum that could

be regarded as equivalent to denying a comparability finding.  See id.; Sea

Shepherd, 46 CIT, at __, 606 F. Supp. 3d at 1325.  Accordingly, the Court will not

compel NMFS to implement an import ban at this time.

## CONCLUSION

In conclusion, the Court observes that the Decision Memorandum contains

no citations to record evidence at all.  Although Defendants and Defendant-

Intervenor aver that there is ample record evidence supporting NMFS'

determination, the Court notes that "it is not the Court's responsibility to sift

through the record to attempt to identify which documents, if any, support

[NMFS]'s determinations."  Jiangsu Senmao Bamboo and Wood Industry Co. v.

United States, 47 CIT __, __, 651 F. Supp. 3d 1348, 1358 (2023); see Defs.' Resp.

at 40–41; Def.-Interv.'s Resp. at 50–53.  Moreover, as noted above, Defendants'

and Defendant-Intervenor's post hoc arguments made in their litigation briefs

cannot save an agency determination that is devoid of explanations or citations to

record evidence.

For the foregoing reasons, the Court concludes that NMFS' determinations in the Decision Memorandum are arbitrary, capricious, and not in accordance with law. The Court vacates and remands the Decision Memorandum for further consideration consistent with this Opinion.

Accordingly, it is hereby

**ORDERED** that Plaintiff's Motion for Judgment upon the Agency Record Pursuant to USCIT Rule 56.1, ECF No. 30, is granted in part and denied in part; and it is further

**ORDERED** that NMFS' Decision Memorandum is vacated and remanded for reconsideration and further explanation consistent with this Opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

1. Defendants shall file their remand comparability findings on or before November 24, 2025;

2. Defendants shall file the administrative record, which shall include a copy of the "Issuance of Comparability Findings for the Government of New Zealand's Set-Net and Trawl Fisheries—Decision Memorandum" with its original attachments, on or before December 8, 2025;

3. Comments in opposition to the remand comparability findings shall be filed on or before January 22, 2026;

Court No. 24-00218                                                    Page 43

    4.  Comments in support of the remand comparability findings shall be filed

on or before March 9, 2026.

                                    /s/ Jennifer Choe-Groves
                               Jennifer Choe-Groves, Judge

Date:  August 26, 2025
       New York, New York