## UNITED STATES COURT OF INTERNATIONAL TRADE

MĀUI AND HECTOR'S DOLPHIN
DEFENDERS NZ INC.,

*Plaintiff,*

v.

NATIONAL MARINE FISHERIES
SERVICE, et al.,

*Defendants,*

GOVERNMENT OF NEW ZEALAND,

*Intervenor-Defendant.*

Case No. 1:24-cv-00218-JCG

Before: Judge Jennifer Choe-Groves

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................ii

INTRODUCTION .............................................................................................. 1

PROCEDURAL POSTURE ................................................................................. 2

ARGUMENT ..................................................................................................... 9

    I.   This Case is Not Moot If the Court Can Grant Any Relief at All to
       MHDD. ................................................................................................9

    II.  MHDD Has Standing. ............................................................................12

        A.  MHDD Meets the Injury and Causation Requirements for
            Standing. .......................................................................................13

        B.  MHDD's Injury Is Redressable. ....................................................16

            1.  The Court Should Respect Congress' Policy
                Determination That Import Bans Are an Effective
                Remedy to Protect Marine Mammal Populations. ..............16

            2.  MHDD Has Established an Import Ban Is Reasonably
                Likely to Result in a Lower Risk of Harm to Māui
                Dolphins. ........................................................................19

                a.  *An Import Ban Will Reduce Economic*
                    *Incentives to Fish in Maui Dolphin Habitat.* ..................21

                b.  *The Government of New Zealand Is Likely to*
                    *Take Action that Reduces Risks to Maui*
                    *Dolphins in Response to a Ban.* ........................................23

CERTIFICATE OF COMPLIANCE ..............................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
  803 F. Supp. 3d 164 (D.D.C. 2025) .........................................................15

*Animal Prot. Inst. of Am. v. Mosbacher,*
  799 F. Supp. 173 (D.D.C. 1992) .............................................................22

*Animal Welfare Inst. v. Kreps,*
  561 F.2d 1002 (D.C. Cir. 1977) ...............................................15, 17, 18

*Biden v. Texas,*
  597 U.S. 785 (2022) ..................................................................................6

*Brereton v. Bountiful City Corp.,*
  434 F.3d 1213 (10th Cir. 2006) ..............................................................10

*Chafin v. Chafin,*
  568 U.S. 165 (2013) ..................................................................................9

*Clean Air Project v. EPA,*
  752 F.3d 999 (D.C. Cir. 2014) ................................................................28

*Comcast Corp. v. Int'l Trade Comm'n,*
  951 F.3d 1301 (Fed. Cir. 2020) ..............................................................11

*Competitive Enter. Inst. v. Fed. Commc'ns Comm'n,*
  970 F.3d 372 (D.C. Cir. 2020) ................................................................20

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.* (*CEI*),
  901 F.2d 107 (D.C. Cir. 1990) ................................................................16

*Cook v. GameStop, Inc.,*
  148 F.4th 153 (3d Cir. 2025) ..................................................................11

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
  793 F.2d 1322 (D.C. Cir. 1986) ..............................................................17

*Ctr. for Biological Diversity v. Haaland,*
  639 F. Supp. 3d 1355 (Ct. Int'l Trade 2023) ..........................................27

*Ctr. for Biological Diversity v. Mattis,*
  868 F.3d 803 (9th Cir. 2017) ..................................................................14

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
    No. CV 20-103 (RDM), 2021 WL 14929 (D.D.C. 2021) .........................................6

*D.C. Hosp. Ass'n v. Dist. of Columbia*,
    73 F. Supp. 2d 8 (D.D.C. 1999) .....................................................................11, 12

*Defs. of Wildlife v. Gutierrez*,
    532 F.3d 913 (D.C. Cir. 2008) ............................................................................20

*Department of Homeland Security v. Regents of the University of California.*
    591 U.S. 1 (2020) .................................................................................... *passim*

*Earth Island Inst. v. Christopher*,
    913 F. Supp. 559 (Ct. Int'l Trade 1995) .........................................................15, 18

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*,
    466 U.S. 435 (1984) ..........................................................................................9, 12

*Entergy Arkansas, LLC v. FERC*,
    134 F.4th 576 (D.C. Cir. 2025) ............................................................................20

*In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    54 F.4th 28 (1st Cir. 2022) ..................................................................................11

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .......................................................................................13, 16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .............................................................................16, 17, 29

*Givens v. Bowser*,
    111 F.4th 117 (D.C. Cir. 2024) ............................................................................10

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021) .......................................................................20, 21, 22

*Havens v. Mabus*,
    759 F.3d 91 (D.C. Cir. 2014) ...............................................................................11

*Hoshine Silicon (Jia Xing) Indus. Co. v. United States*,
    780 F. Supp. 3d 1328 (Ct. Int'l Trade 2025) ......................................................15

*Humane Soc'y of U.S. v. Brown*,
    920 F. Supp. 178 (Ct. Int'l Trade 1996) ...........................................15, 17, 18, 27

*Invenergy Renewables LLC v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ......................................................14

*Ironclad/EEI v. United States*,
    78 Fed. Cl. 351 (2007) ....................................................................................13

*Janssen v. Harri*s,
    321 F.3d 998 (10th Cir. 2003) ..........................................................................8

*Katz v. Donna Karan Co.*,
    872 F.3d 114 (2d Cir. 2017)............................................................................11

*Larson v. Valente*,
    456 U.S. 228 (1982)........................................................................................23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................................13

*Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*,
    698 F. Supp. 3d 10 (D.D.C. 2023) ..................................................................12

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)...................................................................................20, 23

*MHDD v. NMFS*,
    No. 26-cv-00060 (Ct. Int'l Trade Jan. 5, 2026) ...............................................7

*Mitchco Int'l, Inc. v. United States*,
    26 F.4th 1373 (Fed. Cir. 2022) .......................................................................10

*Nat. Res. Def. Council, Inc. v. Ross* (*Vaquita*),
    331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ....................................13, 15, 18

*Nat. Res. Def. Council v. EPA*,
    542 F.3d 1235 (9th Cir. 2008) ........................................................................16

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018)........................................................................19, 26

*Nat. Res. Def. Council v. Raimondo*,
    No. 24-00148 (Ct. Int'l Trade Jan. 16, 2025) ...................................................3

*Nat'l Parks Conservation Ass'n, Inc. v. U.S. Army Corps of Eng'rs*,
    574 F. Supp. 2d 1314 (S.D. Fla. 2008) .............................................................5

*New Jersey v. EPA*,
    989 F.3d 1038 (D.C. Cir. 2021)......................................................................20

*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*,
    913 F.2d 64 (3rd Cir. 1990) ............................................................................23

*S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*,
   191 F.3d 842 (7th Cir. 1999) ........................................................................11

*Safari Club Int'l v. Jewell*,
   No. CV 14-0670 (ABJ), 2015 WL 13651265 (D.D.C. Mar. 12, 2015) ...................22

*Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.*,
   550 F.3d 1121 (Fed. Cir. 2008) ....................................................................12

*SAS Inst., Inc. v. Iancu*,
   584 U.S. 357 (2018) ...................................................................................18

*Sea Shepherd N.Z. v. United States*,
   606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) .............................................. *passim*

*Sea Shepherd N.Z. v. United States*,
   639 F. Supp. 3d 1367 (Ct. Int'l Trade 2023) .............................................10, 12

*Shinnecock Indian Nation v. United States*,
   782 F.3d 1345 (Fed. Cir. 2015) ....................................................................10

*Sierra Club v. EPA*,
   926 F.3d 844 (D.C. Cir. 2019) .....................................................................14

*Tozzi v. U.S. Dep't of Health & Hum. Servs.*,
   271 F.3d 301 (D.C. Cir. 2001) .....................................................................20

*Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*,
   524 F.3d 1229 (11th Cir. 2008) ....................................................................11

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) ...................................................................................20

*Vandor, Inc. v. Militello*,
   301 F.3d 37 (2d Cir. 2002) ..........................................................................11

**Statutes**

16 U.S.C. § 1361 ..............................................................................................17

16 U.S.C. § 1371 ..............................................................................................18

**Regulations**

50 C.F.R. 216.24 .......................................................................................3, 5, 15

**Federal Register**

56 Fed. Reg. 21096 (May 7, 1991) .......................................................................24

90 Fed. Reg. 42395 (Sept. 2, 2025) .................................................................................3

H.R. Rep. No. 100-970 (1998), 1988 U.S.C.C.A.N. 6154 .................................17, 24, 29

**Other Authorities**

Richard W. Parker, *The Use and Abuse of Trade Leverage to Protect the Global Commons: What We Can Learn from the Tuna-Dolphin Conflict*, 12 Geo. Int'l Envtl. L. Rev. 1, 41 (1999) .........................................................................................24

## INTRODUCTION

Plaintiff Māui and Hector's Dolphin Defenders (MHDD) prevailed on the merits in its challenge to the 2024 Comparability Finding for New Zealand's West Coast North Island setnet and trawl fisheries. Accordingly, this Court vacated the arbitrary and unlawful 2024 Comparability Finding. Rather than implementing statutorily mandated import bans in response and working to correct their severely deficient comparability finding, Defendants National Marine Fisheries Service (NMFS) et al. (Federal Defendants) filed this post-ruling motion to dismiss. They justify their motion on two bases. First, Federal Defendants claim that NMFS mooted this case when it published a new comparability finding (the 2025 Comparability Finding) for New Zealand's fisheries just three days after the Court's August 26 Opinion and Order. Second, they claim MHDD did not establish standing "earlier in the litigation" to pursue the claims that the Court already had decided on the merits. Neither argument has merit.

If this case is moot, it is only because the 2024 Comparability Finding expired by its own terms on January 1, 2026. The law is well-established that any dismissal for mootness must be without prejudice. To the extent that any party has a concrete interest in the outcome of this case, the Court can proceed to address standing. And just as the Court of International Trade (CIT) previously determined for similarly situated plaintiffs challenging a comparability finding for these very same two fisheries, MHDD has standing here. But if the Court concludes otherwise, any dismissal for lack of standing also must be without prejudice.[1]

Federal Defendants seek to exploit the messy procedural posture that their own actions have created by preventing or delaying MHDD from pursuing relief in its challenge to the

---

[1] Assuming this Court has jurisdiction, MHDD maintains that the Court should grant its motion to voluntarily dismiss this case without prejudice. ECF No. 72.

currently operable 2025 Comparability Finding, or perhaps even in challenges to future comparability findings. This Court should deny Federal Defendants' motion for the reasons below, and should not allow them to further stymie the efficient resolution of MHDD's active claims for relief to protect its members' interests in the critically endangered Māui dolphin.

## PROCEDURAL POSTURE

On January 24, 2024, NMFS published a comparability finding authorizing imports from the West Coast North Island setnet and trawl fisheries under the MMPA [hereinafter the 2024 Comparability Finding]. NMFS_1232–34. By its own terms, the 2024 Comparability Finding was only "valid from February 21, 2024, through December 31, 2025, unless revoked or revised by [NMFS] in a subsequent action." NMFS_1232. On December 4, 2024, MHDD filed this case challenging the 2024 Comparability Finding and seeking to compel Federal Defendants to implement an import ban on the fisheries. Compl., ECF No. 4. On August 26, 2025, this Court granted judgment on the agency record to MHDD, ruling that the 2024 Comparability Finding was arbitrary and unlawful in multiple respects. Op. & Order, ECF No. 41. The Court vacated the 2024 Comparability Finding and remanded it to NMFS "for reconsideration and further explanation consistent with [the] Opinion." *Id.* at 42.

To understand the context of the procedural quagmire we find ourselves in six months later, it is important to understand the options NMFS had on remand, as explained in *Department of Homeland Security v. Regents of the University of California*. 591 U.S. 1 (2020). When a court finds the basis for an agency's decision "inadequate, a court may remand for the agency to do one of two things: First, the agency can offer 'a fuller explanation of the agency's reasoning *at the time of the agency action*.'" *Id.* at 20 (citation omitted). An agency taking that route "may elaborate later on [the] reason (or reasons)" that were originally given for the decision, "but may not provide new ones." *Id.* at 21. "Alternatively, the agency can 'deal with the problem afresh'

by taking *new* agency action. An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action." *Id.* (citation omitted). In either circumstance, a court may—and usually should—vacate the agency decision during remand. *E.g.*, *id.* at 9 (holding agency decision that lacked sufficient explanation "must be vacated"); *see also* Op. & Order 38 ("[R]emand with vacatur is the default remedy for agency actions deemed unlawful under § 706(2)(A) ….").

Accordingly, after this Court remanded and vacated the 2024 Comparability Finding, NMFS had two options: offer a fuller explanation of the reasoning *for that finding* or take a *new agency action* to publish a superseding comparability finding for the fisheries. Importantly, the latter option would require "comply[ing] with the procedural requirements" for issuing a new comparability finding, *Regents*, 591 U.S. at 21, which must include publishing the finding in the Federal Register, 50 C.F.R. 216.24(h)(8)(i).

Before NMFS could take either of the options from *Regents*, however, it published comparability finding determinations for approximately 2,500 fisheries from 135 nations on September 2, 2025. 90 Fed. Reg. 42395 (Sept. 2, 2025).[2] The comparability findings would be "[e]ffective January 1, 2026," to authorize imports from the fisheries. *Id.* at 42397. NMFS issued the suite of comparability findings to comply with a settlement deadline in another case. Stip. Dismissal, *Nat. Res. Def. Council v. Raimondo*, No. 24-00148 (Ct. Int'l Trade Jan. 16, 2025)

---

[2] NMFS published the determinations to its website four days earlier, on August 29, 2025, just three days after this Court's ruling.

(ECF No. 29).[3] The comparability finding determinations included a new comparability finding for all New Zealand fisheries, including the two fisheries at issue in this case [hereinafter 2025 Comparability Finding].[4] Federal Defendants have been clear that the 2025 Comparability Finding was not intended to respond to the Court's remand order, *e.g.*, Defs.' Resp. Opp'n Pl.'s Mot. Alter or Amend J. & Mot. Dismiss 20–21 ("Admittedly, the 2025 Comparability Findings did not take into account the Court's reasoning in its August 26 Order because NMFS was required to substantially complete them beforehand to submit them to the Federal Register for publication just after the August 26 Order …."), ECF No. 51 [hereinafter Fed. Mot.]; that is, it did not "deal with the problem afresh" during remand, in the words of *Regents*, 591 U.S. at 21. Because the 2025 Comparabilty Finding was not intended to fulfill either of the options for action on remand, MHDD tried to get clarity from NMFS on which path it planned to take in responding to this Court's remand order; but the agency did not provide a position. *See* Pl.'s Mot. Alter or Amend J. 4, ECF No. 43.[5]

---

[3] When NMFS negotiated and entered that settlement in January 2025, it had full knowledge that the claims challenging deficiencies in the comparability finding for the West Coast North Island fisheries were pending in this case and that the agency would have to address those deficiencies if the Court ruled for MHDD. There was no reason NMFS could not have carved those two fisheries (or even New Zealand fisheries broadly) out from the September 1, 2025 deadline to allow it to respond to a ruling in this case.

[4] National Oceanic and Atmospheric Administration (NOAA), *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report, New Zealand*, https://www.fisheries.noaa.gov/s3/2025-08/New-Zealand-final-2025-508.pdf [hereinafter 2024 Comparability Finding Report].

[5] Because the 2024 Comparability Finding had been vacated and the 2025 Comparability Finding admittedly did not address the Court's ruling, MHDD moved to amend or alter the August 26 Order to compel Federal Defendants to implement an import ban until a valid comparability finding is in place.

As noted, the agency action challenged in this case—the 2024 Comparability Finding—was only effective through December 31, 2025.[6] If NMFS was going to pursue the first option from *Regents* and offer a fuller explanation of the reasoning for *that* action to revive it, the agency had to do so before it expired. Justifying an agency action after its expiration would be an exercise in futility. *See Nat'l Parks Conservation Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 574 F. Supp. 2d 1314, 1321 (S.D. Fla. 2008) ("Even if I were to find that the plaintiffs are correct on the merits and that the Corps violated the CWA, ESA, and the APA, a remand would be an exercise in futility because the Corps cannot remedy that violation given that the permit has expired."). The Court's original remand deadline required NMFS to make that decision by November 24, 2025. ECF No. 41, at 42. NMFS sought and received an extension of that deadline to January 6, 2026, due to the government shutdown. ECF Nos. 44, 46, 50.

Soon after the government shutdown ended, on November 24, 2025, NMFS filed an opposition to MHDD's motion to amend judgment and moved to dismiss this case as moot and for lack of standing. ECF No. 51.

In its motion to dismiss, NMFS argued that "[t]he 2025 Comparability Findings … revised and superseded the 2024 Comparability Findings, mooting the action before this Court." Fed. Mot. 15. Arguably, that was an incorrect statement at the time, given that the Federal Register notice for the new comparability findings specified they would not be effective until January 1, 2026. 90 Fed. Reg. 42397; *see* 50 C.F.R. § 216.24(h)(8)(iv) ("[A] comparability

---

[6] That is in large part why MHDD opposed NMFS's motion to stay this case in March 2025: to obtain relief well in advance of the expiration date and to obtain a court ruling that would guide NMFS's decision that was due by the end of 2025 on whether to reauthorize imports after December. *See* Opp'n Mot. Stay Proceedings 5, 11–14, ECF No. 22. This Court's August ruling left NMFS with four months to revive its February 2024-December 2025 import authorization (the 2024 Comparability Finding) before its expiration date, and four months to publish a new comparability finding effective for January 2026 that addressed the Court's ruling. It did neither.

finding shall remain valid for 4 years from publication *or for such other period as the Assistant Administrator may specify*." (emphasis added)). It was also at least theoretically possible that NMFS could have made a remand determination that revived the 2024 Comparability Finding (the first *Regents* option) and superseded the 2025 Comparability Finding before the end of the year. Alternatively, NMFS could have published a new comparability finding that is responsive to the remand (the second *Regents* option) that would replace the 2025 Comparability Finding.

On January 1, 2026, the 2024 Comparability Finding expired by its own terms. At that point, NMFS no longer had an option to revive the expired action by offering "a fuller explanation of the agency's reasoning *at the time*" it issued the 2024 Comparability Finding because the 2024 Comparability Finding could no longer authorize imports. *Regents*, 591 U.S. at 20.[7] The agency's only option for allowing imports was either to rely on the 2025 Comparability Finding or publish new comparability findings. Either option constitutes new final agency action separate from the 2024 agency action challenged in this case. Indeed, NMFS has argued that the 2025 Comparability Finding is a separate "final agency action" that must be challenged with a new complaint. Fed. Mot. 16. And if NMFS "'deal[s] with the problem afresh' by taking *new* agency action" to respond to the Court's August 2025 remand by publishing new findings, *Regents*, 591 U.S. at 21 (citation omitted), that would also constitute a new final agency action that must be challenged with a new complaint, *Biden v. Texas*, 597 U.S. 785, 808 (2022); *see Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, No. CV 20-103 (RDM), 2021 WL 14929, at *2 (D.D.C. 2021) ("In short, even were this Court to retain jurisdiction [during

---

[7] While the 2024 Comparability Finding does specify the December 31, 2025 expiration date "could be revised," NMFS could only do that by taking "a subsequent action." NMFS_1232. It has not done so, and if it does at some point in the future, that would constitute new final agency action that could be challenged in a new lawsuit.

remand], the case would likely need to start from scratch with a new final agency action, a new

complaint, and a new administrative record."). However, NMFS still had given no indication of

which of those options it would take.

So on January 5, 2026, just days after the 2024 Comparability Finding expired by its own

terms and the 2025 Comparability Finding became effective, MHDD filed a new complaint

challenging the 2025 Comparability Finding—just as NMFS had demanded in its motion to

dismiss. Compl., *MHDD v. NMFS*, No. 26-cv-00060 (Ct. Int'l Trade Jan. 5, 2026) (ECF No. 4).[8]

Counsel for MHDD immediately began conferring with counsel for Federal Defendants to

discuss how to proceed most efficiently, and on January 7, 2026, the parties jointly asked the

Court to stay this case so they could discuss a possible resolution that would allow the disputes

"to proceed in a single case on the New Zealand comparability findings, to the extent possible."

ECF No. 59.

In the meantime, on January 6, 2026, NMFS filed confidential remand findings with the

Court. ECF No. 58. It did not and still has not published the findings in any way. As such, they

---

[8] Federal Defendants have repeatedly faulted MHDD for waiting until January to challenge the
2025 Comparability finding and argue that MHDD is somehow to blame for the procedural
posture in this case. In fact, MHDD has always desired to proceed in a single case challenging
the legally operative comparability finding, but has been unable to do so because of Federal
Defendants' refusal to provide clarity on their plans to comply with the remand. If NMFS were
going to publish new findings on or around the January 6, 2026 remand deadline, the findings
would supersede the 2025 Comparability Finding, in whole or in part; so if MHDD had
challenged the 2025 Comparability Finding before then, its case could have become moot, or at
least required supplementation of the complaint. In the interest of efficiency and the conservation
of the parties' and Court's resources, MHDD waited to file its complaint until it could get clarity
from Federal Defendants on which comparability finding would authorize imports in 2026.
MHDD received notice from Federal Defendants via email on January 5, 2026, that the remand
findings would be filed in this case under seal and would not be published. MHDD filed its
challenge to the 2025 Comparability Finding later the same day.

do not "comply with the procedural requirements for new agency action" and cannot constitute the "new agency action" under the second *Regents* option. 591 U.S. at 21.

The current posture of this case, then, is that: this Court remanded the 2024 Comparability Finding to NMFS; the original challenged action expired on January 1, 2026, before the agency provided a "fuller explanation of the agency's reasoning" for that action; and NMFS has not taken "*new* agency action" following remand. *Id.* at 20-21. NMFS has not done either of the options it had available to it in this case under *Regents*.

Nonetheless, MHDD has repeatedly offered to dismiss this case without prejudice via a stipulation (which is self-executing and does not require any action by the Court, *e.g.*, *Janssen v. Harris*, 321 F.3d 998, 1000 (10th Cir. 2003)) so the parties and the Court may focus their time and resources on the challenge to the 2025 Comparability Finding that has been authorizing imports since January 1. However, Federal Defendants refuse to agree to a straightforward voluntary dismissal without prejudice and instead insist on obtaining a ruling on their motion to dismiss without prejudice for lack of jurisdiction. The reasons for their opposition are unclear, but statements by Federal Defendants' counsel at recent status conferences indicate they appear to believe a ruling on the motion to dismiss would have some prejudicial effect on MHDD. *E.g.*, Tr. of 1st Scheduled Status Conference 18–26 (Feb. 3, 2026).

NMFS still has not committed to taking new agency action with a procedurally valid comparability finding to address the issues in this Court's August Order. Federal Defendants instead continue to rely on a 2025 Comparability Finding that they admit does not correct the identified errors. And rather than take any steps to address that situation, Federal Defendants instead have focused their efforts on trying to force MHDD to litigate this case that they insist is moot while also trying to delay MHDD's right to obtain relief in its challenge to the 2025

Comparability Finding. This is a mess of Federal Defendants' own making and of which MHDD is bearing the burden.

## ARGUMENT

If this case is moot, it is due to the expiration of the 2024 Comparability Finding challenged in this case on January 1, 2026, and not the grounds Federal Defendants argue in their motion. If, however, dismissal would prejudice MHDD's ability to litigate its claims in the 2026 case or any other future challenge to a comparability finding for New Zealand's fisheries, then the case cannot be moot because MHDD would have a concrete interest in the outcome of this case.

If the Court finds the case moot, however, it must dismiss without prejudice. It need not reach Federal Defendants' standing arguments because the Court will already lack jurisdiction. Assuming the case is not moot, however, Federal Defendants' belated challenge to MHDD's standing fails. The fatal flaw at the outset is that their redressability argument requires the Court to reject Congress's policy judgment. Congress's determination that import bans under the MMPA will be effective to protect marine mammals abroad is determinative of redressability here. Even if it were not, MHDD meets the applicable legal burden to show that a ban will likely redress its injuries.

## I.    <u>This Case is Not Moot If the Court Can Grant Any Relief at All to MHDD.</u>

A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298 (2012)). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 442 (1984) (citation omitted). Federal Defendants appear to believe that a ruling in their favor on

their motion to dismiss for lack of jurisdiction would have some sort of future, prejudicial effect on MHDD. They are wrong, as discussed below. But assuming they were correct, then MHDD would have a concrete interest in the outcome of this litigation, namely avoiding future prejudice. In that situation, the Court could still grant effectual relief to MHDD.

MHDD's request for substantive relief from the challenged 2024 Comparability Finding became moot on January 1, 2026, because that finding expired by its own terms on that date and "'no fish or fish product can [now] ever enter the United States based' upon them." *Sea Shepherd N.Z. v. United States*, 639 F. Supp. 3d 1367, 1377 (Ct. Int'l Trade 2023) (alteration in original) (citation omitted) (but holding request for declaratory relief is not mooted by the expiration of a comparability finding). The 2025 Comparability Finding could not have mooted MHDD's case before January 1, 2026, because it did not authorize imports before that date. So this case may now be moot, but it would not be for the reason Federal Defendants argue in their brief (the September publication of the 2025 Comparability Finding). *Cf. Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1378 (Fed. Cir. 2022) ("The party arguing that a case has become moot 'bears the burden of coming forward with the subsequent events that have produced that alleged result.'" (citation omitted)). It would be because NMFS limited the 2024 Comparability Finding to expire at the end of 2025.

*If* this case is now moot, it is well-established that dismissal must be without prejudice. *E.g.*, *Givens v. Bowser*, 111 F.4th 117, 122–23 (D.C. Cir. 2024); *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1350 (Fed. Cir. 2015) (quoting *Barlow & Haun, Inc. v. United States*, 118 Fed.Cl. 597, 615 n. 20 (2014)); *Brereton v. Bountiful City Corp.*, 434 F.3d 1213,

1216–20 (10th Cir. 2006).[9] "[A]bsent jurisdiction 'federal courts do not have the power to dismiss with prejudice.'" *Vandor, Inc. v. Militello*, 301 F.3d 37, 38–39 (2d Cir. 2002) (citation omitted). "[D]ismissals for lack of jurisdiction are not decisions on the merits and therefore have no res judicata effect on subsequent attempts to bring suit in a court of competent jurisdiction." *Havens v. Mabus*, 759 F.3d 91, 98 (D.C. Cir. 2014); *see also D.C. Hosp. Ass'n v. Dist. of Columbia*, 73 F. Supp. 2d 8, 12 (D.D.C. 1999) ("Res Judicata does not, however, bar a party or parties from relitigating a previously asserted claim dismissed on justiciability grounds."), *aff'd*, 224 F.3d 776 (D.C. Cir. 2000). Accordingly, if the Court dismisses this case on jurisdictional grounds—either mootness or standing—MHDD would not be limited in its ability to litigate separate or even the same claims in another case challenging a comparability finding for any of New Zealand's fisheries.

That is not to say the Court must dismiss this case as moot. "It is recognized that 'a case may remain alive based on collateral consequences, which may be found in the prospect that a judgment will affect future litigation or administrative action.'" *Comcast Corp. v. Int'l Trade Comm'n*, 951 F.3d 1301, 1307 (Fed. Cir. 2020) (citation omitted). Despite the unambiguous caselaw that "*every* jurisdictional dismissal is without prejudice to litigation of the merits in some other court or at some other time," *S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842, 844 (7th Cir. 1999), Federal Defendants' counsel has argued that there need to be "consequences for the situation that Plaintiffs have created" in this case. Tr. of 1st Scheduled Status Conference 25 (Feb. 3, 2026). It is unclear what "consequences" they have in mind, but

---

[9] The same is true for dismissal due to lack of standing. *E.g.*, *Cook v. GameStop, Inc.*, 148 F.4th 153, 163 (3d Cir. 2025); *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 42 (1st Cir. 2022); *Katz v. Donna Karan Co.*, 872 F.3d 114, 121 (2d Cir. 2017); *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

they have suggested MHDD should not be permitted to raise arguments in a new case "that it didn't previously bring prior to the remand order," *id.* at 20, 23-25, and have implied MHDD may not litigate the remand findings in a future case if NMFS eventually publishes them, *id.* at 18-19. If Federal Defendants were correct about those theories (they are not), then MHDD would "have a concrete interest, however small, in the outcome of the litigation" in order to avoid future limitations on its ability to litigate. *Ellis*, 466 U.S. at 442. Federal Defendants cannot have it both ways and argue this case should be dismissed as moot because it no longer has legal relevance while also insinuating that the disposition of this case would somehow limit MHDD's future litigation rights.[10]

## II.    **MHDD Has Standing.**

"To establish standing under Article III of the Constitution, a plaintiff must show that (1) it suffered an injury-in-fact that is (2) fairly traceable to the challenged conduct of the defendant and (3) likely redressable by a favorable judicial decision." *Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.,* 550 F.3d 1121, 1130 (Fed. Cir. 2008). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.' If a

---

[10] Defendants argue that neither the "capable of repetition, yet evading review" nor the voluntary cessation doctrine exceptions to mootness would apply if the Court finds that this case is otherwise moot. Fed. Mot. 16-18. However, this case is capable of repetition, yet evading review for the same reasons the challenge to an expiring comparability finding for New Zealand was subject to this mootness exception in *Sea Shepherd*. 639 F. Supp. 3d at 1377-83. And insofar as Federal Defendants argue the voluntary cessation doctrine does not apply to the publication of the 2025 Comparability Finding, they ignore that they voluntarily chose to give themselves a September 2025 deadline for a New Zealand comparability finding with full knowledge that this challenge was pending—and then voluntarily made no effort to address the issues in this case when they did publish that finding. *See Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 33 (D.D.C. 2023) ("[H]ow can one say that the allegedly wrongful behavior here cannot 'reasonably be expected to recur?' It has recurred—the Government has reissued substantively the same memorandum, inflicting substantively the same harm. The very thing the Government claims mooted the case proves that it is not moot." (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, Inc., 528 U.S. 167, 189 (2000))).

defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury. So the two key questions in most standing disputes are injury in fact and causation." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024). Federal Defendants do not contest that MHDD has satisfied those two "key questions." *Cf. Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 358 (2007) ("Courts are constrained to find, as a matter of litigation fairness and procedure, that arguments not addressed in moving briefs have been waived." (cleaned up)). They challenge only MHDD's showing of redressability.

Federal Defendants' redressability arguments require the Court to second-guess determinations made by Congress, conflict with established precedent, and are based on erroneous interpretations of the law. Contrary to Federal Defendants' assertions, the law and the facts demonstrate that MHDD's injuries are redressable by this Court.

## A.    MHDD Meets the Injury and Causation Requirements for Standing.

Although Federal Defendants do not challenge the injury and causation prongs, MHDD nevertheless satisfies both. To demonstrate injury-in-fact, a plaintiff must show "that it has suffered a concrete and particularized injury that is either actual or imminent." *Nat. Res. Def. Council, Inc. v. Ross* (*Vaquita*), 331 F. Supp. 3d 1338, 1357 (Ct. Int'l Trade 2018) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007)). MHDD's members have concrete, particularized, and cognizable interests in viewing Māui dolphins for recreational, aesthetic, artistic, cultural, scientific, and environmental purposes. Decl. of Christine Rose in Supp. of Pl.'s Mot. for Summ. J. ¶¶ 12-21, 26, ECF No. 30-4 [hereinafter Rose Summ. J. Decl.]; Decl. of Moira Barber in Supp. of Pl.'s Mot. for Summ. J. ¶¶ 2-6, 9-10, ECF No. 30-5 [hereinafter Barber Summ. J. Decl.]; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562-63 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Vaquita*, 331 F. Supp. 3d at 1357-59 (finding cognizable

13

interest in vaquita caught in foreign fishery on this basis). Many of MHDD's members live near Māui dolphin habitat, and frequently visit that habitat with the goal of observing and enjoying Māui dolphins. Rose Summ. J. Decl. ¶¶ 13, 15-16, 18; Barber Summ. J. Decl. ¶¶ 9-10. Given its critically endangered status, the loss of even a single Māui dolphin due to bycatch would severely injure MHDD and its members. For one, every dolphin that dies of non-natural causes shrinks an already small and rare population, making it even harder for MHDD's members to observe, appreciate, and enjoy Māui dolphins in the wild. Rose Summ. J. Decl. ¶¶ 16, 18, 21, 26; Barber Summ. J. Decl. ¶ 12. Second, any dolphin death or serious injury would be disastrous for the highly imperiled population, and would cause severe distress and injury to MHDD and its members who care deeply about the dolphin's recovery. Rose Summ. J. Decl. ¶¶ 13, 17-18; Barber Summ. J. Decl. ¶ 13.

MHDD's injuries are "fairly traceable" to the challenged action as a matter of law and as a matter of fact. *See, e.g.*, *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1271 (Ct. Int'l Trade 2019) ("The injury may be indirect so long as it is fairly traceable to defendants' conduct.").[11] "Congress, in enacting the MMPA, established as a matter of law the

---

[11] While not necessary to establish its standing here, MHDD has also suffered a procedural injury as a result of Federal Defendants' failure to comply with the Administrative Procedure Act (APA). *See* Compl. ¶¶ 19-20; Rose Summ. J. Decl. ¶ 22. "When a party asserts a procedural injury, it enjoys a somewhat relaxed test as to whether compliance with the procedural requirement would lead to 'redress' of the party's substantive injury." *Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019) (cleaned up). The party must only show "its injury 'is *potentially* redressable' by further agency action on remand." *Id.* at 849 (emphasis added) (citation omitted). MHDD's "concrete interest" in Māui dolphins is affected by Federal Defendants' failure to make a reasoned decision with evidentiary support when determining whether to issue a comparability finding allowing imports. *See* Rose Summ. J. Decl. ¶ 22; *see Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816-17 (9th Cir. 2017) (explaining "[a] 'concrete interest' implicated by a procedural requirement may reflect 'aesthetic, conservational, and recreational' values" in case filed under APA (quoting *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972))). MHDD has certainly shown (below) that its injury is "potentially" redressable by a favorable decision. Federal Defendants cite no legal support for their theory that a foreign plaintiff may not assert a

requisite causal relationship between American importing practices and [foreign harvesting] practices." *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1010 (D.C. Cir. 1977). "In the face of this congressional determination, it is impossible to conclude, … that the causal relationship is 'purely speculative.'" *Id.* As a factual matter, it is undisputed that setnetting and trawl fishing within the Māui dolphin's habitat pose a risk of bycatch, and are in fact the primary contributor to the Māui dolphin's continued decline. NMFS_4359. As long as setnet and trawl fishing is allowed to continue within the Māui dolphin's habitat range, injury to dolphins is not just likely, but inevitable. Decl. of Elisabeth Slooten, Ph.D. ¶¶ 14-16, ECF 22-1. It is also undisputed that these setnet and trawl fisheries export seafood to the United States. *See* NMFS_13013, 13017 (listing West Coast North Island setnet and trawl fisheries in "List of Foreign Fisheries" that export seafood to the United States); *see also* Decl. of Dr. Glenn Simmons ¶¶ 7-8, attached herewith. NMFS's decision to issue a comparability finding to these fisheries allows for these imports to continue; they would otherwise be banned in the absence of such a finding. 50 C.F.R. § 216.24(h)(1). The CIT has consistently found standing based on this exact causal link between decisions to allow imports and resulting environmental impacts. *E.g.*, *Sea Shepherd N.Z. v. United States*, 606 F. Supp. 3d 1286, 1307 n.38 (Ct. Int'l Trade 2022); *Vaquita*, 331 F. Supp. 3d at 1359-61; *Humane Soc'y of U.S. v. Brown*, 920 F. Supp. 178, 204-05 (Ct. Int'l Trade 1996); *Earth Island Inst. v. Christopher*, 913 F. Supp. 559, 569-72 (Ct. Int'l Trade 1995). MHDD's injuries are fairly traceable to the Comparability Finding for the same reasons.

---

procedural injury. Fed. Mot. 14. *But see AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 179-80 (D.D.C. 2025) (finding foreign plaintiff within "zone of interests" to "pursue an APA claim"), *appeal dismissed*, No. 25-5317, 2026 WL 476138 (D.C. Cir. Feb. 18, 2026); *Hoshine Silicon (Jia Xing) Indus. Co. v. United States*, 780 F. Supp. 3d 1328, 1337 (Ct. Int'l Trade 2025) (finding foreign entity could assert procedural harm under APA to establish standing).

**B.    MHDD's Injury Is Redressable.**

MHDD's injuries also are redressable by this Court. *See Hippocratic Medicine*, 602 U.S. at 381. In arguing otherwise, Defendants ask this Court to second-guess Congress's policy choices, disregard well-established precedent that import bans redress environmental injuries, and misconstrue the applicable legal standard. Putting aside the fatal legal flaws with Defendants' argument, they also fail to acknowledge that factual evidence and basic economic principles indicate an import ban is likely to cause both New Zealand fishermen and the New Zealand Government (NZG) to take action that benefits the Māui dolphin. In fact, the CIT has already held that an import ban would redress environmental plaintiffs' injuries with regards to the Māui dolphin *for the very fisheries at issue in this case*. *Sea Shepherd*, 606 F. Supp. 3d at 1307 n.38. The court found "[t]he United States is a significant market for New Zealand's implicated exports" and NZG "is likely to respond to a United States import ban in a way that reduces danger to the Māui dolphin." *Id.* The same conclusion holds here.

1.    The Court Should Respect Congress's Policy Determination That Import Bans Are an Effective Remedy to Protect Marine Mammal Populations.

The Supreme Court has recognized that it is Congress's role to make policy choices as to what remedies will ameliorate specific harms, and that a "congressional determination [on appropriate remedy] warrants judicial attention and respect" in assessing redressability. *Laidlaw*, 528 U.S. at 185. "[A] match between the statutory objective behind the … regulation and the alleged injury" is generally sufficient to establish redressability, although not necessary to do so. *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.* (*CEI*), 901 F.2d 107, 114 (D.C. Cir. 1990) (citation omitted); *see also Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1248 (9th Cir. 2008) ("Where Congress has expressed the need for specific regulations relating to the environment, that expression supports an inference that there is a causal connection between the

lack of those regulations and adverse environmental effects."); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1334-35 (D.C. Cir. 1986) (finding redressability because the "object of the agency's regulation and the injury are … directly linked"). In *Laidlaw*, for example, the Supreme Court found that the imposition of civil penalties under the Clean Water Act would redress injuries to the plaintiffs' interests in the environment because "Congress has found that civil penalties in Clean Water Act cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations." 528 U.S. at 185.

Here, Congress decided that an import ban under the MMPA is an effective remedy for addressing unsustainable marine mammal bycatch in foreign fisheries. *See Kreps*, 561 F.2d at 1010 ("The MMPA … reflects a congressional decision that denial of import privileges is an effective method of protecting marine mammals in other parts of the world."); *Humane Soc'y*, 920 F. Supp. at 205 ("[T]he record currently before the court, as well as that developed earlier before Congress, indicate that [trade restrictions] can be and are effective in furtherance of underlying conservation policies. And the government cannot be heard to argue otherwise."); *see also* 16 U.S.C. § 1361(6) (Congressional declaration of purpose for MMPA stating "marine mammals have proven themselves to be resources of great *international* significance, esthetic and recreational as well as economic, and … they should be protected and encouraged to develop to the greatest extent feasible" (emphasis added)).

This is corroborated by the MMPA's legislative history, where Congress made explicit reference to the effectiveness of denying U.S. markets to foreign nations as a means of forcing changes in destructive fishing practices abroad. H.R. Rep. No. 100-970, at 15 (1998), 1988 U.S.C.C.A.N. 6154, 6156. "In the face of this congressional determination, it is impossible to

conclude," as Federal Defendants urge, "that the causal relationship is 'purely speculative.'" *Kreps*, 561 F.2d at 1010.

Federal Defendants make the remarkable contention in their brief that the very law Congress has charged them with executing will not achieve its intended purpose of protecting marine mammals. In doing so, they ask the Court to substitute its own policy judgement for that of Congress and effectively find that the MMPA's Import Provision (16 U.S.C. § 1371(a)(2)) is not an effective policy tool. *But see SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 368 (2018) ("It is Congress's job to enact policy and it is this Court's job to follow the policy Congress has prescribed."). Federal Defendants would also have this Court ignore well settled precedent from the CIT, which has repeatedly held that import bans can redress an environmental plaintiff's aesthetic and recreational injuries. *E.g.*, *Sea Shepherd*, 606 F. Supp. 3d at 1307 n.38; *Vaquita*, 331 F. Supp. 3d at 1359–61; *Humane Soc'y*, 920 F. Supp. at 205; *Earth Island Inst.*, 913 F. Supp. at 570.

Notably, NMFS itself has determined that import bans under the MMPA would be an effective means to address unsustainable bycatch of marine mammals in foreign fisheries. In 2015, NMFS "evaluate[d] the potential impacts on the environment" of adopting regulations to implement the MMPA Import Provision.[12] NMFS determined that implementing the Import Provision would "increase protection" for marine mammals,[13] and recognized that where "harvesting states are unable or unwilling to enforce IUU [Illegal, Unreported, and Unregulated

---

[12] NMFS, *Final Environmental Assessment, Regulatory Impact Review, and Final Regulatory Flexibility Analysis for a Proposed Rule to Implement Provisions of Section 101(a)(2)(A) of the Marine Mammal Protection Act For Imports of Fish and Fish Products* 5 (August 2016), https://www.fisheries.noaa.gov/s3/2023-01/FINAL_EA_%20RIR_FRFA%20%20MMPA%20Import%20Rule%20Version%208_1_16%20with%20appendices%20-%20Kris%20Gamble%20-%20NOAA%20Federal%20-508.pdf.
[13] *Id*. at 60.

fishing] and bycatch rules, port and market state controls can provide an important, necessary, and cost effective tool to combat IUU and bycatch. The imposition of trade-related measures, … can also reduce … bycatch in a cost effective way."[14] It is surprising that the agency would now tell this Court the opposite.

Congress has made the policy judgment that import bans under the MMPA Import Provision will relieve harm to marine mammals in foreign fisheries. The CIT and even the Defendant agency have recognized that policy choice as an effective remedy. Congress's choice of remedy establishes redressability in this case. This Court should reject Federal Defendants' invitation to disregard Congress's policy choice.

2.    MHDD Has Established an Import Ban Is Reasonably Likely to Result in a Lower Risk of Harm to Māui Dolphins.

Even if Congress's policy judgment were not dispositive of redressability in this case, MHDD meets its burden. The evidence and basic laws of economics establish it is likely that New Zealand fishers and NZG would respond to the loss of access to U.S. seafood markets in a way that reduces bycatch risk to Māui dolphins. Indeed, as discussed below, NZG effectively admitted as much when intervening in this case.

As a threshold matter, Federal Defendants overstate the legal burden to establish redressability. "[I]t is well-settled that petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test[,] even in cases where the injury hinges on the reactions of the third parties …." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018) (quoting *CEI*, 901 F.2d at 113). Accordingly, MHDD only needs to show that an import ban is likely to cause some third party take action that will benefit the Māui dolphin in some way, however small. *See*

---

[14] *Id*. at 86.

*Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("True, a single dollar often cannot provide full redress, but the ability 'to effectuate a partial remedy' satisfies the redressability requirement." (citation omitted)). A plaintiff can rely on a broad range of information to demonstrate that third-party conduct is likely, including "basic laws of economics" and simple market forces such as supply and demand. *E.g.*, *Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 382 (D.C. Cir. 2020); *see also Entergy Arkansas, LLC v. FERC*, 134 F.4th 576, 585 (D.C. Cir. 2025) (finding a plaintiff "certainly may credit 'market forces' in a redressability analysis," if the plaintiff "describe[s] the chain of events"); *Growth Energy v. EPA*, 5 F.4th 1, 33 (D.C. Cir. 2021) (relying on basic laws of economics).

Further, MHDD is not required to specifically "identify what [regulatory] improvements would be and how they would work and produce evidence that such improvements are likely to result from an order of this Court." Fed. Mot. 11; *see New Jersey v. EPA*, 989 F.3d 1038, 1049 (D.C. Cir. 2021) (holding that a plaintiff is not required to "predict[] with specificity" or demonstrate "when, where, or how" a third party will act: "it suffices to point to 'third party conduct that is voluntary but reasonably predictable'" (citation omitted)). A plaintiff is not required show the requested relief would redress their whole injury, either; only that the relief would likely relieve their injury to some partial extent. *Uzuegbunam*, 592 U.S. at 291; *Massachusetts*, 549 U.S. at 524; *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001); *see, e.g.*, *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008) (finding injury to interest in whales redressable where agency "has authority to take into account right whales when promulgating traffic separation schemes; thus, an order from the district court could redress appellants' injury, *at least in part*" (emphasis added)).

a.    *An Import Ban Will Reduce Economic Incentives to Fish in Maui Dolphin Habitat.*

One way an import ban is likely to redress MHDD's injuries is through simple market forces where demand influences supply. If U.S. demand vanishes, fishers are likely to curtail their fishing effort in the affected fisheries because there will be a smaller export market to supply.

New Zealand's fisheries are estimated to export upwards of USD $200,000,000 worth of seafood to the United States each year. Simmons Decl. ¶ 8. The United States is the second largest export market for New Zealand, making up approximately 18% of its total market. *Id.* ¶ 10. This figure is likely to grow as New Zealand actively seeks to grow its fishery export markets. *Id.* ¶¶ 16-17. And NZG has estimated that the last import ban on the West Coast North Island fisheries cost New Zealand about $2 million in seafood exports over its fifteen-month duration. Decl. of Christine Rose ¶ 33, attached herewith [hereinafter 3d Rose Decl.]; *see also* Simmons Decl. ¶ 11 (opining that this figure is underestimated). Losing access to this significant U.S. market demand is likely to result in reduced fishing (i.e., production). Simmons Decl. ¶¶ 11, 14; *see Sea Shepherd*, 606 F. Supp. 3d 1286 at 1307 n.38 (finding standing because "[t]he United States is a significant market for New Zealand's implicated exports").

This case is akin to *Growth Energy v. EPA* in that sense. 5 F.4th at 33. There, environmental groups challenged an agency action requiring fuel manufacturers to buy certain volumes of biofuel because the farming of soybean and corn used to produce the biofuel has negative effects on certain endangered species. *Id.* at 7, 28. The court found the groups' environmental injury was redressable based on a predictable economic chain: blocking the agency action "would cause the demand for corn and soy to drop and at least some farmers would respond by reducing their production of corn and soybeans," and reduced production

would lessen impacts to endangered species. *Id.* at 33. So too here, where an import ban would cause demand for fish to drop, and at least some New Zealand fishers are likely to respond by fishing less or by changing to a fishery that is not subject to the ban (e.g., fisheries outside the Māui dolphin's West Coast North Island habitat or fisheries that use less harmful gear than setnets or trawls)—either of which would make it less likely for Māui dolphins to be injured or killed by fishing activities. 3d Rose Decl. ¶ 32-35; Simmons Decl. ¶ 14.

For the fisheries threatening the Māui dolphin, this economic effect is not theoretical or speculative, but proven. Following the import ban imposed during the *Sea Shepherd* litigation, demand for fish from the relevant area declined significantly. Export volumes decreased for many of the fish caught in the West Coast North Island fisheries "with snapper down 8 percent, kahawai down 20 percent, dogfish down 8 percent, and trevally down 45 percent." 3d Rose Decl. ¶ 33.[15] Commercial catch limits for some of these species have increased after the ban was lifted. *Id.* The likelihood that an import ban will reduce harmful effects of production by reducing demand is sufficient to establish redressability. *E.g.*, *Growth Energy*, 5 F.4th at 33; *Animal Prot. Inst. of Am. v. Mosbacher*, 799 F. Supp. 173, 177 n.7 (D.D.C. 1992) (finding redressability in challenge to agency permit allowing import of whales because although exporting nations "might theoretically export their whales elsewhere, the diminution in demand would correlate directly to the diminution in harm to plaintiffs"); *see also Safari Club Int'l v. Jewell*, No. CV 14-0670 (ABJ), 2015 WL 13651265, at *4 (D.D.C. Mar. 12, 2015) (finding standing for animal welfare group to defend import ban on elephant trophies, because although elephant hunting would still be allowed in foreign nation, fewer U.S. hunters would hunt with ban in place). No "action from

---

[15] *See also* Ministry for Primary Industries, *Situation and Outlook for Primary Industries* 54 (Dec. 2024), https://www.mpi.govt.nz/dmsdocument/66648-Situation-and-Outlook-for-Primary-Industries-SOPI-December-2024, attached herewith as Exhibit D to 3d Rose Decl.

the Government of New Zealand" is necessary to effectuate an economics-driven benefit of an import ban from reduced fishing. *Contra* Fed. Mot. 12.

Federal Defendants are wrong when they claim MHDD's injuries are not redressable because the relevant fisheries "could and would continue to operate notwithstanding the diminished access to the U.S. market." *Id.* at 10-11. MHDD does not need to demonstrate that an import ban would stop operation of the fisheries entirely to establish redressability. Even a small reduction in injury is sufficient. *E.g.*, *Massachusetts*, 549 U.S. at 524; *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (stating a plaintiff "need not show that a favorable decision will relieve his *every* injury"); *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3rd Cir. 1990) (finding partial redress sufficient). If lost access to the U.S. market changes the economic calculus for fishers where they even slightly decrease fishing effort to avoid having unsellable product in the face of a drop in demand, that would partially redress MHDD's injuries because it would mean fewer nets in the water that can capture and kill a Māui dolphin. It is likely that the market forces of a ban would affect fishing activity in a way that redresses MHDD's injuries.

        b.      *The Government of New Zealand Is Likely to Take Action that Reduces Risks to Maui Dolphins in Response to a Ban.*

A second, independent way MHDD's injuries would be redressed is if NZG takes action in response to a ban that reduces risk to Māui dolphins. As discussed above, the action need not completely ameliorate risk, so long as it could help reduce bycatch. Ample evidence shows that NZG is eager to avoid an import ban. Indeed, it has taken action to avoid import bans in the past, including intervening in this case, and is very likely to take action in response to an import ban in the future.

First, history shows that import bans are highly effective at changing the conservation policy of foreign governments, as illuminated by the tuna-dolphin dispute in the 1980s. In that era, foreign tuna fishing vessels in the eastern tropical Pacific Ocean were catching hundreds of thousands of dolphins each year, threatening populations. Congress amended the MMPA to create tuna-specific import rules. Pub. L. No. 100-711, § 4(a), 102 Stat. 4755, 4765-66 (1988) (codified at 16 U.S.C. § 1371(a)(2)). This led to a ban on imports of tuna from Mexico, among other countries. 56 Fed. Reg. 21096 (May 7, 1991). Mexico responded almost immediately: only months after the ban, the Mexican government announced it was strengthening its enforcement of dolphin protections, placing observers on every tuna boat, and creating new research programs to improve dolphin-protective technology. Richard W. Parker, *The Use and Abuse of Trade Leverage to Protect the Global Commons: What We Can Learn from the Tuna-Dolphin Conflict*, 12 Geo. Int'l Envtl. L. Rev. 1, 41 (1999). These policy changes, along with those for other foreign tuna fleets, brought the number of observed dolphin killings down from over 133,000 in 1986 to fewer than 4,000 in 1993. Marine Mammal Commission, *Annual Report to Congress 1995*, at 100 (1996), attached herewith as Exhibit A. In fact, New Zealand was one of the nations that changed its behavior in response to the tuna-specific import rule. To avoid an import ban, New Zealand stopped tuna fishing in the eastern Tropical Pacific entirely. *See* H.R. Rep. No. 100-970, at 15 (1998), 1988 U.S.C.C.A.N. 6154, 6156. Import bans on nations who harvested shrimp without turtle excluder devices have been similarly successful at changing fishing practices to protect turtles in other nations.[16]

---

[16] *See, e.g*, Abhishek Bhowmik et al, *Implementation of TED (Turtle Excluder Device) for Turtle Protection* 6 Vigyan Varta 84, 86 (2025) ("In light of the US restriction on imports from nations that do not use TEDs, India also began testing various imported TEDs."), https://www.vigyanvarta.in/adminpanel/upload_doc/VV_0125_19.pdf, attached herewith as Exhibit B; *see also* Nihkil Sreekandan, *Indigenous turtle-safe fishing devices help India tackle*

Second, NZG's statements and past actions have given every indication that it will likely take action in response to a ban. When NZG moved to intervene in this case, it stated, "An import ban would likely require the NZG to take additional actions and conduct additional analyses that would impose significant burdens." Mot. of NZG for Permissive Intervention 4, ECF No. 16. And NZG has actively participated in the yearslong comparability finding processes and multiple lawsuits on the findings to vigorously protect its access to U.S. markets, indicating it views a potential import ban as a major motivator. Furthermore, New Zealand is actively seeking to grow its fisheries and seafood export market as part of its broader "export-led recovery" strategy. Simmons Decl. ¶ 16; 3d Rose Decl. ¶ 45. This makes market access a strategic concern, particularly access to a major market where an import ban carry implications beyond immediate dollar value, including reputational risk, compliance scrutiny, and potential regulatory contagion in other markets. Simmons Decl. ¶¶ 16-18. It is disingenuous to imply that if an import ban were imposed on the West Coast North Island fisheries, NZG would simply throw up its hands and do nothing to try to get that ban lifted. Rather, it is likely that an import ban would spur the New Zealand Goverment to take remedial action.

Federal Defendants seem to imply that since the *Sea Shepherd* lawsuit did not result in regulatory action by NZG, that is proof that an import ban will never spur action. *See* Fed. Mot. 12-13. There are two main flaws with that argument. First, past inaction does not necessarily predict future inaction. *Cf. id.* at 12 n.1 ("The United States does not intend to suggest that the Government of New Zealand could not or would not *choose* to increase marine mammal protection in response to any action taken by NMFS or this Court."). And taking regulatory

---

*U.S. shrimp ban*, Mongabay (Jan 17, 2025), https://india.mongabay.com/2025/01/indigenous-turtle-safe-fishing-devices-help-india-tackle-u-s-shrimp-ban/, attached herewith as Exhibit C.

action to get an import ban lifted in the future would be prudent for NZG. The *Sea Shepherd* import ban ended up costing New Zealand around 2 million NZ dollars[17]—about the same as the value of annual exports to the United States from the relevant fisheries.[18] Taking action to avoid such significant monetary losses is not "miraculous[]" or speculative, as Federal Defendants contend, Fed. Mot. 11-12, but common sensical and probable. "[T]he notion that financial [incentives] deter environmental misconduct is hardly novel." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin*., 894 F.3d at 104 (alterations in original) (citation omitted). That precisely why Congress provided for an import ban in the MMPA as a tool to instigate conservation action abroad. *See supra* pp. 17-19

Second, contrary to Federal Defendant's claims, NZG *did* take action to avoid the import ban being sought in *Sea Shepherd*. Shortly after that case was filed in 2020 to compel an import ban, NZG made improvements to its fisheries management framework. These changes were significant: NZG reviewed its threat management plan for the Maui dolphin, extended closed areas for setnet and trawl fishing, and funded and implemented the electronic monitoring program.[19] 3d Rose Decl. ¶¶ 38-40; Simmons Decl. ¶ 15. It is highly unlikely the timing was a coincidence. As a result of that lawsuit, NZG would soon need to demonstrate to NMFS that its policies were sufficiently protective to receive a comparability finding and avoid an import ban.

---

[17] Erin Spampinato, *Maui dolphin case is dismissed, eliminating prohibition of US imports of some New Zealand seafood*, Seafood Source (Sept. 20, 2024), https://www.seafoodsource.com/news/environment-sustainability/maui-dolphin-case-is-settled-leaving-the-us-free-to-import-from-new-zealand, attached herewith as Exhibit D.

[18] Mot. Gov't N.Z. for Temp. Stay 5, *Sea Shepherd*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) (No. 1:20-cv-00112-GSK) (ECF No. 115).

[19] New Zealand Government Media Release, *New protection for dolphins and support for changes to fishing methods* (June 24, 2020), https://www.beehive.govt.nz/release/new-protection-dolphins-and-support-changes-fishing-methods, attached herewith as Exhibit E; Fisheries (Hector's and Māui Dolphin) Amendment Regulations 2020 (N.Z.), https://www.legislation.govt.nz/regulation/public/2020/0199/latest/whole.html.

These changes presumably would help NZG defend its framework to NMFS and in court to avoid a potential ban. The CIT has recognized that even the threat of economic sanctions can be enough to spur conservation action abroad. *E.g.*, *Humane Soc'y*, 920 F.Supp. at 204 (finding redressability because the threat of sanctions was "'effective in achieving adequate … compliance'" and "in the absence of economic pressure" the importing nation had been "unwilling or unable to bring its driftnet fleet into compliance with the prohibitions"); *see also Ctr. for Biological Diversity v. Haaland*, 639 F. Supp. 3d 1355, 1359 (Ct. Int'l Trade 2023) (citing Congressional acknowledgement that "the threat of embargo can be 'quietly persuading' to a foreign trading partner" in the conservation context and such threats "remain[] key [to] effective enforcement").

Moreover, the actions NZG took after the *Sea Shepherd* lawsuit was filed, although insufficient to achieve comparability to U.S. standards, were successful at reducing harm to the dolphin to some degree. For example, in the face of fishing restrictions in Māui habitat, a New Zealand fisher changed his gear to protect dolphins in order to continue fishing in the area. 3d Rose Decl. ¶ 34. NZG also witnessed a reduction of harmful gear in priority habitats where fishers chose to switch to less harmful gears when faced with on-board camera requirements.[20] *See also* 3d Rose Decl. ¶ 35; Simmons Decl. ¶ 14. While the import ban was in place, New Zealand sped up and completed its rollout of electronic monitoring in the West Coast North

---

[20] Fisheries New Zealand, *Overview of the rollout of on-board cameras on commercial fishing vessels* 3 (Feb. 9, 2024) (noting the expected rollout of on-board cameras to 300 vessels was reduced to 255 "primarily … due to some vessels choosing to no longer undertake fishing methods requiring on-board cameras"), https://www.mpi.govt.nz/dmsdocument/61636-Overview-of-the-rollout-of-on-board-cameras-on-commercial-fishing-vessels-briefing-B24-0023, attached herewith as Exhibit H to 3d Rose Decl.

Island fisheries. Simmons Decl. ¶ 15. The full scope of benefits from an import ban do not always show up solely in a nation's code of regulations or statutes.

Now that it has not faced an import ban for the past couple years, NZG has proposed to weaken its Fisheries Act "through amendments which would prevent transparency and scrutiny of camera footage, limit camera coverage, and reduce sustainability reviews, while simultaneously increasing ad hoc and unscientific Ministerial discretion over fisheries and oceans management." 3d Rose Decl. ¶ 44. The drafting of the Bill for Parliament that would make those changes was recently put on hold—a pause that, according to Dr. Simmons, is linked to these court actions under the MMPA. Simmons Decl. ¶ 18. An import ban would help protect the Maui dolphin and thus redress MHDD's injury by likely causing NZG to rescind or revise this proposal, lest it have more trouble reestablishing that its new laws are comparable in effectiveness to U.S. standards. Federal Defendants claim this is not sufficient for redressability purposes because a decision not to make things worse is simply "maintenance of the status quo." Fed. Mot. 11-12. But in assessing standing, consequences must "be assessed not by reference to the status quo ante but instead to other actions [the agency] could have taken." *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) (finding standing because "had the EPA taken the course of action that [plaintiffs] claim the law required, they would have been better off"). Here, if an import ban persuades NZG not to weaken its firsheries bycatch laws, MHDD would be better off than if NZG weakens the laws because it does not face a ban.

Finally, even if Federal Defendants were correct in their assertion that NZG did nothing to avoid a ban in the past, those past actions have no predictive value here because they occurred in a context where NMFS was failing to uphold the law. NZG had no incentive to improve its

management when it knew that NMFS would grant it a new comparability finding regardless. After NZG supplemented its application, NMFS rubber stamped it with an arbitrary and unlawful 2024 Comparability Finding to get the *Sea Shepherd* injunction lifted, which this Court then vacated.[21] Against this background of NMFS's noncompliance with its MMPA obligations, when the *Sea Shepherd* court ordered an import ban, NZG had two options to get the ban lifted: it could strengthen domestic protections for the Maui dolphin *or* it could bank on NMFS to once again unlawfully approve an insufficient comparability application. NZG took the latter route, and NMFS concurred. This false choice starkly demonstrates why MHDD's injury is redressable. MHDD is seeking judicial review to ensure the agency complies with the law, so that NZG only has one option to lift the ban as the MMPA intends: increase protections. Indeed, in order for the threat of embargo to work, NZG must know and believe that NMFS will implement the law rigorously. *See Laidlaw*, 528 U.S. at 186 ("[A] threat has no deterrent value unless it is credible that it will be carried out."). Had NMFS properly implemented the law, NZG might well have taken the first option, as it has in the past. *See, e.g.*, H.R. Rep. No. 100-970 at 15 (1998), 1988 U.S.C.C.A.N. 6154, 6156. Now Federal Defendants are using their own failure to comply with the law and provide redress to shield themselves from the judicial consequences of that very failure on redressability grounds. The Court should deny this cynical request.

---

[21] Federal Defendants try to erase this history, stating that "New Zealand provided additional evidence in support of its existing regulations, providing sufficient basis for NMFS to conclude in its expert view, that a comparability finding was warranted," Fed. Mot. 13, as if the agency's conclusion was valid or legally sound. But this Court found that that NMFS's determination was unlawful and that the agency's expert view was not rational or supported by the record.

Respectfully submitted this 27th day of February, 2026.

*/s/ Natalie Barefoot*
Natalie Barefoot
Earthjustice
180 Steuart St #194330
San Francisco, CA 94105
T (415) 217-2000
nbarefoot@earthjustice.org

Sabrina Devereaux
Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org
ceaton@earthjustice.org

*/s/ Brett Sommermeyer*
Brett Sommermeyer
Catherine Pruett
Law of the Wild
7511 Greenwood Avenue North, #4214
Seattle, WA 98103
T (206) 774-0048
brett@lawofthewild.org
catherine@lawofthewild.org

*Attorneys for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc.*

**CERTIFICATE OF COMPLIANCE**

This document complies with the word count limitations as provided for in the Court's Standard Chambers Procedures 2(B) because it contains 9,894 words, excluding the parts of the brief exempted by Standard Chambers Procedures 2(B)(1)(c).

*/s/ Natalie Barefoot*
Natalie Barefoot