**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC., ) ) ) ) | |
| Plaintiff, ) | |
| v. ) | Court No. 1:24-cv-00218-JCG |
| NATIONAL MARINE FISHERIES SERVICE, et al., ) ) ) | |
| Defendants, ) | |
| and ) | |
| NEW ZEALAND GOVERNMENT, ) | |
| Defendant-Intervenor. ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF ITS
<u>MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)</u>**

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

ZACHARY SCOTT SIMMONS
Office of the Chief Counsel
U.S. Customs and Border Protection

DANIEL PAISLEY
Office of the General Counsel
Department of the Treasury

March 13, 2026

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

AGATHA KOPROWSKI
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. iii

Introduction ............................................................................................................................. 1

Argument .................................................................................................................................. 1

   I.   MHDD Has Not Established Standing .............................................................................. 1

      A.   MHDD Cannot Establish Causation Or Redressability As A Matter of Law .................. 2

          1.   MHDD Is Not Entitled To A Relaxed Standing Requirement ..................................... 2

          2.   Congress Promoted Foreign Diplomacy To Address Foreign Fishery Bycatch ......... 3

          3.   NMFS, Like Congress, Concluded That Foreign Diplomacy Could
               Address Foreign Fishery Bycatch ............................................................................... 9

      B.   MHDD Cannot Establish Redressability Using Economics ........................................ 10

      C.   MHDD Cannot Rely On Conjecture To Predict The Actions Of A
          Sovereign State ........................................................................................................... 14

   II.   This Court Cannot Grant Any Relief With Respect To The Agency
       Action Challenged by MHDD ...................................................................................... 16

   III.  *Bioparques* Is Distinguishable ......................................................................................... 19

   IV.  The Basis For Dismissal May Affect Rights Of The Parties ........................................... 21

Conclusion .............................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Animal Welfare Institute v. Kreps,*
    561 F.2d 1002 (D.C. Cir. 1977).............................................................. 3, 4, 5

*Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
    793 F.2d 1322 (D.C. Cir. 1986) .................................................................. 3

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 (Fed. Cir. 2009).................................................................. 17

*Bennett v. Spear,*
    520 U.S. 154 (1997).................................................................................... 16

*Bioparques de Occidente, S.A. de C.V. v. United States,*
    31 F.4th 1336 (Fed. Cir. 2022) ............................................................. 19, 20

*Camp v. Pitts,*
    411 U.S. 138 (1973).................................................................................... 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020).................................................................................. 17, 18

*Doe 1 v. Apple Inc.,*
    96 F.4th 403 (D.C. Cir. 2024)...................................................................... 5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000).................................................................................... 3

*GAF Corp. v. Transamerica Ins. Co.,*
    665 F.2d 364 (D.C. Cir. 1981)................................................................... 21

*Gonzalez v. Thaler,*
    565 U.S. 134 (2012)...................................................................................... 1

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952)...................................................................................... 8

*Klamath Irrigation Dist. v. United States,*
    116 Fed. Cl. 117 (2014) ............................................................................ 21

*Kwan v. United States,*
    272 F.3d 1360 (Fed. Cir. 2001).................................................................... 8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................... *passim*

*Natural Res. Def. Council v. Envtl. Prot. Agency*,
   542 F.3d 1235 (9th Cir. 2008) ............................................................... 3

*Natural Resource Defense Council v. Raimondo*,
   Case No. 24-148 (Ct. Int'l Trade Mar. 25, 2025) ................................. 18

*Syneren Techs. Corp. v. United States*,
   166 F.4th 1040 (Fed. Cir. 2026) ....................................................... 18, 19

*Todd Constr. v. United States*,
   656 F.3d 1306 (Fed. Cir. 2011) ........................................................... 2, 3

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................................. 17

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
   282 F.3d 787 (10th Cir. 2002) ............................................................. 21

*United States v. Texas*,
   599 U.S. 670 (2023) ................................................................................. 8

*Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ................................................................................. 3

*Walter-Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
   479 F.3d 1330 (Fed. Cir. 2007) ........................................................... 21

**Statutes**

5 U.S.C. § 706 ........................................................................ 2, 16, 17, 18

16 U.S.C. § 1361 ............................................................................................ 7

16 U.S.C. § 1371 ................................................................................. *passim*

16 U.S.C. § 1373 .................................................................................... 3, 4

16 U.S.C. § 1374 ............................................................................................ 4

16 U.S.C. § 1378 ............................................................................................ 7

28 U.S.C. § 1581 ........................................................................................... 14

iv

28 U.S.C. § 1919 ............................................................................................ 21

28 U.S.C. §§ 1601-08 ..................................................................................... 14


**Rules**

Fed. R. Evid. 806 ........................................................................................... 11

USCIT R. 12 ........................................................................................ 1, 19, 20

USCIT R. 41 ................................................................................................... 21


**Regulations**

50 C.F.R. § 216.24 ........................................................................... 16, 17, 18, 19


**Other Authorities**

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal
Protection Act—Notification of Comparability Findings and Implementation of
Import Restrictions; Certification of Admissibility for Certain Fish Products,*
90 Fed. Reg. 42,395 (Dep't of Commerce Sept. 2, 2025) ...................... 16, 17, 18, 19

*Implementation of Fish and Fish Product Import Provisions of the Marine
Mammal Protection Act—Notification of Comparability Findings,*
91 Fed. Reg. 1,962 (Dep't of Commerce Mar. 11, 2026)........................ 17

H.R. Rep. No. 92-1488 (1972) (Conf. Rep.).................................................. 7

H.R. Rep. No. 92-707 (1971)......................................................................... 7

H.R. Rep. No. 100-970 (1998).................................................................... 6, 7

Kenneth J. Arrow, *Economic Theory and the Hypothesis of Rationality* 198, 201, *in* The New
Palgrave The World of Economics (John Eatwell, et al. eds., 1991) ...................... 12

Restatement (Fourth) Foreign Relations Law of the United States, Part IV, Introductory Note
(Am. Law Inst. 2018)............................................................................. 14

Sen. Rep. No. 92-83 (1972) ........................................................................... 7

**INTRODUCTION**

Defendants, the National Marine Fisheries Service (NMFS), the Assistant Administrator for NMFS, the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of Homeland Security respectfully file this reply in support of the Government's motion to dismiss, ECF No. 51 (MTD).

In its response opposing the MTD, ECF No. 84 (Resp.), plaintiff, Māui and Hector's Dolphin Defenders NZ Inc. (MHDD), attempts to knock down various straw men, but fails to satisfy the basic elements required to establish standing or to demonstrate that its claims were not rendered moot by a superseding agency action.

Accordingly, the action must be dismissed pursuant to Rules 12(b)(1) and 12(h)(3) of the Rules of the Court (USCIT R.).

**ARGUMENT**

I.   <u>MHDD Has Not Established Standing</u>

MHDD perplexingly dedicates a large portion of its opposition, Resp. at 12-19, to responding to arguments it concedes that the Government did not make, *see id.* at 13 (asserting that the Government waived any arguments to challenge injury and causation).

As an initial matter, challenges to the Court's subject matter jurisdiction including those based on standing "can never be waived or forfeited. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Although causation is not the focus of the Government's standing argument, as the cases cited by MHDD establish, *e.g.*, Resp. at 12-13, causation and redressability are often considered two sides of the same coin, and MHDD is unable to demonstrate causation for many of the same reasons that it cannot establish redressability.

MHDD has not established that its injuries are likely to be addressed by a favorable decision *from this Court*. *See* MTD at 9-10. MHDD does not meaningfully dispute that the Government of New Zealand (NZG) and its commercial fishers are "independent actors . . . whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quotation marks and internal citation omitted). Under binding precedent, MHDD's claims must therefore be dismissed.

A.  <u>MHDD Cannot Establish Causation Or Redressability As A Matter of Law</u>

Relying on cases discussing *causation*, MHDD argues, Resp. at 16-19, that it does not need to demonstrate *redressability* as a factual matter because Congress has already done so as a matter of law. This argument fails for several reasons.

1.  <u>MHDD Is Not Entitled To A Relaxed Standing Requirement</u>

First, the bulk of cases that MHDD cites are in the context of *procedural* injuries. When Congress vests a litigant with certain procedural rights, the litigant faces a somewhat relaxed test when it comes to redressability. *E.g.*, *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1315 (Fed. Cir. 2011). In a footnote, MHDD asserts that it has suffered a procedural injury. Resp. at 14 n.11 (citing Complaint ¶¶ 19-20, ECF No. 4; Declaration of Christine Rose ¶ 22, ECF No. 30-4). In its complaint, MHDD did allege in a conclusory manner that it is suffering a "procedural injury," but nowhere does it explain the alleged procedural defect, and none of its claims arises under 5 U.S.C. § 706(2)(D), "without observance of procedure required by law."

Even if a bare allusion to an alleged procedural injury were sufficient—although it is not—it can hardly be construed as an alleged deprivation of the type of *fundamental* right that must be identified before relaxing standing requirements. *Todd Constr.*, 656 F.3d at 1315 (relaxed standards apply when alleging deprivation of "fundamental procedural rights, such as

2

the right to a hearing, the right to an environmental impact statement, and the right to have a decisionmaker free from ex parte contacts in formal administrative hearings") (internal citations omitted). In the absence of alleging a fundamental procedural right, the cases cited by MHDD are largely inapposite. *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (enforcing right to seek civil penalties against third party under citizen suit provision of the Clean Water Act); *Natural Res. Def. Council v. Envtl. Prot. Agency*, 542 F.3d 1235, 1248 (9th Cir. 2008) (pursuing Clean Water Act citizen suit); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1334-35 (D.C. Cir. 1986) (alleging associational standing to challenge rulemaking procedures). If MHDD's alleged injury rests on the requirement that a comparability finding must follow the law, *e.g.*, Resp. at 14 n.11, this theory also must fail. *Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982) (holding that "the right . . . to require that the Government be administered according to law" cannot demonstrate standing) (internal quotation marks omitted).

  2. <u>Congress Promoted Foreign Diplomacy To Address Foreign Fishery Bycatch</u>

  Second, MHDD is incorrect that "Congress has decided that an import ban under the MMPA is an effective remedy for addressing unsustainable marine mammal bycatch in foreign fisheries." Resp. at 17. In pushing this argument, MHDD primarily relies on *Animal Welfare Institute v. Kreps*, 561 F.2d 1002 (D.C. Cir. 1977). In *Kreps*, the United States Court of Appeals for the D.C. Circuit considered a decision to allow the importation of baby seals from South Africa, which would have otherwise been subject to a moratorium under 16 U.S.C. § 1371(a)(3), a separate provision of the MMPA not at issue here. 561 F.2d at 1004-05. NMFS is authorized by 16 U.S.C. § 1373(d) to promulgate regulations to waive the moratorium required by § 1371(a)(3). *See also Kreps*, 561 F.2d at 1006. Before importing any marine mammals pursuant to such a waiver, a person seeking to do so must obtain a permit, which the agency is authorized

to issue pursuant to 16 U.S.C. § 1374. *Id.* at 1005-06. The permit provisions under § 1374 expressly include a right to seek judicial review by any person opposed to the issuance of the permit. *Id.*

The *Kreps* court held that, despite the absence of a specific right to judicial review in § 1373, Congress nonetheless "clearly intended" review to be available to those who opposed a waiver—a necessary prerequisite to seeking a permit. *Id.* According to the *Kreps* court, by providing this implicit right to judicial review, a fundamental procedure, Congress had thereby conferred standing on the plaintiff to challenge the waiver for South African seals.

MHDD can point to no such statutory right to review with respect to § 1371(a)(2)—the MMPA provision on which it relies—so the primary *Kreps* holding cannot rescue its complaint.

In the alternative, the *Kreps* court concluded that the plaintiff organizations could establish standing without resorting to the statutory scheme. 561 F.2d at 1007. It found that the *record* before the district court demonstrated as a *factual matter* that there was a causal relationship between the enforcement of the MMPA and South African seal harvesting practices. *Id.* at 1009. The panel pointed to specific statements from the government of South Africa that it was making regulatory choices *specifically in response* to the waiver proceedings before the agency. *Id.* (quoting letter from South African official: "The draft regulations covering harvesting methods . . . were initially held in abeyance pending . . . guidance on this subject arising out of the September 1975 hearing in Washington and [Commerce's] waiver regulations."). In contrast, the record of the parallel, overlapping litigation that MHDD initiated demonstrates that an import embargo is not likely to have *any* impact on the NZG's fisheries management because NZG is not authorized under its domestic law to amend its regulations in response to market conditions. Declaration of Emma Taylor in Support of the NZG's Opposition

4

to the Plaintiff's PI Motion ¶¶ 3-4, 2026 Proceedings (Mar. 9, 2026), ECF No. 46-1 (Taylor Decl.). *See also Lujan*, 504 U.S. at 571 & n.6 (it was "entirely conjectural" to conclude that allegedly harmful foreign projects would cease when the record contained "nothing to indicate that the projects . . . will either be suspended, or do less harm to listed species" if the relief sought were obtained, despite memoranda from foreign government explicitly requesting the challenged agency action).

On the record before this Court, no statements from NZG officials have attributed policy decisions to U.S. market access, and available evidence suggests that NZG cannot consider market access when determining fisheries management policy under its domestic law—so the alternative holding in *Kreps* cannot rescue MHDD's complaint.

In *dicta* addressing an argument that had not been raised, the *Kreps* court stated that "we believe that Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices." 561 F.2d at 1010. Even if this *dicta* discussion loosely related to an alternative holding in a 50-year-old non-binding decision construing a different provision of the MMPA were relevant—and it is not—this Court cannot rely on a theory of standing that is inconsistent with *Lujan* and other subsequent precedent. *Cf. Lujan*, 504 U.S. at 573 (rejecting the view that a standing requirement "had been satisfied by congressional conferral upon all persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law"); *Doe 1 v. Apple Inc.*, 96 F.4th 403, 410 (D.C. Cir. 2024) ("Article III provides a constitutional minimum that cannot be lowered by Congress.").

Besides, MHDD misunderstands and mischaracterizes the Congressional intent demonstrated by the legislative history of the MMPA. Resp. at 17-18. MHDD cites to a House

Report discussing a 1988 amendment to the MMPA to argue that Congress explicitly determined that the denial of U.S. markets is "a means of forcing changes in destructive dishing practices abroad." *Id.* at 17 (citing H.R. Rep. No. 100-970, at 15 (1998)). It should go without saying but perhaps deserves acknowledgement given MHDD's position: no trade action by the United States can "forc[e]" a sovereign nation to change its management of commercial fishing practices.

In any event, it is unclear what determination MHDD purports Congress to have made. The only discussion of foreign nations in the portion of the report cited by MHDD relates to a requirement under the MMPA, which is similar to § 1371(a)(2), directing the Secretary of Commerce to determine whether yellowfin tuna purse seine fishers in the eastern tropical Pacific Ocean (ETP) "are using techniques and equipment that prevents mortalities of marine mammals in excess of U.S. standards." H.R. Rep. No. 100-970, at 15. The report summarizes that, of the 18 other nations that engage in such fishing, six have been subjected to import embargoes for exceeding those standards, four have ceased fishing in the ETP, and eight have met the required standards. *Id.* MHDD implies, Resp. at 17, that because four nations ceased fishing in the ETP and another eight met the requisite standards, the House committee concluded that a purse seine *import ban* was effective. But the Report does not state that any of these countries were ever subject to a prohibition, or even threatened with one, so that implication must be inferred without reference to any actual evidence to support it. Nor does this inference account for other important context, like the Agreement on the International Dolphin Conservation Program, May 21, 1998, TAIS 12956 (AIDCP). The AIDCP, which was signed earlier in the same year as the House Report and expanded on a similar 1992 multilateral treaty, each of which had an explicit objective to "progressively reduce incidental dolphin mortalities in the tuna purse-seine fishery

in the Agreement Area to levels approaching zero." *Id.* art. II.1. Of the eight countries that the

House Report states were currently allowed to export to the United States, all but one was an

original signatory to that Agreement. *See* Dep't of State, AIDCP Status List, *available at*

https://www.state.gov/wp-content/uploads/2019/03/214-Intl-Dolphin-Conservation.pdf (last

visited Mar. 13, 2026). Instead of the phantom threat of embargoes that may never have been

made, it is much more plausible that the series of negotiated treaties with binding commitments

led to such positive results.

We do not dispute that an import embargo can be an effective foreign policy tool, but it is

*not* the primary foreign policy tool Congress provided in the MMPA. Rather, Congress mandated

that the Government develop an extensive international program aimed at negotiating

international agreements and extracting other commitments from foreign nations to manage

commercial fisheries to promote conservation. 16 U.S.C. § 1378. Congress repeatedly stressed

the importance of *cooperation* and *negotiations* with trading partners but never emphasized the

use of trade embargoes as a bullying tactic, as MHDD appears to prefer. *Id.* § 1361(4)

("[N]egotiations should be undertaken immediately to encourage the development of

international arrangements for research on, and conservation of, all marine mammals"); Sen.

Rep. No. 92-83, at 10 (1972) ("[T]he [MMPA] includes strong directives on international

cooperation and coordination."); *id.* at 11 ("The committee wishes to emphasize the need for

international cooperation."); H.R. Rep. 92-707, at 14 (1971) ("[T]he Committee felt it to be of

vital significance to include strong language exhorting the Department of State to develop more

effective international treaties for the protection of these animals, which today have little or no

protection."); *id.* at 16 (extolling success of 1911 treaty relating to the taking of fur seals); H.R.

Rep. 100-970, at 30 ("[T]he Secretary is directed . . . to develop agreements on cooperative

research into alternative fishing methods and population studies, limitations on incidental take

levels, and the use of best marine mammal safety techniques and equipment for the purpose of

reducing mortality."); H.R. Rep. No. 92-1488, at 25 (1972) (Conf. Rep.) ("Both the House and

Senate versions required that the Secretaries initiate international negotiations in order to expand

the principles of [the bill] to the high seas and other countries.").

That Congress directed an import embargo in the context of pursuing larger foreign

policy objectives, with explicit emphasis on international negotiations, simply underscores the

inappropriateness of MHDD's theory and preferred interpretation of Congressional intent. *See,*

*e.g.*, *United States v. Texas*, 599 U.S. 670, 679-81 (2023) (holding that states lacked standing to

challenge immigration enforcement policies when, among other things, such policies implicate

foreign policy). The supposed "well settled precedent," Resp. at 18—none of which is binding—

does not change that analysis.

The careful balance of positive tools—like technical assistance and cooperative research

initiatives—against the threat of negative ones—like an import prohibition—to promote foreign

policy objectives is a task for which the Executive Branch is fundamentally equipped to handle

and with which the Judicial Branch should be especially cautious to avoid interference. *See, e.g.*,

*Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) ("[P]olicies in regard to the conduct of

foreign relations . . . . are so exclusively entrusted to the political branches of government as to

be largely immune from judicial inquiry or interference."); *Kwan v. United States*, 272 F.3d

1360, 1364 (Fed. Cir. 2001) ("[Government-to-government] negotiations are consigned to the

executive branch in its conduct of foreign relations").

3.  NMFS, Like Congress, Concluded That Foreign Diplomacy Could Address
Foreign Fishery Bycatch

MHDD is also mistaken that NMFS "determined that import bans under the MMPA

would be an effective means to address unsustainable bycatch of marine mammals in foreign

fisheries." Resp. at 18 (citing NMFS, Final Environmental Assessment, Regulatory Impact

Review, and Final Regulatory Flexibility Analysis for a Proposed Rule to Implement Provisions

of Section 101(a)(2)(A) of the Marine Mammal Protection Act for Imports of Fish and Fish

Products (Aug. 2016)[1] (MMPA Final Assessment)). MHDD selectively quotes from the MMPA

Final Assessment to suggest that NMFS concluded an import ban would have specific beneficial

consequences for marine mammals. *Id.* In discussing the socioeconomic impact of the proposed

rule, NMFS stated that "potential benefits are difficult to quantify" and that "all alternatives" to

the proposed rule (except taking no action) would "increase protection for these species."

MMPA Final Assessment at 60 (quoted at Resp. at 18). In other words, NMFS's conclusion was

that policy actions *other than* the MMPA Import Rule were likely to increase protections for

marine mammals, while recognizing that there was significant ambiguity in weighing other costs.

MHDD also states, Resp. at 18-19, that NMFS recognized in this same report that

"harvesting states are unable or unwilling to enforce IUU [Illegal, Unreported, and Unregulated

fishing] and bycatch rules, port and market state controls can provide an important, necessary,

and cost effective tool to combat IUU and bycatch. The imposition of trade-related measures, . . .

can also reduce . . . bycatch in a cost effective way." The quote pulled by MHDD does not come

from the MMPA Final Assessment, but is in the September 2010 Final Environmental

---

[1] This report is available at https://www.fisheries.noaa.gov/s3/2023-
01/FINAL_EA_%20RIR_FRFA%20%20MMPA%20Import%20Rule%20Version%208_1_16%
20with%20appendices%20-%20Kris%20Gamble%20-%20NOAA%20Federal%20-508.pdf (last
visited Mar. 13, 2026))

Assessment, Regulatory Impact Review, and Regulatory Flexibility Act Analysis for a Final

Rule to Establish Identification and Certification Procedures for Nations Under the High Seas

Driftnet Fishing Moratorium Protection Act (Driftnet Final Assessment), included at Appendix B

to the MMPA Final Assessment. More importantly, the ellipses inserted by MHDD in the second

sentence fundamentally alter the meaning of the sentence to suggest that trade bans, in and of

themselves, have outsized value in preventing bycatch. The full statement is:

> "The imposition of trade-related measures, *encouragement of
> private initiatives, capacity building, and improving the knowledge
> of the full range of social costs associated with IUU fishing and
> bycatch* can also reduce IUU fishing activities and bycatch in a
> cost effective way."

Driftnet Final Assessment at 85 (omitted words italicized). In other words, it is *not* trade-related

measures that are, alone, effective measures for reducing bycatch, but those measures can be

effective when they are combined with other soft powers that fall squarely within the realm of

Executive Branch exercise of foreign diplomacy.

Because none of the sources cited by MHDD support its assertions and binding precedent

requires otherwise, its argument that it can establish causation and redressability as a matter of

law must fail.

### B.  MHDD Cannot Establish Redressability Using Economics

In a last-ditch effort to rescue its claims, MHDD suggests that the "basic laws of

economics" could establish its entitlement to relief. Resp. at 19. Even assuming that such "basic

laws" could establish standing in some instances, MHDD has not demonstrated that they would

do so here.

MHDD has consistently argued that *all* set net and trawl fishing in New Zealand must be

eliminated to redress its harm. *E.g.*, Plaintiff's Motion for Summary Judgment on the Agency

Record at 6 (Apr. 25, 2025), ECF No. 30 ("There is widespread agreement—including from

NMFS—that the risk from set-net and trawl fishing must be eliminated for the Māui dolphin to avoid extinction, much less to recover."). MHDD has admitted that "we don't know" what, if anything, the NZG might do to further regulate commercial fisheries, Status Conference Audio at 1:22:20-21, 1:22:58-23:01 (Feb. 12, 2026),[2] so it cannot demonstrate that such a result is likely to occur. MHDD now asserts that it may maintain its action if it "show[s] that an import ban is likely to cause some third party to take action that will benefit the Māui dolphin in some way, however small." Resp. at 19. The supposed evidence that MHDD puts forth in declarations to establish that "simple market forces" will dictate that an import ban will result in decreased demand and thus decreased fishing, Resp. at 21, likewise does not support its argument. [3]

MHDD first relies on hearsay within the hearsay declaration of Christine Rose to assert that the *Sea Shepherd* import ban cost New Zealand fishers roughly $2 million in exports and resulted in decreased export volumes for affected species. Resp. at 21-22. Assuming that this figure is accurate, it is tautological: an embargo on exports of fish products from New Zealand would likely result in fewer exports of those products. That exports decreased does not demonstrate whether any fisher *reduced* set net or trawl fishing in the range of the Māui dolphin at all, much less specifically in response to the *Sea Shepherd* ban.

---

[2] It is worth remarking that counsel for MHDD provided several concrete examples of what NZG could do: "close certain areas off"; "[r]estrict the times that fisheries are in certain areas"; and engage in "monitoring." *Id.* at 1:22:20-23:01. In fact, NZG implemented each of these measures in the challenged fisheries in its 2020 regulations. *See* Remand Redetermination at 24-25, 29, ECF No. 58 (area and time closures); *id.* at 34-38 (monitoring).

[3] The declarations submitted by MHDD are hearsay, and the Government should be permitted to cross-examine each of MHDD's declarants before the Court relies on hearsay declarations to support injunctive or other relief. *See* Fed. R. Evid. 806 (permitting the party against whom a hearsay statement was admitted to call the declarant as a witness and cross-examine the declarant on the statement).

To support its unsupportable claim, MHDD next relies on the hearsay declaration of its self-proclaimed expert, Glenn Simmons. *Id.* In his declaration, Dr. Simmons states that he "observed that fishers changed their fishing practices" during the *Sea Shepherd* ban. Declaration of Glenn Simmons ¶ 14, ECF No. 84-18. Even taking Dr. Simmons's anecdotal observations at face value, the same paragraph supports the conclusion that these practice changes were not, as MHDD suggests, Resp. at 21, a result of the injunction. Rather, Dr. Simmons clearly attributes the response of fishers to the implementation of the *regulatory changes* NZG had enacted in 2020, two years before the injunction was imposed. Declaration of Glenn Simmons ¶ 14 ("Some vessels even ceased set netting and changed to other gear in order *to avoid the electronic monitoring requirements* that were being implemented.") (emphasis added). While we have no basis to dispute that this reported "behavioural change . . . happened during the import ban," *id.*, this correlation utterly fails to show causation attributable to the Court-ordered embargo—particularly when far more directly impactful changes to New Zealand's fisheries management were simultaneously taking place.

Besides, economic analysis is not as simple as MHDD's vague allusion to a high school economics course's supply and demand lesson relying on a hypothetical world of perfect market knowledge. *Cf.* Kenneth J. Arrow, *Economic Theory and the Hypothesis of Rationality* 198, 201, *in* The New Palgrave The World of Economics (John Eatwell, et al. eds., 1991) ("In the aggregate, the hypothesis of rational behaviour [in response to supply and demand] has in general no implications . . . . The very basis of economic analysis, from Smith on, is the existence of differences in agents. But if agents are different in unspecifiable ways, then [the previous remark] shows that very few, if any, inferences can be made."). An informed analysis would, at a minimum, consider the elasticity of markets for these fisheries, the extent with which

12

their sales rely on domestic demand, the costs of modifying or abandoning commercial practices, and the availability of, and costs of resorting to, alternative domestic or export markets, not to mention the psychological impediments to change, such as the sunk costs of expensive equipment. Without anything approaching such an analysis, MHDD falls back on its reliable friend, conjecture, to attempt to meet its burden.

Again, the actual record available to this Court rebuts MHDD's speculation. According to the New Zealand Ministry of Primary Industries, New Zealand maintains a large seafood export market, with total exports valued around $2.2 billion annually, of which approximately half can be attributed to the type of finfish fisheries challenged in this litigation. Taylor Decl. ¶ 26. The largest destinations for those finfish exports are Australia and China, which collectively account for approximately four times (33 percent) the market share of finfish exported to the United States (eight percent). *Id.* MHDD suggests that the U.S. export finfish sales attributed to the two fisheries challenged in this litigation were around $2 million over the 17-month *Sea Shepherd* embargo, the equivalent of approximately $1.4 million annually. Resp. at 21, 22. Assuming MHDD's figure is correct, simple market forces would suggest that the roughly $363 million annual finfish export market to Australia and China, alone, could likely absorb another $1.4 million, or 0.39 percent, in additional export sales.

Evidence also suggests that New Zealand fishers may already have been preparing to exit the U.S. market for other reasons, including changes in tariff rates, slow economic growth, and inflation. Taylor Decl. ¶ 27. These factors, as well as a recent free trade agreement executed with the European Union, have encouraged export fishers to diversify into markets in Europe and Africa. *Id.* As with so much of MHDD's case, "we don't know," Status Conference Audio at 1:22:20-21, 1:22:58-23:01 (Feb. 12, 2026), exactly how fishers might react to the loss of the U.S.

13

export market and can only guess whether its closure would decrease fishing efforts, increase them, or have no effect at all. *Cf. Lujan*, 504 U.S. at 571 & n.6

    C.  <u>MHDD Cannot Rely On Conjecture To Predict The Actions Of A Sovereign State</u>

Although "we don't know" what, if any, actions the NZG would take in response to an import prohibition, Status Conference Audio at 1:22:20-21, 1:22:58-23:01 (Feb. 12, 2026), MHDD nonetheless asserts that its injury is likely to be redressed because "NZG is eager to avoid an import ban," Resp. at 23.

As we have repeatedly established, neither this Court nor the U.S. Government agencies named in this litigation can direct a foreign sovereign nation to undertake specific policy actions or to regulate the actions of commercial fishers operating on the other side of the world. *See, e.g.*, Restatement (Fourth) Foreign Relations Law of the United States, Part IV, Introductory Note (Am. Law Inst. 2018); 28 U.S.C. §§ 1601-08 (limiting any exercise of a court's jurisdiction over a foreign sovereign to the exceptions to sovereign immunity established under customary international law); 28 U.S.C. § 1581 (defining jurisdictional powers of this Court).

In its typically obfuscating way, MHDD simultaneously encourages this Court to conclude that "history shows" the efficacy of import bans to change foreign government policy, Resp. at 24, while insisting that NZG's prior "inaction [in response to a ban] does not necessarily predict future inaction," Resp. at 25. Is the history of unrelated import prohibitions involving another sovereign dispositive proof that bans lead to foreign regulatory change? Or is history irrelevant to determining whether future regulatory change is likely to occur? Can we ever know or must we guess?

The issue for the Court to determine is not whether "NZG is eager to avoid an import ban," Resp. at 23, but what actions NZG is *likely* to take in response to an order from this Court and, consequently, whether such actions would redress MHDD's alleged injury. Participation in

14

this lawsuit and the *Sea Shepherd* litigation demonstrates a desire to obtain a favorable outcome in a judicial matter in which NZG has an interest, and (arguably) thereby avoid an import ban. But active participation in litigation does not redress MHDD's alleged injury, and MHDD's claims in both this and its parallel litigation are explicitly premised on the notion that NZG did *nothing*[4] to redress that alleged injury in response to the 2022-24 *Sea Sheperd* import ban. *See* Complaint ¶ 81 (latest modification to relevant fisheries protection measures in 2020); Declaration of Elisabeth Slooten, ECF No. 22-1 ¶ 11 (no amendments to regulations since 2020); Declaration of Christine Rose, ECF No. 22-2 ¶ 14 (same).

Realizing the cage in which it locked itself through its own allegations, MHDD now changes its tune and asserts that "NZG *did* take action to avoid the import ban being sought in *Sea Shepherd*." Resp. at 26. In an astounding feat of conjecture, MHDD ignores the purported inaction in response to an actual import ban and points to the 2020 regulatory changes NZG implemented in connection with its Threat Management Plan (TMP), stating "[i]t is highly unlikely the timing was a coincidence." *Id.* Except the timing of the TMP in connection with the *Sea Shepherd* litigation appears to be precisely that—a coincidence. As NZG has explained, it began pre-consultation efforts with tangata whenua (indigenous groups with which NZG is legally obliged to consult) in 2018, Taylor Decl. ¶ 11, roughly *two years* before *Sea Shepherd*'s May 2020 complaint, *cf.* Resp. at 26.

In MHDD's view, the Court can conclude that a future ban will be a likely means to spur future change (which will be nothing like NZG's previous "insufficient" actions, Resp. at 27)

---

[4] To be clear, the Government does not adopt the view that NZG has been passive in its fisheries management since 2020. Rather, there is no indication on the record before this Court that it has taken any official act to manage its fisheries *in response* to the *Sea Shepherd* injunction, rather than in exercising its own sovereign discretion.

because it will not "occur[] in a context where NMFS was failing to uphold the law," Resp. at 28. All the Court needs to do to reach this conclusion is ignore the fact that NZG has *no legal authority* to revise its fisheries management policy in response to market conditions. Taylor Decl. ¶¶ 3-4. As MHDD's ever-shifting arguments and off-key tunes demonstrate, it is impossible to conclude that any action taken by this Court would redress MHDD's alleged injury to its members' aesthetic and other interests is "likely, as opposed to merely speculative." *Lujan*, 504 U.S. at 561 (cleaned up). Accordingly, MHDD cannot demonstrate that this Court has subject matter jurisdiction and its complaint must be dismissed.

II.    This Court Cannot Grant Any Relief With Respect To The Agency Action
       Challenged by MHDD

MHDD appears to argue, Resp. at 9-12, that its claims are not moot because it continues to have a "concrete interest" in this action, without clearly identifying what that interest is. As we established, MHDD does not have standing to pursue its claims against the two challenged fisheries. But even if it did, MHDD misunderstands the relief this Court can order in connection with an action reviewed under 5 U.S.C. § 706 of the Administrative Procedure Act (APA). An agency action is final when (1) it "mark[s] the consummation of the agency's decisionmaking process" and (2) "legal consequences will flow" from it. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted). The 2025 Comparability Findings marked the consummation of the agency's decisionmaking with respect to determining whether United States standards had been exceeded for more than 2,400 fisheries around the globe, as required under 16 U.S.C. § 1371(a)(2). *See generally Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings and Implementation of Import Restrictions; Certification of Admissibility for Certain Fish Products*, 90 Fed. Reg. 42,395 (Dep't of Commerce Sept. 2, 2025). And legal

consequences—that is, the availability of importation into the U.S. market from all global fisheries—flowed directly from the publication of those determinations. *See* 50 C.F.R. § 216.24(h)(1)(ii) (prohibiting any person to import fish and fish products from any fishery that does not have a valid comparability finding in effect); *id.* § 216.24(h)(8)(iv) (a comparability finding is valid at publication in the Federal Register).[5] Whatever legal effect the 2024 Comparability Findings had on the products exported by the two New Zealand fisheries challenged by MHDD here, it ceased as soon as the 2025 Comparability Findings were published.

Under the APA, this Court is limited to *reviewing* a final agency action to determine whether, among other things, it was arbitrary, capricious, or otherwise unsupported by law. 5 U.S.C. § 706(2)(A). Any judicial evaluation of the 2024 Comparability Findings, when those findings have been superseded and have no force or effect, would constitute an impermissible advisory opinion. *E.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Any new agency action, based on a separate record and a distinct articulation of the agency's reasoning, cannot be evaluated here. *E.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009).

MHDD, *e.g.*, Resp. at 6, places undue reliance on *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020). In *Regents*, the Supreme Court explained that when a court remands an action to an agency, the agency may either offer a fuller

---

[5] The legal consequences of the 2025 Comparability Findings have now ceased with respect to the two fisheries challenged in this action and the 13 additional fisheries challenged in MHDD's parallel litigation. NMFS has issued new comparability findings in an effort to consolidate the disparate records created by MHDD's litigation strategy. *Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings*, 91 Fed. Reg. 1,962 (Dep't of Commerce Mar. 11, 2026).

explanation of the grounds for its reasoning *at the time* of the initial determination or it can "deal with the problem afresh" by taking a new agency action, in which case it is not limited to its prior reasons. 591 U.S. at 20-21 (internal quotation marks omitted).

The 2025 Comparability Findings were not issued pursuant to the *MHDD I* Remand Order. Rather, they were issued and submitted to the Federal Register pursuant to the order in *Natural Resource Defense Council v. Raimondo*, Case No. 24-148 (Ct. Int'l Trade Mar. 25, 2025), ECF No. 39, which resolved a claim under 5 U.S.C. § 706(1) that agency action had been unlawfully withheld or unreasonably delayed. The *Regents* framework is irrelevant when an agency is not acting pursuant to a Court-ordered remand, as NMFS did in this instance.[6] *Syneren Techs. Corp. v. United States*, 166 F.4th 1040, 1045 (Fed. Cir. 2026).

MHDD incorrectly suggests, Resp. at 5-6, 10, that the 2024 Comparability Findings were not rendered moot by the 2025 Comparability Findings, but expired on their own terms on January 1, 2026. MHDD seems to rely on an imprecise statement in the Federal Register notice that "[c]omparability findings announced in this notice and compliance with the import restrictions and Certification of Admissibility requirements described in this notice are required beginning January 1, 2026 and will remain in effect until December 31, 2029[.]" 2025 Comparability Findings, 90 Fed. Reg. at 42,395-96. The statement that "[c]omparability findings . . . are required beginning January 1, 2026," does not make sense, and can likely be attributed to scrivener's error. If it meant what MHDD infers, delaying the effectiveness of the comparability findings would be inconsistent with the regulatory requirement that determinations of comparability be issued on or before November 30, 2025, 50 C.F.R. § 216.24(h)(6)(ii), (8)(iv),

---

[6] Although this action had already been rendered moot, NMFS complied with this Court's remand order pursuant to the second *Regents* option when it filed its remand redetermination on January 6, 2026, ECF No. 58.

and the *Raimondo* order requiring their issuance by September 1, 2025. It would also be in violation of the regulatory requirement that import prohibitions are lifted immediately upon the publication of a comparability finding. *Id.* § 216.24(h)(9)(ii)(D). Rather than assume that NMFS acted contrary to the regulations and to judicial decree, the Court should simply interpret the statement as it was intended, to set the length of effectiveness of the findings. "Comparability findings" should not be understood as the subject of the first verbal phrase "are required" but the subject of the second verbal phrase "will remain in effect." 2025 Comparability Findings, 90 Fed. Reg. at 42,395-96.

When an agency undertakes an agency action that renders a previous one moot, it is acting perfectly permissibly, even when litigation is pending and it "reaches the same result in the new action." *Syneren*, 166 F.4th at 1045. Because the 2025 Comparability Findings rendered the agency action in this matter moot, the litigation must be dismissed. USCIT R. 12(h)(3).

III.  *Bioparques* Is Distinguishable

In its Third Amended Scheduling Order, ECF No. 55, the Court requested that the parties "address the issues of justiciability and mootness raised in . . . *Bioparques de Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336 (Fed. Cir. 2022)" in the briefing relating to the MTD.[7] In *Bioparques*, the Federal Circuit considered a challenge to a decision by the Department of Commerce to withdraw from a "2013 Agreement" to suspend an antidumping duty investigation into tomatoes from Mexico. *Id.* at 1338. After terminating the 2013 Agreement, Commerce entered into a separate agreement, the "2019 Agreement," which also agreed to suspend the antidumping duty investigation. *Id.* However, shortly after executing the 2019 Agreement, Commerce resumed the investigation, as it was statutorily required to do in response to a request

---

[7] MHDD did not address this decision.

initiated by domestic tomato producers. *Id.* The plaintiffs filed suit in this Court challenging the

withdrawal from the 2013 Agreement, as well as the final determination in the subsequent

antidumping duty investigation. *Id.* This Court initially dismissed both counts pursuant to

Rule 12(b)(1). *Id.* It held that the 2013 Agreement had been rendered moot by the 2019

Agreement and that the plaintiffs had not suffered a concrete injury with respect to the final

determination in the investigation. *Id.*

The Federal Circuit held that although the challenge to the 2013 Agreement was "not

moot in a jurisdictional sense," it could "state no plausible claim on which relief can be granted

and must therefore be dismissed under Rule 12(b)(6)." *Id.* at 1343. The Federal Circuit did not

elaborate why the challenge to the 2013 Agreement was not jurisdictionally moot, so it is

difficult to discern its reasoning, but the factual circumstances are not similar to this case. The

2019 Agreement did not directly supersede and replace the 2013 Agreement. Commerce had

already withdrawn from the 2013 Agreement, terminating it, before the 2019 Agreement was

negotiated. *Id.* at 1338. And the contracts were discretionary agreements, not statutorily required

determinations that the Government cannot voluntarily abandon without replacement. These

factual circumstances do not appear to be analogous to this action.

The other analysis of the Court of Appeals considering whether the plaintiffs had

established a concrete injury-in-fact also does not have any clear relationship to the

Government's position. *Id.* at 1343. The Government has not argued that MHDD's members

have failed to allege an injury to their aesthetic interests as a result of bycatch—just whether this

bycatch is fairly traceable to any agency action, which it is not, and whether this injury can be

redressed by the Court, which it cannot.

20

IV.     <u>The Basis For Dismissal May Affect Rights Of The Parties</u>

Finally, MHDD dedicates a substantial portion of its brief, Resp. at 10-12, to the question of whether this Court must dismiss its claims without prejudice, suggesting that consideration of the Government's motion to dismiss is somehow irrelevant or immaterial in lights of its own belated motion to voluntarily dismiss pursuant to USCIT R. 41(a)(2). MHDD urges the Court to chase a red herring. Precedent suggests it is legal error to engage in the balancing test required under Rule 41(a)(2) without first resolving jurisdictional questions. *Walter-Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 479 F.3d 1330, 1342 (Fed. Cir. 2007) (applying 4th Circuit law and concluding error was harmless under the circumstances presented).

Moreover, the *basis* for the Court's dismissal matters as different rights may attach, regardless of whether dismissal is with or without prejudice. For example, dismissal for want of jurisdiction may result in an order for just costs. 28 U.S.C. § 1919. And when dismissing under Rule 41(a)(2), the Court must determine whether any "terms and conditions" should attach. These terms can vary depending on the specific circumstances. *See, e.g.*, *GAF Corp. v. Transamerica Ins. Co.*, 665 F.2d 364, 371 (D.C. Cir. 1981) (affirming award of attorney fees as term and condition for voluntary dismissal); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 809 (10th Cir. 2002) (no abuse of discretion to dismiss action voluntarily with prejudice); *Klamath Irrigation Dist. v. United States*, 116 Fed. Cl. 117, 120 (2014) (court granted voluntary dismissal of claim without prejudice on the condition that plaintiffs agree to pay costs if claims were refiled in a new action).

Once the Court determines the appropriate basis for dismissal, it may consider which, if any, terms and conditions should attach to its order, and additional briefing may be warranted at that time.

**CONCLUSION**

For these reasons and the reasons in the MTD, we respectfully request that the Court

dismiss the complaint for lack of jurisdiction.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

OF COUNSEL:                                    PATRICIA M. MCCARTHY
MARK HODOR                                     Director
Office of the General Counsel
National Oceanic & Atmospheric Administration

                                               /s/Agatha Koprowski
ZACHARY SCOTT SIMMONS                          AGATHA KOPROWSKI
Office of the Chief Counsel                    Trial Attorney
U.S. Customs and Border Protection             U.S. Department of Justice Civil Division
                                               P.O. Box 480, Ben Franklin Station
DANIEL PAISLEY                                 Washington, D.C. 20044
Office of the General Counsel                  Tel: (202) 507-6081
Department of the Treasury                     Fax: (202) 353-0461
                                               Email: agatha.koprowski@usdoj.gov

March 13, 2026                                 *Attorneys for Defendants*

22

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss Pursuant to Rule 12(b)(1) contains 6,742 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/Agatha Koprowski